IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ERICA YVONNE SHEPPARD, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | NO. 4:14-cv-00655 |
| | § | |
| WILLIAM STEPHENS, Director, | § | THIS IS A CAPITAL CASE. |
| Correctional Institutions Division, | § | |
| Texas Department of Criminal | § | |
| Justice, | § | |
| | § | |
| Respondent. | § | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

W. Alan Wright
Texas Bar No. 22062700
Federal ID No. 14350
*Attorney in Charge*

CROUCH & RAMEY, LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas  75201
214-922-7100 Telephone
214-922-7101 Facsimile
awright@crouchfirm.com

**ATTORNEYS FOR PETITIONER
ERICA YVONNE SHEPPARD**

## TABLE OF CONTENTS

I.     PROCEDURAL AND FACTUAL BACKGROUND.............................................1

    A. Procedural Background ....................................................................................1

        1.  After Conducting an Evidentiary Hearing and Receiving Additional Evidence from Petitioner After The Hearing, The District Court Recommended a New Sentencing Trial.................................................2

        2.  The CCA Rejected the District Court's Recommendation and Affirmed Petitioner's Death Sentence ............................................3

    B. Factual Background ..........................................................................................4

        1.  The guilt/innocence phase..............................................................4

            a.  The State's evidence............................................................4

            b.  Ms. Sheppard's duress: what the jury never heard.................5

        2.  The punishment phase.....................................................................7

            a.  The State's evidence............................................................7

            b.  Ms. Sheppard's mitigating evidence: what the jury never heard ............9

II.    STANDARD OF REVIEW APPLICABLE TO INEFFECTIVE ASSISTANCE CLAIMS ...........................................................................15

    A. The CCA's Decision was Based on anUnreasonable Application of *Strickland*................................................................................................15

    B. Unreasonable Determination Of The Facts In Light of Record Before The State Courts ........................................................................................19

III.   CLAIMS FOR RELIEF .......................................................................24

    A. Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Punishment Phase of Ms. Sheppard's Trial, in Violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 688 (1984)..........24

        1.  Trial counsel's performance was deficient ……………………………….25

            a.  The relevant standard of care required an adequate pre-trial investigation in preparation for the penalty phase ...........................25

                i.   The prevailing standard of care at the time of Ms. Sheppard's trial mandated that defense counsel conduct a thorough social history..................................................28

            b.  Trial counsel failed to perform the necessary investigation..................49

            c.  Trial counsel's performance was deficient in numerous other respects ........................................................................54

i.     Trial counsel failed to present the First Special Issue to the jury in any meaningful or coherent manner ................................... 55

ii.    Trial counsel failed to present evidence that Ms. Sheppard was under duress preceding, during, and after the crime .............. 56

iii.   Trial counsel failed to call Jerry Bryant, Jr. as a witness .............. 58

iv.    Trial counsel failed to move for mistrial on the basis of the prosecutor's threats against Jerry Bryant, Jr. ................................ 59

v.     Trial counsel failed to investigate, adequately cross-examine the State's witnesses, or present defense evidence regarding the alleged unadjudicated offense of the attempted murder of Wayland Ray Griggs .................................... 60

vi.    Counsel failed to admit the testimony of Ms. Sheppard's grandmother, Annie Smith, regarding her opinion of Ms. Sheppard's future dangerousness if she were sentenced to life imprisonment .......................................................................... 62

vii.   Counsel failed to admit mitigating evidence in the punishment phase regarding Ms. Sheppard's experiences at the Matagorda County Women's Crisis Center and Covenant House .......................................................................... 62

viii.  Counsel failed to admit the testimony of defense witness Patrice Green at the punishment phase or to make a bill of exception or offer of proof ........................................................... 63

ix.    Defense counsel's failure to provide an adequate life history of Ms. Sheppard and to submit the correct referral questions to Dr. Ray resulted in Dr. Ray's failure to perform a reasonably competent examination of Ms. Sheppard .................. 64

       a.  Dr. Priscilla Ray's cursory pre-trial evaluation of Ms. Sheppard (Appendix 24) ........................................... 64

       b.  Dr. Mark Cunningham's comprehensive analysis showed the many deficiencies in Dr. Ray's report and the failure of trial counsel to investigate and submit mitigating evidence (Appendix 6) ............................ 69

       c.  Dr. Myla Young's neuropsychological evaluation of Ms. Sheppard showed significant organic brain dysfunction and impairments (Appendix 25) ................................ 73

       d.  Dr. Rebekah Bradley's comprehensive clinical psychological evaluation of Ms. Sheppard showed that Ms. Sheppard suffered and suffers from three psychiatric disorders (Appendix 26) ........................................... 78

x.     Counsel failed to object to the prosecutor's improper argument at the punishment phase regarding physical abuse of Ms. Sheppard .................................................84

xi.    Counsel failed to complain at trial of the prosecutor's threats to a key defense witness.................................84

2.  Counsel's errors and omissions prejudiced the defense at the penalty phase..........................................................................................85

    a.  The prejudice inquiry .......................................................85

    b.  Ms. Sheppard was prejudiced..........................................90

        i.   The punishment phase evidence ....................................90

        ii.  The missing evidence the jury did not hear ...................93

             Fact Witnesses .......................................................93

             a.  Erica Sheppard (Appendix 14) .............................93

             b.  Madelyn McNeil (Appendix 8) ...........................102

             c.  Annie Smith (Appendix 9)...................................108

             d.  Kelly Lynn Garcia (Appendix 13)......................111

             e.  Janie Whitaker (Appendix 10)...........................116

             f.  Ronda Robinson (Appendix 12) .........................117

             g.  Glenda Davenport (Appendix 11) ......................125

             h.  Jonathan Sheppard (Appendix 16)......................129

             i.  Isabel Rodriguez (Appendix 17).........................131

             j.  Aaron C. Green (Appendix 18) ..........................131

             k.  Emma Brooks (Appendix 19).............................132

             l.  Tangela Price-Sells (Appendix 20).....................133

             m. Lloyd Jackson (Appendix 21)..............................134

             n.  Tommi Eanes (Appendix 23)..............................135

             Expert Witnesses ....................................................136

             a.  Dr. Priscilla Ray (Appendix 24) ........................136

             b.  Dr. Mark Cunningham (Appendix 6) ..................138

             c.  Dr. Myla Young (Appendix 25) .........................136

             d.  Dr. Rebekah Bradley (Appendix 26)...................147

B. Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Guilt/Innocence Phase of Ms. Sheppard's Trial, in Violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 688 (1984)..................................................................................151

    1. Trial counsel failed to object to the trial court's erroneous instructions to the veniremen in the final grand panel that, in a hypothetical case, a getaway driver and a bank robber should receive the same punishment..................................................................151

    2. Ms. Sheppard's counsel failed to object to the prosecutor's improper and misleading statements regarding the specifics of Texas' parole law in capital cases during voir dire .........................................................152

    3. Defense counsel failed to (i) request jury instructions on the lesser included noncapital offenses of robbery and murder, (ii) object to the failure of the charge to include the instructions, or (iii) complain about the absence of these instructions on appeal ....................................156

    4. Defense counsel refused to allow Ms. Sheppard to testify at her trial and failed to explain the right to testify Ms. Sheppard..............................159

    5. Counsel failed to move for a mistrial or complain at trial of the prosecutor's threats to a key defense witness, Jerry Bryant, Jr. ................160

C. Trial Court Errors in the Guilt/Innocence Phase Violated Ms. Sheppard's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments..................................................................................161

    1. The trial court's erroneous instructions to the veniremen in the final grand panel that, in a hypothetical case, a getaway driver and a bank robber should receive the same punishment ..............................................161

    2. The trial court's erroneous denial of Ms. Sheppard's objection to the State's striking of venireman Ronnie Simpson pursuant to *Batson* ..........166

    3. The trial court's erroneous denial of Ms. Sheppard's challenge for cause to venireman Edith Greer Smith, who said she would be predisposed to answer the questions in a manner to give Ms. Sheppard the death penalty merely because the charge was capital murder ..................................................................................171

    4. The trial court's error in permitting juror David Paul Herd to "chicken out" after having been interviewed and accepted as a juror, denied Ms. Sheppard due process and a fair and impartial jury and violated her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution .........................................175

5. The trial court's failure to allow the jury to consider a verdict against Ms. Sheppard on the lesser included noncapital offenses of robbery and murder ..................................................................................179

D. Trial Counsel Rendered Ineffective Assistance With Respect to the Guilt/Innocence Phase of Ms. Sheppard's Trial by Failing to Present Evidence and Obtain a Jury Instruction on Duress .........................................181

1. Trial counsel failed to present evidence of the only viable defense available to Ms. Sheppard: that she was under duress preceding, during, and after the crime .....................................................................181

   a. Trial counsel failed to call Ms. Sheppard as a witness........................183

   b. Trial counsel failed to call Jerry Bryant, Jr. as a witness ....................183

   c. Trial counsel failed to elicit testimony from Sherry Brown that would have supported the defense of duress ........................................184

   d. Trial counsel failed to elicit testimony from Annie Smith that would have supported the defense of duress ........................................184

   e. Trial counsel failed to call as a witness persons with knowledge of Ms. Sheppard's social history and elicit from them facts that would have supported the defense of duress ........................................185

   f. Trial counsel failed to engage and present testimony of any expert witness to support the defense of duress ...................................186

2. Counsel failed to obtain a jury instruction on duress................................187

E. The Trial Court's Errors in Excluding Mitigating Evidence in the Punishment Phase Denied Ms. Sheppard Due Process and a Fundamentally Fair Trial and Violated Ms. Sheppard's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments..........................................188

1. The trial court erred in excluding mitigating evidence in the punishment phase from Ms. Sheppard's grandmother, Annie Smith, regarding her opinion of whether Ms. Sheppard would be a threat to society if sentenced to life imprisonment ...................................................188

2. The trial court erred in excluding mitigating evidence in the punishment phase regarding Ms. Sheppard's experiences at the Matagorda County Women's Crisis Center and Covenant House ...........190

3. The trial court erred in refusing to permit defense witness Patrice Green to testify at punishment about Ms. Sheppard's reputation and character ...................................................................................................192

4. The Application of the Texas Rules of Criminal Evidence to exclude the testimony of defense witness Patrice Green at the punishment

phase violated Ms. Sheppard's rights to a fair trial and due process under the Fourteenth Amendment ..............................................194

5.  Exclusion of testimony of Jerry Bryant on Fifth Amendment grounds deprived Ms. Sheppard of a fair trial and violated Ms. Sheppard's rights to due process under the Fourteenth Amendment .........................194

F.  A Pattern of Prosecutorial Misconduct Violated Ms. Sheppard's Right to Due Process and a Fundamentally Fair Trial Under the Fifth, Eighth and Fourteenth Amendments.............................................................195

1.  The prosecutor misstated the law with regard to what mitigation is in closing argument at the punishment phase, and the trial court endorsed it ......................................................................195

2.  The state improperly presented argument at punishment that there had been no evidence about physical abuse, when the State's own objections to the evidence offered by the defense kept the evidence out...............................................................................198

3.  The trial court erred in allowing the prosecutor to shift the burden of proof to the defense as to the death penalty during argument ..................199

4.  The trial court erred in allowing the State to argue, totally outside the record, that Ms. Sheppard had hit the victim with the statue....................201

5.  The prosecutor committed misconduct in forcing a key defense witness not to testify ........................................................................203

G.  Ms Sheppard Was Denied Her Constitutional Rights to Equal Protection and Due Process by the Admission of Her Prior Unadjudicated Offenses at the Sentencing Phase of Her Capital Murder Trial .....................................206

PRAYER FOR RELIEF.............................................................................209

VERIFICATION....................................................................................210

CERTIFICATE OF SERVICE .....................................................................210

ERICA YVONNE SHEPPARD petitions this Court for relief from an unconstitutional conviction and sentence of death.  The judgment and sentence under attack were entered by the 185th Judicial District Court of Harris County, Texas.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 2241(d) and 2254.

## I.      PROCEDURAL AND FACTUAL BACKGROUND

### A.     Procedural Background

Applicant Erica Yvonne Sheppard ("Applicant" or "Ms. Sheppard") is confined at the Mountain View Unit, Texas Department of Criminal Justice, in Coryell County, Texas by Wayne Scott, Executive Director of the Texas Department of Criminal Justice.  Ms. Sheppard's confinement, restraint and sentence of death are pursuant to the judgment of the 185th Judicial District Court of Harris County, Texas, entered in Cause No. 668505 on March 3, 1995.

Applicant was represented at trial by Charles Brown, Hazel Bolden and Kristine Woldy.  Applicant was represented on direct appeal by Kristine Woldy.  Her capital murder conviction and sentence of death were affirmed by the Texas Court of Criminal Appeals ("CCA") by opinion dated June 18, 1997 in Case No. 72,127, *Sheppard v. State*.

By order of the CCA dated October 3, 1997, attorney James Keegan of Houston was appointed to represent Ms. Sheppard in state habeas corpus proceedings.  By order of the CCA dated May 1, 1998, attorney Keegan was discharged as appointed counsel. Thereafter, the undersigned counsel entered his appearance as state habeas corpus counsel for Ms. Sheppard.

**1. After Conducting An Evidentiary Hearing and Receiving Additional Evidence From Petitioner After The Hearing, The District Court Recommended A New Sentencing Trial.**

Petitioner's state habeas corpus application was filed on July 1, 1998. On September 2 and 3, 2008, Judge Susan Baetz Brown, the Presiding Judge of the 185th District Court of Harris County and a former Harris County capital prosecutor, conducted an evidentiary hearing on the allegations in Petitioner's application. At the direction of the district court, Petitioner filed after the hearing the expert reports of Dr. Young (Appendix 25) and Dr. Bradley (Appendix 26). Petitioner also filed an affidavit of Dr. Ray, the appointed psychiatrist (Appendix 24). Petitioner also filed affidavits of fact witnesses (including Tommi Eanes) after the hearing. *See* Appendix 23.

On August 24, 2012, the district court issued its Findings of Fact, Conclusions of Law and Order (Appendix 27) recommending that Petitioner be granted a new sentencing trial on her fourteenth claim for relief, ineffective assistance of counsel in the investigation and presentation of mitigating evidence regarding Petitioner's sexual abuse, physical abuse, neglect, and domestic violence. App. 27, Findings 137-152, Conclusion 43.

The district court also found as follows in its recommended Finding 114, in ruling on Petitioner's second, third, ninth, eleventh through twentieth, twenty-second, twenty-fourth, twenty-seventh, thirty-second, and thirty-sixth grounds for relief (all relating to effectiveness of counsel):

> 114.   The Court finds trial counsel provided ineffective assistance at the punishment phase of applicant's trial in failing to present or fully develop evidence regarding the applicant's background and failure to present testimony expert or otherwise that would allow the jury to understand the

implications of the applicant's background including physical abuse, sexual abuse or domestic violence for consideration in determining the answer to the special issues. The Court finds this failure resulted in a violation of the applicant's constitutional rights.

App. 27.  The CCA accepted Finding 114 in its Order:

We disagree with the trial court's recommendation to grant relief with regard to Allegation 14, and reject Findings 137 through 152 and Conclusion 43. . . . We adopt the trial judge's findings and conclusions with regard to all other allegations.

App. 28 at 2, 5.

### 2.  The CCA Rejected the District Court's Recommendation and Affirmed Petitioner's Death Sentence.

The CCA's Order rejected the district court's recommendation to grant relief on Petitioner's punishment phase ineffective assistance claim.   App. 28.[1]   As noted previously, the district court found that trial counsel was deficient in the development and presentation of evidence from "expert witnesses as to the effect of the applicant's character, background, physical abuse, domestic abuse or the applicant's alleged evidence of PTSD or alleged evidence of brain dysfunction and how this would relate to the issues of mitigation." App. 27.

In rejecting this recommended finding by the district court, the CCA's Order displays a cursory and incomplete analysis of the habeas record submitted by Petitioner as to experts and fails to acknowledge or analyze the limited scope and deficiencies Dr. Ray testified to in her habeas affidavit.  App. 24.  The CCA's limited analysis of expert evidence focuses solely on Dr. Ray's pre-trial report and trial testimony and does not

---

[1] Significantly, however, the CCA adopted Finding 114 (App. 28), which also recommended a new sentencing trial.

acknowledge or analyze any of the expert testimony and evidence presented by state habeas counsel.

**B.     Factual Background**

**1.     The guilt/innocence phase**

**a.     The State's evidence**

The evidence presented to the jury by the State in the guilt/innocence phase can be broken into two parts: that which came from Ms. Sheppard's statement, which was the only evidence before the jury about what happened inside the home of the Complainant, and evidence from other witnesses, which was mostly evidence of the bloody scene and the emotions of the family members of the deceased, along with a partial palmprint identified as belonging to Ms. Sheppard.

Ms. Sheppard's statement, admitted into evidence as State's Exhibit 38B, conceded that Ms. Sheppard participated in the acts leading up to the Complainant's death.   The statement also explains that James Dickerson, rather than Ms. Sheppard, killed the Complainant.

The body of the Complainant, covered by a pile of bedclothes, was found by her daughter, when her daughter came home from college.  SF 20:18-49.

Houston police officer Jimmy L. Schraub, a latent print examiner, identified State's Exhibit 73 as the door to the room in which the Complainant's body was found, which had been removed from the scene and brought to the latent lab to develop prints. Officer Schraub testified that he found a left palm and finger print that matched

4

Ms. Sheppard's prints.  SF 20:196-223.  No other prints belonging to Ms. Sheppard were found at the scene of the Complainant's death or in the vehicle.

### b.   Ms. Sheppard's duress: what the jury never heard

Although the jury heard no evidence of it at trial, investigation by habeas counsel has determined that Ms. Sheppard's participation in the death of the Complainant was the product of duress against her and her baby, Audria, by Dickerson.   Specifically, Ms. Sheppard informed her counsel and counsel's hired investigator before trial that, on the day of the incident, Dickerson threatened Ms. Sheppard and her daughter with death if they did not obey his bidding.

For instance, the investigative report prepared by John Castillo, the investigator hired by defense counsel, contains the following discussion:

> TUESDAY, OCTOBER 19, 1993, I went to 1301 Franklin, HCSO, and found Erica at 3/A/2.  A tape recorded interview was conducted.  The following is a brief of the interview.
>
> * * *
>
> Erica stated that on the day of the incident, she and James had just finished eating.  Erica stated that she, James, and her one year old baby (who was in a stroller), went out for a walk and sit by the pool and talk.  Erica stated that on this particular day her brother, Jonathan had not worked and was in the apartment, sleeping.
>
> Erica stated that as they walked by the washateria and she recalls seeing a white female going from a car into an apartment.  Erica stated that the female did this several times taking something from the car into the apartment.  Erica stated that the woman was dressed in a black top with tan colored pants.  The car was black and she believes the car was a Mazda.  Erica stated that she did not pay much attention to the woman at this time.  Erica stated that she and James at

that time were just walking and carrying a friendly conversation.

> *Erica stated that suddenly James grabbed her by the arm and told her that if she didn't go with him that he would kill her and the baby.  Erica stated that she looked at James and stated, "Jesus why", and that James told her to shut up.*

> Erica stated that they then followed James into the woman's apartment.  Erica stated that they walked through a fence enclosed patio to get to the apartment back door.  Erica stated the back door was unlocked.  *Erica stated that before going inside the apartment, James grabbed her and threatened her verbally a second time, by saying, "If you don't go in, I'll kill you and the baby".*

> Erica stated that once inside the apartment, James told her to put the baby next to one of the walls.

Report of Investigator John Castillo, App. 1, Ex. A at 2-3 (emphasis supplied).

According to Investigator Castillo's Report, the threats by Dickerson continued after the Complainant was killed:

> Erica stated that she was crying and so scared of James and what he might do to her and the baby.

> Erica states that they first drove to Jonathan's apartment and she packed clothes for her and the baby.  Erica stated that James packed his own clothes.  Erica stated that James parked the car so that he could keep and [sic] eye on her when getting their belonging packed into the car.

> Erica stated that she and the baby got in the back of the car but that James then took the baby and told her to drive.  Erica stated that she asked James where and he told her he did not know and just to go.  Erica stated that she only knows Houston and Bay City so she headed out of Houston and toward Bay City.

> Erica stated that on the way to Bay City, James told her that he was going to kill her.  James also told her that she

might as well see her friend Sherry, while in Bay City, because she was never going to see her again.

\* \* \*

Erica stated that they spent the night at Sherry's house. Erica stated that they all slept together in the same room. Erica stated that she and Sherry slept on the bed and that James and the baby slept on the floor. Erica stated that James wanted the baby with him.

\* \* \*

Erica stated that while on the road to Bay City, James kept the knife on her and told her he would slit her throat if she attempted to escape.

Castillo Report, App. 1, Ex. A at 4-6.

Attorney Brown's notes from his initial meeting with Ms. Sheppard contain the notation "James threatened her -- Kids" and "James threatened her & baby -- Baby was there," consistent with Investigator Castillo's Report. Charles Brown Affidavit, App. 1, Ex B at 1. *See also* Sheppard Affidavit, App. 14, ¶ 55. Even though duress was the only available defense, trial counsel presented none of this evidence to the jury.

### 2. The punishment phase

### a.    The State's evidence

The state's evidence in the sentencing phase consisted of Ms. Sheppard's confession and the testimony of eleven witnesses. Notably absent was any expert who could opine on Ms. Sheppard's future dangerousness.

Following the reading of the confession, the State recalled Korey Jordan. Jordan told the jury that the day before the crime he saw a small, blonde woman "walking -- practically running across the parking lot." He said that he saw Ms. Sheppard behind this

woman, and that the blonde woman ran up the stairs and past him.  Jordan claimed to have been frightened, and to have assumed that Sheppard and Dickerson were trying to kill the woman.

The State next called Anna Allen, who testified that around 10:30 on the evening of June 29, 1993, after she arrived home and parked her car she saw two people, a white male and a black female, standing near the dumpsters.  As she got out of her car, she said the female began walking toward her.  Ms. Allen said that she crossed the parking lot, walking toward her apartment, and saying hello to the woman, who responded by saying, "hi."  Immediately after the exchange of greetings, Ms. Allen ran up the stairs to her apartment.

Next, Sherry Brown was recalled to testify about a conversation between Ms. Sheppard and James Dickerson, which she claimed to have overheard.  She claimed to have heard Ms. Sheppard say "How she would try to jack cars," "get parts and stuff off of them" and "sell them" "if they needed some money."

The State called Paula Allen, the former wife of Ms. Sheppard's husband Jerry Bryant, Jr., and Wayland Ray Griggs, who testified that the night after a fight between Bryant and Griggs, Griggs was the victim of a drive by shooting.  Ms. Allen told the jury that she met Erica Sheppard and rode with her to Bryant's mother's home where Bryant got into the car carrying a rifle and threatened her.  The three then rode to Griggs' home in the country, where Bryant instructed Ms. Sheppard to go knock on the door.  Ms. Sheppard returned to the car.  Bryant told Ms. Sheppard to drive up slowly, Sheppard

silently complied, and Ms. Allen first heard five or six shots behind her head and then heard somebody moan.  The car then sped away.

The State recalled Mary Matocha, who testified that Ms. Sheppard had a bad reputation for being peaceful and law abiding.  The State also called Maurice Ashcraft to testify that Ms. Sheppard's reputation in Bay City was bad.

The State called Mary Ross and Sharon Harvey, who testified that they met Ms. Sheppard while incarcerated in the Harris County Jail.  Each described an occasion when a news story regarding Sheppard aired and Sheppard told fellow inmates that the story was about her.  Ross testified that another inmate had advised Ms. Sheppard that she could be moved to the third floor, where inmates with mental disorders were kept, by attempting suicide, having throwing or kicking rages, or going into a major depression. Harvey also testified that she heard Ms. Sheppard ask another inmate how she might be moved to the third floor; Harvey, however, testified that it was Mary Ross who advised Ms. Sheppard on this subject.

Last, the State called Michael Meagher to testify about his family, his experience in learning about his sister's death, attending her funeral, and what life has been like without her.

### b. Ms. Sheppard's mitigating evidence: what the jury never heard

Defense counsel did not call Ms. Sheppard to testify as to the circumstances of duress under which Dickerson compelled her to participate in the robbery that resulted in the murder by Dickerson of the Complainant.  The jury, therefore, did not know that Ms. Sheppard participated in the robbery only under threat of death to her and her baby.

9

Nor did defense counsel put Ms. Sheppard on the stand to testify about her life and background.   In fact, in preparation for trial, defense counsel never even asked Ms. Sheppard about her social history.   Sheppard Affidavit, App. 14, ¶ 54.   Had defense counsel allowed Ms. Sheppard to testify, the jury would have heard the following evidence:

a.   As a young child, perhaps as young as three years old, Ms. Sheppard and her brother were beaten and abused by their babysitter.

b.   At approximately this same age, Ms. Sheppard was sexually assaulted and forced to perform oral sex on the babysitter's boyfriend, who threatened to kill her mother if she told anyone of the abuse.

c.   When Ms. Sheppard finally did tell her mother about the abuse, her mother did not believe her.

d.   After this, Ms. Sheppard went to live with her grandmother, who met her material and emotional needs; Ms. Sheppard's mother would only visit during holidays.

e.   Ms. Sheppard was beaten and hit by her mother with a belt; sometimes the whippings were so out of hand that Ms. Sheppard's grandmother had to intervene.

f.   Ms. Sheppard's mother had a number of lesbian relationships; some of these lesbian lovers were abusive to Ms. Sheppard and her brother.

g.   Ms. Sheppard had very little contact with her father, mostly because he was not interested in forming any kind of a relationship; Ms. Sheppard understands that her father and mother divorced when she was very young, because of her father's violent outbursts toward her mother.

h.   Ms. Sheppard has always attended church, and she relies heavily on her faith.

i.   Ms. Sheppard's first pregnancy occurred when she was thirteen years old and living in Bay City; her mother beat her half to death upon hearing the news; she then had an abortion.

j.    Ms. Sheppard was sexually assaulted twice when she was around sixteen or seventeen years old; the first attack was by a Hispanic man, who forced her to perform oral sex with a knife to her throat, threatening to kill her if she screamed.

k.    The second sexual assault occurred at a party at a friend's house, at which Ms. Sheppard was raped as she phased in and out of consciousness.

l.    Ms. Sheppard's second pregnancy resulted in the birth of a son, Haybert, on November 20, 1989; Ms. Sheppard was sixteen years old; Haybert's father was someone she barely knew and had no relationship with after Haybert was born.

m.    Ms. Sheppard dropped out of high school in tenth grade, because she was frustrated.

n.    Ms. Sheppard's third pregnancy resulted in the birth of a second son, Manchie, on June 22, 1991; Manchie's father, Tim Harris, now denies that Manchie is his son.

o.    After Manchie was born, Ms. Sheppard's mother continued to be physically abusive to her, attempting to strangle her with the phone cord one time.

p.    Because of this fight, Ms. Sheppard went to the Covenant House for a time.

q.    Ms. Sheppard met Jerry Bryant in August, 1991; Jerry was very possessive and jealous.

r.    In November 1991, when Ms. Sheppard learned she was again pregnant, Jerry Bryant began to be verbally abusive to her, calling her whore, slut and bitch.

s.    Jerry Bryant warned Ms. Sheppard that, if she ever left him, he would track her down and kill her; one day, Jerry ran Ms. Sheppard off the road in her car.

t.    Ms. Sheppard's daughter, Audria, was born on August 3, 1992, after a high risk pregnancy; shortly after birth, Audria was admitted to Texas Children's Hospital and was diagnosed as having an intolerance for milk; Ms. Sheppard believed her daughter was dying; while at the hospital caring for her daughter, Ms. Sheppard decided that she wanted to be a nurse.

11

u.      While staying at the hospital with Audria, Jerry Bryant punched and beat Ms. Sheppard until she lost consciousness; Ms. Sheppard then went home with her mother.

v.      Jerry Bryant threatened Ms. Sheppard in other ways, including placing a knife to her throat and threatening to kill her if she ever left him; Jerry also pointed guns at her, and Ms. Sheppard would occasionally awaken to a rifle pointed at her face.

w.      Jerry Bryant again beat Ms. Sheppard in May, 1993, a couple of months after the incident at the hospital and shortly before the robbery and murder at issue in this case.

x.      After that beating, Ms. Sheppard went to the Matagorda Women's Crisis Center; Ms. Sheppard was very vigilant concerning Jerry Bryant after that, because she feared he would make good on his threat to kill her for having left him; Ms. Sheppard went to stay with her brother Jonathan, in Houston, because she feared Jerry would find her at her mother's or grandmother's houses.

Sheppard Affidavit, App. 14.

Defense counsel did not call Ms. Sheppard's mother, Madelyn McNeil, to testify. Ms. McNeil confirmed the details of her daughter's social history. McNeil Affidavit, App. 8; Habeas Tr. 9-3-08. In addition, although defense counsel did call Ms. Sheppard's grandmother, Annie Smith, to testify, Mrs. Smith never spoke to Ms. Sheppard's attorneys about the case and no one on Ms. Sheppard's defense team talked to Mrs. Smith about what her testimony would be. Mrs. Smith would have been glad to answer questions about her granddaughter's background and life, her love of her children, her care for her grandmother, and her dreams about going to school and being a nurse. Smith Affidavit, App. 9.

In short, defense counsel completely failed to offer relevant and compelling mitigating evidence when such evidence was easily available. Indeed, defense counsel

failed to even undertake the investigation that would have made them aware of such evidence.

Attorney Brown testified at the state habeas hearing to his lack of diligence in investigating and presenting mitigating evidence during the punishment phase of the trial, admitting he was aware before trial that:

- Ms. Sheppard had been physically and verbally threatened by Dickerson on the day of the incident (2 W.H. 4-15);[2]

- Ms. Sheppard had been sexually molested at five or six years of age by the boyfriend of a baby-sitter, and that her mother denied the truth of the claim (2 W.H. 21-24, 53:18-54:2);

- Jerry Bryant, Jr. was the father of Ms. Sheppard's third baby and that she had suffered physical abuse from him such that two police reports were made at the Houston Police Department (2 W.H. 44:25-45:5); and

- Ms. Sheppard had reported to Dr. Priscilla Ray, the appointed psychiatrist, a family history of depression in her mother (2 W.H. 57:15-24).

Notwithstanding this admitted knowledge by trial counsel, the only evidence of the foregoing highly relevant mitigation factors presented to the jury came in the form of a five-page report by Dr. Priscilla Ray, the appointed medical expert, which recited in skeletal fashion the foregoing facts gleaned from Dr. Ray's single interview with Ms. Sheppard before trial. Although they had personal knowledge of the relevant facts and were available to testify, neither Ms. Sheppard, Ms. Sheppard's mother, Madelyn McNeil, nor her brother, Jonathan Sheppard, were presented at trial. 2 W.H. 77:22-24

---

2 "W.H." refers to the transcript of the September 2-3, 2008 state court writ hearing, at which evidence in support of Petitioner's application for writ of habeas corpus was presented.

(Erica Sheppard); 2 W.H. 71:19-72:6 (Madelyn McNeil); 2 W.H. 61:19-62:15 (Jonathan Sheppard).[3]

Moreover, Mr. Brown admitted at the state habeas hearing that he did not ask Dr. Ray or Annie Smith, Ms. Sheppard's grandmother, questions regarding Ms. Sheppard's history of abuse, her pregnancies and abortions, or her or her family's history of mental illness when he presented them to testify at the sentencing trial.  2 W.H. 162:9-25 (Dr. Ray); 2 W.H. 160:16-162:8 (Annie Smith).   Mr. Brown also testified at the habeas hearing to his failure to engage experts to assist him in investigating and preparing the case for trial.  He testified that he did not consult with or seek the assistance of any of the following experts:

- A mitigation expert (2 W.H. 86:9-23);
- A social worker (2 W.H. 86:24-87:3);
- A neurologist (2 W.H. 90:9-11, 15-17);
- A neuropsychologist (2 W.H. 90:12-14, 18-20);
- An expert on the impact of child abuse (2 W.H. 90:21-25, 91:21-24);
- An expert on the impact of spousal abuse (2 W.H. 91:25-92:11);
- An expert on the impact of trauma (2 W.H. 92:12-23); or
- An expert on posttraumatic stress disorder, or PTSD (2 W.H. 92:24-93:9).

Mr. Brown testified that the only "professional person" he sought help from was Dr. Ray, and he considered it "part of her duties" to examine Ms. Sheppard on the impact of child abuse.  2 W.H. 87:2-3, 90:21-25, 91:21-24.

---

3 Habeas counsel presented affidavit evidence from the following additional witnesses who did not testify at trial because they were never contacted prior to trial: Tommie Eanes (Madelyn McNeil's girlfriend who witnessed parental abuse) (App. 23); Emma Brooks (Ms. Sheppard's caretaker/tutor in Bay City) (App. 19); Lloyd Jackson (pastor in Bay City) (App. 21); Aaron Green (Justice of the Peace and former employer with knowledge of abuse by Jerry Bryant, Jr.) (App. 18) and Tangela Sells-Price (cousin with personal knowledge of Ms. Sheppard's difficult childhood) (App. 20).   Neither the district court's findings and conclusions nor the CCA's opinion mentions any of these witnesses.

II.     **STANDARD OF REVIEW APPLICABLE TO INEFFECTIVE
        ASSISTANCE CLAIMS**

**The AEDPA poses no bar to granting relief on Ms. Sheppard's ineffective assistance
of counsel claim because the state court rejection was both an unreasonable
application of clearly established Supreme Court precedent and resulted from an
unreasonable determination of the facts in light of the evidence before the state
courts.**

The AEDPA is no bar to habeas corpus relief for Ms. Sheppard's claim because

the state court adjudication was unreasonable in numerous respects, many of which have

been noted above.  Ms. Sheppard need demonstrate only that the state court rejection was

unreasonable under either 28 U.S.C. § 2254(d)(1) or § 2254(d)(2).  She can show both.

A.     **The CCA's decision was based on an unreasonable application of
       *Strickland*.**

The CCA's rejection of Ms. Sheppard's punishment phase ineffective-assistance-

of-counsel claim in its cursory order rejecting the trial court's recommendation of a new

sentencing trial was an unreasonable application of *Strickland v. Washington*, 466 U.S.

668 (1984).  The CCA stated:

> The trial court found that "counsel did not fully present the mitigating
> evidence," but the record shows that the testimony the trial court faults
> counsel for not developing through Robinson, Davenport, and Smith was
> actually before the jury through the testimony and report of Birdwell, Dr.
> Ray, and others.  A decision not to present cumulative testimony does not
> constitute ineffective assistance.

App. 28 at 4.

The CCA's order does not even mention the voluminous evidence from both

expert and fact witnesses developed and introduced by habeas counsel.  For that matter,

the trial court's recommended findings and conclusions, even though recommending a

new sentencing trial based on ineffective assistance, do not mention or discuss the testimony of the many witnesses who testified in the state habeas proceeding.

Habeas counsel undertook an extensive investigation of Ms. Sheppard's social and family history. Counsel submitted a total of nine fact witness and expert affidavits, as well as voluminous social history records and documents not presented at trial, in support of the habeas application when it was filed in 1998. Counsel submitted eleven affidavits of fact and expert witnesses, and even more social history documents and records, in postconviction proceedings. Counsel also called four witnesses to testify in person at the September 2008 evidentiary hearing.

In denying punishment-phase relief, the CCA narrowly focused on the post-conviction testimony of only three fact witnesses, failing to acknowledge the testimony of the remaining witnesses and, perhaps more importantly, failing to acknowledge expert evidence presented in state habeas showing that Ms. Sheppard suffered from borderline to low average intellectual disability, significant brain dysfunction, depression, PTSD, and dissociative disorder, findings resulting from psychological evaluations which Dr. Ray admitted she did not and was not asked to perform at trial. Contrary to the CCA's characterization, the evidence developed in habeas is not cumulative of the evidence the jury heard at trial. Ignoring, and thus wholly discounting, Ms. Sheppard's expert witnesses was an unreasonable application of *Strickland*: "it was not reasonable to discount entirely the effect that [expert] testimony might have had on the jury or the sentencing judge." *Porter v. McCollum*, 558 U.S. 30, 43 (2009).

The Supreme Court's decisions following *Strickland* have consistently held that a reviewing court undertaking the necessary prejudice analysis must consider the totality of the evidence, which includes the evidence presented at trial as well as the evidence developed and introduced in habeas corpus proceedings.  *See, e.g., Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) ("[T]he State [Virginia] Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."); *Wiggins v. Smith*, 539 U.S. 510, 534, 536 (2003) ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence. . . . [W]e evaluate the totality of the evidence — 'both that adduced at trial, and the evidence adduced in the habeas proceeding[s].'" (quoting *Williams*, 529 U.S. at 397-398)); *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) ("It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S.Ct. 2052.").

The Court's more recent decisions in *Porter v. McCollum* and *Sears v. Upton*, 561 U.S. __, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) also apply the *Williams* rule.  *See Porter*, 558 U.S. at 41 (same, quoting *Williams*, 529 U.S. at 397–398). *See also Sears*, 561 U.S. __, 130 S.Ct. at 3266-3267 (same, quoting *Porter*, 558 U.S. at 41).

The CCA's Order in the instant case did not look at the totality of the mitigating evidence.  The CCA was required under the Supreme Court's precedents to focus on evidence that was not presented or developed at trial in addition to evidence that was presented at trial.  The CCA determined that "the testimony the trial court faults counsel for not developing through Robinson, Davenport, and Smith was actually before the jury through the testimony and report of Birdwell, Dr. Ray, and others" and concluded that "[a] decision not to present cumulative testimony does not constitute ineffective assistance."  App. 28.

The CCA's limited analysis ignores the vast bulk of the postconviction testimony and evidence from fact witnesses presented by habeas counsel.  It also completely fails to address the evidence from expert witnesses proffered in postconviction proceedings.  This was an unreasonable application of *Strickland*:

> The Florida Supreme Court's decision that Porter was not prejudiced by his counsel's failure to conduct a thorough—or even cursory—investigation is unreasonable. The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing.

*Porter*, 558 U.S. at 42.  Petitioner has shown that the evidence from the postconviction witnesses is different in type and character from that presented in the limited mitigation case trial counsel presented to the jury.  The CCA's failure to observe the requirements of *Strickland* and the Supreme Court's decisions following it is an unreasonable application of *Strickland*.  Because the state court decision involved an unreasonable application of *Strickland*, there is no bar to federal habeas corpus relief.  28 U.S.C. § 2254(d)(1).

**B.** **Unreasonable determination of the facts in light of record before the state courts**

Additionally, when the CCA rejected the trial court's recommendation of a new sentencing trial, it decided Ms. Sheppard's claim based on numerous unreasonable determinations of fact in light of the state court record, any one of which defeats the application of § 2254(d) to this claim. The district court's August 24, 2012 Findings of Fact, Conclusions of Law and Order (Appendix 27) recommended that Petitioner be granted a new sentencing trial on her fourteenth claim for relief, ineffective assistance of counsel in the investigation and presentation of mitigating evidence regarding Petitioner's sexual abuse, physical abuse, neglect, and domestic violence. App. 27, Findings 137-152, Conclusion 43.

The district court also found as follows in its recommended Finding 114, in ruling on Petitioner's second, third, ninth, eleventh through twentieth, twenty-second, twenty-fourth, twenty-seventh, thirty-second, and thirty-sixth grounds for relief (all relating to effectiveness of counsel):

> 114.   The Court finds trial counsel provided ineffective assistance at the punishment phase of applicant's trial in failing to present or fully develop evidence regarding the applicant's background and failure to present testimony expert or otherwise that would allow the jury to understand the implications of the applicant's background including physical abuse, sexual abuse or domestic violence for consideration in determining the answer to the special issues. The Court finds this failure resulted in a violation of the applicant's constitutional rights.

App. 27. The CCA's rejection of the trial court's recommendation to grant relief with regard to Allegation 14, and rejection of Findings 137 through 152 and Conclusion 43

(App. 28 at 2, 5) is wholly contrary to undisputed testimony and evidence from fact and expert witnesses, none of whom the CCA even acknowledged in its ruling.

Petitioner's claims of ineffective assistance are governed under the standards set out in *Strickland*. To establish ineffectiveness, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. To establish prejudice, the defendant is required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. *Strickland* defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating a claim that counsel failed to adequately investigate, *Strickland* states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

Decisions of the Supreme Court addressing ineffective assistance in the sentencing phase of a capital trial have affirmed the vitality of the *Strickland* analysis. For instance, in *Williams*, the Court approved the federal district court's argument that the failure of trial counsel to conduct an adequate mitigation investigation was not a "strategic decision to rely almost entirely on the fact that Williams had voluntarily confessed," 529 U.S. at 373, holding that the merits of Williams' ineffective assistance claim were "squarely governed" by *Strickland*. *Id.* at 394.

Similarly, in *Wiggins*, the Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be

directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment."  539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 690-91).  As the Supreme Court observed, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."  *Id.* at 527.

In *Rompilla*, the Supreme Court held that trial counsel were ineffective even though their efforts to find mitigating evidence included "interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase."  545 U.S. at 381.  The Court found Rompilla's lawyers ineffective for failing to examine the court file on his prior conviction for rape and assault, which was a public record of which they were aware and which included a transcript of the rape victim's testimony.  *Id.* at 383.  Addressing *Strickland*'s prejudice requirement, the Court observed that, had Rompilla's counsel examined the file on Rompilla's prior conviction, they would have learned that (1) there were test results "pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling" (*id*. at 391); (2) Rompilla's parents were severe alcoholics, his mother drank during her pregnancy with Rompilla, and he and his brothers had serious drinking problems (*id.* at 391-92); (3) Rompilla's father had a vicious temper, he frequently fought with and beat Rompilla's mother, and he verbally and physically abused and beat Rompilla (*id.*); and (4) "on at least one occasion his mother stabbed his father" (*id.*).

In *Porter*, the Supreme Court held that trial counsel's failure to investigate or present mitigating evidence of the petitioner's "abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity" warranted habeas relief.  558 U.S. at 33.  In a holding of significance in this case, the Court held that the decision by the Florida Supreme Court "that Porter was not prejudiced by his counsel's failure to conduct a thorough — or even cursory — investigation is unreasonable.  The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing."  *Id*. at 42.

Most recently, in *Sears*, the Supreme Court held in granting habeas relief that the state court had employed an improper prejudice analysis, stating:

> We have never limited the prejudice inquiry under *Strickland* to cases in which there was only "little or no mitigation evidence" presented. . . .  We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.

130 S.Ct. at 3266 (emphasis in original).  Considered in light of the holdings of these cases, the cursory mitigation investigation by Ms. Sheppard's trial counsel is plainly ineffective.

The record in this proceeding demonstrates that Ms. Sheppard's trial counsel wholly failed to undertake a reasonable investigation into Ms. Sheppard's "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." *See, e.g., Wiggins*, 539 U.S. at 524 (investigations into mitigating evidence should

"comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor" and that "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences.").  As detailed previously, trial counsel failed to develop or present more than skeletal evidence of Petitioner's character and background, her social and medical history, or her family history.  Counsel also failed to make any attempt to adduce expert testimony such as that obtained and proffered by post-conviction counsel from Dr. Cunningham, Dr. Young and Dr. Bradley.

Dr. Ray, who testified at Ms. Sheppard's trial, admitted in her postconviction affidavit that, if she had been asked to diagnose whether Ms. Sheppard suffered from PTSD or other trauma related psychosis, she was qualified and able to do so at the time she conducted her clinical evaluation in 1994.   App. 24.   Under the standards of *Strickland* and its progeny, the performance of Ms. Sheppard's trial counsel was deficient, and Ms. Sheppard was prejudiced by their deficiencies.

Because the state court decision was riddled with unreasonable applications of *Strickland* and based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d) poses no bar to habeas relief.

## III.        CLAIMS FOR RELIEF

### A.   Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Punishment Phase of Ms. Sheppard's Trial, in Violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).

This Court must apply *Strickland v. Washington*, 466 U.S. 668 (1984), to determine whether trial defense counsel were ineffective in failing to adequately investigate and present the available mitigating evidence during sentencing.   Under *Strickland*, the defendant first "must show that counsel's representation fell below an objective standard of reasonableness," which must be judged under "prevailing professional norms."   *Id*. at 688.  In evaluating a claim that counsel failed to adequately investigate, *Strickland* holds that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691.

Second, the defendant must satisfy the prejudice requirement by showing a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

This test is not outcome determinative.  The *Strickland* Court expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94.  Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."   *Id*. (emphasis

24

supplied).   Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.  *Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir. 1990) (the prejudice prong imposes "a lower burden of proof than the preponderance standard.").

The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the evidence standard rather than the lesser reasonable probability standard would result in a decision that was contrary to federal law as determined by that Court.  *Id*. at 405-06 ("If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent because we held in Strickland that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'").

### 1.    Trial counsel's performance was deficient.

#### a.    The relevant standard of care required an adequate pre-trial investigation in preparation for the penalty phase.

The Eighth and Fourteenth Amendments require that sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v.*

*North Carolina*, 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id*. at 604. Likewise, the sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence," *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), such as a "troubled youth," *id*. at 107.[4]

Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604).

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse

---

[4] In *Eddings*, the sentencing judge believed that he was legally prohibited from considering as mitigation that: the defendant was "raised without proper guidance;" his parents were divorced; he lived "without rules or supervision" with a mother who was possibly an alcoholic and a prostitute; when he stayed with his father he was subjected to "excessive physical punishment" and "physical violence;" he was "emotionally disturbed;" "his mental and emotional development" were less than his 16-years-of-age; and he "had a sociopathic or antisocial personality disorder." *Id*. at 107.

frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty.  *Woodson*, 428 U.S. at 304.  A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence.

"Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation."  *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  *See also Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006) ("[t]he imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing").

The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.  *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)).

i.    **The prevailing standard of care at the time of Ms. Sheppard's trial mandated that defense counsel conduct a thorough social history.**

In state post-conviction proceedings, trial counsel admitted—and the state court found—that, despite knowledge before trial of Ms. Sheppard's history of parental, sexual and spousal abuse, as well as her family history of mental illness, trial counsel failed to consult with or seek the assistance of experts who could have offered relevant and compelling mitigating evidence when such evidence was easily available or, indeed, to even undertake the investigation that would have made them aware of such evidence. See App. 1 (Charles Brown); Findings (App. 27) 114, 137-152.

Thus, the trial counsel's ignorance about Ms. Sheppard's background is ***not*** in dispute, the sole question is who is at fault for counsel's ignorance.   In light of the applicable standard of care, trial counsel's failure to affirmatively inquire about or investigate Ms. Sheppard's background was unquestionably deficient.

In *Bobby v. Van Hook*, 130 S.Ct. 13 (2009) (per curiam), the Supreme Court stated that "[r]estatements of professional standards, we have recognized, can be useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place."  *Van Hook*, 130 S.Ct. at 17 (emphasis added).  Van Hook was tried 18 years before the promulgation of the ABA Guidelines relied upon by the lower court.  *Id*.  The Court contrasted the 2003 ABA Guidelines with the 1980 ABA Standards for Criminal Justice that would have been applicable to Van Hook's trial.  The 1980 Standards were "quite different."  *Id*.  While the 1980 Standards described counsel's duties in only "general terms," the 2003

Guidelines

> discuss the duty to investigate mitigating evidence in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin. *See* ABA Guidelines 10.7, comment., at 80–85. They include, for example, the requirement that counsel's investigation cover every period of the defendant's life from the "moment of conception, *id*., at 81, and that counsel contact "virtually everyone . . . who knew [the defendant] and his family" and obtain records "concerning not only the client, but also his parents, grandparents, siblings, and children, *id*., at 83.

*Id*. (quoting the ABA Guidelines).

The Supreme Court concluded that Van Hook's counsel were not deficient when measured against contemporaneous standards of care. *Id*. at 18 ("Van Hook insists that the Sixth Circuit's missteps made no difference because his counsel were ineffective even under professional standards prevailing at the time. He is wrong."). "Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—without even pausing to consider whether they reflected the prevailing professional practice at the time of the trial—was error. *Id*. *See also Cullen v. Pinholster*, 131 S.Ct. 1388, 1404 (2011) (trial counsel, after conducting a reasonable mitigation investigation, reasonably deployed a defense known and used by the California defense bar at the time of Pinholster's 1984 capital trial).

Subsequently, the Supreme Court illustrated the sources from which courts can ascertain professional norms of criminal defense practice. In *Padilla v. Kentucky*, 130 S.Ct. 1473, 1482–83 (2010), in which the Court deemed deficient counsel's failure to advise a non-citizen defendant about the immigration consequences of a guilty plea, the Supreme Court relied on the ABA guidelines, as well as numerous other sources, to determine the prevailing standard of care:

The weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation. National Legal Aid and Defender Assn., Performance Guidelines for Criminal Representation § 6.2 (1995); G. Herman, Plea Bargaining § 3.03, pp. 20-21 (1997); Chin & Holmes, Effective Assistance of Counsel and the Consequences of Guilty Pleas, 87 Cornell L.Rev. 697, 713-718 (2002); A. Campbell, Law of Sentencing § 13:23, pp. 555, 560 (3d ed. 2004); Dept. of Justice, Office of Justice Programs, 2 Compendium of Standards for Indigent Defense Systems, Standards for Attorney Performance, pp. D10, H8-H9, J8 (2000) (providing survey of guidelines across multiple jurisdictions); ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-5.1(a), p. 197 (3d ed.1993); ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(f), p. 116 (3d ed.1999).   "*[A]uthorities of every stripe- including the American Bar Association, criminal defense and public defender organizations, authoritative treatises, and state and city bar publications*-universally require defense attorneys to advise as to the risk of deportation consequences for non-citizen clients . . . ."   Brief for Legal Ethics, Criminal Procedure, and Criminal Law Professors as *Amici Curiae* 12-14 (footnotes omitted) (citing, *inter alia,* National Legal Aid and Defender Assn., Guidelines, *supra,* §§ 6.2–6.4 (1997); S. Bratton & E. Kelley, Practice Points: Representing a Noncitizen in a Criminal Case, 31 The Champion 61 (Jan./Feb.2007); N. Tooby, Criminal Defense of Immigrants § 1.3 (3d ed.2003); 2 Criminal Practice Manual §§ 45:3, 45:15 (2009)).

*Id*. (emphasis added).  Thus, the Court looked to the applicable ABA guidelines, as well as other publications and treatises, including the publications of criminal defense organizations, to establish the relevant standard of care.

"Authorities of every stripe," as well as reported decisions describing Texas capital trials, confirm that the mid-1990's standard of care, like the 2003 ABA Guidelines, required a thorough social history when preparing to defend a capital case. As in the current ABA Guidelines, "the duty to investigate mitigating evidence" was prescribed "in exhaustive detail, specifying what attorneys should look for, where to look, and when to begin." *Van Hook*, 130 S.Ct. at 17.

Materials from Texas capital defense CLE programs and defender publications

well before Mr. Sheppard's trial reflect a well-defined standard of care requiring counsel to seek out a wide range of mitigating evidence.  For example, the State Bar of Texas 20th Annual Advanced Criminal Law Course took place in July of 1994, seven months before Ms. Sheppard's trial.  Materials distributed at the State Bar course included a primer on defending capital cases at the sentencing phase  *See, e.g., Capital Sentencing Strategy: A Defense Primer*, July 1994) (hereinafter "1994 State Bar Materials").  The materials reflect the expectation that defense counsel will conduct a searching life history investigation:

> A thorough intergenerational life history *must* be developed, incorporating all life history documents and interviews with all first and second degree relatives, friends, [and] peers.  As relatives with histories of relevant physical illnesses (diabetes, endocrine/hormonal, and neurological) and mental illnesses are identified, obtain their medical and life history documents.

1994 State Bar Materials at 17–18 (emphasis added).  The standard of care required that the defense team search for all potentially relevant mitigating circumstances because the then-relatively new mitigation special issue made explicit that "everything about the circumstances of the underlying offense (or other prior bad acts), the defendant's character, and the defendant's record (read 'history') is relevant to the jury's final determination of the issue."  *Id.* (emphasis in the original).

The 1994 State Bar of Texas materials document that counsel had a duty to independently investigate the wide range of social, psychological, medical, environmental, and other factors that shaped the client's life.  Like the current ABA standards, the 1994 State Bar Materials instructed counsel to both collect a comprehensive set of life history documents and interview people who can shed light on

the client's background.  To that end, the 1994 State Bar Materials provided counsel with "an *initial* list of essential people to talk to and records to obtain."  *Id*. (emphasis added). The list was not intended to be comprehensive because "[e]ach person and document will have information that will lead to additional people and records that [counsel] will need to talk to or obtain."  *Id*.  Thus, the materials defined a starting point for a mitigation investigation that expands in the directions indicated by the information gathered by counsel.

According to the 1994 State Bar Materials, an appropriate document collection began with: birth certificates; birth records; prenatal records; church records; school records; educational records; childhood photographs; medical records; mental health records; work records; jail, court, and police records for family members; civil proceedings records; marriage records; social service agency records; Texas Youth Commission records; juvenile records; parole and probation records; military records; records from prior offenses (including attorney, jail, prosecution, court, and media records); records related to every co-defendant (including court, prosecution, jail, and attorney records); prison records; and prosecution records.  *Id*. at 18–21.

The standard of care called for a thorough intergenerational life history, which included interviews with "all first and second degree relatives, friends, [and] peers."  *Id*. at 17.  Counsel were expected to interview life history witnesses about a wide range of topics, and not merely ask "Is there anything you think we should know about the client?"  Because the life history witnesses often have no concept of what is important or mitigating about a person's background, it was counsel's obligation to raise and explore

the relevant areas with the witnesses.  Hence the 1994 State Bar Materials specifically

instructed counsel to inquire into a broad range of topics, including:

- sexual and physical abuse;
- medical care, education, and nutrition;
- difficulty reading, speech impediments;
- nightmares, sleep disturbances, fear of the dark;
- withdrawal, quietness, shyness;
- rocking, biting, head banging during early childhood;
- anxiety, nervousness, crying,
- superstitions;
- fears;
- the parents' socio-economic history;
- client and family physical illness and disabilities;
- client and family mental illness and/or mental retardation;
- family history of suicide;
- a detailed drug and alcohol history, including age first used, frequency, amounts, effects, and so forth.

*Id*. at 17-21.

The ultimate aim of the mitigation investigation is to support a punishment phase

defense: "Once you have assembled everything—both information and records—

regarding your client's life, you must create a defense."  *Id*. at 22.  Counsel should seek

to "humanize" the client and "explain as much as possible."  *Id*.  Counsel must relate the

mitigating evidence to the criminal act.  "*Negative*" qualities, such as abuse or mental

illness, "are often the *primary* source of explanatory evidence."  *Id*. (emphasis added).  It

is important to "[e]xplain as much as possible" because "[f]acts in a vacuum are what

prosecutions are made of."  *Id*.  Counsel's duty during the punishment phase was to

"[u]se [their] witnesses to fully develop the picture of a person who is life-worthy."  *Id*.

After describing the scope of the initial mitigation investigation, the 1994 State

Bar Materials address, at length, the strategic and legal justifications for obtaining expert

assistance when preparing for the punishment phase.  *Id*. at 23-36.  The primer explains

that *Ake v. Oklahoma*, 470 U.S. 68 (1985), entitles indigent defendants to the assistance

of a psychiatrist when sanity or future dangerousness is likely to be a significant factor at

trial.  Of course, future dangerousness is at issue in every Texas capital prosecution, thus

*Ake* established "a valuable right because expert testimony plays a major role in almost

every capital murder trial."  1994 State Bar Materials at 23; *see also id*. at 26–27 ("a

capital defendant in Texas is always entitled to the assistance of a psychiatrist to rebut

testimony about future dangerousness because future dangerousness is always a

significant aggravating factor at the sentencing phase").   The primer advised that

"[c]ounsel can use a well planned Ake motion to obtain substantial funds to retain an

expert of his own choice in almost any subject who can function as a real defense

consultant and keep his work product and communications with the defendant

confidential until he testifies."  *Id*.

Finally, the 1994 State Bar Materials included a set of sample motions, three of

which were for obtaining expert assistance in preparation for the punishment phase.  The

first, "Motion for the Assistance of a Psychiatrist on the Issues of Insanity and

Mitigation," *id*. at 124-29, begins by noting that counsel has conducted a thorough

investigation of the defendant's character and background (including reviewing the

defendant's school records, prison records, medical records, and interviewing many

witnesses).  *Id.* at 124.  The motion then models how to argue that the available social

history information indicates that mental health issues will be at issue in the punishment

phase, and that funding for a mental health expert is necessary because the jury must be

able to consider mental health evidence "when deciding the ultimate issues in this case." *Id.* at 125-28.[5]  Two other sample motions gave defense counsel a template for requesting additional expert funding when further testing was warranted and for requesting expert assistance to rebut the State's expert on future dangerousness.  *Id*. at 130-38.  The 1994 State Bar of Texas Materials were hardly cutting-edge material, they merely conformed to the national capital defense norms in place since the mid-1980's.

Decisions of the Texas Court of Criminal Appeals applying *Strickland* to cases tried in the mid-1990's confirm that the 1994 State Bar Materials accurately described the prevailing standard of care in Texas.  For example, in *Ex parte Gonzales*, 204 S.W.3d 391, 393–96 (Tex. Crim. App. 2006), the CCA held that trial counsel were deficient for not investigating whether there was a history of child abuse even though counsel "never even dreamed" it was an issue relevant to his client's case.  On July 20, 1994, Gabriel Gonzales, along with four other members of the Crips gang, robbed a pawn shop to get guns and money.  *Id*. at 393.  "While his accomplices were smashing display cases and stealing guns, [Gonzales] chased one of the proprietors of the shop into the back of the store and shot her.  Then he returned to the cash register and forced an employee to open it."  *Id*.  Gonzales was sentenced to death on February 19, 1997.  The representation at issue in *Gonzales* spanned all of 1996.

Gonzales' trial counsel interviewed Gonzales about his life from birth up to the

---

[5] Ms. Sheppard's counsel were sufficiently aware of the standard of care that they filed a boilerplate motion for a psychiatric evaluation.  Even though it contained little information about Ms. Sheppard because counsel never investigated Ms. Sheppard's social history, the court granted the request—which itself is further evidence of the extent to which such evaluations were routinely done in the mid-1990's.

trial. *Id*. at 394.  Counsel also talked to the client's mother once before trial, and to the

client's sister during trial.  None of them revealed that Gonzales was frequently sexually

and physically abused when he was small child.  Unbeknownst to trial counsel, the

mother believed that the father was sexually abnormal and used excessive force on the

children and, when she learned that her husband was sexually abusing their daughter, she

notified the police and obtained a divorce.  *Id.*  Trial counsel stated that he

> *did not ask [the family members] or the applicant about any specific topics*
> such as abuse in the applicant's past.  His interviews with the mother and
> sister started "globally in nature," but he "never even dreamed" of the issue
> of abuse, and he "certainly didn't really inquire about it."  He did ask the
> applicant about how he grew up.  "I just start from the beginning, you
> know, tell me all about you.  Where were you born and so forth, leading
> them up to—to this time."  The applicant did not volunteer any information
> about abuse.  The sister testified at the habeas hearing that she did not
> volunteer information about the abuse because she is ashamed of having
> been abused and it is not very easy to talk about.

*Id*. at 394–95 (emphasis added) (footnotes omitted).

Although Gonzales's trial counsel had interviewed both Gonzales's mother and

sister about Gonzales's background—the sister even testified at punishment to

Gonzales's difficult childhood and his borderline mental retardation—Gonzales's counsel

never specifically asked these potential witnesses whether Gonzales had been abused, and

thus did not present evidence of abuse at sentencing.  *Id*. at 394–95.

Post-conviction counsel hired a psychiatrist who, after interviewing Gonzales and

reviewing some of his records, diagnosed him with "chronic post-traumatic stress

disorder, attention-deficit disorder with hyperactivity, mixed personality disorder with

explosive and antisocial traits, hereditary epilepsy, dyslexia and other learning disorders."

*Id*. at 395.  The psychiatrist concluded that:

This is an individual who at an early age had [neurological and learning disorders]. He also had stigmata of Post Traumatic Stress Disorder as a result of extensive sexual abuse and molestation by his genetic father. He apparently was threatened with homicidal intention, by the perpetrator, if he revealed to his mother that this behavior was going on.

This individual also has a Borderline Normal Intelligence Quotient which would lead to poor processing of information and probably lower level of control of behaviors which included antisocial behaviors and impulsive behaviors at an early age. There was extensive drug abuse at an early age which extended into adult age with participation in buying and selling drugs.

This is an individual who has received many educational services, marginal psychiatric services as a child, and evolved into a very impulsive, angry adult whose trust was destroyed because of sexual molestation as a child. He, therefore, was not able to evolve deep interpersonal relationships that are so important for someone to learn to control and monitor his own behavior so that he was able to function in a job as a normal productive citizen.

This individual would require extensive psychiatric treatment for Post Traumatic Stress Disorder and Chemical Dependence in order to be rehabilitated in to [*sic*] a law-abiding, productive member of society.

*Id*. at 395–96.

Because counsel was not aware of this information, the issue before the CCA was whether counsel failed to conduct a reasonable investigation to uncover mitigating evidence. The trial court found that trial counsel were not deficient: "The trial court was not persuaded, however, that defense counsel conducted an unreasonable investigation because 'this information was all known to Applicant, who was legally competent to stand trial, and he made no mention of it to his trial counsel.'" *Id*. at 396.

The CCA, however, held that the failure to investigate and inquire into the subject of abuse when interviewing the client and relevant witnesses fell below an objective standard of reasonableness for Texas capital trial counsel and rendered trial counsel's

mitigation investigation unreasonable. *Id*. at 397. The CCA noted that the Supreme Court had made clear in *Penry v. Lynaugh*, 492 U.S. 302 (1989), that the pre-1991 Texas sentencing statute violated the Eighth Amendment when it precluded consideration of mitigating evidence beyond the scope of the special issues. In a footnote, the court catalogued numerous cases tried under the former statute in which counsel had investigated and presented mitigating evidence. *Gonzales*, 204 S.W.3d at 396 n.32.

In 1991, the Texas capital sentencing "statute was amended to comprise a much broader range of mitigating evidence, namely, 'all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant.'" *Id*. at 397 (footnote omitted). According to *Gonzales*, courts must assess counsel's preparation for the punishment phase in light of this development. Relevant mitigating evidence clearly included "the defendant's childhood and his physical and mental health." *Id*. Thus, "at the time of [Gonzales's] trial, an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child." *Id*. at 397.

In granting relief to Gonzales, the CCA plainly announced that, in a post-1991 trial, capital defense counsel were *required* to investigate the client's childhood and mental health—even in a case in which (1) counsel, *before* investigating, "never even dreamed" the investigation would turn up evidence of abuse; and, (2) counsel interviewed family members who did not spontaneously volunteer that the client had been abused. Put differently, by the mid-1990's, Texas capital defense counsel had a duty to

independently investigate mitigating circumstances related to mental and physical health, and the client's childhood, regardless of whether the information was volunteered by the client and his family. *See also Ex parte Kerr*, 2009 WL 874005, at *2 (Tex. Crim. App. April 1, 2009) (unpublished) (overturning a 1995 death sentence based on ineffective assistance of counsel because trial counsel failed to discover "compelling evidence of physical and emotional abuse, familial violence, wretched treatment of the defendant by his father, alcoholism, the mental retardation of siblings, drug abuse, a history of head injuries, learning disabilities, and possible fetal alcohol syndrome."); *Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003) ("[I]n the context of a [1987 Texas] capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances." (citation omitted)); *Moore v. Johnson*, 194 F.3d 586, 617 (5th Cir. 1999) (holding, when overturning a 1980 Houston death sentence, "that [because] counsel's conduct in failing to develop or present mitigating evidence was not informed by any investigation and not supported by reasonably professional limits upon investigation, we find that there is no decision entitled to a presumption of reasonableness under *Strickland*.").

Judge Cochran wrote a concurring opinion in *Gonzales* further clarifying the applicable professional norms. "[D]efense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. *The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself*." *Ex parte Gonzales*, 204 S.W.3d at 400 (Cochran, J., concurring) (emphasis added). The Supreme

Court has made it clear that "defense counsel may be required to investigate potential mitigating facts even when the defendant is 'uninterested in helping' or is 'even actively obstructive' in developing a mitigation defense." *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374 (2005).  Judge Cochran—like both the 1994 State Bar Materials and the current ABA Guidelines—emphasized that counsel's duty to investigate encompassed, at a minimum, a duty to inquire into specific areas of potential mitigation:

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]"  *At a minimum, defense counsel must privately quiz his client about any and all positive and negative facts about the defendant's upbringing, personality, social interactions, thoughts and feelings.  It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions.*  Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic.  Such topics might include:
>
> 1.   Childhood accidents and injuries;
> 2.   Trips to the emergency room;
> 3.   Serious illnesses at any time;
> 4.   Physical abuse to the defendant or any other member of the family;
> 5.   Any sexual abuse to the defendant or any other member of the family;
> 6.   Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
> 7.   The defendant's relationship with and attitudes toward every member of the family;
> 8.   Drug or alcohol use or abuse by himself and any or all members of the family;
> 9.   Any mental health treatment of any member of the family, including the defendant;
> 10.  The cohesiveness of the family;
> 11.  The family's standard of living and living conditions;
> 12.  Any and all available school records;
> 13.  Any record of learning disabilities;
> 14.  Childhood and adult social relationships with members of the same and opposite sex;
> 15.  Any marriage, divorce, children, step-children, or surrogate family

relationships, and their positive or negative influence upon the defendant;

16.   Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;

17.   Any and all traumatic experiences;

18.   Any and all especially proud moments;

19.   Membership in religious, social, educational, charitable organizations;

20.   The client's five best and worst memories.

*Id*. 400–01 (emphasis added).

While *Strickland* accords deference to counsel's strategic decisions, Judge Cochran emphasized that this deference does not come due until *after* counsel complies with these prevailing norms of capital defense investigation:

> Only after a lengthy and thorough interview with his client will defense counsel be in a position to decide which are the most promising mitigation areas to pursue.  Because of finite resources and time, capital counsel's strategic and tactical decisions regarding the further investigation, development, and use of potential mitigating evidence should be given great deference.  *But deference is not due to counsel who fails to interview his client at sufficient length and depth to discover, as accurately as possible, the unvarnished truth about his client . . . .  [C]apital counsel bears the responsibility for at least making every reasonable attempt to uncover possible mitigation facts from his client.*

*Id*. at 401.

In addition to training materials and defense publications pre-dating Ms. Sheppard's trial, and CCA decisions holding counsel to those same standards in contemporaneous trials, this Court can ascertain the prevailing professional practice from reported decisions describing numerous Texas capital trials in the decade leading up to the representation at issue here.  Widespread litigation over whether Texas's pre-1991 sentencing scheme allowed jurors to give mitigating effect to a defendant's punishment phase evidence provides a rich body of case law describing the mitigating evidence that

Texas capital defense counsel routinely investigated and presented to juries.  A survey of capital cases in the late 1980's and early 1990's confirms the extent to which counsel gathered detailed social history evidence when preparing for capital trials—in Houston and elsewhere in Texas—for almost a decade before Ms. Sheppard's trial.  *See, e.g.*, *Ex parte Smith*, 309 S.W.3d 53, 59-60 (Tex. Crim. App. 2010) (1990 Harris County trial in which defendant presented a detailed social history, including that his "family lived in poverty, caused in part by the loss of his father when he was 12 years old.  [The applicant's] mother, . . . working as a maid, could not afford to move the family from Houston's "Fifth Ward," a dangerous neighborhood filled with prostitution, drugs, and crime.  At the time of the crime, fourteen people lived in [the applicant's mother's] three-bedroom home.  [The mother of the applicant's son] was violently killed, so [the applicant's mother] took [the applicant's son] into her house as well.  Shortly before the crime, [the applicant] and his younger sister, . . . were violent crime victims themselves—with [the applicant's] sister forced to strip in public in front of him, and [applicant] assaulted with a gun that misfired as it was held to his temple.  Surrounded by drugs and poverty all his life, [the applicant] became a drug addict, using crack whenever he could get a hold of it.  Lacking education and any job skills or opportunities, [the applicant] began to steal to support his addiction"); *Ex parte Davis*, 2009 WL 3839065, at *2 (Tex. Crim. App. Nov. 18, 2009) (unpublished) (1992 Harris County trial in which "[t]he jury was presented with evidence that applicant suffered from severe learning disabilities, functional illiteracy, childhood head injuries, deficits in social functioning, drug and alcohol 'dependency' by age fifteen, and a physically violent and emotionally traumatic

upbringing."); *Ex parte Buntion*, 2009 WL 3154909, at *2 (Tex. Crim. App. Sept. 30, 2009) (unpublished) (1991 Harris County trial in which "[t]he jury was presented with evidence that applicant had a troubled childhood in a 'very bad neighborhood,' was severely physically mistreated by his alcoholic father, and ran away from home to work on a dairy farm for room and board because his family was very poor.   Two psychologists testified that applicant suffered from 'primary paranoid personality disorder,' mild 'brain dysfunction' or 'neurological impairment,' and depression."); *Ex parte Jones*, 2009 WL 1636511, at *3 (Tex. Crim. App. June 10, 2009) (unpublished) (1991 Harris County trial in which the defendant introduced mitigating evidence of "a psychological impairment that makes him susceptible to the influences of consistent, stronger, anti-social personalities in his environment, his abandonment by his biological father, and his intelligence, work ethic, reliability, and trustworthiness."); *Ex parte Martinez*, 233 S.W.2d 319, 320 (Tex. Crim. App. 2007) (1989 Harris County trial in which defendant presented evidence of repeated admissions to the State Hospital for psychiatric illness, including "[s]chizophrenic reaction, chronic, undifferentiated, with paranoid and catatonic features"; a troubled childhood, and alcohol abuse starting at age thirteen.); *Gunter v. State*, 858 S.W.2d 430, 452 (Tex. Crim. App. 1993) (Clinton, J., dissenting) (1987 trial in Harris County in which defendant presented mitigating evidence that he had been abused as child, his mother abandoned him when he was 3-and-a-half years-old (at which point he was still in diapers and not toilet trained), his adoptive parents were strict and sent him to school unbathed and unfed as punishment, he was hit with a strap until bloody, punished with an iron, school records indicated he may have

been sexually abused by his adoptive parents, he had deep emotional problems, he

suffered from a hearing impairment and a learning disorder, he was in and out of juvenile

and foster families); *Ramirez v. State*, 815 S.W.2d 636, 655–56 (Tex. Crim. App. 1991)

(1986 Harris County trial in which defendant presented detailed social history evidence

that the defendant was raised in poverty and subsisted on food stamps (which ran out

before the end of each month at which point the family of 8 would live on bread,

mayonnaise, and butter), the father abused the children and the mother, the father once

beat the defendant for intervening when his father was trying to rape his sister (after

which he beat up the sister and the mother), the father beat the defendant with extension

cords and fists, the defendant was getting high from sniffing paint by the time he was 9 or

10 years old, a psychological evaluation performed for the juvenile probation revealed

that defendant's IQ was 57).[6]

---

[6] Defense counsel were gathering and presenting social history evidence in contemporaneous capital trials throughout the State of Texas. *See Ex parte Hood*, 304 S.W.3d 397, 400 (Tex. Crim. App. 2010) (1990 trial in which defendant offered mitigating evidence that he was crushed by a truck that backed over him at age 3, he was in the hospital for five months and had to relearn how to walk 2 years later, he was left with permanent injuries from the accident, his behavior changed, he had noticeable speech problems (including stuttering), he developed a fear of being inside of buildings, he was left with cognitive impairments and attended special education throughout his school career, he failed the second and seventh grade, he failed the army entrance exam three times, he suffered from brain impairments that compromised his judgment and impulse control); *Ex parte Hathorn*, 296 S.W.3d 570, 72–73 (Tex. Crim. App. 2009) (1985 trial in which defendant presented evidence that his "father and step-mother were neglectful; that his father was abusive and beat him nightly during his first two years of grade school—on one occasion for going to church; that his father had shot and killed his pony and a dog and appellant had to bury the dog; and that his father was violent and carried a weapon. The former Chief Psychologist for the Texas Department of Corrections testified about Applicant's violent and dysfunctional home environment and how it may have shaped his development and contributed to the offense for which he was charged."); *(Damon) Richardson v. State*, 879 S.W.2d 874, 883 (Tex. Crim. App. 1993) (1988 trial in which defendant presented evidence that his mother was in and out of penal institutions, he never knew his father, he was raised in poverty with little supervision, sometimes went hungry, sometimes stole food, went to state institutions for children, he was illiterate, stuttered, slow learner); *Ex parte Moreno*, 245 S.W.3d 419, 423–24 (Tex. Crim. App. 2008) (1987 Bexar County trial in which defendant presented

social history evidence that he was born with a deformity to his left ear; abandoned by his birth parents and adopted as an infant; during the first seven years of his life; he underwent five surgeries to try to correct his deformity; neighborhood boys taunted him because of his deformity, and his mother would console him; when he was still a small child, both his mother and his grandmother became very ill; his father was compelled to take a second job in order to support his family and pay medical expenses; he was sent to live with relatives, necessitating frequent changes in the schools he attended; his mother died when he was fifteen years old; he dropped out of school and worked a number of menial jobs while living in his father's house; he was only eighteen years old at the time he committed his capital offense.); *Satterwhite v. State*, 858 S.W.2d 412, 426 (Tex. Crim. App. 1993) (defendant presented extensive social history evidence in the punishment phase of his 1989 trial, including inadequate parenting, an alcoholic mother, below average academic ability, an IQ of 74, a history of delusions and hallucinations, and expert testimony that defendant was a chronic paranoid schizophrenic); *Zimmerman v. State*, 860 S.W.2d 89, 101 (Tex. Crim. App. 1993) (1990 trial in which defendant presented mitigating evidence that he was twice abandoned as child, he was a victim of child abuse, he had a metal plate inserted into his skull at age 10, he had a low-average IQ, and he had been a good son to his adoptive mother); *Chambers v. State*, 866 S.W.2d 9, 27–28 (Tex. Crim. App. 1993) (1991 trial in which defendant's case in mitigation included evidence that his father never home, his father blew marihuana smoke in face, he lived in an atmosphere in which violence toward women was common, he only made it through the 10th grade in school, he had attempted suicide, he sought assistance from the Texas Department of Mental Health and Mental Retardation but had no received it, he almost froze to death and was found face down in the street, he had never been convicted of felony); *Elliott v. State*, 858 S.W.2d 478, 486 (Tex. Crim. App. 1993) (1987 trial in which defendant presented evidence that he had dropped out of school by the 8th grade, he was raised by single parent and grew up in a housing project, he was well behaved in jail); *Ex parte Kunkle*, 852 S.W.2d 499, 503 (Tex. Crim. App. 1993) (defendant was 18 years old at the time of the crime, used LSD and alcohol at time of crime, his father had been discharged from the military for depression, his mother had also been treated for depression, he was kicked out of the home for smoking marijuana, he weighed 189 pounds when expelled from his home but his weight dropped to 130 pounds—and he had sores on his face—after he was kicked out); *(Miguel) Richardson v. State*, 886 S.W.2d 769, 772–75 (Tex. Crim. App. 1991) (a history of kindness towards others, his artistic talent, child abuse by the defendant's father, testimony regarding racial strife in Oklahoma City and the effect of that strife on the defendant's emotional development, and a history of religious devotion and church membership)*; Ex parte McGee,* 817 S.W.2d 77, 79–80 (Tex. Crim. App. 1991) (*1984* capital trial that recounted a childhood during which defendant's mother abandoned him and his eight brothers and sisters when he was four, but collected a government check for the children in order to support a drug habit, two of his sisters became prostitutes to support themselves, his six-month-old sibling died from starvation, he was then placed in a foster home where he was beaten with a broom and an extension cord leaving him with physical scars and emotional problems, defendant suffered a brain injury at birth and had possible brain damage and mental retardation, he had an IQ of 66); *Delk v. State*, 855 S.W.2d 700, 709 (Tex. Crim. App. 1993) (defendant presented evidence in his 1986 trial of a turbulent family life history that included numerous parental marriages and divorces, paternal abandonment, death of step-father, abuse of both the defendant and his mother at the hands of another step-father, dropping out of school in the 6th grade, and being shuffled from home to home, including a stay in a boys' home); *Gribble v. State* 808 S.W.2d 65, 75 (Tex. Crim. App. 1990) (defendant presented detailed evidence from his troubled childhood, which chronicled an upbringing in poverty, during which his mother was institutionalized for severe mental illness and his father for burglary, Mr. Gribble was shuffled around from home to home for the first few years of his life until his mother came home, he then moved with his family into a shack without running water, within a few months his step-father abandoned the family (his mother was pregnant at the time), his mother was unable to care for children and spent much of her time in bars, his mother sexually abused him as a small

Cases in which life verdicts were returned also illustrate the prevailing professional norms of the mid-1990's.[7]  *See, e.g. Sloan v. State*, 1997 WL 110000, at *1 (Tex. App.-Hous. (14th Dist.) Mar. 13, 1997) (1993 Harris County trial in which the jury answered the mitigation issue in favor of the defendant).  Andre Sloan was an ex-convict who shot killed three people, "[a]ll were killed execution-style, face down on the floor" during a robbery.  John Makeig, *Man Who Killed 3 Drug Dealers is Spared Execution*, Houston Chronicle, Sept. 4, 1993, at A35 (available at http://www.chron.com/CDA/archives/archive.mpl?id=1993_1151301).  Sloan's lawyers

> portrayed their client as a pathetic figure with an 81 IQ who grew up doomed to a life of crime.  He was one of three sons born to a now-deceased drug dealer who had his children selling marijuana for him before they were teen-agers.
>
> In his last year at Kashmere High School, Sloan made a straight-F report card, except for one passing grade in physical education.  At age 17, he was reading on the second-grade level.

*Id*.  The jury foreman reported that "the panel, in its day-long deliberations, was able to determine Sloan is a continuing menace to society but felt there was *ample* 'mitigation' to bypass returning a sentence of death by injection."  *Id*. (emphasis added).

The detailed and varied evidence summarized in these opinions (many from Harris County) demonstrates the extent to which extensive social histories were collected

---

child, the defendant had severe mental illness, including depression and psychotic illusions, his history of abuse and mental illness was the cause of his violence towards women); *Lackey v. State*, 819 S.W.2d 111, 115–16 (Tex. Crim. App. 1989) (the defendant's father physically abused him and his mother, low IQ, troubled childhood, voluntary intoxication, and history of periodic drinking with blackouts).

[7] These highly instructive cases are difficult to identify because, even if the defendant appeals, the points of error are generally all related to the guilt/innocence phase and thus there is no description of the mitigating evidence presented during the punishment phase.

through punishment-phase investigation in Texas during the ten years or more preceding Mr. Sheppard's trial.  Texas capital defense teams, consistent with state and national prevailing norms, routinely investigated the client's life and presented the client's social history in mitigation.  And these cases were tried *before* the 1991 addition of the mitigation special issue gave Texas juries an adequate opportunity to give effect to mitigating evidence.

As the 1994 State Bar Materials and the CCA's ineffective assistance of counsel decisions make explicit, the 1991 addition of the mitigation special issue to Texas's sentencing scheme left no doubt that counsel had a duty to investigate all potentially relevant mitigating circumstances, and specifically the client's childhood and his mental and physical health.  These sources specified what attorneys should look for and even where to look.  They describe an investigation that begins at birth, or before, and documents the client's whole life.

At the time of Ms. Sheppard's trial, the prevailing professional norms required counsel to conduct a thorough mitigation investigation.  *See Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) ("It is unquestioned that under the prevailing professional norms at the time of Porter's [1988] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'") (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).  *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) (investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the

prosecutor"); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing to 1989 ABA Guidelines to establish prevailing professional norms in 1989 capital trial).  The Texas and national practices reflect "well-defined norms" for mitigation investigation, and thus the floor below which counsel may not descend.  *Wiggins*, 539 U.S. at 524-25; *Rompilla*, 545 U.S. at 380.

The Texas standard of care is reflected in the ABA Guidelines specifying that counsel should investigate the defendant's full history, including "medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); . . . family and social history (including physical, sexual or emotional abuse)."  1989 Guideline 11.4.1.D.2.  Counsel must also interview "witnesses familiar with aspects of the client's history that might affect the . . . possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death."   1989 Guideline 11.4.1.D.3.   Counsel's duty "is not discharged merely by conducting a limited investigation."  *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007).  Counsel must "seek records, interview family members and friends, and obtain appropriate mental evaluations well in advance of trial." *Poindexter v. Mitchell*, 454 F.3d 564, 579 (6th Cir. 2006).

Termination of mitigation investigation is only appropriate in the context of an informed decision, after a thorough investigation.  *Rompilla*, 545 U.S. at 395; *Wiggins*, 539 U.S. at 527–28.  Even if counsel performed some investigation, that does not preclude a finding of deficient performance with respect to further investigation they

reasonably should have done under the circumstances. *Rompilla*, 545 U.S. at 388–89; *Wiggins*, 539 U.S. at 527, 534.

Federal courts, even under the deferential scheme of the AEDPA, should scrutinize claims of strategy in light of a close reading of the record and a state court finding of strategic purpose for an omission should be disregarded if it cannot withstand such scrutiny. *Wiggins*, 539 U.S. at 526-27.

The duty to investigate and prepare for the punishment phase also includes rebutting the prosecution's case in aggravation. Counsel must, at a minimum, secure the information in possession of law enforcement. *Rompilla*, 545 U.S. at 385-87.

Further, under the circumstances of this case, counsel had an obligation to secure the assistance of experts in a capital trial. 1989 ABA Guideline 11.4.1 ("Counsel should secure the assistance of experts where it is necessary or appropriate for . . . presentation of mitigation");; *Sears v. Upton*, 130 S.Ct. 3259, 3264 (2010) (holding trial counsel ineffective, in part, for failing to present expert testimony that could have helped jury better understand defendant in a 1993 capital trial because "[c]ompetent counsel should have been able to turn some of the adverse evidence into a positive"). Here, that duty was heightened because counsel represented to the trial court that expert assistance was necessary to effectively prepare for the punishment phase, and the trial court *agreed and authorized funding for an expert*.

### b.   Trial counsel failed to perform the necessary investigation.

None of Ms. Sheppard's trial attorneys investigated or developed mitigation evidence or testimony for use in the sentencing phase of Ms. Sheppard's trial. Brown

Affidavit, App. 1, ¶¶ 40, 42, 54; Bolden Affidavit, App. 2, ¶¶ 34, 35; Woldy Affidavit, App. 3, ¶ 5. *See also* Habeas Tr. 9-2-08, 9-3-08.

The investigator hired by attorney Brown, John Castillo, conducted some interviews relevant to mitigation.  Brown Affidavit, App. 1, Ex. A.  However, attorney Brown did not follow up on Mr. Castillo's investigation, and neither attorney Bolden nor attorney Woldy met with Mr. Castillo at any time or interviewed any witnesses or potential witnesses regarding the case.  Brown Affidavit, App. 1, ¶¶ 16, 17; Bolden Affidavit, App. 2, ¶¶ 7, 34, 35; Woldy Affidavit, App. 3, ¶ 5. *See also* Habeas Tr. 9-2-08, 9-3-08.

Attorney Brown testified that:

- His representation as lead counsel for Ms. Sheppard was the first time he was primarily responsible for the representation of a defendant in a death case, and was the second such capital case in which he was ever involved.

- He did not consider Attorney Bolden qualified to serve in the role as second chair, and was disappointed with her appointment to that position.

- The Court did not grant his request for additional assistance until the time for investigation and trial preparation was exhausted, and the jury selection process had been underway for several days; Attorney Woldy did not begin participating in the defense until the day that trial began.

- Neither Attorney Bolden nor Attorney Woldy met with investigator John Castillo at any time during the representation of Ms. Sheppard.

- He did not provide either Attorney Bolden or Attorney Woldy with Mr. Castillo's report.

- Neither Attorney Bolden nor Attorney Woldy interviewed any witnesses or potential witnesses regarding the case.

- It is his practice when serving as first chair trial counsel in a capital murder case to rely on his second chair counsel to conduct a significant portion of the jury voir dire, and to be responsible for the investigation and development of mitigation evidence and testimony to be presented during the sentencing phase of the trial.

- Attorney Bolden was unable to conduct any effective voir dire or to assist in the selection of the jury.

- Attorney Bolden did not investigate or develop mitigation evidence or testimony for use in the sentencing phase of Ms. Sheppard's trial.

- Each time that he consulted with Ms. Bolden regarding any decision in the handling of the case, Ms. Bolden simply responded that she thought he should do whatever he thought was best. She was unable to offer any input into the development of trial strategy or the handling of any witnesses or evidence.

- Ms. Sheppard was the first capital murder defendant for whom he served as first chair trial counsel and hers was only the second capital murder case in which he was ever involved. Attorney Bolden was unable to assist in the case in any meaningful way. Attorney Woldy was not appointed until trial was underway and was therefore unaware of the facts and witnesses that were not presented at trial.

App. 1, ¶¶ 8, 14-17, 40-43, 53. Attorney Bolden testified that:

- Prior to her appointment in the Sheppard case, she had never represented a defendant in the trial of a death penalty case.

- From the time of the appointment in the Sheppard case, she was not excited that I would be working under Charles Brown. She did not believe that Mr. Brown had the knowledge skill and experience to be lead counsel in a case of this magnitude.

- Mr. Brown did not provide her with a copy of or advise her of the content of investigator John Castillo's report at any time, even after the trial had commenced.

- She did not interview any counselor or attendant who personally treated Erica Sheppard during her admittance to the Covenant House runaway shelter at any time prior to the trial of the Sheppard case.

- She did not interview any counselor or attendant who personally treated Erica Sheppard during her admittance to the Matagorda Women's Crisis Center at any time prior to the trial of the Sheppard case.

- She did not participate in the investigation and trial preparation for the Sheppard case. Mr. Brown did not assign to her any responsibility for investigation or case preparation.

- Mr. Brown did not assign to her any responsibility for developing evidence or testimony of mitigating factors for use in the sentencing phase of the Sheppard case, and she did not investigate or develop any such testimony or evidence.

- She was not involved with the selection of Dr. Priscilla Ray as a testifying expert witness, and did not interact with Dr. Ray during her representation of Ms. Sheppard.

- She did not interview any witnesses or potential witnesses for the Sheppard case, and she was not aware of Mr. Brown having interviewed any witness or potential witness.

App. 2, ¶¶ 4, 5, 7, 32-36, 39.  Attorney Woldy testified that:

- On February 27, 1995, after jury selection had begun, she was appointed to represent Ms. Sheppard and to assist Attorney Brown as third chair trial counsel during the remainder of the trial proceedings.

- She did not ever see the report of investigator John Castillo, and was not aware of the investigation.

- She did not interview any witnesses or potential witnesses regarding the case.

- She did not observe Attorney Bolden to conduct any meaningful role in the defense of Erica Sheppard.  Throughout the trial, on those few occasions when she observed Attorney Brown to seek input or suggestions from Attorney Bolden, Ms. Bolden responded only that Mr. Brown should do whatever he thought was best.

- It is her opinion as an experienced criminal defense attorney who has handled capital murder cases that an attorney appointed to handle a case that he views as a high pressure one requiring the attention of two attorneys should request that the court appoint a qualified second chair attorney.

- A lead attorney in such a case should also request the replacement of any second chair that he considers not up to the task of assisting in the investigation, preparation, and trial of the case.

- An attorney in such a circumstance whose request for sufficient assistance by capable counsel is denied by the court should place his unfulfilled request for additional assistance on the record of the case.

App. 3, ¶¶ 3, 5, 7, 10, 19.

Attorney Brown testified at the state habeas hearing to his lack of diligence in investigating and presenting mitigating evidence during the punishment phase of the trial, admitting he was aware before trial that:

- Ms. Sheppard had been physically and verbally threatened by Dickerson on the day of the incident (2 W.H. 4-15);

52

- Ms. Sheppard had been sexually molested at five or six years of age by the boyfriend of a baby-sitter, and that her mother denied the truth of the claim (2 W.H. 21-24, 53:18-54:2);

- Jerry Bryant, Jr. was the father of Ms. Sheppard's third baby and that she had suffered physical abuse from him such that two police reports were made at the Houston Police Department (2 W.H. 44:25-45:5); and

- Ms. Sheppard had reported to Dr. Priscilla Ray, the appointed psychiatrist, a family history of depression in her mother (2 W.H. 57:15-24).

Notwithstanding this admitted knowledge by trial counsel, the only evidence of the foregoing highly relevant mitigation factors presented to the jury came in the form of a five-page report by Dr. Priscilla Ray, the appointed medical expert, which recited in skeletal fashion the foregoing facts gleaned from Dr. Ray's single interview with Ms. Sheppard before trial. Although they had personal knowledge of the relevant facts and were available to testify, neither Ms. Sheppard, Ms. Sheppard's mother, Madelyn McNeil, nor her brother, Jonathan Sheppard, were presented at trial. 2 W.H. 77:22-24 (Erica Sheppard); 2 W.H. 71:19-72:6 (Madelyn McNeil); 2 W.H. 61:19-62:15 (Jonathan Sheppard).

Moreover, Mr. Brown admitted at the state habeas hearing that he did not ask Dr. Ray or Annie Smith, Ms. Sheppard's grandmother, questions regarding Ms. Sheppard's history of abuse, her pregnancies and abortions, or her or her family's history of mental illness when he presented them to testify at the sentencing trial. 2 W.H. 162:9-25 (Dr. Ray); 2 W.H. 160:16-162:8 (Annie Smith). Mr. Brown also testified at the habeas hearing to his failure to engage experts to assist him in investigating and preparing the case for trial. He testified that he did not consult with or seek the assistance of any of the following experts:

- A mitigation expert (2 W.H. 86:9-23);
- A social worker (2 W.H. 86:24-87:3);
- A neurologist (2 W.H. 90:9-11, 15-17);
- A neuropsychologist (2 W.H. 90:12-14, 18-20);
- An expert on the impact of child abuse (2 W.H. 90:21-25, 91:21-24);
- An expert on the impact of spousal abuse (2 W.H. 91:25-92:11);
- An expert on the impact of trauma (2 W.H. 92:12-23); or
- An expert on posttraumatic stress disorder, or PTSD (2 W.H. 92:24-93:9).

Mr. Brown testified that the only "professional person" he sought help from was Dr. Ray, and he considered it "part of her duties" to examine Ms. Sheppard on the impact of child abuse.  2 W.H. 87:2-3, 90:21-25, 91:21-24.

It is clear from the testimony of trial counsel that the team was inexperienced and dysfunctional and–despite numerous flags for necessary social history investigation–nobody did the requisite punishment phase investigation.  Moreover, in the absence of an adequate investigation, counsel could not provide their expert with crucial materials or ask the appropriate referral questions.  This also meant that counsel could not get critical social history documents into evidence because they either did not have the appropriate witnesses or because they did not provide them to a testifying expert witness.  As a result, counsel failed to investigate and adequately prepare to meet the State's aggravating evidence.

### c.    Trial counsel's performance was deficient in numerous other respects.

In addition to their failure to conduct a reasonable investigation regarding Ms. Sheppard's history of sexual abuse, physical abuse, neglect and domestic violence and to present mitigating evidence even though considerable evidence existed, counsel's performance was also deficient in at least the following respects.

### i.      Trial counsel failed to present the First Special Issue to the jury in any meaningful or coherent manner.

At the guilt/innocence phase of her trial, Ms. Sheppard's attorneys failed to present any evidence of any defense, including the duress defense for which evidence was readily available.  Thus, defense counsel knew that the first special issue of possible future dangerousness would be crucial to Ms. Sheppard's chances of avoiding a death sentence.  Yet, at the sentencing phase, there was a complete failure to present any coherent theory to support a negative answer on this issue, leaving the jury with nothing but the prosecution's unchallenged, flawed analysis of this issue on which to base their finding.

As shown herein, the only expert called by any party in the sentencing phase, Dr. Priscilla Ray, was completely ineffective as a "future dangerousness" expert.  *See* § III.A.1.c.ix, *infra* herein.

But there was another factor involved in the failure at the sentencing phase. Defense counsel failed to place the first special issue in any conceptual framework other than the one presented by the prosecution.  Their failure to adduce evidence that shows that Ms. Sheppard would actually be a low statistical risk for future acts of violence, and to place a life sentence in any meaningful context, meant that the jury was not given the means to make the kind of rational, informed decision envisioned in the *Strickland* standard for effectiveness of counsel.  An examination of the closing arguments by defense counsel demonstrates an almost total lack of attention to the future dangerousness issue.  Attorney Bolden did not mention future dangerousness at all.  SF 27:19-27. Attorney Brown's final argument was scarcely better, as he questioned whether

Ms. Sheppard would be a threat to anyone in thirty-five years in the penitentiary (which statement drew an objection the trial court sustained, despite the trial court's earlier ruling in the case allowing discussion of the thirty-five year minimum sentence (Tr. 71-90), and stated that:

> They cannot prove probability.  They brought no evidence to prove to you probability of over 51 percent.  While she has been incarcerated, she has not.

SF 27:37-38.

For its part, the prosecution went out of its way to disparage Dr. Ray's report, arguing that "based on the limitations in her examination of the defendant and her lack of familiarity with this case . . . her evaluation isn't worth the paper it's printed on." SF 27:15-16.    Additionally, prosecution argument characterized Ms. Sheppard as a "jackal" and a "predator," stating that "I tell you, as God as my witness, that this woman deserves death by lethal injection without a doubt because she is nothing but a hunter." SF 27:47, 50.    Plainly, in the absence of any meaningful evidence of future dangerousness from the defense, the prosecution was free to argue and develop the theme that Ms. Sheppard would be dangerous in the future.  This argument and analysis was fundamentally flawed, as the Cunningham Affidavit shows.  *See* Cunningham Affidavit, App. 6; *see also* § III.A.1.c.ix.b., *infra* herein.

### ii.    Trial counsel failed to present evidence that Ms. Sheppard was under duress preceding, during, and after the crime.

Having failed to present Ms. Sheppard's only viable defense, duress, during the guilt/innocence phase of the trial, counsel compounded the error by again failing to present that evidence in the sentencing phase.

There was no plausible strategic reason for omitting her testimony or other evidence pertinent to a duress defense from the guilt/innocence phase. No perceived difficulty in the presentation of a defense can justify a decision to present no viable defense theory at all for a client who has pled not guilty. Moreover, in the face of a conviction, counsel was presented anew with the opportunity to present the duress evidence to persuade the jury to spare Ms. Sheppard's life. Counsel failed to do so.

The defense case in the sentencing phase was very brief. Records custodians from Covenant House and the Matagorda Women's Crisis Center were called, and redacted records were offered in evidence. As a result, the jury learned only that Ms. Sheppard had been admitted to these facilities: it did not learn why. No counselor from either facility was called to testify. No evidence was offered regarding Ms. Sheppard's physical, emotional, or mental state at the time of admission or at any time while at either shelter. A psychiatrist who examined Ms. Sheppard on one occasion gave brief testimony. A nurse from Bay City and Ms. Sheppard's grandmother, Annie Smith, each testified for a few minutes. These witnesses did not relay facts to demonstrate that Ms. Sheppard would not have been in Marilyn Meagher's apartment on June 30, 1992 but for James Dickerson's threats to harm Ms. Sheppard and her infant if she resisted going with him. They were not questioned regarding Ms. Sheppard's or Dickerson's behavior during the interval between the crime and the arrest.

For the same reasons expressed in § III.D., *infra*, counsel was ineffective in failing to present Ms. Sheppard, other fact witnesses, other evidence, and expert testimony on duress in the sentencing phase of the trial.

### iii.     Trial counsel failed to call Jerry Bryant, Jr. as a witness.

Jerry Bryant, Jr. was Ms. Sheppard's common law husband and the father of her youngest child, Audria.   Bryant was also the co-defendant named with Ms. Sheppard in the unadjudicated charge of attempted murder about which the State presented significant testimony in the sentencing phase of the trial.   And, Bryant was one of the several people who visited Ms. Sheppard and Dickerson in Bay City during the time between the murder of Marilyn Meagher and the defendants' arrests.   Bryant had personal knowledge of Ms. Sheppard's social history, including his abuse of her, her care of their child, and her family and community relationships.   He also had observed her demeanor and that of Dickerson during the period following the crime.   And, Bryant had personal knowledge about the alleged prior unadjudicated offense that formed the cornerstone of the State's request that the jury sentence Ms. Sheppard to death.

Trial counsel subpoenaed Bryant, but failed to call him to testify.   This was ineffective. *See* Charlton Affidavit, App. 7.

Paula Allen testified for the State in the sentencing phase.   She told the jury that she was in a car driven by Ms. Sheppard from which Jerry Bryant, Jr. shot Wayland Ray Griggs in November 1991.   The State argued to the jury that it should conclude, based on Paula Allen's testimony, that Ms. Sheppard was involved in an attempted murder prior to the crime against Marilyn Meagher and was therefore a person who would pose a continuing danger to society if sentenced to life in prison.

Jerry Bryant, Jr. is Paula Allen's former common law husband; the two have five children together.   Bryant had knowledge of Allen's previous statements regarding the

alleged drive by shooting, including the sworn statement in which she had previously admitted that she did not witness Griggs' injury, did not see Ms. Sheppard or Bryant on the evening of the shooting, and had lied about being a witness because she was angry with Bryant.

> ### iv.   Trial counsel failed to move for mistrial on the basis of the prosecutor's threats against Jerry Bryant, Jr.

It may be impossible to determine whether a fair trial was possible following the prosecutor's threat to bring the strong arm of the law down upon Jerry Bryant, Jr. if he testified.  Had Bryant been called, his testimony may well have been less certain than it would otherwise have been.  It was likely not possible to erase the taint of Assistant District Attorney Goodhart's improper suggestion that this witness, although he had not been charged with any wrongdoing as a result of his visits to Ms. Sheppard and Dickerson at the Bay City Econo Lodge on July 1-2, 1993 in the twenty months since, would be indicted for that behavior if he took the stand.

Counsel should have sought a mistrial if Bryant's testimony was either not obtained or at all equivocal.  Counsel's failure to do so was ineffective.

> ### v.   Trial counsel failed to investigate, adequately cross-examine the State's witnesses, or present defense evidence regarding the alleged unadjudicated offense of the attempted murder of Wayland Ray Griggs.

Defense counsel was advised by the district attorney before trial that the unadjudicated attempted murder charge regarding Wayland Ray Griggs would be presented at trial.  Tr. 151.  Nonetheless, counsel did not prepare to meet that evidence.

Lawrence P. Gwin, Jr. represented Ms. Sheppard in connection with the alleged drive by shooting. Attorney Gwin's affidavit reflects that he possessed knowledge about the charge and its dismissal, as well as the affidavit of Paula Allen in which she swore that she had no personal knowledge of the shooting. Attorney Gwin was never contacted by counsel, and did not learn of the capital murder charge against Ms. Sheppard until he was contacted by post-conviction counsel in June 1998.

Gwin was available and would have been willing to testify. *See* Gwin Affidavit, App. 5, ¶ 10. Trial counsel's failure to contact Attorney Gwin and even to investigate his knowledge was ineffective.

The record reflects that Attorney Brown's cross-examination of Paula Allen was, at best, cursory:

> Q.    (by Mr. Brown)  Now, you had the opportunity to go to the police about this; isn't that true?
>
> A.    Yes.
>
> Q.    And you made one statement to the police originally; isn't that true?
>
> A.    Yes.
>
> Q.    Then you had an opportunity very shortly after that to go back to the police and made another statement; isn't that true?
>
> A.    Yes.
>
> Q.    And, in fact, that case against Jerry Bryant and Erica Sheppard was dismissed, wasn't it?
>
> A.    Yes.
>
> Q.    And that was based on your testimony; isn't that true?

> A.    Yes.
>
> Q.    Because you were, in fact, lying about what happened
>        the original night; isn't that true?
>
> A.    No, sir.

SF 25:89-90.

Trial counsel failed to introduce the content of the sworn affidavit of Paula Allen in which she testified, "I did not see Erika [sic] Sheppard or Jerry Bryant, Jr. the night of the shooting.  I did not see Mr. Griggs the night of the shooting.  I do not know who shot Mr. Griggs."  Gwin Affidavit, App. 5, Ex. A.  The jury did not learn that Ms. Allen had testified under oath that she was nowhere in the vicinity when Griggs was shot.  And, the jurors did not hear that Ms. Allen swore that she and had previously given a false statement to the police because she "was angry with Jerry" but that "I will testify on the stand if the case comes to trial [that I did not witness Griggs' shooting.]."  *Id*.

Counsel's cross-examination of Paula Allen was ineffective because of what it omitted.

Trial counsel's failure to call Jerry Bryant or to investigate Vincent Perry's possible testimony *(see* Paula Allen Affidavit, Gwin Affidavit, App. 5, Ex. A) regarding the Griggs shooting was also ineffective.

>   **vi.    Counsel failed to admit the testimony of Ms. Sheppard's
>            grandmother, Annie Smith, regarding her opinion of
>            Ms. Sheppard's future dangerousness if she were sentenced to
>            life imprisonment.**

In overruling Ms. Sheppard's direct appeal complaint regarding the exclusion in the punishment phase of the "future dangerousness" testimony of Annie Smith,

Ms. Sheppard's grandmother, the CCA recognized the merit to Ms. Sheppard's argument but held that the claim was not preserved for appellate review because no offer of proof was made at trial.  Op. 15.

Counsel's failure to admit the testimony or preserve the error for appellate review is ineffective assistance, entitling Ms. Sheppard to a new trial.  *Strickland*, 466 U.S. at 694; *Ex. Parte Drinker*, 821 S.W.2d at 956.

> **vii.    Counsel failed to admit mitigating evidence in the punishment phase regarding Ms. Sheppard's experiences at the Matagorda County Women's Crisis Center and Covenant House.**

On direct appeal, the Court of Criminal Appeals affirmed the exclusion of mitigating evidence in the punishment phase from the Matagorda County Women's Crisis Center and Covenant House, holding that "At trial, appellant offered no exception or exemption under which her statements might be admitted into evidence."  Op. 16.

The Court of Criminal Appeals further noted that Ms. Sheppard's counsel had not argued at trial that the excluded evidence was not hearsay on the ground that it was not offered for the truth of the matter asserted.  Op. 16,  n.6.  Nor did counsel argue any other hearsay exception, such as Rule 803(3).

Counsel's ignorance of applicable rules of evidence is ineffective assistance, entitling Ms. Sheppard to a new trial.  Moreover, the application of state rules of evidence to exclude relevant testimony in the punishment phase of a capital trial violates due process and denies the defendant a fair trial.  *Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 2151-52 (1979).

### viii. Counsel failed to admit the testimony of defense witness Patrice Green at the punishment phase or to make a bill of exception or offer of proof.

In his examination of Ms. Green at the punishment phase, Ms. Sheppard's trial counsel was unable to formulate proper questions to the witness to establish that Ms. Sheppard did not have a criminal record and that Ms. Sheppard had a good reputation in Bay City.  SF 26:71-73.

Counsel's inability to even ask a nonobjectionable question on issues of such importance as mitigating evidence is ineffective assistance, entitling Ms. Sheppard to a new trial on punishment.

In addition, the Court of Criminal Appeals held on direct appeal that counsel's failure to make a bill of exception or other offer of proof prevented the Court from assuming "that Green's testimony would, in fact, have constituted potentially mitigating evidence."  Op. 17.  In this respect, counsel again rendered ineffective assistance.

### ix. Defense counsel's failure to provide an adequate life history of Ms. Sheppard and to submit the correct referral questions to Dr. Ray resulted in Dr. Ray's failure to perform a reasonably competent examination of Ms. Sheppard.

The failure of defense counsel's psychological expert to perform a reasonably competent examination of Ms. Sheppard resulted in a violation of her right to due process as well as her rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and similar provisions under Texas law.  *Ake v. Oklahoma*, 470 U.S. 68, 74, 105 S. Ct. 1087, 1091 (1985).

### a. Dr. Priscilla Ray's cursory pre-trial evaluation of Ms. Sheppard (Appendix 24)

In the instant case Ms. Sheppard's constitutional entitlement arose by virtue of state-appointed trial counsel's use of Priscilla Ray, M.D. as the expert upon whom counsel depended for a full psychological examination of Ms. Sheppard.

In her affidavit filed in this case on October 4, 2011 (App. 24), Dr. Ray confirms the limited scope of her work on this case. Dr. Ray testified that she was contacted by attorney Brown to conduct a psychiatric evaluation of Erica Yvonne Sheppard. Ray Affidavit, ¶ 4. Mr. Brown asked her as a psychiatrist to evaluate Ms. Sheppard's competency and sanity, as well as to evaluate whether Ms. Sheppard was likely to be influenced by men who were in a position to be abusive. *Id*. Mr. Brown did not request that Dr. Ray evaluate Ms. Sheppard with any psychiatric diagnosis, and she therefore limited the scope of her evaluation to those three impressions: sanity, competence and influence of potentially abusive men. *Id*. Dr. Ray recorded her impressions of her two-hour clinical evaluation of Ms. Sheppard in her Clinical Evaluation report dated November 30, 1994. *Id*.

Dr. Ray's clinical evaluation of Ms. Sheppard was not intended as a medically diagnostic interview, and Dr. Ray did not engage in clinical, diagnostic inquiries as she would typically perform for a medically diagnostic evaluation. *Id*., ¶ 5. Dr. Ray's focus was on competency and sanity, which is a different referral question and medical evaluation than one focused on diagnosing psychiatric conditions. *Id*. If Mr. Brown had requested that she perform a medical diagnosis for Ms. Sheppard, Dr. Ray was qualified and capable of doing so at that time. *Id*. As a licensed psychiatrist with an active private

practice, Dr. Ray has regularly performed medical, psychiatric diagnoses of her patients since 1985.  *Id*.

Specifically, Mr. Brown did not ask Dr. Ray to provide a diagnosis regarding whether Ms. Sheppard suffered from post traumatic stress disorder ("PTSD") or any other trauma-related psychoses.  *Id*., ¶ 6.  One of the impressions that Dr. Ray did form, that Ms. Sheppard was more susceptible to threats by men who were in positions to be abusive, is not inconsistent with a PTSD diagnosis.  *Id*.  In order to diagnose a patient with PTSD with clinical certainty, Dr. Ray would have to evaluate specific criteria as detailed in DSM-IV.  *Id*.

If she had been asked to diagnose whether Ms. Sheppard suffered from PTSD or other trauma related psychosis, Dr. Ray was qualified and able to do so at the time she conducted her clinical evaluation in 1994.  *Id*., ¶ 7.  The criteria by which PTSD could be clinically diagnosed were published in 1980 by the American Psychiatric Association in the third edition of its Diagnostic and Statistical Manual of Mental Disorders (DSM-III) nosologic classification system (Davison & Neale, 1998), and revised in the DSM-III-R in 1987.  *Id*.  In 1992, the World Health Organization classified a substantially similar syndrome in the tenth edition of the International Statistical Classification of Diseases, Injuries, and Causes of Death (ICD-10, 1992).  *Id*.  Dr. Ray was familiar at that time with the DSM-III and DSM-III-R and the related professional literature.  *Id*.

As documented in her Report, Dr. Ray's examination consisted of a review of the medical records from Ms. Sheppard's treatment at the Harris County Jail as well as a clinical psychiatric interview lasting two hours.  *Id*., ¶ 8.  Because the scope of her

assignment was limited, Dr. Ray determined it unnecessary to conduct any additional interviews or review any other records. *Id.* Dr. Ray did not interview any family members, social workers, or other doctors who had provided previous medical attention. *Id.* Dr. Ray did not review and was not provided access to any of the following:

- Investigative Report of Investigator John Castillo

- Medical Records

- School Records

- Offense and Incident Reports

- Affidavits or Statements from any individuals

- Records from any Social Services organization, such as women's shelters

*Id.*

Ms. Sheppard was not appropriately evaluated by Dr. Ray. Due to trial counsel's failures to provide Dr. Ray with an adequate life history and to direct Dr. Ray into the proper areas of inquiry, Dr. Ray failed to provide defense counsel with any meaningful evaluative insight into Ms. Sheppard's psychological profile and history as it regarded the crime with which she was charged. *See* Clinical Evaluation of Dr. Ray, Defendant's Exhibit 4-B. Indeed, Dr. Ray's cursory report is little more than an opinion of Ms. Sheppard's post-conviction mood and general disposition. Rather than discussing the existence and magnitude of any psychosis affecting Ms. Sheppard, the effect of childhood sexual and physical abuse and neglect or the domestic violence to which Ms. Sheppard had been subjected, and other psychological indices relevant to Ms. Sheppard's actions and capacity at the time of the offense, Dr. Ray's examination

was simply geared toward determining Ms. Sheppard's mood and mental state at the time of the evaluation.

Dr. Ray's report concluded that Ms. Sheppard should be considered competent to stand trial and that Ms. Sheppard should be considered sane at the time of the alleged offense.  Defendant's Exhibit 4-B.  Additionally, Dr. Ray concluded that:

> Ms. Sheppard is, in my opinion, likely, because of her background, to be more susceptible to threats by men who are in a position to be abusive and to be more easily influenced in such situations.

*Id.*  Significantly, however, Dr. Ray's report contains no discussion or conclusions regarding the issue of Ms. Sheppard's future dangerousness.

When examined by defense counsel at trial, Dr. Ray was asked whether Ms. Sheppard would be a future danger to society.  SF 26:43.  She testified that several factors are considered in the determination, including the subject's current status, past events of violence, the nature of the crime the subject is currently charged with, and the overall statistical likelihood of dangerousness.  SF 26:43.  When specifically asked her expert opinion as to whether, based on her observations of Ms. Sheppard, Dr. Ray thought "it would be a probability" that Ms. Sheppard would continue to have acts of violence in the future, Dr. Ray stated that the probability is "less likely than 50 percent." SF 26:45-46.  Dr. Ray also testified that, if Ms. Sheppard were placed in the Texas Department of Corrections, there would be less than a fifty percent probability that she would be a continuing threat to that society.  SF 26:46.

When asked by defense counsel, Dr. Ray testified that no psychiatrist could accurately predict a person's future dangerousness.  SF 26:47.  In addition, when asked

whether there were any statistics regarding women and acts of violence in the penitentiary, Dr. Ray testified that, while she was sure there are, she was not familiar with them. SF 26:47. Defense counsel's direct examination of Dr. Ray is only nine pages long. SF 26:39-47.

If Dr. Ray had been given the tools with which to conduct a reasonably competent examination, she would have discovered numerous facts which would have been relevant to both the guilt/innocence and sentencing phases of trial. *See* Cunningham Affidavit, App. 6. She certainly would have testified as to the fourteen mitigation factors addressed in Dr. Cunningham's evaluation. Cunningham Affidavit, App. 6.

If Dr. Ray had conducted any investigation whatsoever of the psychological literature concerning future dangerousness, she would have learned what Dr. Cunningham has testified to: "Females have dramatically lower rates of serious violence both within prison and in the community. This is a well established finding in criminal justice." Cunningham Affidavit, App. 6 at 39. However, as Dr. Ray candidly admitted, she was not familiar with any statistics regarding women and acts of violence in the penitentiary. SF 26:47.

Additionally, during the sentencing phase, the above facts would have been relevant as mitigating circumstances and as bearing upon whether Ms. Sheppard acted "deliberately" at the time of the offense. The fact that Dr. Ray did not discover these facts -- or refer to Ms. Sheppard to someone who *could* discover these facts -- resulted in a tremendous misunderstanding of Ms. Sheppard's condition by the sentencing jury and violated Ms. Sheppard's right to due process and her rights under the Sixth, Eighth and

Fourteenth Amendments of the United States Constitution and similar provisions under Texas law.

In addition, expert testimony and evidence provided by habeas counsel shows even further the prejudicial limitations of Dr. Ray's report.  This expert evidence from Mark Cunningham, Ph.D., Myla H. Young, Ph.D. and Rebekah G. Bradley, Ph.D. addressed topics the significance of which was known at the time of Ms. Sheppard's trial. The testimony of Dr. Cunningham, Dr. Young and Dr. Bradley could and should have been put on before the jury as part of a reasonably competent examination, as it would have been relevant to both the guilt/innocence and sentencing phases of trial.

> **b.  Dr. Mark Cunningham's comprehensive analysis showed the many deficiencies in Dr. Ray's report and the failure of trial counsel to investigate and submit mitigating evidence (Appendix 6)**

As previously noted, Dr. Cunningham submitted a comprehensive analysis of this case in relation to the future dangerousness issue.   Cunningham Affidavit, App. 6. Dr. Cunningham analyzed factors in Ms. Sheppard's case that, had they been presented to the jury, would have allowed them to analyze the future dangerousness issue in a manner favorable to Ms. Sheppard.

In his analysis, Dr. Cunningham considered the four fundamental questions essential for a more relevant and precise assessment of future violence: (1) what violence?, (2) what severity?, (3) what context?, (4) what time period?  App. 6 at 31-34. Dr. Cunningham stated that Ms. Sheppard's gender is perhaps the most important individualized factor in determining the base rate likelihood of future violence.  *Id.* at 39. Dr. Cunningham also observed that Ms. Sheppard's continuing family relationships with

her children, her mother and maternal grandmother would be a factor "which reduces the incidence of both prison disciplinary and assaultive offenses." *Id*.

Dr. Cunningham, who reviewed extensive records and documentation in Ms. Sheppard's case, states in his evaluation that:

> There is conceptual and research literature regarding violence risk assessment and violence risk assessments of capital offenders which may have significant implications to the trier of fact both in avoiding misconceptions and error, and in approaching the capital sentencing risk assessment task with a greater degree of scientific understanding.   This literature may not be well known to psychologists who are   not routinely practicing in this particular risk assessment context.

Cunningham Affidavit, ¶ 9.   As part of his preparation in this case, Dr. Cunningham reviewed the report prepared by Dr. Priscilla Ray, the psychiatrist called by defense counsel at trial and noted:

> It is disturbing to note that blatantly inadequate time and resources appears to have been directed toward the identification, elaboration, or presentation of mitigating or risk assessment information and conceptualizations prior to her [Ms. Sheppard's] capital trial.   Dr. Priscilla Ray, defense psychiatrist, spent only an hour and a half in interviewing Erica.   An interview of this duration is insufficient to obtain a comprehensive and detailed history of the sort required in a capital sentencing evaluation.   This becomes quite apparent when it is considered that 14 significant factors were identified in the current preliminary evaluation as being potentially important in mitigation, in addition to numerous factors relevant to violence risk assessment.   In a 90 minute interview, Dr. Ray would have had only six minutes to elicit and develop a complete history of each factor, much less to clarify the personal impact, meaning and repercussions of each of these in Erica's life.   When it is noted that Erica's history involved repeated sexual victimization, the inadequacy of time spent in the social history/mental health/mitigation evaluation becomes starkly obvious.   The development of a complete history is essential if the jury is to understand both the adverse events and their formative significance in Erica's life.   It is additionally of concern that Dr. Ray did not contact family or other third parties who could have provided context and details of Erica's history that were influential but which Erica might not recall.   These individuals would also have been

important sources of external perspective on Erica's development, interaction patterns, and personality -- all of which are relevant both to mitigation issues and violence propensity.

Cunningham Affidavit, ¶ 10.   Dr. Cunningham points out in his evaluation that "[a]ctuarial or group statistic methods have been repeatedly described as not an adjunct to, but rather superior to clinical methods in predicting the behavior of individuals." Cunningham Affidavit at 30.   Dr. Ray's evaluation was a clinical evaluation and contained no actuarial or group statistic methods; indeed, Dr. Ray testified at trial that she was not familiar with the literature in the field regarding future dangerousness.  SF 26:47.

Dr. Cunningham's evaluation identified fourteen mitigating factors in Ms. Sheppard's case.  Cunningham Affidavit at 10.  Although a reasonable investigation by defense counsel would have uncovered this abundance in mitigating evidence, the record is silent on these factors:

1. Early life instability and unstable attachments;
2. Observed domestic violence;
3. Paternal abandonment;
4. Sexual abuse;
5. Physical abuse;
6. Learning disability;
7. Attention deficit disorder;
8. Sexual victimization by older males;
9. Teenage pregnancies;
10. Observed community violence;
11. Sexual assault;
12. Domestic violence victimization-battered woman's syndrome;
13. Post Traumatic Stress Disorder; and
14. Impact of Erica Sheppard's execution on her children.

Cunningham Affidavit at 10.

The facts and implications of each of these mitigating factors is addressed in detail in Dr. Cunningham's evaluation.   Cunningham Affidavit at 10-30.   None of the above evidence was brought out at the punishment phase, even though witnesses with personal knowledge were available and willing to testify.   *See, e.g.,* McNeil Affidavit, App. 8, ¶¶ 15-18; Smith Affidavit, App. 9, ¶¶ 7-9; Sheppard Affidavit, App. 14, ¶ 54.

c. **Dr. Myla Young's neuropsychological evaluation of Ms. Sheppard showed significant organic brain dysfunction and impairments (Appendix 25)**

Dr. Young is a clinical psychologist specializing in neuropsychology and neuropsychological assessments; she conducts neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients. Young Decl. (App. 24), ¶ 1-2. Dr. Young performed an examined neuropsychological evaluation of Ms. Sheppard to determine the presence (if any) and severity of organic deficits, and to render an opinion as to (1) whether and how such impairments would have affected her cognitive functioning throughout her lifetime up to the time of the offense and (2) to determine whether Ms. Sheppard's deficits would have been measurable with neuropsychological testing available at the time of her arrest and trial. *Id.*, ¶ 11.

Dr. Young conducted approximately 18 hours of neuropsychological evaluation of Ms. Sheppard over the course of 3 days on November 19-21, 2008. Id., ¶ 17. Observing that Ms. Sheppard "fully cooperated with the evaluation, gave her best effort on all tests, and made no attempt to manipulate, fake or exaggerate her abilities on neuropsychological testing," Dr. Young concluded that "she was expending her best efforts" in the evaluation and that the evaluation was thus "a valid and reliable assessment of Ms. Sheppard's brain functioning." *Id.*, ¶ 18.

Dr. Young assessed Ms. Sheppard's neuropsychological functioning by administering two neuropsychological batteries: (1) the Halstead-Reitan Neuropsychological Battery, which has been well-established since 1985, continues to be widely accepted in the scientific neuropsychological community, and has normative

standards specific to the Black population; and (2) a neuropsychological testing battery consisting of a series of independently selected, contemporary neuropsychological tests. Id., ¶ 22.  Dr. Young noted that all of the tests she administered "have documented and published reliability and validity, were appropriately standardized, are available to all qualified neuropsychologists, and are generally accepted in the scientific neuropsychology community." *Id*.  Dr. Young further noted that the independent tests administered, or an earlier version of the test, "were available at the time of Ms. Sheppard's arrest and trial." *Id*.

The neuropsychological tests administered to Ms. Sheppard included the following: 15 Item Test; Test of Malingering Memory (TOMM); Wechsler Adult Intelligence Scale (WAIS-IV); Test of Nonverbal Intelligence (TONI 3); Wechsler Individual Achievement Test (WIAT-11); Smell Identification Test (SIT); Grooved Pegboard Test (GPT); Conners' Continuous Performance Test (CPT); California Verbal Learning Test (CVLT-IS), including the Forced Choice subset; Wechsler Memory Scale (WMS-111); Rey Complex Figure Test; Executive Functioning Test (EFT); and Wisconsin Card Sorting Test (WCST).  *Id*., ¶ 23.  The Halstead-Reitan Neuropsychological Battery tests administered included Reitan-Klove Sensory-Perceptual Examination; Finger Tapping Test; Trail Making Test A; Trail Making Test B; Seashore Rhythm Test; Speech Sounds Perception Test; and Tactual Performance Test including Memory and Location Trials; Category Test. *Id*.  The tests also included a Detailed Assessment of Posttraumatic Stress (DAPS). *Id*.

Dr. Young reported that all of the test instruments "have been professionally reviewed, have published documentation of acceptable reliability and validity, can be purchased by qualified neuropsychologists and are generally accepted within the neuropsychological community." *Id.* In addition, Dr. Young testified that, with respect to all of the tests (or their predecessor editions), the methodology and the research on which she based her conclusions "were available, accepted in the professional community, and valid at the time of Ms. Sheppard's arrest in 1993 and trial in 1995." *Id.*

Dr. Young reported that Ms. Sheppard's intellectual functioning is in the "Low Average Range," which means that her general mental ability is "lower than 90% of others her same age." *Id.*, ¶ 26. While individuals with general mental ability at this level are "typically able to function in society," they are psychologically "vulnerable to emotional dependency" and "often assume a passive role in interpersonal relationships, avoid emotional decision-making, have limited coping abilities, are easily disorganized, and are vulnerable to 'psychological overload.'" *Id.* Socially, individuals at this level of mental ability are "typically immature and somewhat incompetent." *Id.* They are "easily swayed by peer influences, tend to misunderstand the nature and/or depth of a relationship, tend to use faulty social judgments, have a strong need to look 'okay' even when they are not 'okay,' often do not know that they need help, and when they recognize the need for help often are reluctant to ask for that help." *Id.* Dr. Young reported that when circumstances are "atypical, are particularly complex, unclear, have multiple choices of ways to respond, have multiple choices of ways to change actions once those actions are started, and/or are highly stressful or emotional," individuals with

this general mental ability "are often unable to function adequately" and "tend to misinterpret the situation, make ineffective plans, make poor decisions, use poor judgment, and are unable to change or make changes in their responses to accommodate changes in the situation when change is indicated and needed." *Id.*, ¶ 28.

Dr. Young summarized her findings and conclusions as follows:

a.    Ms. Sheppard's general intellectual ability is in the Borderline to Low Average Range, and lower than 90% of individuals of her same her age and education. Her mental age equivalence is 14.0 years of age. (*Id.*, ¶ 59).

b.    In simple situations, and with episodic help from others, Ms. Sheppard would be expected to be able to function adequately-living independently, enjoying some social, interpersonal, and family relationships, and employed in a job if that job is consistent with her abilities. In simple situations Ms. Sheppard's ability to comprehend and use reasonably good judgment would typically be adequate. (*Id.*).

c.    In situations which are novel, demanding, unclear, require simultaneous consideration of several pieces of information in making decisions and require good judgment, however, Ms. Sheppard would be seriously compromised and would be vulnerable to making bad decisions and using bad judgment, unable to change her actions when the situation demanded a change. (*Id.*).

d.    In emotional situations which are not threatening, not complex, and do not require a great deal of emotional independence, individuals who have this level of general mental ability are generally able to maintain adequate interpersonal and social relationships. In reasonably simple relationships and situations, Ms. Sheppard's psychological functioning could be adequate. In emotional relationships and situations which are complex or demanding, however, Ms. Sheppard would not be expected to function adequately. She would tend to be more emotionally dependent on others, and to seek out another to make emotional decisions for her. In situations which are emotionally complex, or in situations which threaten loss of her emotional support, Ms. Sheppard would be seriously compromised, and would tend to make unreasonable decisions that are not in her best interest, tend to use poor judgment, and tend to be unable to use the good judgment to move to another relationship. (*Id.*, ¶ 60).

e.    The brain dysfunction that Ms. Sheppard experiences, however, is greater than can be accounted for by her limited general mental ability alone. Ms.

Sheppard experiences impaired motor coordination, attention and concentration, memory and learning, visual-perceptual-motor, secondary language (arithmetic), and executive functioning. Her abilities on neuropsychological testing indicate brain dysfunction for Ms. Sheppard that affects all brain regions, but with the most severe dysfunction in the prefrontal cortex, temporal cortex, adjacent extended limbic system structures (amygdala hippocampus, thalamus), and connections among these systems (orbitofrontal, frontal-subcortical, hippocampal connection systems). (*Id.*, ¶ 61).

f.     The prefrontal cortex mediates reasoning, simultaneously considering several pieces of information, problem-solving, planning, assessing the circumstances of the situation, making considered decisions, anticipating consequences of actions, flexibly changing thinking and actions, inhibiting actions as needed, and regulating emotional experiences and responses. The temporal cortex, adjacent limbic system structures and connections among these systems primarily mediate emotional arousal, the ability to accurately interpret an emotional or stressful situation, memory and the ability to use memories of prior experiences to evaluate the current emotional or stressful situation. (*Id.*)

g.     Also of importance in understanding Ms. Sheppard's thinking and actions are the functional relationships among these brain structures. As an example, the primary functions of the temporal cortex and adjacent limbic system are to receive information that is potentially emotionally laden, to interpret and initiate response to this information ("fight or flight"), and to send messages to other brain regions that control actions in response to that emotion. One primary function of the frontal cortex is to receive emotional information from the temporal cortex and adjacent limbic structures, to organize, interpret and evaluate the meaning of that emotion, and to send information to other brain structures to either inhibit or excite (stimulate or set in motion) action. In other words, the temporal-limbic system is the metaphoric energy producing "ignition" of the brain, the thalamus is the metaphoric "engine" of the brain, and the frontal cortex is the metaphoric "steering" and "brake" of the brain. (*Id.*, ¶ 62).

h.     Ms. Sheppard's abilities across neuropsychological testing indicate that she experiences significant dysfunction of all of these brain systems (temporal, limbic and frontal). When presented with a complex, confusing, highly emotional and/or highly stressful situation, Ms. Sheppard would be vulnerable to confusion and misinterpretation, and vulnerable to the influence of others. She would be vulnerable to impaired abilities to assess a situation, reason, develop and evaluate a plan, anticipate consequences of the plan, simultaneously consider several pieces of information, assess and re-assess the situation, change the plan that she developed or refuse to carry

77

out a plan that was developed by another individual when information from the situation should tell her that refusal was needed. In a confusing, emotional and/or complex situation, Ms. Sheppard would be vulnerable to responding in a non-thinking, automaton-like way rather than as a thinking and reasoning adult. Once action is initiated, Ms. Sheppard's ability to re-evaluate the situation, anticipate the consequences and change her actions would also be impaired. (*Id*.).

i.    The brain dysfunction that Ms. Sheppard experiences is, unfortunately, consistent with her life history. Without help from others, Ms. Sheppard would not be able to function independently or adequately. (*Id.*, ¶ 63.).

j.    Ms. Sheppard's brain impairments would be known by any competent neuropsychologist who evaluated her offense and Ms. Sheppard at the time of her trial. Neuropsychological testing procedures that would have adequately detected Ms. Sheppard's brain dysfunction were available at the time of her offense and of her trial. (*Id.*, ¶ 64.).

Dr. Young stated in closing that she "would have advised trial counsel of these impairments." *Id.*, ¶ 65. Unfortunately, trial counsel undertook no investigation that would have disclosed these impairments. As a result, the jury was unaware of Ms.Sheppard's impairments.

> **d.    Dr. Rebekah Bradley's comprehensive clinical psychological evaluation of Ms. Sheppard showed that Ms. Sheppard suffered and suffers from three psychiatric disorders (Appendix 26)**

Dr. Bradley, an Assistant Professor in the Department of Psychiatry and Behavior Science at Emory University, is an expert on the impact of exposure to childhood abuse and other early adverse life events, the impact of trauma exposure across the life span and genetic and environmental predictors of posttraumatic stress disorder, depression and other mental and physical outcomes of trauma exposure. Bradley Affidavit (App. 26), ¶ 1. She is the director of a Veteran's Administration, multidisciplinary, outpatient, posttraumatic stress disorder (PTSD) treatment team, which is responsible for providing

assessment and treatment to veterans exposed to traumatic events while in military service. *Id.*

Dr. Bradley evaluated Ms. Sheppard with respect to her family, developmental and social background, and her history of childhood abuse and exposure to other adverse and traumatic events in childhood and adolescence. *Id.*, ¶ 2. Dr. Bradley evaluated the "potential impact of these factors on Ms. Sheppard in terms of her psychological and behavioral functioning with a particular focus on Posttraumatic Stress Disorder and associated symptoms." *Id.* She was asked to assess these factors "with respect to her psychological and behavioral functioning across her lifetime." *Id.*

Dr. Bradley conducted a 12-hour clinical interview with Ms. Sheppard on December 11-12, 2008. Id., ¶ 3. Dr. Bradley also conducted a 2-hour interview with Ms. Sheppard's mother on December 13, 2008. *Id.*

Based on her interviews and her review of case records, Dr. Bradley determined that "across the course of Ms. Sheppard's childhood and adolescence she experienced repeated physical and emotional abuse as well as sexual abuse/assaults." *Id.*, ¶ 7. Dr. Bradley further determined that:

> During critical developmental phases, she lived in an atmosphere of terror and fear that prevented her from experiencing and learning from healthy childhood experiences. In addition, while still an adolescent, at age 17, Ms. Sheppard experienced severe and repeated physical and verbal intimate partner violence. In addition to these multiple abusive and traumatic experiences, her early environment included a number of other adverse experiences and stressful circumstances. Due to their occurrence over the course of her neurobiological and psychological development, these events negatively impacted Ms. Sheppard's thoughts, beliefs, emotions and behaviors across the course of her lifespan.

*Id.* Dr. Bradley's report noted in detail the following aspects of Ms. Sheppard's life:

     a.     Childhood sexual abuse/sexual assault/rape (*Id.*, ¶¶ 8-19);

     b.     Childhood physical abuse (*Id.*, ¶¶ 20-30);

     c.     Witnessing violence between parents (*Id.*, ¶¶ 31-33);

     d.     Emotional neglect and abuse and unsafe and chaotic living arrangements (*Id.*, ¶¶ 34-40);

     e.     Mental illness and alcohol and drug use in Ms. Sheppard's family (*Id.*, ¶¶ 41-45);

     f.     Neighborhood/school violence during childhood and adolescence (*Id.*, ¶¶ 46); and

     g.     Domestic violence and intimate partner violence experienced by Ms. Sheppard (*Id.*, ¶¶ 47-55).

Dr. Bradley noted that a "comprehensive psychosocial history involves, when possible, the gathering collateral information from multiple sources including (but not limited to) interviewing or reviewing statements of family members and other people important in the life of the person being evaluated, reviewing any prior psychiatric records, reviewing records from other institutions with which the person being evaluated has been involved including schools records and in the case of Ms. Sheppard records from the battered women's shelter and records from the shelter for adolescents where she received services." *Id.*, ¶ 57.

Dr. Bradley noted that such an evaluation is important for multiple reasons:

> One of the reasons is to provide collateral support for symptoms and experiences being reported by the person being evaluated. Another reason, particularly in the case where trauma exposure and exposure to child abuse and neglect are involved, is that one of the impacts of traumatization and exposure to abuse and neglect is a tendency to

avoid talking about or reporting full accounts or important details of their experiences on trauma abuse and neglect.  There are a number of possible reasons for this.  One of these is that people often feel shame about their experience of trauma and abuse or about specific details of these experiences.   For example, in the case of Ms. Sheppard she clearly experienced shame with respect to aspects of the verbal and emotional abuse by her mother as well as with respect to aspects of her sexual assault at age 16.    Another is that remembering certain aspects of experiences of trauma or abuse can lead to increased physiological and psychological distress.  This was also case with Ms. Sheppard, who became visibly physically and psychologically distressed when my evaluation of her focused on some aspects of her past experiences of trauma and abuse.  This avoidance of thoughts and other reminders of such experiences is a symptom of posttraumatic stress disorder.  A third reason is that people often have difficulty remembering full details of traumatic experiences or even when they do have memory of details, these memories can be disorganized and difficult to relay to others.

*Id.*, ¶ 58.  With respect to Ms. Sheppard, Dr. Bradley stated that:

In my evaluation of Ms. Sheppard a number of her accounts of abuse reflected this type of disorganization.   A fourth reason, that is common in cases when a person has been exposed to child abuse or to other forms of ongoing interpersonal violence in the home, is that they do not know which parts of their experiences to report to others. For example, in cases of ongoing physical violence within families people will give a negative response to the question, "were you physically abused as a child" but when asked about specific experiences that constitute abuse they report them.  The reason for this discrepancy is not that they are lying when asked about their history of childhood physical abuse but that they do not recognize that the experiences they had constituted abuse.

*Id.*

Based on her assessment of Ms. Sheppard and her review of the materials provided to her, Dr. Bradley diagnosed Ms. Sheppard with three psychiatric disorders:

a.    Major depression, recurrent, severe with psychotic features, in partial remission (*Id.*, ¶¶ 71-75);

b.    Posttraumatic stress disorder (PTSD), prolonged (*Id.*, ¶¶ 71, 76-87); and

c.     Dissociative disorder, not otherwise specified (*Id*., ¶¶ 71, 88-91).

Dr. Bradley identified other of Ms. Sheppard's psychological and behavioral problems and coping responses, including the following:

a.     Hiding her emotions from others, while potentially protecting Ms. Sheppard in her home environment, likely led to difficulty in forming relationships with others who might look at the way she responded to them and believe that she was cold or uncaring (*Id*., ¶¶ 93-94);

b.     Acquiescing or cooperating rather than fighting back, which was apparent in Ms. Sheppard's description of her experiences and behaviors at the time of the crime at issue, in that she described believing that if she did not cooperate with James Dickerson or if she tried to leave or run away from him it would increase the danger and risk to herself and to her baby (*Id*., ¶¶ 95-97);

c.     "Learned helplessness," which is often used to understand the development of mental illnesses such as major depression as well as to understand why it is difficult for people to leave abusive relationships even when they have the opportunity; Ms. Sheppard's description of her thoughts, emotions and behaviors at the time of the crime at issues reflects a style of learned helplessness, and her narrative of the event reflected an inability to generate alternate solutions or behaviors and inability to act directly to protect herself or her infant at the time of the crime at issue (*Id*., ¶¶ 98-99);

d.     A damaged sense of self, resulting from persistent exposure to violence and abuse, in which Ms. Sheppard began to believe that she had qualities that would lead others to hurt her; she also described these beliefs associated with her behaviors and emotions during and after the crime at issue; in particular, this belief appears to have led her to believe that she and her daughter were at increased risk for harm at the hands of James Dickerson during and after the crime at issue(*Id*., ¶ 100);

e.     Her persistent exposure to interpersonal violence and abuse appears to have impacted Ms. Sheppard's perceptions of and beliefs about other people; she seems to have developed the belief that not only are other people untrustworthy, they are also likely to be dangerous to her and to attempt to hurt her; in association with this she appears to have developed the belief, also grounded in her experiences, that talking with and seeking assistance from others when faced with a danger or threat is not only unlikely likely to be helpful but also has the potential to exacerbate or worsen danger and harm (*Id*., ¶ 101);

f.      This belief was reflected in her descriptions of multiple experiences in her life; in particular it is reflected in her response to the violence and abuse by Jerry Bryant, Jr. and in her description of some her thoughts, emotion and reactions during and after the crime at issue (*Id.*, ¶ 102);

g.      These defensive styles that developed in the context of the abuse would have interacted with one another and compounded one another; as an example, her sense of herself as damaged interacted with her tendency to become emotionally numb; she described this process as, "I think don't nobody give a shit about me so I should just go away and not feel things;" the combination and interaction of these coping patterns appears to have occurred at the time of and after the crime at issue (*Id.*, ¶ 103);

h.      For example Ms. Sheppard appears to have combined the tendency to believe that others are likely to hurt her and her estimation of threat towards her by James Dickerson with a response reflecting learned helplessness and an overall belief that the best way to remain safe in the face of threat and danger is to cooperate and "go along" (*Id.*).

i.      Ms. Sheppard's mental/intellectual limitations, particularly the deficits in her executive functioning, are likely to have exacerbated the tendency to rely on these coping styles and reactions; although these deficits appear to have impacted her day to day functioning to some extent, they became even more notable when she was faced with complex problems or increased stress or threat; in these circumstances, she is significantly more vulnerable to behaving in an unplanned and impulsive manner (*Id.*, ¶ 104);

j.      Likewise, in the face of increased emotions or severe stress, she is less likely to be able solve problems or organize her behaviors in a logical or rational manner; she is also less likely to generate and follow thought out and effective plans of action; these problems of ineffective responding in the face of stress, a tendency to rely on longstanding but problematic coping responses, and poor ability to control impulses or act thoughtfully under stress, appear to have been present at least dating from late childhood and adolescence and to have been present prior to and at the time of the crime at issue. (*Id.*).

The failure of trial counsel and their appointed expert, Dr. Ray, to make any attempt to explore the subjects of the reports of Dr. Young and Dr. Bradley violated Ms. Sheppard's right to due process and her rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

> **x.      Counsel failed to object to the prosecutor's improper argument at the punishment phase regarding physical abuse of Ms. Sheppard.**

In its direct appeal Opinion, the CCA held that Ms. Sheppard's complaint regarding the improper argument was waived because no timely, specific objection was made at trial. Op. (App. 15) at 19.

Counsel's failure to object to such improper and prejudicial argument constitutes ineffective assistance. *Strickland*, 466 U.S. at 694; *Ex Parte Drinkert*, 821 S.W.2d at 956.

> **xi.     Counsel failed to complain at trial of the prosecutor's threats to a key defense witness.**

When the assistant district attorney told Mr. Brown that he would indict Jerry Bryant if Mr. Bryant testified, Mr. Brown did nothing. He did not bring the prosecutor's misconduct to the trial court's attention. Brown Affidavit, App. 1, ¶ 52. He did not call Mr. Bryant to testify. Brown Affidavit, App. 1, ¶¶ 50, 51. Despite the prosecution's urging to the trial court, he did not request a hearing outside the presence of the jury to determine on what issues, if any, Mr. Bryant might claim a Fifth Amendment privilege.[8] SF 25:5. He did not object when the prosecutor pointed out in closing argument that the

---

[8] At the beginning of the punishment phase, the prosecution asserted to the trial court that Mr. Bryant, if called as a defense witness, might wish to invoke his Fifth Amendment rights against self-incrimination and suggested that the trial court conduct a hearing outside the presence of the jury on this issue. SF 25:5. Mr. Brown did not request a hearing and did not call Mr. Bryant as a witness. SF 25:5. Brown Affidavit, App. 1, ¶ 51.

defense did not have any defense witnesses to support her claims of abuse.  SF 27:9.  In

fact, Mr. Brown did nothing to cure the prosecutor's misconduct.[9]

Because Mr. Brown failed to take any steps to remedy the prosecutorial

misconduct, Ms. Sheppard did not receive effective assistance from her counsel and is

entitled to a new trial.  *See Raney v. State*, 958 S.W.2d 867, 879 (Tex. App.--Waco 1997,

no pet.).

### 2. Counsel's errors and omissions prejudiced the defense at the penalty phase.

### a. The prejudice inquiry

Because counsel's preparation and presentation was so inadequate, they were left

with little to say about why the jury should answer the mitigation special issue "yes."  By

failing to conduct a social history investigation, Ms. Sheppard's counsel effectively

conceded this issue to the State, and with it the most fundamental Eighth Amendment

guarantee to emerge from the Supreme Court's post-*Furman*[10] capital punishment

jurisprudence: "our cases ha[ve] firmly established that sentencing juries must be able to

give meaningful consideration and effect to all mitigating evidence that might provide a

basis for refusing to impose the death penalty on a particular individual, notwithstanding

the severity of his crime or his potential to commit similar offenses in the future."  *Abdul-*

*Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).  Trial counsel's deficient performance

thwarted this critical function.

---

[9] Indeed, when the prosecutor delivered this threat to Mr. Brown, Mr. Brown immediately agreed with the prosecutor not to call Mr. Bryant to testify, stating "All right, we will do it your way."  Brown Affidavit, App. 1, ¶ 50; Leonard Affidavit, App. 4.

10 *Furman v. Georgia*, 408 U.S. 238 (1972).

Several principles guide this Court's prejudice analysis of Ms. Sheppard's punishment-phase ineffectiveness claim. First, when determining whether counsel's errors resulted in the required prejudice, a court must presume that the jury acted according to law. *Strickland*, 466 U.S. at 694. In other words, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id*. at 695. Therefore, not only does one presume that the decisionmaker followed the law, the law itself, *i.e.*, "the standards that govern the [sentencing] decision," must provide the context for determining whether a probability sufficient to undermine confidence in the outcome exists.

The prejudice inquiry is therefore a case-specific assessment of the effect trial counsel's deficient performance had on the reliability of a particular proceeding. In many death penalty states, sentencing laws require that the sentence in a capital case be determined by weighing aggravating factors against mitigating factors. If the jury determines that the mitigating factors outweigh the aggravating factors, the jury is instructed to return a verdict of life. If, however, the jury determines that the aggravating factors outweigh the mitigating factors, then the jury is instructed to return a verdict of death.[11] In these cases, "the question is whether there is a reasonable probability that,

_____

[11] *See, e.g.,* CAL. PENAL CODE § 190.3 ("the trier of fact . . . shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole"); FLA. STAT. ch. 921.141 (trier of fact must determine "[w]hether sufficient mitigating circumstances exist which outweigh the aggravating circumstances found to exist"); MD. CODE ANN., CRIMINAL LAW § 2-303(i)(1) ("If the court or jury finds that one or more of the mitigating circumstances . . . of this section

absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

A court reviewing an ineffective assistance of counsel claim in a Texas death penalty case, however, does not ask this precise question because the Texas capital sentencing statute does not require the jurors to engage in a weighing analysis. Instead, Texas asks jurors to answer two "special issues."[12] The special issues are fact questions that the jury must answer either "yes" or "no," and the jury's answers determine whether the defendant receives life or death.

The first special issue is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1). The second special issue is "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[13] Acts 1991, 72nd Leg., ch. 838, § 1 (1991) (amended 2005). If the jury answers the first special issue "yes" and the second special issue "no," the trial court must impose a sentence of death.

---

exists, it shall determine by a preponderance of the evidence whether the aggravating circumstances . . . of this section outweigh the mitigating circumstances.").

[12] In a minority of cases, the sentencing jury must answer three questions. The third question asks whether the defendant intended or anticipated loss of life. The jury is given this third special issue only when the jury was charged in the guilt phase under Texas's law of parties. *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(2).

[13] Texas has since amended the sentencing options in capital cases to death and life without parole. Accordingly, special issue two now asks whether sufficient mitigating circumstances exist to warrant that a sentence of "life imprisonment without parole rather than a death sentence be imposed." TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1).

For any other combination of answers—including the inability of the jury to unanimously agree on an answer for any question—the trial court must assess a sentence of life.  TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

The mitigation question is the most important question in Texas capital cases.  It contains the constitutionally-required mechanism giving jurors broad discretion to consider and give effect to the defendant's proffered mitigating evidence, by asking jurors to answer the bottom-line question whether "sufficient mitigating circumstance[s]" warrant withholding the ultimate punishment for a defendant who they have already determined beyond a reasonable doubt poses a continuing threat to society.

In light of the Texas sentencing scheme, the existence of prejudice turns on whether there is a reasonable probability that, absent counsel's errors, *one juror* would have answered the mitigation *or* future dangerousness special issue differently or not at all.  *Wiggins*, 539 U.S. at 537; *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003) (relevant question is whether totality of evidence "would have affected the sentencing decision of at least one juror").  Prejudice ensues whenever the totality of the mitigating evidence "might well have influenced [a] jur[or]'s appraisal" of the defendant's moral culpability.  *Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 538; *Williams*, 529 U.S. at 398.

Second, and relatedly, "[m]itigating evidence unrelated to future dangerousness may alter the jury's selection of the death penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."  *Williams v. Taylor*, 529 U.S. at 398.  This is especially true in Texas because the capital sentencing scheme poses the two separate

88

questions to the jury, and a judge may not impose a death sentence unless the jury unanimously answers both in the State's favor. Thus, even if the jury unanimously believes that the defendant will be a future danger to society, it still must answer the mitigation special issue.

Significantly, a Texas jury addresses this mitigation special issue *only* if it first unanimously finds that the defendant will pose a future danger. *See* TEX. CODE CRIM. PROC. art. 37.071, §§ 2(d)(2), (e)(1). Thus, in *every case* where the mitigation question is in issue, the jury will already have determined unanimously and beyond a reasonable doubt that the defendant poses a continuing threat of future violence. The question of whether the undiscovered mitigation evidence might make the defendant appear even *more* dangerous thus has no practical consequence.

Third, in making the prejudice determination, a court must consider the totality of the evidence before the jury and then assess the effect the errors might have had on any of the fact findings made by the sentencer. As the *Strickland* Court observed:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. *Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.* Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id*. at 695–96 (emphasis added). Thus, a court reviewing how counsel's errors affected the punishment phase of a Texas capital sentencing proceeding must examine the relevant

special issue (*i.e.*, the "factual findings") to determine whether and to what extent it may have been affected in light of the evidence before the jury.

Given the absence of a meaningful punishment phase defense by Ms. Sheppard's counsel, there is a reasonable probability that one juror would have changed her vote if presented with the following compelling mitigating evidence.

### b.    Ms. Sheppard was prejudiced.

Had counsel conducted an adequate social history investigation, the defense case would have been a far more meaningful exploration of Ms. Sheppard's background than the parade of witnesses who were asked only superficial questions.  Counsel could have explained to the jury the circumstances of Ms. Sheppard's life that led to her chaotic and traumatic life.  While this information does not excuse the crime, it explains it.  In *Rompilla*, 545 U.S. at 393, the Supreme Court found that mitigation evidence

> adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test.  It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," *Wiggins v. Smith*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor*, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing, *Strickland*, 466 U.S., at 694, 104 S.Ct. 2052.

545 U.S. at 393.  The same is true in Ms. Sheppard's case.

### i.    The punishment phase evidence

The State's evidence in the sentencing phase consisted of Ms. Sheppard's statement and the testimony of eleven witnesses.  Notably absent was any expert who could opine on Ms. Sheppard's future dangerousness.

Following the reading of the statement, the State recalled Korey Jordan.  Jordan told the jury that the day before the crime he saw a small, blonde woman "walking -- practically running across the parking lot."  He said that he saw Ms. Sheppard behind this woman, and that the blonde woman ran up the stairs and past him.  Jordan claimed to have been frightened, and to have assumed that Sheppard and Dickerson were trying to kill the woman.

The State next called Anna Allen, who testified that around 10:30 on the evening of June 29, 1993, after she arrived home and parked her car she saw two people, a white male and a black female, standing near the dumpsters.  As she got out of her car, she said the female began walking toward her.  Ms. Allen said that she crossed the parking lot, walking toward her apartment, and saying hello to the woman, who responded by saying, "hi."  Immediately after the exchange of greetings, Ms. Allen ran up the stairs to her apartment.

Next, Sherry Brown was recalled to testify about a conversation between Ms. Sheppard and James Dickerson, which she claimed to have overheard.  She claimed to have heard Ms. Sheppard say "How she would try to jack cars," "get parts and stuff off of them" and "sell them" "if they needed some money."

The State called Paula Allen, the former wife of Ms. Sheppard's husband Jerry Bryant, Jr., and Wayland Ray Griggs, who testified that the night after a fight between Bryant and Griggs, Griggs was the victim of a drive by shooting.  Ms. Allen told the jury that she met Erica Sheppard and rode with her to Bryant's mother's home where Bryant got into the car carrying a rifle and threatened her.  The three then rode to Griggs' home

91

in the country, where Bryant instructed Ms. Sheppard to go knock on the door.  Ms. Sheppard returned to the car.  Bryant told Ms. Sheppard to drive up slowly, Sheppard silently complied, and Ms. Allen first heard five or six shots behind her head and then heard somebody moan.  The car then sped away.

The State recalled Mary Matocha, who testified that Ms. Sheppard had a bad reputation for being peaceful and law abiding.  The State also called Maurice Ashcraft to testify that Ms. Sheppard's reputation in Bay City was bad.

The State called Mary Ross and Sharon Harvey, who testified that they met Ms. Sheppard while incarcerated in the Harris County Jail.  Each described an occasion when a news story regarding Sheppard aired and Sheppard told fellow inmates that the story was about her.  Ross testified that another inmate had advised Ms. Sheppard that she could be moved to the third floor, where inmates with mental disorders were kept, by attempting suicide, having throwing or kicking rages, or going into a major depression. Harvey also testified that she heard Ms. Sheppard ask another inmate how she might be moved to the third floor; Harvey, however, testified that it was Mary Ross who advised Ms. Sheppard on this subject.

Last, the State called Michael Meagher to testify about his family, his experience in learning about his sister's death, attending her funeral, and what life has been like without her.

Defense counsel did not call Ms. Sheppard to testify as to the circumstances of duress under which Dickerson compelled her to participate in the robbery that resulted in

the murder by Dickerson of the Complainant.   The jury, therefore, did not know that Ms. Sheppard participated in the robbery only under threat of death to her and her baby.

Nor did defense counsel put Ms. Sheppard on the stand to testify about her life and background.   In fact, in preparation for trial, defense counsel never even asked Ms. Sheppard about her social history.  Sheppard Affidavit, App. 14, ¶ 54.

Defense counsel did not call Ms. Sheppard's mother, Madelyn McNeil, to testify. Ms. McNeil confirmed the details of her daughter's social history.   McNeil Affidavit, App. 8;  Habeas  Tr.  9-3-08.    In  addition,  although  defense  counsel  did  call Ms. Sheppard's  grandmother,  Annie  Smith,  to  testify,  Mrs. Smith  never  spoke  to Ms. Sheppard's attorneys about the case and no one on Ms. Sheppard's defense team talked to Mrs. Smith about what her testimony would be.   Mrs. Smith would have been glad to answer questions about her granddaughter's background and life, her love of her children, her care for her grandmother, and her dreams about going to school and being a nurse.  Smith Affidavit, App. 9.

In short, defense counsel completely failed to offer relevant and compelling mitigating evidence when such evidence was easily available.   Indeed, defense counsel failed to even undertake the investigation that would have made them aware of such evidence.

### ii.     The missing evidence the jury did not hear

Had defense counsel conducted a reasonable investigation of Ms. Sheppard's history of sexual abuse, physical abuse, neglect and domestic violence they would have discovered the following evidence, which was readily available from the witnesses listed below.

### 3. Fact Witnesses

####    a.    Erica Sheppard (Appendix 14)

As a young child, perhaps as young as three years old, Ms. Sheppard and her brother, Jonathan, were physically abused by a babysitter and family friend known to Ms. Sheppard only as "Cookie."  Sheppard Affidavit (App. 14), ¶¶ 2, 3.  For no stated reason, Cookie punched, whipped, and beat Erica and Jonathan.  Sheppard Affidavit, ¶ 3.  The beatings involved extension cords, boards, belts, and whatever else Cookie could get her hands on; Erica recalls once seeing Cookie beat Jonathan with barbed wire.  Sheppard Affidavit, ¶ 3.  Erica recalls Cookie making her go with her to the store, even if without shoes, resulting in her feet being burned by the black top and being cut on broken glass in a ditch alongside the road.  Sheppard Affidavit, ¶ 4.

At around three years of age, Cookie's boyfriend sexually assaulted Erica.  Sheppard Affidavit, ¶ 5.  The man made Erica perform oral sex on him while in the bathroom, and Erica recalls being afraid of going into the bathroom.  Sheppard Affidavit, ¶ 5.  Erica was also penetrated by Cookie's boyfriend, which caused her incredible pain and perhaps a loss of consciousness.  Sheppard Affidavit, ¶ 6.  Erica recalls seeing blood on the bed or floor after this attack, and cleaning up the blood to try to prevent Cookie from beating her for making a mess.  Sheppard Affidavit, ¶ 6.  This man threatened to kill Erica's mother if she ever told anyone of the abuse and she believed he was serious.  Sheppard Affidavit, ¶ 7.  When Erica finally told her mother what was happening, she did not believe her.  Sheppard Affidavit, ¶ 8.  She then confided in her grandmother, Annie Smith, who did believe her.  Erica and Jonathan then went to stay with their grandmother.  Sheppard Affidavit, ¶ 8.

Erica and her brother were passed from mother to grandmother several times as they were raised.  Sheppard Affidavit, ¶ 10.  Erica's mother was very heavy handed, hitting or beating Erica and Jonathan with a belt when they were "bad."  Sheppard Affidavit, ¶ 13.  Sometimes the whippings were so out of hand that Erica's grandmother had to pull her mother off of her.  Sheppard Affidavit, ¶ 13.

After Erica's mother and her father, Alexander Sheppard, divorced, Erica's mother began numerous live-in lesbian relationships when Erica was a child and teen.  Sheppard Affidavit, ¶ 14.  Some of these relationships were abusive.  Sheppard Affidavit, ¶ 14.  Erica recalls that Sheila, the first of her mother's lovers she can remember, was mean to Erica and Jonathan, throwing a phone and hitting Jonathan and causing him to run away from home.  Sheppard Affidavit, ¶ 15.  Shawn, another of Erica's mother's lovers, was also abusive and had a bad temper.  Sheppard Affidavit, ¶ 16.  Erica recalls seeing Shawn jump on her mother more than once.  Sheppard Affidavit, ¶ 16.  Shawn was abusive to Erica and Jonathan, once beating them both when she suspected them of killing her goldfish.  Sheppard Affidavit, ¶ 16.

Other children teased Erica because her mother was a lesbian.  Sheppard Affidavit, ¶ 17.  Erica has had very little contact with her father, Alexander Sheppard, mostly because he was not interested in forming any kind of relationship.  Sheppard Affidavit, ¶ 18.  Erica always attended church, and relied heavily on her faith.  Sheppard Affidavit, ¶ 20.  She attended Mother Zion Missionary Baptist Church while living in Bay City with her grandmother.  Sheppard Affidavit, ¶ 20.  When staying in Houston with her mother, she attended New Faith Missionary Baptist Church.  Sheppard Affidavit, ¶ 20.

As a teen, Erica continued to move around, staying with her mother and grandmother and sometimes moving in for brief periods with friends and boyfriends. Sheppard Affidavit, ¶ 21. Also during these years, Erica's mother would sometimes send her to the streets. Sheppard Affidavit, ¶ 21.

One night, Erica snuck out of the house to attend a pool party. Sheppard Affidavit, ¶ 23. When Erica's mother caught her, she beat her with a belt. Sheppard Affidavit, ¶ 23. Erica ran away from home at age thirteen and moved back with her grandmother. Sheppard Affidavit, ¶ 23.

Erica's first pregnancy occurred when she was thirteen years old and living in Bay City. Sheppard Affidavit, ¶ 24. Erica's mother beat her "half to death" upon hearing the news of her pregnancy. Sheppard Affidavit, ¶ 24. Erica had an abortion because she did not want a child when she was that young. Sheppard Affidavit, ¶ 24. Erica was sexually assaulted twice when she was around sixteen and seventeen years old. Sheppard Affidavit, ¶ 25. The first attack, which occurred when she was walking to an area fast food restaurant, was by a Hispanic man who pulled up to Erica in a car and, when she either got into the car or was dragged into the car, placed a knife to her throat and threatened to kill her if she screamed. Sheppard Affidavit, ¶ 25. The man then forced Erica to perform oral sex on him while he drove, later dropping her off a few blocks from where he first picked her up. Sheppard Affidavit, ¶ 25. Erica did not call the police because she wanted to forget the incident; she did not even tell her mother, recalling her mother's reaction to the news that Cookie's boyfriend had molested her as a child. Sheppard Affidavit, ¶ 25.

The second sexual assault took place at a friend's house and Erica thinks someone slipped a drug in her wine cooler just prior to the assault.  Sheppard Affidavit, ¶ 26. Erica was tricked by someone to go into a bedroom, and she was jumped when she attempted to pass through the bedroom.  Sheppard Affidavit, ¶ 26.  Erica thinks that she phased in and out of consciousness, and she recalls hearing one man tell another to "get him some of it."  Sheppard Affidavit, ¶ 26.  Erica does not know how many people had sex with her or how she got home that night.  Sheppard Affidavit, ¶ 26.  This incident was not reported, either.  Sheppard Affidavit, ¶ 26.

Erica left high school at sixteen years of age to have her first child, Haybert, a son born on November 20, 1989.  Sheppard Affidavit, ¶¶ 27, 28.  Haybert's father was someone Erica barely knew and had no relationship with after Haybert was born. Sheppard Affidavit, ¶ 27.  After Haybert was born, Erica resumed high school at Madison High, dropping out in tenth grade, because she was frustrated.  Sheppard Affidavit, ¶ 28. Erica's second son, Manchie, was born on June 22, 1991.  Sheppard Affidavit, ¶ 29. Although Manchie's father, Tim Harris, allowed Erica to live with him for a while during the pregnancy,  he later told Erica that she would have to leave and now denies that Manchie is his son.  Sheppard Affidavit, ¶ 29.  When Erica left Tim Harris's house, she moved into the Covenant House, a shelter for teenagers.  Sheppard Affidavit, ¶ 30. Haybert was with her and she was pregnant with Manchie.  Sheppard Affidavit, ¶ 30. Erica worked to obtain her GED during her pregnancy with Manchie and earned her degree right before Manchie was born.  Sheppard Affidavit, ¶ 31.

Erica moved back in with her mother after Manchie was born, but her mother continued to be physically abusive to her.  Sheppard Affidavit, ¶ 31.  Erica recalls an incident when her mother, incorrectly suspecting that she had skipped work, strangled her with a phone cord.  Sheppard Affidavit, ¶ 31.  Because of this fight, Erica tried to move out, staying with Tim Harris again and then with a friend, then returning to the Covenant House and then moving back in with her grandmother, who got her signed up for food stamps and encouraged her to go back to school.  Sheppard Affidavit, ¶ 32.  Erica attended classes at the local Adult Learning Center, and her grandmother helped her get a secretarial job working for a county judge.  Sheppard Affidavit, ¶ 32.  Both Manchie and Haybert resided with Erica at her grandmother's house.  Sheppard Affidavit, ¶ 32.

Erica met Jerry Bryant, Jr. in August, 1991, when Manchie was two months old. Jerry, who was nice, romantic, and caring when he first met Erica, soon moved into the home of Erica's grandmother with her and the children.  Sheppard Affidavit, ¶ 33.  Jerry was very possessive of Erica from the beginning.  Sheppard Affidavit, ¶ 34.  When she asked him to stop hanging around the judge's office while she worked, he accused her of having an affair with the judge.  Sheppard Affidavit, ¶ 34.

In November, 1991, Erica learned she was pregnant.  Sheppard Affidavit, ¶ 35. Even though he acted happy that she was pregnant, Jerry Bryant began to be verbally abusive to Erica for the first time, calling her whore, slut and bitch.  Sheppard Affidavit, ¶ 35.  Jerry, who sometimes said that he would hit Erica if she were not pregnant, began staying out nights and drinking a lot.  Sheppard Affidavit, ¶ 35.  Jerry often warned Erica that, if she ever left him, he would track her down and kill her.  Sheppard Affidavit, ¶ 35.

One day, after Erica had left Jerry's body shop following a heated argument, Jerry ran her off the road in his car, even though she was very pregnant at the time. Sheppard Affidavit, ¶ 36. With Erica in the car was Jerry's stepmother, Isabel Bryant, and both Isabel and Erica went to the local emergency room. Sheppard Affidavit, ¶ 36. Erica's third child, Audria Bryant, was born on August 3, 1992. Sheppard Affidavit, ¶ 36.

When she was less than a week old, Audria was admitted to Texas Children's Hospital because she could not hold down formula. Sheppard Affidavit, ¶¶ 37, 38. Audria remained in the hospital for several weeks, after being diagnosed as having an intolerance for milk. Sheppard Affidavit, ¶ 38. While Audria was in the hospital, Erica decided that she wanted to be a nurse. Sheppard Affidavit, ¶ 38. Although Erica stayed at the hospital night and day while Audria was ill, Jerry Bryant never came to visit his child or inquire about her health. Sheppard Affidavit, ¶ 39. Instead, he began insisting that Erica stay at home instead of at the hospital. Sheppard Affidavit, ¶ 39. Erica refused, saying her daughter was dying and she needed to be with her. Sheppard Affidavit, ¶ 39. One day, when Jerry came to the hospital demanding that Erica come home with him so he could have sex with her, she turned her back and began to walk away from him. Sheppard Affidavit, ¶ 39. Jerry jumped on Erica at the hospital, and beat her unconscious. Sheppard Affidavit, ¶ 39.

Erica went home from the hospital with her mother. Sheppard Affidavit, ¶ 40. A few days later, after Jerry begged her forgiveness and she returned to him, they resumed residence with Erica's grandmother. Sheppard Affidavit, ¶ 40.

After this incident, Jerry began following Erica, telling her that he had observed her every movement during the day, and describing in great detail what she had done. Sheppard Affidavit, ¶ 41.  Sometimes Jerry would come home unexpectedly, as if trying to catch Erica doing something wrong.  Sheppard Affidavit, ¶ 41.

Jerry also began threatening Erica in other ways, including placing a knife to her throat and threatening to kill her if she ever left him.  Sheppard Affidavit, ¶ 42.  Jerry also pointed guns at Erica and sometimes she would awaken to have him pointing a rifle at her face.  Sheppard Affidavit, ¶ 42.

After Audria regained her health, Erica enrolled in a vocational school, where she attended nursing classes until March, 1993, when she was dropped due to missing too many days, a result of having to go to court so often for the attempted murder case in Bay City.  Sheppard Affidavit, ¶ 43.  When she was dropped, Erica was three months shy of graduation.  Sheppard Affidavit, ¶ 43.

While in vocational school, Erica stayed with her mother.  Sheppard Affidavit, ¶ 44.  One day, Jerry came to the school and insisted that Erica return to Bay City with him.  Sheppard Affidavit, ¶ 44.  Erica picked up her children, who were in day care, and went with him because she was afraid; even during her absence, Jerry had stayed with her grandmother, and she feared for her grandmother's safety.  Sheppard Affidavit, ¶ 44. After Erica returned to live with Jerry, he bragged that he had come to Houston to kill her one day but had changed his mind after getting there.  Sheppard Affidavit, ¶ 45.  Jerry described what Erica had done on that day he followed her.  Sheppard Affidavit, ¶ 45.

The last time Jerry beat Erica was in May, 1993, at the home of Jerry's uncle, Pete Bryant.  Sheppard Affidavit, ¶ 46.  Jerry had found the address and phone number of Erica's long-time friend, Cedrick Howard, and decided that Erica must have been having an affair with the man.  Sheppard Affidavit, ¶ 47.  Jerry brought Cedrick to Pete's home in order to confront Erica, who denied the affair.  Sheppard Affidavit, ¶ 47.  Jerry dragged Erica off the couch by her feet and began beating her about the head and face on the floor, leaving a dent in Erica's skull from the beating.  Sheppard Affidavit, ¶ 47.  After Uncle Pete pulled Jerry off of Erica and Jerry left the house, Erica called the Bay City police.  Sheppard Affidavit, ¶ 47.  When the police arrived, Erica was told that she should check into a local women's shelter and file charges from there.   Sheppard Affidavit, ¶ 48.  Erica went to the Matagorda Women's Crisis Center that night or the next day, leaving Manchie with her grandmother and taking Haybert and Audria with her to the shelter.  Sheppard Affidavit, ¶ 49.  While at the shelter, Erica learned that she was pregnant again.  Sheppard Affidavit, ¶ 49.  She decided to have an abortion, as she did not want another of Jerry's children.  Sheppard Affidavit, ¶ 49.

After Erica left Jerry, she feared he would make good on his threat to kill her for having left him.  Sheppard Affidavit, ¶ 51.  Erica went to stay with her friend and sometime lover, Sherry Brown, after leaving the shelter, as she was afraid to go to her mother's or grandmother's houses, because she feared Jerry would find her.  Sheppard Affidavit, ¶ 52.  Because she feared Jerry would find her, she could not remain with Sherry, so she made arrangements to stay with her brother, Jonathan, in Houston.

Sheppard Affidavit, ¶ 52.  Erica's plan was to get herself together, get a job, and then find a place of her own.  Sheppard Affidavit, ¶ 52.

Erica told the police, the investigator hired by her attorneys and Dr. Priscilla Ray that her baby Audria was with her in the apartment during the incident at Wild Indigo and that James Dickerson threatened to kill Erica and her baby if she did not do what he said. Sheppard Affidavit, ¶ 55.

### b.    Madelyn McNeil (Appendix 8)

Madelyn McNeil is Erica Sheppard's mother.  McNeil Affidavit (App. 8), ¶ 1.  *See also* Habeas Tr. 9-3-08.  Madelyn and Erica's father, Alexander Sheppard, were married at the time of Erica's birth and remained married until Erica was four years old.  McNeil Affidavit, ¶ 2; Habeas Tr. 9-3-08.  They had one other child, Jonathan Sheppard.  McNeil Affidavit, ¶ 2; Habeas Tr. 9-3-08.  During the years leading up to their divorce, Madelyn and Alexander separated and reconciled several times.  She would leave him because Alexander was violent and hateful to her.  McNeil Affidavit, ¶ 2.  Alexander hit Madelyn in front of the children, usually on the weekends when he came home drunk.  McNeil Affidavit, ¶ 2.  Often she hit him back, and they would get into a physical fight; Madelyn was always the loser of the fights, and usually had bruises as a result.  McNeil Affidavit, ¶ 2.

Sometimes Madelyn would take her children to Markham, where they would stay with her mother, Annie Smith.  McNeil Affidavit, ¶ 2.  Alexander would call Madelyn at some point, apologizing and promising to never hit her again.  McNeil Affidavit, ¶ 2.  For years she accepted his apologies and returned, only to find herself in the same situation

she had run from to begin with:  Alexander would get drunk, start an argument, and they would get into a violent fight.  McNeil Affidavit, ¶ 2.

After their divorce, Alexander had little to do with Erica and Jonathan.  It was as if he divorced himself from Jonathan and Erica when he and Madelyn divorced.  McNeil Affidavit, ¶ 3.  Madelyn remembers Alexander telling her "If I'm not going to be with the Mom, then I'm not going to be with the kids."  He did not pay child support on a regular basis and Madelyn had to take him to court to try and collect it.  McNeil Affidavit, ¶ 3.

Erica was moved around a lot all during the years she was growing up, alternating staying with Madelyn in Houston and with Madelyn's mother in Markham, 85 miles away.  McNeil Affidavit, ¶ 4.  When Erica was a baby and she and Jonathan stayed with Madelyn's mother, Madelyn tried to visit them on the weekends.  McNeil Affidavit, ¶ 4.  Because she sometimes had to work two jobs, though, Madelyn was not able to visit her children much at all.  McNeil Affidavit, ¶ 4.  Erica and her brother both missed Madelyn, and complained that they did not see her enough.  McNeil Affidavit, ¶ 4.  Sometimes her children let it be known that they felt Madelyn did not love them, or else she would have them live with her.  Madelyn realizes now that Erica needed more of her attention.  McNeil Affidavit, ¶ 4.

Besides her work schedule, sometimes the instability of Madelyn's personal life interfered with the upbringing of her children.  McNeil Affidavit, ¶ 5.  After Alexander and Madelyn divorced, she lived with two other men.  McNeil Affidavit, ¶ 5.  After those relationships failed, Madelyn became involved with three women; each resided with her during their relationships.  McNeil Affidavit, ¶ 5.  Madelyn and her mother could not

agree as to whether Madelyn should uproot Erica and Jonathan and bring them to Houston whenever Madelyn wanted.  McNeil Affidavit, ¶ 5.  Madelyn and her mother also had a conflict because Mrs. Smith disagreed with Madelyn's lifestyle and sexual orientation.  McNeil Affidavit, ¶ 5.  One time Madelyn had to call the police to have them help her get Jonathan out of her mother's house, because she would not let Madelyn have him.  McNeil Affidavit, ¶ 5.

When Erica was about three years old, she and Jonathan stayed with Madelyn for a period of time.  McNeil Affidavit, ¶ 6.  Because Madelyn worked, she left them with a babysitter, Cookie, a woman she had known since childhood.  McNeil Affidavit, ¶ 6.  Cookie's boyfriend stayed with her and would be in the house when Erica and Jonathan were there.  McNeil Affidavit, ¶ 6.  At some point, Erica and Jonathan told Madelyn this boyfriend had molested them.  McNeil Affidavit, ¶ 6.  Madelyn found this hard to believe, because she thought she knew Cookie well enough to know she would not allow such a thing to happen.  McNeil Affidavit, ¶ 6.  Madelyn realizes now that she simply could not confront that her babies were being abused this way.  Madelyn continued to send them to Cookie's house until Erica and Jonathan told Madelyn's mother of the abuse.  McNeil Affidavit, ¶ 6.  Mrs. Smith believed the sexual assaults had happened, and took Erica and Jonathan to live with her again.  McNeil Affidavit, ¶ 6.  When Madelyn talked about this with Erica several years later, she came to understand that Erica had been telling her the truth about this man molesting her.  McNeil Affidavit, ¶ 6.

It was not always easy being a single parent; Madelyn disciplined Erica and Jonathan by hitting them with switches or belts. McNeil Affidavit, ¶ 7.  Once Mrs. Smith

stepped in to stop Madelyn from hitting them because she thought the whipping had gone on too long.  McNeil Affidavit, ¶ 7.  Madelyn did not know any better and thought this was the only way to teach them right from wrong.  McNeil Affidavit, ¶ 7.

Although Erica tried hard in school, she had trouble learning.  McNeil Affidavit, ¶ 8.  As a child and teenager, she also showed signs of what Madelyn now knows to be Attention Deficit Disorder.  McNeil Affidavit, ¶ 8.  Madelyn learned about this condition because she has been diagnosed with it.  McNeil Affidavit, ¶ 8.  Besides Madelyn, other people in the family have been diagnosed with this, including Erica's brother, grandfather, and her son.  McNeil Affidavit, ¶ 8.  Erica was never tested or treated for this disorder.  McNeil Affidavit, ¶ 8.  Erica seemed to get frustrated at school, and this was one of the reasons she dropped out.  McNeil Affidavit, ¶ 8.

When Erica was thirteen, she got involved with a man who was in his twenties.  McNeil Affidavit, ¶ 9.  Erica snuck out of the house to be with this man.  McNeil Affidavit, ¶ 9.  When Madelyn discovered what had been going on, she confronted Erica.  McNeil Affidavit, ¶ 9.  Erica ran away for a few weeks, to be with this older man, who eventually took her to stay with Madelyn's mother.  McNeil Affidavit, ¶ 9.  Later that same year, Erica began seeing another older boy and became pregnant.  McNeil Affidavit, ¶ 9.  Madelyn whipped Erica when she learned of the pregnancy and then went with her to have an abortion.  McNeil Affidavit, ¶ 9.

By the time she was nineteen years old, Erica had had three children with three different men.  McNeil Affidavit, ¶ 10.  The fathers of Erica's first two children, Haybert and Manchie, were not involved with them or supportive in any way.  McNeil Affidavit,

¶ 10.  Erica did her best as a single parent, with Madelyn and her mother helping when she needed us.  McNeil Affidavit, ¶ 10.  Madelyn has no doubt that Erica loves her children.  McNeil Affidavit, ¶ 10.

Erica's longest relationship was with Jerry Bryant, the father of her third child, Audria.  McNeil Affidavit, ¶ 11.  Jerry was very possessive and even violent to Erica during their years together.  McNeil Affidavit, ¶ 11.  He would follow Erica when she left home to attend vocational school.  McNeil Affidavit, ¶ 11.  Although Madelyn never witnessed Jerry hitting Erica, she was told about the fights after they happened and saw the bruises on her face and body.  McNeil Affidavit, ¶ 11.  And, Madelyn saw for herself how afraid of Jerry Erica would be at times.  McNeil Affidavit, ¶ 11.

When Audria was a baby, she spent several weeks in the hospital due to a problem with her stomach.  McNeil Affidavit, ¶ 12.  Erica stayed every day at the hospital with her baby, because she wanted to be with Audria at all times.  McNeil Affidavit, ¶ 12.  This caused problems between Erica and Jerry, who wanted Erica to be at home with him, instead of at the hospital.  McNeil Affidavit, ¶ 12.  Erica called Madelyn from the hospital one night and asked if she could come and get her.  McNeil Affidavit, ¶ 12.  Jerry had beaten her up because she would not come home with him.  McNeil Affidavit, ¶ 12.

There were other times Erica ran away from Jerry.  McNeil Affidavit, ¶ 13.  Sometimes she would bring her children to Madelyn's house during the night, just to get away from him.  McNeil Affidavit, ¶ 13.  Erica would have to park her car behind the house, so Jerry could not see it from the street if he drove by.  McNeil Affidavit, ¶ 13.

Erica attended church regularly from the time she was a small child until the time of her arrest, whether she was staying with Madelyn or with Madelyn's mother.  McNeil Affidavit, ¶ 14.  Erica was very active in the two churches, and was well known by the pastors and by members of the churches.  McNeil Affidavit, ¶ 14.

At the time of Erica's arrest and trial, Madelyn resided in Houston.  Madelyn made several attempts to speak to Erica's attorney, Charles Brown, about Erica's case. McNeil Affidavit, ¶ 15.  Mr. Brown was seldom available to speak to Madelyn when she called.  McNeil Affidavit, ¶ 15.  When they did speak, Mr. Brown did not ask Madelyn questions about Erica's background or character.  McNeil Affidavit, ¶ 15.  If he had, Madelyn would have told him the same information that is in her affidavit.  McNeil Affidavit, ¶ 15.  If anyone had asked Madelyn for the names of witnesses who could describe Erica's character for the jury, she could have provided several; but no one asked her for such information.  McNeil Affidavit, ¶ 15.

Madelyn thinks it also would have been important to tell the jurors how absurd it is to believe Erica left Audria alone in an apartment while she went out with James Dickerson.  McNeil Affidavit, ¶ 16.  Audria was only ten months old at the time.  McNeil Affidavit, ¶ 16.  It had not been too long since her recovery; she almost died as a result of the problem with her stomach.  Erica was so protective of that baby, there is no way she would have left Audria alone like the authorities told the jurors.  McNeil Affidavit, ¶ 16.

Madelyn also would have been able to tell the jurors that Erica was not a violent person.  McNeil Affidavit, ¶ 17.  Erica's response to violence and aggression has always been to quietly take whatever was being dished out, whether the person doing the hitting

was Jerry or even Madelyn.  McNeil Affidavit, ¶ 17.  Madelyn knows Erica well because she is her daughter.  Erica would be able to live in prison without anyone needing to be afraid of her.  McNeil Affidavit, ¶ 17.  If Madelyn had been asked at the time of her trial if she thought Erica would be a future threat to society, she would have said "No." McNeil Affidavit, ¶ 17.

Madelyn attended Erica's trial in 1995.  McNeil Affidavit, ¶ 18.  She was not allowed to sit in the courtroom because she had been subpoenaed by Erica's attorney to be a witness.  McNeil Affidavit, ¶ 18.  No one on Erica's defense team talked to Madelyn about what her testimony would be.  McNeil Affidavit, ¶ 18.  She was not prepared in any way to be a witness.  McNeil Affidavit, ¶ 18.  Madelyn is not sure why they decided to not let her testify on her daughter's behalf.  McNeil Affidavit, ¶ 18.  Madelyn would have gladly told the jurors about Erica's background and her character.   McNeil Affidavit, ¶ 18.

### c.    Annie Smith (Appendix 9)

Annie Smith, Erica's grandmother, resides in Markham, Texas.  Smith Affidavit (App. 9), ¶ 1.  Mrs. Smith raised Erica for most of her life, and feels she knows Erica better than anyone else could know her.  Smith Affidavit, ¶ 2.  Erica is like a daughter to Mrs. Smith.  Mrs. Smith is now taking care of Erica's three children.  Smith Affidavit, ¶ 2.

Even though she spent most of her life with Mrs. Smith, Erica also stayed sometimes with her mother, Madelyn McNeil, Mrs. Smith's daughter.  Smith Affidavit, ¶ 3.  Mrs. Smith and Madelyn did not always agree on how Erica and her brother should

be raised.  Smith Affidavit, ¶ 3.  Mrs. Smith did not approve of Madelyn's lifestyle, and thought the children were better off with her.  Smith Affidavit, ¶ 3.

Erica attended Mrs. Smith's church regularly from the time she was a small child until the time she was arrested.  Smith Affidavit, ¶ 4.  Erica was active in Mrs. Smith's churches, and was well known by the pastors and other members of the church.  Smith Affidavit, ¶ 4.  Erica has a beautiful voice and she sang during services.  Smith Affidavit, ¶ 4.  Erica was baptized at Mrs. Smith's church.  Smith Affidavit, ¶ 4.

During the years Erica was with Jerry Bryant, they both lived with Mrs. Smith.  Smith Affidavit, ¶ 5.  Mrs. Smith did not see Jerry hit Erica, but knew Erica was sometimes afraid of him.  Smith Affidavit, ¶ 5.  And, Mrs. Smith heard of the fights after they happened.  Smith Affidavit, ¶ 5.  Mrs. Smith also knew Jerry was following Erica around, because he told Mrs. Smith about driving all the way to Houston just to see if Erica was really attending vocational school.  Smith Affidavit, ¶ 5.  The last time they fought, Erica left Mrs. Smith's home to live in a shelter for abused women.  Smith Affidavit, ¶ 5.  Mrs. Smith did not know where Erica went, but she knew Erica was hiding from Jerry.  Smith Affidavit, ¶ 5.

Mrs. Smith was aware that Erica and Jerry had some problems with Jerry's ex-wife, Paula Allen.  Smith Affidavit, ¶ 6.  Paula may have been jealous of Jerry spending time with Erica.  Smith Affidavit, ¶ 6.  Paula and Jerry had several children together.  Smith Affidavit, ¶ 6.  One night Erica woke Mrs. Smith up because there was a fire right outside Mrs. Smith's house.  Smith Affidavit, ¶ 6.  It turned out someone had set Jerry's

truck on fire.  Smith Affidavit, ¶ 6.  Mrs. Smith was told later that Paula Allen had done it.  Smith Affidavit, ¶ 6.

At the time of Erica's arrest and trial, Mrs. Smith lived in Markham.  Smith Affidavit, ¶ 7.  Mrs. Smith never spoke to Erica's attorneys about her case.  Smith Affidavit, ¶ 7.  One day Mrs. Smith met with their private investigator, though, and told him about the day of Erica's arrest.  Smith Affidavit, ¶ 7.  The investigator did not ask Mrs. Smith any questions about Erica's background or character.  Smith Affidavit, ¶ 7.  Had he done so, she would have been able to provide a lot of information about Erica, because she raised her.  Smith Affidavit, ¶ 7.  If the attorney had contacted Mrs. Smith, she would have told him the same information that is in her affidavit.  Smith Affidavit, ¶ 7.  If anyone had asked Mrs. Smith for the names of witnesses who could describe Erica's character for the jury, she could have provided several.  Smith Affidavit, ¶ 7.  No one asked Mrs. Smith for this kind of information.  Smith Affidavit, ¶ 7.  Mrs. Smith loves Erica very much and would have been willing to help them defend her.  Smith Affidavit, ¶ 7.

Mrs. Smith testified briefly at Erica's trial in 1995.  Smith Affidavit, ¶ 8.  No one on Erica's defense team talked to Mrs. Smith about what her testimony would be.  Smith Affidavit, ¶ 8.  Mrs. Smith wishes she had been asked questions about Erica's background and life, because she would have gladly told the jurors about Erica's love of her children, her care for Mrs. Smith, and her dreams about going to school and being a nurse.  Smith Affidavit, ¶ 8.  Mrs. Smith could have told the jury about how Erica was shuffled from one home to another when she was a child.  Smith Affidavit, ¶ 8.

Mrs. Smith would have explained that Erica was sexually abused when she was very young. Smith Affidavit, ¶ 8. Mrs. Smith could have told the jurors that Erica's baby's father, Jerry Bryant, was sometimes violent towards her. Smith Affidavit, ¶ 8.

Mrs. Smith tried to tell the jurors that she knew Erica to be a non-violent person, and that she would be no threat to anyone if they gave her a life sentence. Smith Affidavit, ¶ 9. Mrs. Smith was not permitted to testify about this. Smith Affidavit, ¶ 9. Mrs. Smith believes with all her heart that Erica is a peaceful person who loves life and all of God's children. Smith Affidavit, ¶ 9. Mrs. Smith also believes Erica would not be a threat to anyone in prison or in the outside world. Smith Affidavit, ¶ 9.

### d.    Kelly Lynn Garcia (Appendix 13)

Kelly Garcia was incarcerated in the Harris County Jail from September, 1993 until May, 1994, during which time she was housed on the same unit as Ms. Sheppard. Garcia Affidavit (App. 13), ¶ 2. They were both lodged in the eleventh floor protective custody unit, a unit that was comprised of single cells. Garcia Affidavit, ¶ 2. During the daytime, the doors of their cells were left unlocked, which allowed the inmates to visit each other's cells or the day room. Garcia Affidavit, ¶ 2.

Ms. Garcia and Ms. Sheppard spent a lot of time together in Ms. Garcia's cell, participating in a Bible study with at least one other inmate and a jail chaplain. Garcia Affidavit, ¶ 3. Ms. Garcia and Ms. Sheppard also conducted their own Bible study outside the sessions organized by the jail ministry. Sometimes Ms. Sheppard sang hymns to Ms. Garcia. Garcia Affidavit, ¶ 3. Both Ms. Sheppard and Ms. Garcia took comfort in their religion. Garcia Affidavit, ¶ 3.

During their time together, Ms. Garcia and Ms. Sheppard discussed many things, including Ms. Sheppard's life, her abuse as a child, her poor relationship with her mother, being a victim of domestic violence and her family.  Garcia Affidavit, ¶ 4.  Ms. Sheppard loved and worried about the grandmother who had raised her, and sometimes commented that she could not stand knowing that her grandmother would probably die before Ms. Sheppard could see her again in the free world.  Garcia Affidavit, ¶ 4.  Ms. Sheppard also missed and worried about her three children.  Garcia Affidavit, ¶ 4.

Ms. Sheppard also spoke to Ms. Garcia about her case.  Garcia Affidavit, ¶ 5.  Ms. Sheppard told Ms. Garcia that James Dickerson killed the lady and that he had threatened to hurt Ms. Sheppard's baby if she did not cooperate with him.  Garcia Affidavit, ¶ 5.  Ms. Sheppard told Ms. Garcia that she and James Dickerson were out walking, and that Ms. Sheppard had her small baby with her when Dickerson made her go along with him to the lady's apartment.  Garcia Affidavit, ¶ 5.  Ms. Sheppard always became very emotional when she described what had happened to the lady who was killed; Ms. Sheppard would often tell Ms. Garcia that she could not get the lady off her mind, and seemed mostly bothered by memories of the woman begging not to be hurt.  Garcia Affidavit, ¶ 5.  Ms. Garcia believes these memories were very vivid to Ms. Sheppard, because Ms. Sheppard's whole body would shake and she would cover her ears with her hands when she spoke of the lady begging for her life.  Garcia Affidavit, ¶ 5.  Ms. Garcia would try to comfort Ms. Sheppard, but Ms. Sheppard almost seemed to grieve about it.  Garcia Affidavit, ¶ 5.

Ms. Sheppard also talked to Ms. Garcia about the victim's daughter. Garcia Affidavit, ¶ 6. Ms. Sheppard stated that the daughter was very young and that she had come home and found her mother dead. Garcia Affidavit, ¶ 6. Ms. Sheppard tried to relate to this girl and said she did not know how she would have dealt with finding her own mother that way. Garcia Affidavit, ¶ 6. Ms. Sheppard said she worried about this daughter's emotional state and that she hoped the daughter would be okay. Garcia Affidavit, ¶ 6.

Ms. Sheppard always expressed sadness over what had happened, and Ms. Garcia came to understand that she was truly remorseful. Garcia Affidavit, ¶ 7. Ms. Sheppard never bragged about her involvement in the woman's death; based on what Ms. Garcia saw of Ms. Sheppard, she was so troubled by what had happened that Ms. Garcia cannot imagine that Ms. Sheppard had ever bragged about it. Garcia Affidavit, ¶ 7.

During her seven months with Ms. Sheppard, Ms. Garcia saw her depressed more days than not. Garcia Affidavit, ¶ 8. Sometimes Ms. Sheppard would tell Ms. Garcia she had given up, and that she knew she would get a death sentence; some days Ms. Sheppard would not come out of her cell. The guards kept a close watch on Ms. Sheppard, often tapping the glass on her door to rouse her and made sure she was okay. Garcia Affidavit, ¶ 8. The guards and some of the inmates would encourage Ms. Sheppard to come out of her cell and spend time with the rest of the inmates. On these days, if Ms. Sheppard came out of her cell at all, she appeared sluggish. Garcia Affidavit, ¶ 8.

At some point, Ms. Sheppard's depression worsened to the point that she would not eat, refused her medication, and stayed in her cell most of the time; she seemed to be

falling apart.  Garcia Affidavit, ¶ 9.  This may have been why she moved to the psychiatric unit for awhile.  Garcia Affidavit, ¶ 9.  Ms. Garcia never heard Ms. Sheppard ask anyone how to get herself moved to the psychiatric unit, and Ms. Sheppard did not seek a transfer there.  Garcia Affidavit, ¶ 9.

Some of the inmates on the unit harassed Ms. Sheppard, calling her names like "Grandmother Killer."  Garcia Affidavit, ¶ 10.  These inmates belittled Ms. Sheppard and treated her differently than they treated the rest of the inmates.  Garcia Affidavit, ¶ 10. Ms. Sheppard did not confront or argue with these inmates; when harassment got too bad, she would either seek shelter in Ms. Garcia's cell or would hibernate in her own cell. Garcia Affidavit, ¶ 10.  Sometimes Ms. Garcia heard Ms. Sheppard crying in her cell at night.  Garcia Affidavit, ¶ 10.

There was a period of time while Ms. Garcia and Ms. Sheppard were incarcerated together that Ms. Sheppard was going back and forth to court.  Garcia Affidavit, ¶ 11. Ms. Sheppard would spend time in Ms. Garcia's cell each evening, telling her what had happened that day.  Garcia Affidavit, ¶ 11.  One day, Ms. Sheppard was so upset that she lay on the floor of Ms. Garcia's cell all curled up, rocking and holding her head, saying "I can't take it anymore."  Garcia Affidavit, ¶ 11.  This was a day Ms. Sheppard learned more about what some of the inmates had told the media and authorities about Ms. Sheppard allegedly bragging about the crime.  Garcia Affidavit, ¶ 11.

Stories about Ms. Sheppard's case appeared on television news during this time when Ms. Sheppard was going to court, but Ms. Garcia does not remember Ms. Sheppard

ever watching the stories.  Garcia Affidavit, ¶ 12.  Ms. Sheppard usually went to her cell to avoid seeing them.  Garcia Affidavit, ¶ 12.

Ms. Sheppard told Ms. Garcia that her attorneys would not listen to her and that she had no input as to her trial.  Garcia Affidavit, ¶ 13.  Ms. Sheppard said this caused her to give up hope and she eventually had no interest in what would happen to her.  Garcia Affidavit, ¶ 13.

During her time with Ms. Sheppard, Ms. Garcia met many inmates who passed through their unit.  Garcia Affidavit, ¶ 14.  A few of them talked about going to the authorities to give information about Ms. Sheppard; as far as Ms. Garcia could determine, Ms. Sheppard had never even discussed her case with these inmates.  Garcia Affidavit, ¶ 14.  A few inmates would be taken from the cell area for visits and would return with ice and other items the inmates normally did not have access to; some of these inmates tried to get information from Ms. Sheppard about her case. Garcia Affidavit, ¶ 14.

Once, a couple of inmates asked the guards to move Ms. Sheppard to another unit, stating they wanted her moved because they did not like being housed with a "Grandmother Killer."  Garcia Affidavit, ¶ 15.  Instead of moving Ms. Sheppard, the guards moved the complaining inmates.  Garcia Affidavit, ¶ 15.

At the time of Ms. Sheppard's trial, Ms. Garcia resided in Houston and did not have any charges pending against her.  Garcia Affidavit, ¶ 16.  Ms. Garcia would have been available to speak to Ms. Sheppard's attorneys or investigator, and should have been easy to locate.  Garcia Affidavit, ¶ 16.  If someone associated with Ms. Sheppard's defense had come to her, Ms. Garcia would have told them the same information that is

in her affidavit.   Garcia Affidavit, ¶ 16.   Ms. Garcia made no effort to contact Ms. Sheppard's attorneys because she did not know that what she had to say could be relevant.  Garcia Affidavit, ¶ 16.

### e.       Janie Whitaker (Appendix 10)

Janie Whitaker, a licensed minister, was an Assistant Chaplain at the Harris County Jail in 1994.  Whitaker Affidavit (App. 10), ¶ 1.  In that capacity, she became acquainted with Erica Sheppard, who was an inmate at that jail in 1994.  Whitaker Affidavit, ¶ 1.  Chaplain Whitaker met Erica when she enrolled in a sexual abuse class taught by Chaplain Whitaker at the jail.  Whitaker Affidavit, ¶ 2.  This class was attended by inmates who had been victims of sexual, physical, and emotional trauma.  Whitaker Affidavit, ¶ 2.  The purpose of the class was to confront and deal with issues of past abuse, learn to forgive the abuser, and learn to overcome the abuse issues in order to allow the healing process to begin.  Whitaker Affidavit, ¶ 2.

Many victims of such abuse spend their lives blocking out or denying that the abuse occurred.  Whitaker Affidavit, ¶ 3.  Chaplain Whitaker tells her students that the process she helps them go through is like peeling an onion; the core of the onion represents each individual, while the layers of the onion are formed by the issues of abuse and denial of that abuse over a period of years.  Whitaker Affidavit, ¶ 3.  By confronting the memories of abuse and learning to cope and forgive, the layers are slowly peeled away; during the process, emotions of sadness and hurt always come to the surface. Whitaker Affidavit, ¶ 3.

What Chaplain Whitaker recalls about Erica is that she was a very sweet young woman who was dealing with a lot of issues and trauma from her history.  Whitaker

Affidavit, ¶ 4.   Chaplain Whitaker recalls that Erica was cooperative and abided by the guidelines of the class, which included not discussing what happened in the class. Whitaker Affidavit, ¶ 4.   Erica was honest about healing and was determined to overcome the problems and behavior associated with her past victimization.   Whitaker Affidavit, ¶ 4.   Chaplain Whitaker had the impression that, whatever Erica had done that caused her to be in jail, she was sorry for it.   Whitaker Affidavit, ¶ 4.

At the time of Erica's trial, Chaplain Whitaker lived in Houston.   Whitaker Affidavit, ¶ 5.   Chaplain Whitaker was never contacted by Erica's attorneys about her case; if she had been asked, she would have told the attorneys, and even the jurors at Erica's trial, what she knows about Erica.   Whitaker Affidavit, ¶ 5.   If Chaplain Whitaker had been contacted back then, her memory would have been better as to details of her contact with Erica and Erica's participation in the class, because the class was taking place at the time.   Whitaker Affidavit, ¶ 5.

### f.   Ronda Robinson (Appendix 12)

Ms. Robinson has counseled thousands of runaways and/or neglected children in her fifteen (15) years with Covenant House of Texas ("Covenant House"), a shelter for runaways, abused and/or neglected children.   Robinson Affidavit (App. 12), ¶¶ 1-4. Ms. Sheppard was a Covenant House resident on two occasions in 1990.   Robinson Affidavit, ¶ 4.   She was first admitted to Covenant House with her eight month old son, Haybert, on August 22, 1990.   Robinson Affidavit, ¶ 6.   Ms. Sheppard claimed to have spent the night away from home on more than ten previous occasions and had no prior arrests.   Robinson Affidavit, ¶ 6.   She also said she had a job at Astroworld that paid $3.90 per hour.   Robinson Affidavit, ¶ 6.   Ms. Sheppard alleged that her mother had

physically abused her by strangling her with a telephone cord.  Robinson Affidavit, ¶ 6.

According to Ms. Sheppard, the Houston Police Department referred her to Covenant

House after responding to a call about an altercation between her and her mother.

Robinson Affidavit, ¶ 6.  She refused to return home to her mother, stating that she did

not want to give her mother another chance to hurt her.  Robinson Affidavit, ¶ 6.

Ms. Sheppard's first Covenant House stay lasted one day.  Robinson Affidavit,

¶ 7.  Before her discharge, she vowed to save money so she could "get her own place"

and to "keep working to save money."  Robinson Affidavit, ¶ 7.  Ms. Robinson met with

Ms. Sheppard's mother to obtain her consent for Ms. Sheppard, a minor, to stay in

Covenant House.  Robinson Affidavit, ¶ 7.  When Ms. Sheppard's mother refused to give

the requisite consent, Ms. Sheppard was released the same day.  Robinson Affidavit, ¶ 7.

In Ms. Robinson's opinion, Ms. Sheppard was not at Covenant House long enough to

resolve the problems that brought her there.   Robinson Affidavit, ¶ 7.

On November 6, 1990, Ms. Sheppard was admitted to Covenant House a second

time.  Robinson Affidavit, ¶ 8.  She reported to Covenant House that she and her mother

were having problems and that she did not want to return home at that time and

complained about verbal abuse by her mother.  Robinson Affidavit, ¶ 8.  Ms. Sheppard

also claimed that she was pregnant and was considering an abortion.  Robinson Affidavit,

¶ 8.  During her stay at Covenant House, Ms. Sheppard was scheduled to attend classes

daily and attend individual and group counseling.  Robinson Affidavit, ¶ 8.

Ms. Robinson's first encounters with Ms. Sheppard began when she entered

Covenant House.   Robinson Affidavit, ¶ 9.   They began to keep in touch because as

various kids come through, Ms. Robinson sometimes forms a bond with them, and Ms. Sheppard was one of those kids.   Robinson Affidavit, ¶ 8.  Ms. Sheppard was one of the people with whom Ms. Robinson kept up with while she was in Covenant House, while she was gone and as she came back through Covenant House.  Robinson Affidavit, ¶ 9.  During her two Covenant House stays, Ms. Sheppard attended school and worked at Astroworld.   Robinson Affidavit, ¶ 9.  She did not interact very often with the other residents, but followed the rules.  Robinson Affidavit, ¶ 9.  She was not "homeless," as are most Covenant House residents, but had conflicts with her mother that caused her to leave home, making her a typical runaway.  Robinson Affidavit, ¶ 9.

In Ms. Robinson's view, Ms. Sheppard's need to stay at Covenant House stemmed a lot from the parent/child conflict.  Robinson Affidavit, ¶ 11.  Ms. Sheppard did not get along well with her mother, and Ms. Robinson understood that Ms. Sheppard's grandmother played a key role in giving her a place to stay when she and her mother were not getting along.  Robinson Affidavit, ¶ 11.  Ms. Sheppard spent time between her mother's and grandmother's houses.  Robinson Affidavit, ¶ 11.  She spent more time with her grandmother than she did with her mother.   Robinson Affidavit, ¶ 11.   The grandmother was her primary care giver even though her mother was legal guardian.  Robinson Affidavit, ¶ 11.   Ms. Sheppard felt safest and most comfortable with her grandmother and that's where she headed when things didn't go right with Ma -- back to grandmother.  Robinson Affidavit, ¶ 11.

The only time Ms. Robinson met Ms. Sheppard's mother was the day after Ms. Sheppard arrived at Covenant House for the first time.  Robinson Affidavit, ¶ 12.

Ms. Sheppard came one night and her mother showed up the next day.  Robinson Affidavit, ¶ 12.  Ms. Robinson met with the mother and could tell that there were issues between Ms. Sheppard and her mother because the mother was much more concerned about Ms. Sheppard's child than she was about Ms. Sheppard.  Robinson Affidavit, ¶ 12.  Ms. Sheppard's mother was not very receptive during their conversations about how Covenant House could assist Ms. Sheppard.  Robinson Affidavit, ¶ 12.  Instead, she was only concerned about her grandchild -- Ms. Sheppard's baby.  Robinson Affidavit, ¶ 12.  She didn't want her grandchild to stay in a shelter.  Robinson Affidavit, ¶ 12.  There was obviously conflict between her and Ms. Sheppard.   Robinson Affidavit,  ¶ 12.  Ms. Sheppard's mother expressed to Ms. Robinson that Erica's choice was to stay at Covenant House, but that the grandchild would go home with her.  Robinson Affidavit, ¶ 12.

Ms. Robinson told Ms. Sheppard's mother that she did not have the right or authority to give Ms. Sheppard's mother Ms. Sheppard's child without Ms. Sheppard's consent.  Robinson Affidavit, ¶ 13.  Ms. Sheppard's mother was not too happy about that, threatening Ms. Robinson that she worked in an attorney's office or the Mayor's office and that it didn't work that way.  Robinson Affidavit, ¶ 13.  The meeting ended quickly after Ms. Sheppard's mother learned that she could not take her grandchild home without Ms. Sheppard's consent, and that she left and left Ms. Sheppard and the child at Covenant House.  Robinson Affidavit, ¶ 13.

Based on Ms. Robinson's experience with Ms. Sheppard, she was a very neat kid, but Ms. Robinson could tell that she had tendencies to be rebellious when she didn't get

her way.  Ms. Robinson knew that Ms. Sheppard was not a street child -- she was just a runaway child who ran from one home environment to another to save face.  Robinson Affidavit, ¶ 14.  In Ms. Robinson's view, Ms. Sheppard had no exposure to the street at all and, thus, was fairly naive about the dangers of the street and those who live there. Robinson Affidavit, ¶ 14.

During Ms. Sheppard's stays at Covenant House, she did not have a lot of interaction with people other than she came, she took care of the things that she needed to take care of, she took care of her business.  Robinson Affidavit, ¶ 15.  She was quiet to a certain extent, but she did have people she would talk with and she wasn't one of the kids that would give Ms. Robinson problems or anything like that.  Robinson Affidavit, ¶ 15. So visibly, Ms. Sheppard was just a child.  Robinson Affidavit, ¶ 15.  Basically, what she was doing as Ms. Robinson recalled, was that she went to school and had a part-time job at Astroworld, so that's what consumed a lot of her time -- while she was in Covenant House.  Robinson Affidavit, ¶ 15.  Covenant House provided care for her child while she attended school and worked at her Astroworld job.  Robinson Affidavit, ¶ 15.  She followed her plan, which was going to school and work.  Robinson Affidavit, ¶ 15.

Ms. Robinson saw Ms. Sheppard maybe once or twice after she left Covenant House; she would stop to visit Ms. Robinson.  Robinson Affidavit, ¶ 16.  Ms. Robinson is from Bay City and Ms. Sheppard was from Markham, so their cities are fairly close together.  Robinson Affidavit, ¶ 16.  Also, Ms. Sheppard's grandmother lives across the street from Ms. Robinson's aunt, so they had a common connection and bond.  Robinson Affidavit, ¶ 16.  Ms. Robinson saw that Ms. Sheppard was a child who didn't know what

she was getting into. Robinson Affidavit, ¶ 16. Coming from Bay City and being in that environment, Ms. Robinson believed that Houston would swallow you up, and believes that perhaps that's what happened to Ms. Sheppard -- she wasn't familiar with it. Robinson Affidavit, ¶ 16.

Ms. Robinson was very surprised to learn that Ms. Sheppard was accused of capital murder. Robinson Affidavit, ¶ 17. For some kids who stay at Covenant House, Ms. Robinson can tell that they are full of anger and hatred and likely to get into trouble, but Ms. Sheppard was not like that. Robinson Affidavit, ¶ 17. Ms. Robinson never saw that Ms. Sheppard had any anger, hatred or violence brewing inside her. Robinson Affidavit, ¶ 17. Ms. Robinson never thought that Ms. Sheppard would be dangerous. She did not see that in her. Robinson Affidavit, ¶ 17. Ms. Robinson would never have thought that Ms. Sheppard would be capable of murder based on her interactions with and observations of her. Robinson Affidavit, ¶ 17. Ms. Robinson believed that Ms. Sheppard might have been a rebellious child, but not a seriously angry, violent child. Robinson Affidavit, ¶ 17. Ms. Robinson had other kids like Ms. Sheppard come through who were not coming from the street, who have a good home or at least a home and are more the type of spoiled brat category. Robinson Affidavit, ¶ 18. Ms. Robinson believes that Ms. Sheppard shares with those children certain characteristics that would make her think that a murder like the one she was accused of would be possible only by association. Robinson Affidavit, ¶ 18. In Ms. Robinson's view, the streets will eat you up and based on who one was with, she can see kids being in the wrong place at the

wrong time.  Robinson Affidavit, ¶ 18.  Kids associate with the wrong crowd.  Robinson Affidavit, ¶ 18.

Ms. Robinson cannot picture anything causing those kids, like Ms. Sheppard, to get into trouble, other than being in the wrong place at the wrong time.  Robinson Affidavit, ¶ 18.  Kids who are on the street do what they have to do in order to survive and if a child has done that long enough or is exposed to that long enough, then they end up doing whatever they have to do in order to survive.  Robinson Affidavit, ¶ 18.  Perhaps that is what happened to Ms. Sheppard, in Ms. Robinson's view.  Robinson Affidavit, ¶ 18.

Some Covenant House kids end up in abusive situations, battered wife type situations.  Robinson Affidavit, ¶ 19.  They think it is okay because they are convinced that the person loves them.  Robinson Affidavit, ¶ 19.  So, Covenant House has had to rescue kids and get them out of that situation.  Robinson Affidavit, ¶ 19.  Ms. Robinson could see someone of Ms. Sheppard's personality looking for someone to love her, support her and ending up in a battered wife type situation.  Robinson Affidavit, ¶ 19.  Based on Ms. Robinson's years of experience with and education regarding children, Ms. Robinson believes that if Ms. Sheppard landed in a battering situation, that it would be difficult for her to get out of it.  Robinson Affidavit, ¶ 19.

Someone subpoenaed Ms. Sheppard's Covenant House records before her 1995 capital murder trial.  Robinson Affidavit, ¶ 20.  Ms. Robinson made copies and gave them to the messenger who came for them.  Robinson Affidavit, ¶ 20.  Someone from the media called Ms. Robinson to discuss the fact that both Ms. Sheppard and a boy named

James Dickerson (Ms. Sheppard's co-defendant for the capital murder charge) may have been former Covenant House residents.  Robinson Affidavit, ¶ 20.  Ms. Robinson never spoke with Ms. Sheppard's trial lawyers regarding Ms. Sheppard's case, her background, her stay at Covenant House or her character before her 1995 capital murder trial.  Robinson Affidavit, ¶ 20.  Just before Ms. Robinson testified at trial, she had her first conversation with Ms. Sheppard's lawyer about her testimony.  Robinson Affidavit, ¶ 20.  Their conversation was brief and he told her basically what her role would be in identifying Covenant House records related to Ms. Sheppard.  Robinson Affidavit, ¶ 20.  That is the only time Ms. Robinson ever talked with a lawyer or other representative for Ms. Sheppard before her 1995 capital murder trial.  Robinson Affidavit, ¶ 20.  No lawyer or other representative for Ms. Sheppard ever went through Ms. Sheppard's Covenant House records with Ms. Robinson or asked her about the case, Ms. Sheppard's background, her stay at Covenant House or her character until this year, when Ms. Robinson met with Ms. Sheppard's present counsel.  Robinson Affidavit, ¶ 20.

If Ms. Sheppard's attorney had asked Ms. Robinson to give substantive testimony concerning the matters discussed in her Affidavit, or related to other personal knowledge she has about Ms. Sheppard, she would have provided that testimony.  Robinson Affidavit, ¶ 21.  Ms. Robinson could have testified about Ms. Sheppard's character based on what she learned about it during and after her two stays at Covenant House.  Robinson Affidavit, ¶ 21.

Additionally, if Ms. Sheppard's attorney or other representative had asked Ms. Robinson to arrange for them to interview other Covenant House employees who

knew Ms. Sheppard, Ms. Robinson would have been glad to arrange such a meeting. Robinson Affidavit, ¶ 22.  However, no attorney or other representative for Ms. Sheppard ever requested such a meeting from Ms. Robinson.  Robinson Affidavit, ¶ 22.  Although other Covenant House employees had contact with Ms. Sheppard while she stayed at Covenant House, Ms. Robinson is not aware of Ms. Sheppard's attorneys contacting any of these employees to testify at Sheppard's Capital Murder trial or to discuss Ms. Sheppard, her background or her stays at Covenant House.  Robinson Affidavit, ¶ 22.

### g.    Glenda Davenport (Appendix 11)

Glenda Davenport, the Director of the Matagorda County Women's Crisis Center (the "Crisis Center"), has fourteen (14) years of experience as a battered women's advocate.  Davenport Affidavit (App. 11), ¶ 2.  In that capacity, she has counseled and/or conducted the intake process for at least five hundred (500) battered and abused women, including Ms. Sheppard.  Davenport Affidavit, ¶ 5.

Ms. Sheppard was admitted to the Crisis Center on May 26, 1993.  Davenport Affidavit, ¶ 5.  When Ms. Sheppard arrived at the Crisis Center, she had suffered physical, sexual and psychological abuse.  Davenport Affidavit, ¶ 6.

Ms. Sheppard was referred to the Crisis Center by the police after her husband reportedly got mad because she had gotten an address from an old friend.  Davenport Affidavit, ¶ 7.  Ms. Sheppard and her husband were at Ms. Sheppard's grandmother's when her husband attacked her.  Davenport Affidavit, ¶ 7.  Her husband [reportedly] jerked her hair and hit her in the eye.  Davenport Affidavit, ¶ 7. She had a knot on her head where he pulled it.  Davenport Affidavit, ¶ 7.  Ms. Sheppard's husband at the time, her alleged batterer, was named Jerry Bryant, Jr.  Davenport Affidavit, ¶ 7. Ms. Sheppard

125

told Ms. Davenport that her head continued to hurt after she was admitted to the Crisis Center as a result of the injury her husband inflicted.  Davenport Affidavit, ¶ 7.

With Ms. Sheppard were her nine (9) month old baby and a three (3) year old child.  Davenport Affidavit, ¶ 8.  Ms. Sheppard spent nine (9) days in the Crisis Center. Davenport Affidavit, ¶ 8.  Ms. Sheppard needed child care so that she could attend appointments such as searching for housing, attending job interviews, and the like. Davenport Affidavit, ¶ 8.  Ms. Sheppard also attended a battered women's support group meeting while she was at the Crisis Center, as reflected in the Child Care Contract. Davenport Affidavit, ¶ 8.  Ms. Sheppard told the Crisis Center that she was six weeks pregnant and informed the Crisis Center that she planned to have an abortion as soon as she could find a ride.  Davenport Affidavit, ¶ 8.

While in the Crisis Center, Ms. Sheppard decided to divorce her husband and planned to talk to Legal Aid about filing a protective order against him.   Davenport Affidavit, ¶ 9.  Ms. Sheppard also told a Crisis Center employee that she didn't know what she would do if something happened to her children and said that she would try to set goals and get her life back together.  Davenport Affidavit, ¶ 9.

Ms. Sheppard left the Crisis Center of her own accord nine (9) days after she was admitted.  Davenport Affidavit, ¶ 10.  Ms. Sheppard was in a lot of pain when she left the Crisis Center.  Davenport Affidavit, ¶ 10.  She had filed a protective order against her husband, Bryant, and planned to divorce him and stay with a cousin.   Davenport Affidavit, ¶ 10.

Ms. Davenport has learned that family violence problems occur when the abuser is a "control freak" who will do whatever he or she can to keep power over the battered person. Davenport Affidavit, ¶ 11. In Ms. Davenport's experience, the battered person has very low self-esteem and is easily influenced by the batterer. Davenport Affidavit, ¶ 11. The batterer typically keeps the abused person's esteem low, makes threats of violence regarding the victim and/or his or her family, isolates the victim, tightly controls the victim's "privileges," such as his or her ability to come and go as he or she pleases, controls the victim's money, transportation, phone calls, contact with family and friends. Davenport Affidavit, ¶ 11. Personal characteristics of the typical victim of family violence are low self-esteem, childhood and/or other abuse, and a mother or grandmother who was also battered. Davenport Affidavit, ¶ 11. Oftentimes, the batterer will force his victim to commit crimes, including prostitution or drug sales or use. Davenport Affidavit, ¶ 11.

Ms. Davenport believes that Ms. Sheppard fits the profile of a family violence victim. Davenport Affidavit, ¶ 12. Based on Ms. Davenport's interviews with Ms. Sheppard and review of the records in her Crisis Center file, Ms. Davenport believes that Ms. Sheppard had low self-esteem as a result of battering by her husband and was easily influenced by him. Davenport Affidavit, ¶ 12. Ms. Davenport would have made Ms. Sheppard leave the Crisis Center if she ever showed any violent tendencies, but she never showed any such tendencies toward violence while she was at the Crisis Center. Davenport Affidavit, ¶ 12.

Ms. Sheppard's attorneys never spoke with Ms. Davenport before or during her 1995 capital murder trial.  Davenport Affidavit, ¶ 13.  Neither Ms. Sheppard's attorneys nor any of their representatives ever asked Ms. Davenport what she knew about Ms. Sheppard, how well Ms. Davenport knew Ms. Sheppard, whether Ms. Davenport believed Ms. Sheppard posed a probability of future dangerousness, whether Ms. Davenport would be willing to testify at Ms. Sheppard's capital murder trial or any other questions regarding Ms. Sheppard or family violence victims.  Davenport Affidavit, ¶ 13.  Ms. Davenport does not recall any attorney or other person working for Ms. Sheppard or her attorneys visiting the Crisis Center before her 1995 capital murder trial.  Davenport Affidavit, ¶ 13.  Patricia Birdwell ("Birdwell"), the Crisis Center's Director at the time of Ms. Sheppard's 1995 capital murder trial, never discussed Ms. Sheppard or her capital murder trial with Ms. Davenport and never asked Ms. Davenport to testify during the trial.  Davenport Affidavit, ¶ 13.

Ms. Davenport did not testify in Ms. Sheppard's 1995 capital murder trial, but was in the courthouse during the punishment phase of the trial.  Davenport Affidavit, ¶ 14.  Ms. Davenport was present in the courthouse only because Ms. Birdwell asked Ms. Davenport to accompany her to Houston for the trial.  Davenport Affidavit, ¶ 14.  Ms. Davenport would have testified on Ms. Sheppard's behalf at her capital murder trial if she had been subpoenaed by a court to testify, as Birdwell was.  Davenport Affidavit, ¶ 14.  Ms. Davenport could have testified to each of the matters discussed in this Affidavit as well as any other matters regarding Ms. Sheppard on which Ms. Davenport has personal knowledge.  Davenport Affidavit, ¶ 14.

Patty Markey had contact with Ms. Sheppard as a Crisis Center employee while Ms. Sheppard stayed at the Crisis Center.  Davenport Affidavit, ¶ 15.  Ms. Davenport is not aware of Ms. Sheppard's attorneys contacting Ms. Markey regarding Ms. Sheppard's upcoming capital murder trial, her background or her stay at the Crisis Center. Davenport Affidavit, ¶ 15.

### h.      Jonathan Sheppard (Appendix 16)

Jonathan Sheppard, Ms. Sheppard's brother, is about two years older than his sister.  J. Sheppard Affidavit (App. 16), ¶ 2.  For most of their childhood, Jonathan and Erica were raised by their maternal grandmother, Annie Lee Smith, in Markham, Texas. *Id*., ¶ 3.

Their mother, Madelyn Smith Johnson, lived in Houston, and she would visit the children in Markham on the weekends or during the summers.  *Id*., ¶ 4.  Jonathan and Erica often went back and forth between Markham and Houston, which was almost a two-hour drive.  *Id*.

When Jonathan and Erica were young, they were physically and sexually abused by a babysitter and her boyfriend.  *Id*., ¶ 5.  Jonathan later came to learn that the babysitter's name was Lonnie Marie Spann, but he and Erica only knew this woman as "Cookie."  *Id*.  Cookie was a friend of Jonathan and Erica's mother from the neighborhood.  *Id*.  Jonathan was about seven and Erica was about five years old, and the abuse happened over the course of a summer.  *Id*.  Jonathan believes that it was the summer just before his second grade year, which would have been the summer before Erica entered Kindergarten.  *Id*.  It was the worst summer of Jonathan's life.  *Id*.

Jonathan and Erica's mother had come from Houston to live with them, and she had moved them into a small apartment in Bay City, about eight miles from where their grandmother lived in Markham.  *Id.*, ¶ 6.  Because school was out for the summer and their mother was working during the day, they were left in the care of the neighbor they knew as Cookie.  *Id.*

Cookie was physically abusive towards Jonathan and Erica.  *Id.*, ¶ 7.  She would constantly hit them with her hands or whip them with electrical cords.  *Id.*  She would do other things like make them walk to store without any shoes.  *Id.*  It was during the summer and they would burn their feet on the hot pavement.  *Id.*  The abuse happened almost every day.  *Id.*

Cookie had a boyfriend, and Cookie made Ms. Sheppard, then only about five years old, perform oral sex on him several times that summer.  *Id.*, ¶ 9.  Cookie made Jonathan sit there and watch.  *Id.*  Jonathan told his grandmother about the abuse, and told her that he did not want to go back with Cookie anymore.  *Id.*, ¶ 10.  Jonathan and Erica's mother did not believe the children, and neither she nor the grandmother ever reported the abuse to the authorities.  *Id.*, ¶¶ 10, 12.

Jonathan testified to the abuse of Ms. Sheppard by Jerry Bryant, Jr., the father of Ms. Sheppard's third child, Audria, noting that Erica was trying to get away from Jerry in June 1993 when she came to visit Jonathan in Houston.  *Id.*, ¶ 30-33.

Jonathan further testified that Ms. Sheppard's attorneys and investigator never interviewed him about his and Ms. Sheppard's life, that he did not testify at the

punishment phase of Ms. Sheppard's trial, and that he would have testified to the facts of his life and that of Ms. Sheppard if he had been asked to do so. *Id.*, ¶¶ 34-35.

### i.   Isabel Rodriguez (Appendix 17)

Isabel Rodriguez, who was once married to the father of Jerry Bryant, Jr., came to know Ms. Sheppard at the age of 18. Rodriguez Affidavit (App. 17), ¶ 3. She testified that Jerry Bryant, Jr. was controlling, violent and abusive towards Ms. Sheppard, and that he repeatedly threatened Ms. Sheppard verbally and even with a pistol on one occasion. *Id.*, ¶¶ 7-9, 14-18. She further testified that Ms. Sheppard was very loving when it came to her children; that Ms. Sheppard was not a violent person; that Ms. Sheppard was naïve and easily manipulated; and that Ms. Sheppard was playful and never violent with the children of Ms. Rodriguez. *Id.*, ¶¶ 32-35. Ms. Rodriguez was never contacted by any of Ms. Sheppard's attorneys before trial, and she would have testified if she had been asked to do so. *Id.*, ¶ 36.

### j.   Aaron C. Green (Appendix 18)

Aaron Green, Justice of the Peace of Matagorda County, Texas since 1991, was Ms. Sheppard's employer for about one year in 1990 or 1991. Green Affidavit (App. 18), ¶¶ 2-3. Ms. Sheppard was well-mannered, a hard worker and did a good job. *Id.*, ¶ 5.

Judge Green knew Ms. Sheppard's grandmother as a "stern woman who demanded a lot of respect. *Id.*, ¶ 4. On a personal level, Judge Green thought Ms. Sheppard was naïve, easily manipulated, and easily misled. *Id.*, ¶ 10. Judge Green grew up with Jerry Bryant, Jr. and knew him to have a reputation for beating and abusing women, stating that Bryant "treated all his girlfriends like dogs." *Id.*, ¶ 11-12.

When Ms. Sheppard was with Mr. Bryant, Judge Green often saw her "with black eyes and bruises on her face." *Id.*, ¶ 14.  From what Judge Green knew of Ms. Sheppard, she was never a violent person, and he was shocked when he heard that she was involved in this case because he did not "see Erica as being capable of killing anyone." *Id.*, ¶ 17. However, because of her tendency to be manipulated, Judge Green did see Ms. Sheppard as "the kind of person who would be in the wrong place at the wrong time." *Id.*

Judge Green was never contacted by any of Ms. Sheppard's attorneys prior to trial. *Id.*, ¶ 18.  Had anyone interviewed him, he would have told them everything he stated in his affidavit and he would have willingly testified to those facts at her trial." *Id.*

### k.     Emma Brooks (Appendix 19)

Emma Brooks has known Ms. Sheppard since she was a little girl because Ms. Brooks was good friends with Ms. Sheppard's grandmother.  Brooks Affidavit, ¶ 4.  Ms. Brooks had a son about the same age as Ms. Sheppard, and they attended Markham Elementary School at the same time.  *Id.*, ¶ 5.

Ms. Brooks attended Mother Zion Missionary Baptist Church, and she recalls that Ms. Sheppard attended Mother Zion as well.   Id., ¶ 16.   At the insistence of their grandmother, Ms. Sheppard and her brother Jonathan were church "all the time."   Id. They would go to service on Wednesday, choir rehearsals on Thursday, and then Sunday school and Sunday service.  *Id.*  The children were "good about attending church and being involved" because their grandmother "would not have it any other way."  *Id.*

Ms. Brooks never knew Ms. Sheppard to be a violent person, and she was shocked to hear on the news that Ms. Sheppard could have been involved in a murder.  *Id.*, ¶ 18.

She does not think that Ms. Sheppard is capable of killing anyone. *Id*.  Ms. Sheppard had three young children; surely, she "had to be thinking about those kids." *Id*.

Ms. Brooks was never contacted by any of Ms. Sheppard's attorneys prior to trial. *Id*., ¶ 19.  Had anyone interviewed her, she would have told them everything she stated in her affidavit and she would have willingly testified to those facts at Ms. Sheppard's trial. *Id*.

### l.    Tangela Price-Sells (Appendix 20)

Tangela Price-Sells, the cousin of Ms. Sheppard's half-brother Alexander Sheppard III, is about three years older than Ms. Sheppard.   Price-Sells Affidavit (App. 20), ¶ 3.

Ms. Price-Sells remembers Ms. Sheppard from Mother Zion Missionary Baptist Church, where they attended Vacation Bible School together. *Id*., ¶ 6.  Ms. Sheppard was always at Sunday service with her grandmother, and like all the children who were part of the Mother Zion community, she was also at all the social functions, such as church picnics. *Id*.

Ms. Price-Sells is an active member of New Faith Church in Houston, where she became a member when she was in middle or high school.  Id., ¶ 8.  When Ms. Sheppard was about 14 or 15 years, she was living in Houston with her mother, and she became an active member of New Faith Church around that time. *Id*.  When she was in high school, Ms. Price-Sells was President of the church's High School Ministry and Vice President of the youth choir.  Id., ¶ 9.  Ms. Sheppard sang soprano in the youth choir, of which one of the membership requirements was to regularly attend Sunday school and Tuesday Bible Study. *Id*.  Ms. Sheppard attended Sunday school, Sunday service, and Bible Study, and

she met the criteria without any problems and thus was able to continue with the choir. *Id*.

Ms. Price-Sells and Ms. Sheppard were close only to the extent that we were both members of New Faith Church. *Id*., ¶ 17. The youth of New Faith was their social nucleus, and all of their friends came from the church. *Id*. Ms. Price-Sells and Ms. Sheppard hung out with the same group of people from the church, and they would do things together, such as going shopping or to the movies. *Id*. Ms. Sheppard liked to do these activities just as much as anyone else. *Id*.

Ms. Price-Sells was never contacted by any of Ms. Sheppard's attorneys prior to trial. *Id*., ¶ 18. Had anyone interviewed her, she would have told them everything she stated in her affidavit and she would have willingly testified to those facts at her trial or if called as a witness in post-conviction proceedings. *Id*.

### m.    Lloyd Jackson (Appendix 21)

Lloyd Jackson, who has served as a deacon for over 40 years at Mother Zion Missionary Baptist Church in Bay City, Texas, has known Ms. Sheppard from the time she was a young girl. Jackson Affidavit, ¶ 2-3. Ms. Sheppard was very active in the church as a youngster and, like most children who attended Mother Zion, she sang in the Children's Choir. Id., ¶ 4. Deacon Jackson recalled that Ms. Sheppard loved to sing, that she always had a beautiful voice, and it seemed to him that she very much enjoyed singing in the choir. *Id*.

During the summers, Ms. Sheppard attended Vacation Bible School. *Id*., ¶ 5. On Sundays, Ms. Sheppard faithfully attended service and Sunday school. *Id*., ¶ 6. She was particularly active in Sunday school; about the time Ms. Sheppard was in junior high

school, she served as the secretary of Sunday school, where she would do things such as monitor the enrollment of students in the program and help keep record of the students' attendance every Sunday.  *Id*.  She was a great help to the church elders in this regard. *Id*.

 Ms. Sheppard was never a problem child.  *Id*., ¶ 7.  She was always respectful and obedient, and Deacon Jackson felt that this had to do with Ms. Sheppard's grandmother, who was a strict disciplinarian.  *Id*.

### n.    Tommi Eanes (Appendix 23)

Tommi Eanes, who has known Ms. Sheppard since she was 14 or 15 years old, was in a relationship with Ms. Sheppard's mother, Madelyn Johnson, for about 11 years beginning in 1988.  Eanes Affidavit (App. 23), ¶ 2.  Ms. Eanes and Madelyn lived together for almost 11 years.  *Id*.  When Ms. Sheppard was not in Markham with her grandmother, she stayed with her mother and Ms. Eanes.  *Id*.

Ms. Eanes observed Madelyn "buck up" to Ms. Sheppard many times, calling Ms. Sheppard a "bitch," using a belt to give Ms. Sheppard a "good whooping" and getting in Ms. Sheppard's face to say "I will kill you."  *Id*., ¶¶ 5-7.

Madelyn was physically abusive with Ms. Eanes once, and they "got into a full-blown physical fight, throwing punches at each other wherever they landed."  *Id*., ¶ 9. Ms. Eanes remembered getting a call from the Covenant House a couple of times letting her and Madelyn know that Ms. Sheppard was there.  *Id*., ¶ 11.  She recalls going there with Madelyn one time to pick up Ms. Sheppard's son, Haybert.  *Id*.  Madelyn's attitude about Erica being in the Covenant House was that it "just had to be put in God's hands."

*Id.*, ¶ 12.  Madelyn would tell Ms. Eanes that she had to pray for Ms. Sheppard, but that she should "let it go and put it in God's hands." *Id.*

Ms. Eanes recalls that when Ms. Sheppard became pregnant with her first son, Haybert, she told Ms. Eanes instead of Madelyn because she was afraid to tell Madelyn. *Id.*, ¶ 13.  Madelyn never really wanted to be a mother; she always wanted to do her own thing. *Id.*, ¶ 16.  Madelyn got very depressed for a period when she and Ms. Eanes were together. *Id.*, ¶ 19.  Madelyn had lost her job, and she was having financial problems. *Id.* Ms. Eanes recalls her being very down; she would ask her what was wrong and try to get her to talk about her problems, but Madelyn was not one to talk about her problems. *Id.*

Ms. Sheppard was never a violent person.  Id., ¶ 20.  Ms. Eanes never saw her lay a hand on anyone, including her own children. *Id.*  She was a very loving and caring mother. *Id.*  Ms. Sheppard was not the kind of person to be involved in crime. *Id.*, ¶ 23. It was way out of character for her. *Id.*

Ms. Eanes was never contacted by anyone on Ms. Sheppard's defense team. *Id.*, ¶ 25.  Had anyone contacted her, she would have willingly told them everything she stated in her affidavit and would have testified if asked. *Id.*

### 4. Expert Witnesses

#### a. Dr. Priscilla Ray (Appendix 24)

In her affidavit filed October 4, 2011, Dr. Ray confirmed the limited scope of her work in this case. App. 24.  Dr. Ray testified that she was contacted by attorney Brown, who asked her as a psychiatrist to evaluate Ms. Sheppard's competency and sanity, as well as to evaluate whether Ms. Sheppard was likely to be influenced by men who were in a position to be abusive. App. 24, ¶ 4.  Mr. Brown did not request that Dr. Ray

136

evaluate Ms. Sheppard with any psychiatric diagnosis, and she therefore limited the scope of her evaluation to those three impressions: sanity, competence and influence of potentially abusive men. *Id*. Dr. Ray recorded her impressions of her two-hour clinical evaluation of Ms. Sheppard in her Clinical Evaluation report dated November 30, 1994. Defendant's Exhibit 4-B.

Dr. Ray's clinical evaluation of Ms. Sheppard was not intended as a medically diagnostic interview, and Dr. Ray did not engage in clinical, diagnostic inquiries as she would typically perform for a medically diagnostic evaluation. App. 24, ¶ 5. Dr. Ray's focus on competency and sanity was a different referral question and medical evaluation than one focused on diagnosing psychiatric conditions. *Id*. If Mr. Brown had requested that she perform a medical diagnosis for Ms. Sheppard, Dr. Ray was qualified and capable of doing so at that time. *Id*. As a licensed psychiatrist with an active private practice, Dr. Ray has regularly performed medical, psychiatric diagnoses of her patients since 1985. *Id*.

Mr. Brown did not ask Dr. Ray to provide a diagnosis regarding whether Ms. Sheppard suffered from post traumatic stress disorder ("PTSD") or any other trauma-related psychoses. App. 24, ¶ 6. One of the impressions that Dr. Ray did form, that Ms. Sheppard was more susceptible to threats by men who were in positions to be abusive, is not inconsistent with a PTSD diagnosis. *Id*. In order to diagnose a patient with PTSD with clinical certainty, Dr. Ray would have to evaluate specific criteria as detailed in DSM-IV. *Id*.

If she had been asked to diagnose whether Ms. Sheppard suffered from PTSD or other trauma related psychosis, Dr. Ray was qualified and able to do so at the time she conducted her clinical evaluation in 1994.  App. 24, ¶ 7.

As documented in her Report, Dr. Ray's examination consisted of a review of the medical records from Ms. Sheppard's treatment at the Harris County Jail as well as a clinical psychiatric interview lasting two hours.  App. 24, ¶ 8.  Because the scope of her assignment was limited, Dr. Ray determined it unnecessary to conduct any additional interviews or review any other records.  *Id*.  Dr. Ray did not interview any family members, social workers, or other doctors who had provided previous medical attention. *Id*.  Dr. Ray did not review and was not provided access to any of the following:

- Investigative Report of Investigator John Castillo
- Medical Records
- School Records
- Offense and Incident Reports
- Affidavits or Statements from any individuals
- Records from any Social Services organization, such as women's shelters

*Id*.

### b.    Dr. Mark Cunningham (Appendix 6)

Dr. Cunningham submitted a comprehensive analysis of this case in relation to the future dangerousness issue.  Cunningham Affidavit, App. 6.  Dr. Cunningham analyzes factors in Ms. Sheppard's case that, had they been presented to the jury, would have allowed them to analyze the future dangerousness issue in a manner favorable to Ms. Sheppard.

Dr. Cunningham, who is board certified in Forensic Psychology, a distinction held by fewer than two hundred psychologists in the United States, has provided forensic

evaluation services in over three hundred seventy-five cases and participated as an expert

forensic psychologist regarding sentencing determination issues in numerous capital

cases.   Cunningham Affidavit, ¶¶ 3, 4.   Dr. Cunningham, who reviewed extensive records

and documentation in Ms. Sheppard's case, states in his evaluation that:

> There is conceptual and research literature regarding violence
> risk assessment and violence risk assessments of capital
> offenders which may have significant implications to the trier
> of fact both in avoiding misconceptions and error, and in
> approaching the capital sentencing risk assessment task with a
> greater degree of scientific understanding.   This literature
> may not be well known to psychologist who are  not routinely
> practicing in this particular risk assessment context.

Cunningham  Affidavit, ¶ 9.   As part of his preparation in this case, Dr. Cunningham

reviewed  the  report  prepared  by  Dr. Priscilla Ray,  the  psychiatrist  called  by  defense

counsel at trial and noted:

> It is disturbing to note that blatantly inadequate time and
> resources appears to have been directed toward the
> identification, elaboration, or presentation of mitigating or
> risk assessment information and conceptualizations prior to
> her [Ms. Sheppard's] capital trial.   Dr. Priscilla Ray, defense
> psychiatrist, spent only an hour and a half in interviewing
> Erica.   An interview of this duration is insufficient to obtain a
> comprehensive and detailed history of the sort required in a
> capital sentencing evaluation.   This becomes quite apparent
> when it is considered that 14 significant factors were
> identified in the current preliminary evaluation as being
> potentially important in mitigation, in addition to numerous
> factors relevant to violence risk assessment.   In a 90 minute
> interview, Dr. Ray would have had only six minutes to illicit
> and develop a complete history of each factor, much less to
> clarify the personal impact, meaning and repercussions of
> each of these in Erica's life.   When it is noted that Erica's
> history  involved  repeated  sexual  victimization,  the
> inadequacy of time spent in the social history/mental
> health/mitigation evaluation becomes starkly obvious.   The
> development of a complete history is essential if the jury is to

> understand both the adverse events and their formative
> significance in Erica's life.  It is additionally of concern that
> Dr. Ray did not contact family or other third parties who
> could have provided context and details of Erica's history that
> were influential but which Erica might not recall.  These
> individuals would also have been important sources of
> external perspective on Erica's development, interaction
> patterns, and personality -- all of which are relevant both to
> mitigation issues and violence propensity.

Cunningham Affidavit, ¶ 10.  As Dr. Cunningham points out in his evaluation, "[a]ctuarial or group statistic methods have been repeatedly described as not an adjunct to, but rather superior to clinical methods in predicting the behavior of individuals." Cunningham Affidavit at 30.  Dr. Ray's evaluation was a clinical evaluation and contained no actuarial or group statistic methods; indeed, Dr. Ray testified at trial that she was not familiar with the literature in the field regarding future dangerousness.  SF 26:47.

In his analysis, Dr. Cunningham considers the four fundamental questions essential for a more relevant and precise assessment of future violence:  (1) what violence?, (2) what severity?, (3) what context?, (4) what time period?  Cunningham Affidavit at 31-34.  With respect to the contextual factor, there are two relevant possibilities:  (1) within the state prison system over the period of a capital life sentence incarceration and (2) in a free society if eventually paroled.  Cunningham Affidavit at 32. Dr. Cunningham notes that "in a capital sentencing assessment of violence potential in prison, it would seem relevant to consider that prison is a highly structured and intensely supervised setting quite distinct from free society, warranting utilization of base rates that are specific to that context."  Cunningham Affidavit at 32.  Examination of several statistical studies shows that the "supervision, structure, weapons restriction, and external

stress insulation context of prison works to sharply limit lethal violence  -- even in a population that exhibited marked violence in the community."  Cunningham Affidavit at 33.   Dr. Cunningham notes that serious predictive errors may occur "by inferring violence potential to individual dispositional characteristics or behavioral history alone without reference to context."  Cunningham Affidavit at 33.   Dr. Cunningham further notes that:

> Thus the group of offenders (convicted of capital offenses) most similar to Erica's have been demonstrated to have a low base rate of serious institutional violence, with studies by Marquart and colleagues revealing a disproportionately low base rate as compared to other inmates.  Base rate data regarding capital offenders and their disciplinary outcome in the general prison population reveal that less than ten percent were guilty of chronic violent rule infractions unless incarcerated in administrative segregation.

Cunningham Affidavit at 36.  Dr. Cunningham further notes that aging is well established as a significant factor in reduced based rate likelihood of criminal violence in both community and prison context, observing that both large scale representative community samples and inmate samples have found lower rates of antisocial personality disorder incidents and prison disciplinary problems as individuals age.  Cunningham Affidavit at 36, 37.

Next, Dr. Cunningham's study particularizes prison violence base rate data to Ms. Sheppard.  Dr. Cunningham states that "it is notable that Erica does not have a long standing pattern of routine and repetitive physical aggression or violence" and that "[t]he absence of routine, repetitive violence developmentally and during long-time term jail incarceration reduces the likelihood of her responding with violence to interpersonal

conflicts in prison." Cunningham Affidavit at 38. Noting that Ms. Sheppard does appear to have been prone to meeting her dependency needs by impulsively attaching herself to marginal men, Dr. Cunningham observes that "Erica's seeking and participating in treatment efforts is viewed as reducing the likelihood of future violence." Cunningham Affidavit at 39. Dr. Cunningham also notes that, with Erica's aging across a capital life sentence, he anticipates "that her judgment would improve and her relationship dependency would lessen." Cunningham Affidavit at 39.

Dr. Cunningham states that Ms. Sheppard's gender is perhaps the most important individualized factor in determining the base rate likelihood of future violence:

> Females have dramatically lower rates of serious violence both within prison and in the community. This is a well established finding in criminal justice. Males are arrested at four times the rate of females, account for 90.3% of the homicides, and 87.5% of the violent crime. Nationwide, 17 times as many males as females were confined in State Prisons in 1992. The reduced potential for violence is also reflected in the generally lower level of security female inmates are held at within TDCJ, including female death row security as compared to male death row security.

Cunningham Affidavit at 39.

Dr. Cunningham also observes that Ms. Sheppard's continuing family relationships with her children, her mother and maternal grandmother would be a factor "which reduces the incidence of both prison disciplinary and assaultive offenses." Cunningham Affidavit at 39.

Similarly, Ms. Sheppard's disciplinary record at the Harris County Jail "points to a capacity to conform her behavior to institutional requirements" and "a capacity to control

anger and deal with interpersonal problems in a non-violent fashion." Cunningham Affidavit at 40.

Dr. Cunningham's application of parole recidivism data to Ms. Sheppard took into account the factors of age, gender and family support system, concluding that Ms. Sheppard's likelihood of criminal violence on capital parole would be below the base rates of the capital groups describes in the literature examined by Dr. Cunningham. Cunningham Affidavit at 42, 43. Dr. Cunningham's conclusion regarding the issue of future violence in Ms. Sheppard's case is as follows:

> There are multiple compelling mitigation themes in Erica's social history which could have been described in detail at her capital sentencing trial had these been adequately investigated. There was further substantial research data available to describe and illustrate the implication of the factors for Erica's development, and to place her moral capability at the time of offense in some perspective.
>
> Risk assessment of the probability of the future violence is most reliably based on actuarial data which is then conservatively individualized to the particular defendant. Actuarial data indicates that capital offenders as a class have a low rate of institutional violence. Erica's co-participation with males and her past violence, absence of historic routine violence in her behavioral repertoire, gender, and continuing family support all indicate that her risk of prison violence would be lower than the capital offender base rate. It is anticipated that this risk would further decline as Erica ages across a capital life term. Capital offenders have lower rates of parole recidivism than general parolee cohorts. Most make a successful parole adjustment. It is anticipated that Erica is somewhat more likely than these capital offender parolee groups to make a successful parole adjustment as a function of older age at the time of parole eligibility, gender, and a family support system.

Cunningham Affidavit at 43, 44.

Dr. Cunningham's evaluation identified fourteen mitigating factors in Ms. Sheppard's case. Cunningham Affidavit at 10. Although a reasonable investigation by defense counsel would have uncovered this abundance in mitigating evidence, the record is silent on these factors:

1.  Early life instability and unstable attachments;

2.  Observed domestic violence;

3.  Paternal abandonment;

4.  Sexual abuse;

5.  Physical abuse;

6.  Learning disability;

7.  Attention deficit disorder;

8.  Sexual victimization by older males;

9.  Teenage pregnancies;

10  Observed community violence;

11  Sexual assault;

12. Domestic violence victimization-battered woman's syndrome;

13. Post Traumatic Stress Disorder; and

14. Impact of Erica Sheppard's execution on her children.

Cunningham Affidavit at 10.

The facts and implications of each of these mitigating factors is addressed in detail in Dr. Cunningham's evaluation. Cunningham Affidavit at 10-30. None of the above evidence was brought out at the punishment phase, even though witnesses with personal knowledge were available and willing to testify. *See, e.g.,* McNeil Affidavit, App. 8, ¶¶ 15-18; Smith Affidavit, App. 9, ¶¶ 7-9; Sheppard Affidavit, App. 14, ¶ 54.

c.     **Dr. Myla Young (Appendix 25)**

Dr. Myla Young is a clinical psychologist specializing in neuropsychology and neuropsychological assessments; she conducts neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients. App. 25, ¶¶ 1-2.  Dr. Young performed a neuropsychological evaluation of Ms. Sheppard to determine the presence (if any) and severity of organic deficits, and to render an opinion as to (1) whether and how such impairments would have affected her cognitive functioning throughout her lifetime up to the time of the offense and (2) to determine whether Ms. Sheppard's deficits would have been measurable with neuropsychological testing available at the time of her arrest and trial.  App. 25, ¶ 11.

Dr. Young conducted approximately 18 hours of neuropsychological evaluation of Ms. Sheppard over the course of 3 days on November 19-21, 2008. App. 25, ¶ 17.  Dr. Young assessed Ms. Sheppard's neuropsychological functioning by administering two neuropsychological batteries: (1) the Halstead-Reitan Neuropsychological Battery, which has been well-established since 1985, continues to be widely accepted in the scientific neuropsychological community, and has normative standards specific to the Black population; and (2) a neuropsychological testing battery consisting of a series of independently selected, contemporary neuropsychological tests.  App. 25, ¶ 22. Dr. Young noted that the independent tests administered, or an earlier version of the test, "were available at the time of Ms. Sheppard's arrest and trial."  *Id*.  The tests included a Detailed Assessment of Posttraumatic Stress (DAPS).  App. 25, ¶ 23.

Dr. Young summarized her findings and conclusions as follows:

a.    Ms. Sheppard's general intellectual ability is in the Borderline to Low Average Range, and lower than 90% of individuals of her same her age and education. Her mental age equivalence is 14.0 years of age. (App. 25, ¶ 59).

b.    In simple situations, and with episodic help from others, Ms. Sheppard would be expected to be able to function adequately-living independently, enjoying some social, interpersonal, and family relationships, and employed in a job if that job is consistent with her abilities. In simple situations Ms. Sheppard's ability to comprehend and use reasonably good judgment would typically be adequate. (*Id*.).

c.    In situations which are novel, demanding, unclear, require simultaneous consideration of several pieces of information in making decisions and require good judgment, however, Ms. Sheppard would be seriously compromised and would be vulnerable to making bad decisions and using bad judgment, unable to change her actions when the situation demanded a change. (*Id*.).

d.    In emotional situations which are not threatening, not complex, and do not require a great deal of emotional independence, individuals who have this level of general mental ability are generally able to maintain adequate interpersonal and social relationships. In reasonably simple relationships and situations, Ms. Sheppard's psychological functioning could be adequate. In emotional relationships and situations which are complex or demanding, however, Ms. Sheppard would not be expected to function adequately. She would tend to be more emotionally dependent on others, and to seek out another to make emotional decisions for her. In situations which are emotionally complex, or in situations which threaten loss of her emotional support, Ms. Sheppard would be seriously compromised, and would tend to make unreasonable decisions that are not in her best interest, tend to use poor judgment, and tend to be unable to use the good judgment to move to another relationship. (App. 25, ¶ 60).

e.    The brain dysfunction that Ms. Sheppard experiences, however, is greater than can be accounted for by her limited general mental ability alone. Ms. Sheppard experiences impaired motor coordination, attention and concentration, memory and learning, visual-perceptual-motor, secondary language (arithmetic), and executive functioning. Her abilities on neuropsychological testing indicate brain dysfunction for Ms. Sheppard that affects all brain regions, but with the most severe dysfunction in the prefrontal cortex, temporal cortex, adjacent extended limbic system structures (amygdala hippocampus, thalamus), and connections among these systems (orbitofrontal, frontal-subcortical, hippocampal connection systems). (App. 25, ¶ 61).

146

f.    Ms. Sheppard's abilities across neuropsychological testing indicate that she experiences significant dysfunction of all of these brain systems (temporal, limbic and frontal). When presented with a complex, confusing, highly emotional and/or highly stressful situation, Ms. Sheppard would be vulnerable to confusion and misinterpretation, and vulnerable to the influence of others. She would be vulnerable to impaired abilities to assess a situation, reason, develop and evaluate a plan, anticipate consequences of the plan, simultaneously consider several pieces of information, assess and re-assess the situation, change the plan that she developed or refuse to carry out a plan that was developed by another individual when information from the situation should tell her that refusal was needed. In a confusing, emotional and/or complex situation, Ms. Sheppard would be vulnerable to responding in a non-thinking, automaton-like way rather than as a thinking and reasoning adult. Once action is initiated, Ms. Sheppard's ability to re-evaluate the situation, anticipate the consequences and change her actions would also be impaired. (*Id.*).

g.    The brain dysfunction that Ms. Sheppard experiences is, unfortunately, consistent with her life history. Without help from others, Ms. Sheppard would not be able to function independently or adequately. (App. 25, ¶ 63.).

h.    Ms. Sheppard's brain impairments would be known by any competent neuropsychologist who evaluated her offense and Ms. Sheppard at the time of her trial. Neuropsychological testing procedures that would have adequately detected Ms. Sheppard's brain dysfunction were available at the time of her offense and of her trial. (App. 25, ¶ 64.).

### d.    Dr. Rebekah Bradley (Appendix 26)

Dr. Rebekah Bradley, an Assistant Professor in the Department of Psychiatry and Behavior Science at Emory University, is an expert on the impact of exposure to childhood abuse and other early adverse life events, the impact of trauma exposure across the life span and genetic and environmental predictors of posttraumatic stress disorder, depression and other mental and physical outcomes of trauma exposure.  App. 26, ¶ 1. She is the director of a Veteran's Administration, multidisciplinary, outpatient, posttraumatic stress disorder (PTSD) treatment team, which is responsible for providing

assessment and treatment to veterans exposed to traumatic events while in military service.  *Id*.

Dr. Bradley evaluated Ms. Sheppard with respect to her family, developmental and social background, and her history of childhood abuse and exposure to other adverse and traumatic events in childhood and adolescence.  App. 26, ¶ 2.  Dr. Bradley evaluated the "potential impact of these factors on Ms. Sheppard in terms of her psychological and behavioral functioning with a particular focus on Posttraumatic Stress Disorder and associated symptoms."  *Id*.  She was asked to assess these factors "with respect to her psychological and behavioral functioning across her lifetime."  *Id*.

Dr. Bradley conducted a 12-hour clinical interview with Ms. Sheppard on December 11-12, 2008. App. 26, ¶ 3. Dr. Bradley also conducted a 2-hour interview with Ms. Sheppard's mother on December 13, 2008.  *Id*.

Based on her interviews and her review of case records, Dr. Bradley determined that "across the course of Ms. Sheppard's childhood and adolescence she experienced repeated physical and emotional abuse as well as sexual abuse/assaults." App. 26, ¶ 7. Dr. Bradley further determined that:

> During critical developmental phases, she lived in an atmosphere of terror and fear that prevented her from experiencing and learning from healthy childhood experiences. In addition, while still an adolescent, at age 17, Ms. Sheppard experienced severe and repeated physical and verbal intimate partner violence. In addition to these multiple abusive and traumatic experiences, her early environment included a number of other adverse experiences and stressful circumstances. Due to their occurrence over the course of her neurobiological and psychological development, these events negatively impacted Ms. Sheppard's thoughts, beliefs, emotions and behaviors across the course of her lifespan.

*Id*.  Dr. Bradley's report noted in detail the following aspects of Ms. Sheppard's life:

a.      Childhood sexual abuse/sexual assault/rape (App. 26, ¶¶ 8-19);

b.      Childhood physical abuse (App. 26, ¶¶ 20-30);

c.      Witnessing violence between parents (App. 26, ¶¶ 31-33);

d.      Emotional neglect and abuse and unsafe and chaotic living arrangements (App. 26, ¶¶ 34-40);

e.      Mental illness and alcohol and drug use in Ms. Sheppard's family (App. 26, ¶¶ 41-45);

f.      Neighborhood/school violence during childhood and adolescence (App. 26, ¶ 46); and

g.      Domestic violence and intimate partner violence experienced by Ms. Sheppard (App. 26, ¶¶ 47-55).

Dr. Bradley noted that a "comprehensive psychosocial history involves, when possible, the gathering collateral information from multiple sources including (but not limited to) interviewing or reviewing statements of family members and other people important in the life of the person being evaluated, reviewing any prior psychiatric records, reviewing records from other institutions with which the person being evaluated has been involved including schools records and in the case of Ms. Sheppard records from the battered women's shelter and records from the shelter for adolescents where she received services."  App. 26, ¶ 57.

Dr. Bradley noted that such an evaluation is important because "one of the impacts of traumatization and exposure to abuse and neglect is a tendency to avoid talking about or reporting full accounts or important details of their experiences on trauma abuse and neglect" and because "remembering certain aspects of experiences of trauma or abuse can lead to increased physiological and psychological distress."  App. 26, ¶ 58.  An avoidance

of thoughts and other reminders of such experiences is a symptom of posttraumatic stress disorder. *Id*.

Based on her assessment of Ms. Sheppard and her review of the materials provided to her, Dr. Bradley diagnosed Ms. Sheppard with three psychiatric disorders:

a. Major depression, recurrent, severe with psychotic features, in partial remission (App. 26, ¶¶ 71-75);

b. Posttraumatic stress disorder (PTSD), prolonged (App. 26, ¶¶ 71, 76-87); and

c. Dissociative disorder, not otherwise specified (App. 26, ¶¶ 71, 88-91).

Defense counsel failed to perform a reasonable investigation into their client's life, and deprived Ms. Sheppard's jury of the tools they needed to fairly judge whether she should live or die for her crime. Ms. Sheppard is entitled to a new trial in which jurors, after hearing a balanced presentation of all the mitigating and aggravating evidence, have a chance to formulate a "'reasoned moral response to the defendant's background, character, and crime.'" *Penry v. Lynaugh*, 492 U.S. 302, 327 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (O'Connor, J., concurring)).

Cases decided by the U.S. Supreme Court and the Texas Court of Criminal Appeals have confirmed the scope of the requirement that defense counsel perform a reasonable investigation into their client's life. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (investigations into mitigating evidence should "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor" and that "among the topics counsel should

consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences."); *Ex parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) (Mitigating evidence includes "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant") (citing TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1)).  *See also Ex parte Gonzales*, 204 S.W.3d at 400 (Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the circumstances of the offense, the defendant's character and background, and any evidence that lessens the personal moral culpability of the defendant) (Cochran, J., concurring).

**B.    Trial Counsel Rendered Ineffective Assistance of Counsel with Respect to the Guilt/Innocence Phase of Ms. Sheppard's Trial, in Violation of the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984).**

**1.    Trial counsel failed to object to the trial court's erroneous instructions to the veniremen in the final grand panel that, in a hypothetical case, a getaway driver and a bank robber should receive the same punishment.**

Appellate counsel for Ms. Sheppard conceded in her direct appeal brief to the Court of Criminal Appeals that trial counsel did not object to the trial court's erroneous instructions to the *jury* panel.  In its disposition of this point, the Court of Criminal Appeals, citing *Enmund* and *Tison*, agreed that Ms. Sheppard "correctly points out that in the context of the death sentence, this is an oversimplification of the law."  Op. (App. 15) at 2, n. 2.  Nonetheless, the complaint regarding the trial court's erroneous instructions was held to be waived by trial counsel's failure to object during voir dire.  *Id*. at 2.

Counsel's failure to object to the erroneous instruction resulted in the claim being waived and the error not preserved for appellate review.   Ms. Sheppard was plainly prejudiced by her counsel's *waiver* of this argument.   There is a reasonable probability that, but for the errors by Ms. Sheppard's counsel, the result of her trial would have been different.  *Strickland*, 466 U.S. at 694; *Ex Parte Drinkert*, 821 S.W.2d 953, 956 (Tex. Crim. App. 1991).   As a result of counsel's ineffective assistance, Ms. Sheppard is entitled to a new trial.

**2. Ms. Sheppard's counsel failed to object to the prosecutor's improper and misleading statements regarding the specifics of Texas' parole law in capital cases during voir dire.**

During voir dire, the prosecutor misled prospective jurors, many of whom were ultimately selected as jurors, regarding the specifics of Texas' parole law in capital cases. The prosecutor was *able* to mislead jurors into possibly believing that Ms. Sheppard could be eligible for parole in a few short *years* by stating that "the legislature changes [the parole laws] and can change [the parole laws] at anytime" and "[t]here is no guarantee one way or the other what [the parole laws] will be today or tomorrow."  SF 6:19.

Following are examples where the prosecutor materially misled jurors concerning the Texas parole laws applicable to Ms. Sheppard's case:

**Juror No. 93 (selected on the jury):**

> In the State of Texas, we are not like several states in the United States, we do not have life without parole. Meaning if you get a life sentence you stay there for the rest of your natural life and die.

We don't have that in Texas.  You are eligible for parole at certain significant points in time.  For this particular case because of it's time frame, it's what we call life 35.  Meaning that if the defendant was given a life sentence that they would stay in the penitentiary for 35 years as a minimum before eligibility for parole.

Now in Texas that has shifted over the years.  At one time it was what we call a life 15 state, life 20, life 35 and now a life 40 state.  As you can see the legislature has changed those minimum requirements of years in the penitentiary, they have moved it up *and they can as easily move it back*, it just depends on what they want to do.

SF 6:106-107.

**Juror No. 40 (selected on the jury):**

Now, the State of Texas is not a state of life without parole.  You may have read about that or heard about it.  People can parole out on a life sentence. In this particular case, we're governed by a rule that says: Life means that an individual would serve a minimum of 35 years before being eligible for parole.  They may or may not receive parole at the end of that 35 years.

Historically, it used to be a minimum of 15 years, then 20 and then 35 and now, it's 40.  So, you can see *the legislature has changed it anyway they want.  So, there is no telling that it may change or not change at any point in time but that's something you are not permitted to consider, what the legislature might do in the future.*

SF 6:125.

**To Juror No. 94 (selected on the jury):**

[T]here is another issue that may come up, it's called parole.  You probably heard about that, you read enough about it in the papers and it talks about the fact that people getting out early release or whatever.  A lot of people don't like that.

In this particular case there is only two alternatives life or death and a life sentence in the State of Texas, however, we are not a life without parole state.  You can get parole on a life sentence in this state.

In this particular case, the governing law which we would anticipate that the Judge would tell you would be life 35.  Meaning that the defendant would be subjected to 35 years in the penitentiary before they're eligible for probation - - I'm sorry -- parole comes up.

Now historically in the past we have been a life 15 state, a life 20, life 35, life 40.  *So you can see the legislature has changed those minimums.  So they can change any direction however we the people decide to do that.  So there is no set thing* but you do need to understand there is no such thing as life without parole.

SF 9:24-25.

As clearly demonstrated above, the prosecutor was permitted to mislead the jurors into believing that Ms. Sheppard could be eligible for parole in as few as 15 years, if not sooner, "because the legislature changes it and can change it at anytime.  There is no guarantee one way or the other what [the parole laws] will be today or tomorrow."  SF 6:19.  As a result of counsel's failure to object and the trial court's failure to cure the prosecutor's material misrepresentation, Ms. Sheppard's constitutional rights under the Sixth, Eighth and Fourteenth Amendments were clearly violated.

The CCA has repeatedly "held that parole, and the issues surrounding the minimum prison term necessary for parole eligibility, are not matters for jury consideration in a capital murder prosecution."  *Rhoades v. State,* 934 S.W.2d 113, 119 (Tex. Crim. App. 1996); *see also, e.g., Stantellan v. State,* 939 S.W.2d 155, 170 (Tex. Crim. App. 1997); *Smith v. State*, 898 S.W.2d 838, 846 (Tex. Crim. App. 1995); *Broxton*

*v. State*, 909 S.W.2d 912, 919 (Tex. Crim. App. 1995); *Sonnier v. State*, 913, S.W.2d 511, 521 (Tex. Crim. App. 1995).  Such questions concerning parole eligibility are not a proper area of inquiry for veniremembers.  *See Ford v. State*, 919 S.W.2d 107, 116 (Tex. Crim. App. 1996).  Although Ms. Sheppard's trial counsel filed the ill-advised motion requesting permission to allow parole eligibility questions during voir dire, neither Ms. Sheppard's trial counsel nor the trial court should have permitted the prosecution to materially mislead the jury members in such a prejudicial manner.

In addition, the mere filing of the ill-advised motion requesting permission to allow such questions during voir dire evidences a clear lack of effective assistance to Ms. Sheppard.  Ms. Sheppard was only twenty-one years old and in good health at the time of trial.  Therefore, providing the jury with any information that Ms. Sheppard could become eligible for parole while still at a fairly young age could only prejudice Ms. Sheppard during the penalty phase of the case.

Typically, defense counsel in a capital murder case may seek permission to question the veniremembers concerning parole eligibility to establish that a life sentence, even with the possibility of parole, is tantamount to a life sentence without parole given the defendant's age, health and other special circumstances.  *See Colburn v. State*, 1998 Tex. Crim. App. LEXIS 23 (February 25, 1998).  However, even in such cases, the CCA has uniformly held that parole eligibility issues should not be presented to the jury.  *See id.*  Therefore, in this case, especially where Ms. Sheppard is a healthy young woman, any discussion before the jury about parole eligibility could only harm Ms. Sheppard in the eyes of the jury when deciding death or life in prison -- especially when the

prosecution materially misled the jurors during voir dire about the length of time before Ms. Sheppard could possibly become eligible for parole.

As a result, the jury in Ms. Sheppard's case may reasonably have believed that Ms. Sheppard could be released on parole several years prior to her true eligibility date if she were not sentenced to death. Therefore, as noted by the United States Supreme Court, "[t]o the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing [Ms. Sheppard] to death and sentencing [her] to a limited period of incarceration." *Simmons v. South Carolina*, 512 U.S. 154, 114 S. Ct. 2187 (1994). This grievous misperception was encouraged by Ms. Sheppard's trial counsel's failure to object to the prosecution's misleading and improper statements and by the trial court's failure to provide any sort of curative instruction. As a result, Ms. Sheppard was denied due process and effective assistance as guaranteed by the United States Constitution. Therefore, this case should be reversed and remanded for a new trial.

> **3. Defense counsel failed to (i) request jury instructions on the lesser included noncapital offenses of robbery and murder, (ii) object to the failure of the charge to include the instructions, or (iii) complain about the absence of these instructions on appeal.**

The record in this case indicates that defense counsel did not request that the jury be instructed on the lesser included noncapital offenses of robbery and murder or object to the failure of the charge to include the instructions. Rather, defense counsel requested that the jury be instructed on the offense of conspiracy to commit capital murder, which request was denied. Tr. 199-200; SF 51-52.

Defense counsel's failure to complain of the absence of these jury instructions (either at trial or on appeal), which are supported by the evidence at trial, constitutes ineffective assistance, thereby entitling Ms. Sheppard to a new trial.

In a criminal case, the trial court must instruct the jury on any lesser included offenses where there is evidence that, if the defendant is guilty, he is only guilty of a lesser included offense. *Moreno v. State*, 721 S.W.2d 295, 302 (Tex. Crim. App. 1986), *citing Aguilar v. State*, 682 S.W.2d 556 (Tex. Crim. App. 1986). The requirement to instruct on lesser included offenses is even stricter in capital cases. *Beck v. Alabama*, 447 U.S. 625 (1980). In this case, Ms. Sheppard was entitled to an instruction on the lesser included offenses of noncapital murder and robbery. Murder is always a lesser included offense of capital murder. *Thomas v. State*, 701 S.W.2d 653, 657 (Tex. Crim. App. 1985).

To be entitled to submission of a lesser included offense instruction, the defendant need not introduce conclusive evidence of the lesser included offense. *See, e.g. Stevenson v. United States*, 162 U.S. 313, 319, 16 S. Ct. 839 (1896). Rather, the record simply must contain some evidence of the lesser offense. *Moreno*, 721 S.W.2d at 295. In this case, the evidence introduced clearly supported a lesser included offense instruction.

Under Texas law, the "disputed factual element" that distinguishes "capital murder" from "non-capital murder in the course of committing a robbery" is the culpable mental state of the defendant. "Not only must the accused be found to have intended to engage in the act that caused the death, he also must have specifically intended that death

result from that conduct." *Kinnamon v. State*, 791 S.W.2d 84, 88-89 (Tex. Crim. App. 1990).

Ms. Sheppard's statement contained significant evidence that she did not specifically intend the death of Complainant.  Under the events as described in Ms. Sheppard's statement, a reasonable juror could have concluded that Ms. Sheppard did not specifically intend to kill the Complainant.

The evidence submitted in this case unquestionably established that Ms. Sheppard was guilty of a serious violent offense, but it also left some doubt as to an element that would justify conviction of a capital offense:  Ms. Sheppard's specific intent.

In *Beck*, the United States Supreme Court stated:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious violent offense -- but leaves some doubt with respect to an element that would justify conviction of a capital offense -- the failure to give the jury the "third option" of convicting on a lesser-included offense would seem inevitably to enhance the risk of an unwarranted conviction.

447 U.S. at 637.   The *Beck* Court held that the "enhanced risk of an unwarranted conviction" cannot be tolerated in a case where the defendant's life is at stake.  *Id.* Accordingly, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, the State is "constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id.* at 638. *See also Rembert v. Dugger*, 842 F.2d 301, 303 (11th Cir.), *cert. denied*, 488 U.S. 969, 109 S. Ct. 500 (1988) ("*Beck* is unequivocal in setting forth the requirement that as long as there is a possibility of a death sentence, a defendant has a constitutional right to the relevant lesser-included instruction.").   The failure to give the jury the "third option" of

convicting on a lesser included offense enhanced the risk of Ms. Sheppard's conviction. As a result, Ms. Sheppard was unconstitutionally sentenced to death. *Beck*, 447 U.S. at 637-639. The trial court's failure to instruct, and defense counsel's failure to request, appropriate lesser included offense instructions or complain about their absence on appeal, deprived Ms. Sheppard of her constitutional rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and similar provisions under Texas law. Counsel's failure to raise or preserve the complaint is ineffective assistance.

### 4. Defense counsel refused to allow Ms. Sheppard to testify at her trial and failed to explain the right to testify to Ms. Sheppard.

A defendant has a fundamental Fifth Amendment right to testify which cannot be waived by counsel or by the court. *Rock v. Arkansas*, 483 U.S. 44, 49-52, 107 S. Ct. 2704, 2708-10 (1987). The right to testify is violated unless there is a knowing, voluntary, and intelligent waiver of the right. *See United States v. Teague*, 908 F.2d 752, 759 (11th Cir. 1990), *reh'g granted*, 953 F.2d 1525 (11th Cir.), *cert. denied*, 113 S. Ct. 127 (1992).

Ms. Sheppard wanted to testify at her trial, and the decision that she would not testify was made by her attorneys against her wishes. Sheppard Affidavit, App. 14, ¶ 56. Ms. Sheppard's attorneys never explained to her that she had the constitutional right to testify on her own behalf. *Id*.

Ms. Sheppard was prejudiced by virtue of this violation of her constitutional right to testify, and reversal and remand for a new trial is required.

### 5. Counsel failed to move for mistrial or complain at trial of the prosecutor's threats to a key defense witness, Jerry Bryant, Jr.

It may be impossible to determine whether a fair trial was possible following the prosecutor's threat to bring the strong arm of the law down upon Jerry Bryant, Jr. if he testified.  Had Bryant been called, his testimony may well have been less certain than it would otherwise have been.  It was likely not possible to erase the taint of Assistant District Attorney Goodhart's improper suggestion that this witness, although he had not been charged with any wrongdoing as a result of his visits to Ms. Sheppard and Dickerson at the Bay City Econo Lodge on July 1-2, 1993 in the twenty months since, would be indicted for that behavior if he took the stand.  Counsel should have sought a mistrial if Bryant's testimony was either not obtained or at all equivocal.  Counsel's failure to do so was ineffective.

When the assistant district attorney told Mr. Brown that he would indict Jerry Bryant if Mr. Bryant testified, Mr. Brown did nothing.  He did not bring the prosecutor's misconduct to the trial court's attention.  Brown Affidavit, App. 1, ¶ 52.  He did not call Mr. Bryant to testify.  Brown Affidavit, App. 1, ¶¶ 50, 51.  Despite the prosecution's urging to the trial court, he did not request a hearing outside the presence of the jury to determine on what issues, if any, Mr. Bryant might claim a Fifth Amendment privilege.[14] SF 25:5.  He did not object when the prosecutor pointed out in closing argument that the

_____

[14] At the beginning of the punishment phase, the prosecution asserted to the trial court that Mr. Bryant, if called as a defense witness, might wish to invoke his Fifth Amendment rights against self-incrimination and suggested that the trial court conduct a hearing outside the presence of the jury on this issue.  SF 25:5. Mr. Brown did not request a hearing and did not call Mr. Bryant as a witness.  SF 25:5.  Brown Affidavit, App. 1, ¶ 51.

defense did not have any defense witnesses to support her claims of abuse.  SF 27:9.  In fact, Mr. Brown did nothing to cure the prosecutor's misconduct.[15]

Because Mr. Brown failed to take any steps to remedy the prosecutorial misconduct, Ms. Sheppard did not receive effective assistance from her counsel and is entitled to a new trial.  *See Raney v. State*, 958 S.W.2d 867, 879 (Tex. App.--Waco 1997, no pet.).

### C.    Trial Court Errors in the Guilt/Innocence Phase Violated Ms. Sheppard's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1.    The trial court's erroneous instructions to the veniremen in the final grand panel that, in a hypothetical case, a getaway driver and a bank robber should receive the same punishment.

In the course of his various meetings with full panels of potential jurors, the trial judge repeatedly used an example to describe the application of the law of parties to a robbery case.  This example involved the judge and the prosecutor, Mr. Goodhart, deciding to rob a bank, where the prosecutor took the gun inside the bank and the judge stayed in the car as the getaway driver.  Part of this voir dire included the statement that both parties would be guilty of capital murder.  SF 4:12, 8:54, 12:93-94, 19:16-18.

However, in front of the final grand panel, the court took it one step further, saying that not only would the robber and the getaway driver each be guilty of capital murder, but also that each should receive the same punishment.[16]  SF 19:15.

---

[15] Indeed, when the prosecutor delivered this threat to Mr. Brown, Mr. Brown immediately agreed with the prosecutor not to call Mr. Bryant to testify, stating "All right, we will do it your way."  Brown Affidavit, App. 1, ¶ 50; Leonard Affidavit, App. 4.

[16] ". . . Let's say that Mr. Goodhart and I decide to go rob First City National Bank.  I don't go in the bank, I just drive the car.  But Mr. Goodhart goes in and he robs the bank and comes back out.  We are equally guilty under the law of robbery of First City National Bank.  Does everyone understand that?

Venireman 196, Joseph Edward Curry, a panelist that heard those remarks, served on the jury.  SF 19:60-100.  Venireman David William Fisher, who served as the alternate juror and was present during the entire guilt/innocence evidence with the rest of the jury, was also a part of that panel.  SF 19:149-184.

In a capital case where the death penalty is sought, the trial court is statutorily required to question the entire panel of prospective jurors about principles of reasonable doubt, burden of proof, return of indictment by the grand jury, presumption of innocence, and opinion.  TEX. CODE CRIM. PROC. ANN. art. 35.17 (Vernon 1996 Supp.).  Those instructions and any others given by the trial court must be *accurate* principles of law.

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  TEX. PENAL CODE ANN. § 7.01(a) (Vernon 1994).  A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.  TEX. PENAL CODE ANN. § 7.02(a)(2) (Vernon 1994).

Each party to an offense may be charged with commission of the offense.  TEX. PENAL CODE ANN. § 7.01(b) (Vernon 1994).  Therefore, as to the "law of the parties"

---

*And by law, we should be equally responsible as to punishment*.  In other words, I shouldn't get less punishment because I just drove the car than Mr. Goodhart gets because he actually went into the bank with the gun.  Does everyone understand that?  Do you agree with it?  Do you disagree with it? Don't see any heads nodding up and down, so I assume that you agree with me."  SF 19:15-16.

instruction on guilt, related to the bank robbery example, the trial court provided a correct instruction of the law.

However, in instructing as to punishment, the trial court was *wrong*.  In a capital case, if an individual is found guilty of capital murder, there is to be a separate sentencing hearing, where evidence may be presented by either side "as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty."  TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (Vernon 1996 Supp.). The trial court then is statutorily required to submit to the jury three issues.[17]   The determination of those three issues is what determines the penalty to be assessed.  Those questions are:

> (1)     whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
>
> (2)     whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken;
>
> (3)     whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2 (Vernon 1996 Supp.).

_____

[17]Only two questions are submitted when the jury is not permitted to convict the accused as a party pursuant to Sections 7.01 and 7.02 of the Penal Code.

The U.S. Supreme Court has held that the mere participation in a robbery in the course of which a murder is committed does not, absent a showing of more, support the imposition of a death sentence:

> [I]f a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.' . . .  Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

*Enmund v. Florida*, 458 U.S. 782, 799, 801, 102 S. Ct. 3368, 3377-79 (1982).  **See also** *Tison v. Arizona*, 481 U.S. 137, 158, 107 S. Ct. 1676, 1688 (1987) (major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement).

Clearly, the evidence available on those issues will differ from defendant to defendant, and will not be exactly the same for two co-defendants, no matter how equal their participation in the charged offense might be.  The trial court effectively told the jury panel that, for the purposes of persons accused as parties, the questions were meaningless, because whatever they would think appropriate for one would automatically be appropriate for the other.

When a prosecutor misstates the law in argument to the jury, it can be deemed to deny the accused a fair trial and cause reversal.  *See Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. 1982); *Cook v. State*, 540 S.W.2d 708, 710 (Tex. Crim. App. 1976). An erroneous instruction by both the prosecutor and the judge during voir dire on the

definition of "intoxication" in an involuntary manslaughter prosecution, even where the blood/alcohol content portion of the indictment was abandoned before the case went to the jury, was error.  *Lopez v. State*, 779 S.W.2d 411, 415 (Tex. Crim. App. 1989).

It is presumed that the jury follows the instructions given by the judge in the manner *presented*.  Lopez, 779 S.W.2d at 415, *Rose v. State*, 752 S.W.2d 529, 554 (Tex. Crim. App. 1987, op. on reh'g), *Cobarrubio v. State*, 675 S.W.2d 749, 752 (Tex. Crim. App. 1983).

Due course of law pursuant to Tex. Code Crim. Proc. Ann. art. 1.04 (Vernon 1977), Article 1, section 19 of the Texas Constitution, and due process of law pursuant to the Fifth and Fourteenth Amendments of the United States Constitution require that the State provide a fair trial to an accused citizen.  That issue must be considered even more closely when that citizen may be killed by the State as a result of the trial.  Here the trial court's erroneous statement of law was particularly damning because Ms. Sheppard is female, and her co-defendant, James Dickerson, was male.  In American society, being what it is, it is the natural scheme of things for a jury to look somewhat less severely on a female accused citizen than a male citizen with the same accusation.  The trial court's statement that they should *both be punished equally* in a parties situation in a capital murder case denied Ms. Sheppard due course of law.

Because the trial court erred in giving the grand panel erroneous information on the law as to punishment, this cause should be ordered reversed and remanded for a new trial.

2. **The trial court's erroneous denial of Ms. Sheppard's objection to the State's striking of venireman Ronnie Simpson pursuant to *Batson*.**

The United States Supreme Court has determined that it is a violation of the equal protection clause of the United States Constitution for either side to exercise peremptory challenges in a racially discriminatory manner.  *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

The record is clear that in this case Ms. Sheppard is black.  SF 5:87.  Two members of the jury were black, Denise L. Ray and Robert Williams.  SF 19:186.  The State of Texas used nine peremptory challenges, three on blacks: Ronnie Simpson, Nathaniel Cherry, and Roy Qualls.  SF 19:187.  This claim complains of the erroneous denial of Ms. Sheppard's objection to the State's use of a peremptory challenge in a racially discriminatory manner on Ronnie Simpson.

Venireman Simpson identified himself as an employee of the VA Medical Center. He said that he managed hazardous waste for the facility, and there would be a problem for him at work if he served on the jury, because they were short-handed.  SF 5:48.  He agreed, however, to put aside that concern if he did serve on the jury.  SF 5:49.

Mr. Simpson said that he had been falsely arrested and accused of a crime and served a day or two in jail in Tennessee.  SF 5:52-54.  He also knew some people who had been in prison.  SF 5:54.

The prosecutor asked nearly everyone whether he thought a woman with children might be mitigation, and Mr. Simpson thought it might be.  SF 5:68.

After questioning by the defense, the State exercised a peremptory challenge on Mr. Simpson.  A *Batson* challenge was made at that time.  SF 5:83.  The State provided the following reasons:

1)  that Mr. Simpson would be weak on question #3 because Ms. Sheppard has small children;

2)  that Mr. Simpson had been the victim of false arrest;

3)  that Mr. Simpson said it would be hard to answer the special issues for death on just the crime facts;

4)  that when the defense started its voir dire examination, Mr. Simpson said "hello" to Ms. Sheppard personally, so that the State "feared some affinity."

SF 5:84.

Ms. Sheppard's *Batson* objection was overruled.  After some further potential veniremen had been examined, defense counsel once again raised the *Batson* issue as to Mr. Simpson, pointing out to the court that venireman 34, Mr. Herd, and venireman 21, Mr. Chambers, were white and answered questions essentially the same as Mr. Simpson did.  Ms. Sheppard's *Batson* objection was once again overruled.  SF 6:108.

At the conclusion of voir dire, after all the jurors had been selected, the *Batson* issue was once again raised.  Defense counsel then pointed out that those two panelists, Mr. Chambers and Mr. Herd, were white, answered in essentially the same way, and both were at least initially accepted for service on the jury.  SF 19:188.  The objection was once again overruled.  SF 19:190.

David Paul Herd, a white venireman, was an engineering manager with Cooper Oil & Tool.  SF 6:62-63.  He indicated that he had a prostate problem for which he had received medication, but that things were now back to normal.  SF 6:63.

When asked about any scheduling difficulties, he informed the court that his wife was due for elective surgery and had not yet been scheduled, and that he was concerned about that.  SF 6:65.  He said that his neighbor's son had been clubbed to death, and the perpetrator was now in prison.  SF 6:66.

Mr. Herd's son had been arrested several times for problems with his girlfriend and received deferred adjudication on a felony retaliation charge.  SF 6:67.  Mr. Herd expressed his opinion that he thought the incident did not warrant a felony charge. SF 6:68.  He also expressed some ill will for the prosecutors who handled the case because of the lengthy delay and the strain on his family.  SF 6:69.

In discussing the future dangerousness issue, Mr. Herd recognized that there would be a difference between future dangerousness in the free world society and that of the prison system, because there were more controls in prison than in the open society. SF 6:76.

Larry Raymond Chambers told the court that he would rather not be on this jury. SF 5:92. He had never served on a jury before, and he did not think that a capital murder was the place to start.  SF 5:93.  He said that as far as punishment were concerned, a young female with children would be a concern because he would wonder what would happen to the children.  SF 5:117.

Mr. Chambers admitted that he personally received deferred adjudication for DWI in Brazoria County about 12 years earlier.  SF 5:120.  He initially said he could not give the death penalty just on the facts of the offense, even if those facts were grievous. SF 5:126.  When prompted with hypothetical fact situations, he admitted that perhaps he could if the victim of the offense were a child.  SF 5:126.  He would also find it hard to consider the death penalty for the non-shooter in a parties case.  SF 5:133.

Whether a trial is civil or criminal, potential jurors and parties have an equal protection right to jury selection procedures that are free from state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.  *Georgia v. McCollum*, 505 U.S. 42, 112 S. Ct. 2348 (1992).  Justice O'Connor called the *Batson* rule a "special rule of relevance, a statement about what this Nation stands for" and not a statement of fact.  *Brown v. North Carolina*, 479 U.S. 940, 941-942, 107 S. Ct. 423 (1986).

Ms. Sheppard raised a *prima facie* case, sufficient for the State to be required to respond with what they deemed were racially neutral reasons.  The issue of whether in actuality a *prima facie* case was raised is, therefore, moot.  *Hill v. State*, 827 S.W.2d 860, 865 (Tex. Crim. App.), *cert. denied*, 506 U.S. 905, 113 S. Ct. 297 (1992).  Ms. Sheppard retains, however, the burden of persuasion to establish purposeful racial discrimination. *Adanandus v. State*, 866 S.W.2d 210 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 1215, 114 S. Ct. 1338 (1994).

*Batson* challenges present an unusual difficulty in capital cases because of the individual voir dire.  The Court has in the past recognized that and relied solely on information available to the trial court at the time of the challenge.  *See, e.g.*, *Staley v.*

169

*State*, 887 S.W.2d 885, 890 n.3 (Tex. Crim. App. 1994), *cert. denied*, 514 U.S. 1020, 115 S. Ct. 1366 (1995).   That action is not necessary here, however, because defense counsel renewed the objection twice more, each time pointing out the two individuals accepted, at least initially, by the State to serve on the jury whose answers mirrored those of the stricken panelist.   In this case, then, the Court should look at the entire voir dire examination of all the panelists in deciding whether it is left with a firm conviction that a mistake has been committed.   *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Crim. App.), *cert. denied*, 506 U.S. 942, 113 S. Ct. 381 (1992).

The State claimed it did not like Mr. Simpson because they believed he would be weak on the mitigation issue because Ms. Sheppard had small children.   Mr. Simpson was asked if he thought that might be mitigation evidence and he said it might.   He did not say that he would not give the death penalty because of it or that it would affect his choice of life or death.   Like Mr. Simpson, Mr. Chambers also had "concerns" about a young female with children.

The State claimed it did not like Mr. Simpson because he had been the victim of a false arrest.   Yet he said that had happened to him in Tennessee, and that he held no ill will against these prosecutors for that incident.   Mr. Herd's son had received felony deferred adjudication for retaliation in a set of incidents that involved his son and his son's girlfriend.   Mr. Herd expressed some ill will for the prosecutors as well as the law, because of the stress under which his family labored for so long.

The State claimed it did not like Mr. Simpson because he said it would be hard to answer the special issues for death on just the facts of the offense, even if they were bad.

170

Mr. Chambers also stated that he could not give the death penalty just on the facts of the offense, even if they were grievous.  He finally relented slightly by admitting that if the victim of the offense were a child, he might be able to consider the death penalty. Mr. Chambers also expressed a difficulty with the death penalty for the non-shooter in a parties case.

The State claimed it did not like Mr. Simpson because when the defense started its voir dire examination, Mr. Simpson said "hello" to Ms. Sheppard personally, and the State "feared some affinity."

The inescapable conclusion to be drawn from the foregoing is that the State did not like Mr. Simpson because he was black.  He was entitled to serve on this jury.  The State's reasons for excusing him were pretext, particularly the final one -- the "affinity" between a young black woman and a young black man.

Because the trial court erred in overruling Ms. Sheppard's *Batson* motion as to Mr. Simpson, this cause should be reversed and remanded for a new trial.

> **3.  The trial court's erroneous denial of Ms. Sheppard's challenge for cause to venireman Edith Greer Smith, who said she would be predisposed to answer the questions in a manner to give Ms. Sheppard the death penalty merely because the charge was capital murder.**

Although the State did not need to exercise all its peremptory challenges, the defense did so.  One of the defense peremptories was used on venireman Edith Greer Smith, after the trial court denied Ms. Sheppard's challenge for cause.

Ms. Smith indicated that her answer on the questionnaire on one question was that "any man, woman, child, or any person young or old, man or woman, if found guilty of

capital murder should pay for it with their own life." SF 13:91. She confirmed that was her feeling.

The State asked Mr. Smith: "You are on a jury and you find that person guilty of capital murder. Your answer as it was given in the questionnaire was that any person young or old, man or woman, who commits capital murder should pay for it with their own life. That suggests to me you may be predisposed to say if I found someone guilty of capital murder I know what the ranges of punishment are but I would answer those questions yes, yes and no because it's a capital murder?" SF 13:92-93. Then the following exchange occurred:

> A.   I would say probably that would be true.
>
> Q.   And we can't deal with probabilities except in one question.
>
> Okay?
>
> I need to know from you is that how you feel?
>
> A.   Yes.
>
> Q.   And that would be how you would react?
>
> A.   Yes.
>
> Mr. BROWN: Challenge for cause, Your Honor.
>
> THE COURT: That would be denied.

SF 13:93.

When questioned further by defense counsel, Ms. Smith then said she could envision a set of circumstances where she could answer the third special issue yes, after having answered the first two yes. SF 13:101. The final question she was asked was: "In

172

all criminal cases the jury is asked to consider the full range of punishment.  So I'm going to go back again to the question asked you awhile ago if you were on a capital murder case and you found the person guilty of capital murder knowing that that means a grievous sentence and all that, the aggravation, would you be predisposed -- would you answer in all circumstances yes, yes, and no?"  SF 13:102.  Her response was: "No.  I would not be predisposed."  SF 13:102.  The State then accepted Ms. Smith and the defense exercised a peremptory challenge.

Article 35.16(c)(2) of the Texas Code of Criminal Procedure authorizes the defense to challenge for cause any venireman who has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor.  When a potential juror vacillates on the question of his or her ability to follow the law as it pertains to the juror's legal role in a criminal proceeding, the Court routinely defers to the findings of the trial court.  *Adanandus*, 866 S.W.2d at 222.  A vacillating juror is one who gives contradictory responses to those voir dire questions which test the venire member's ability to follow the law.  *Id*.

In reviewing the trial judge's decision to sustain a challenge for cause, the question is whether the totality of the voir dire testimony supports the trial judge's finding.  The decision is reviewed under a clear abuse of discretion standard for review.  *Cantu v. State*, 842 S.W.2d 667, 681 (Tex. Crim. App. 1992).

There was a clear abuse of discretion here. Ms. Smith responded honestly to defense counsel's first questions – that she would be predisposed to answer the questions in such a way that the death penalty would be imposed if she found Ms. Sheppard guilty of capital murder.

Ms. Smith was very involved in police activities. SF 13:58. She had actually attended the police academy. SF 13:88. She was the staff supervisor of the school district's living resources center, which grows live specimens for school work. SF 13:57. She had previously been a teacher. SF 13:67. She was part of a neighborhood patrol group. SF 13:60. She had served on a prior robbery jury. When asked about the facts of the case, her initial description was "It was a *black* male who had tried to steal from a home." SF 13:63 (emphasis supplied). She described her philosophy in stamping out crime by saying, in part, "My approach would be more idealistic; that is, at eliminating the bad people at the beginning so we didn't have those people at the end. . . ." SF 13:67.

In short, Ms. Smith was not the typical vacillating juror. Once she realized that defense counsel was trying to use her answer to remove her from the panel, she changed it. She never explained the change, and she never admitted to having misunderstood the question. This was not a vacillating juror -- this was juror who made it clear that she wanted a hand in "eliminating the bad people."

The trial court erred in overruling Ms. Sheppard's challenge for cause to venireman Edith Greer Smith. Ms. Sheppard used a peremptory challenge on Ms. Smith, and expended all her peremptory challenges. Because the trial court erred in overruling

this challenge for cause, this cause should be ordered reversed and remanded for a new trial.

> **4. The trial court's error in permitting juror David Paul Herd to "chicken out" after having been interviewed and accepted as a juror, denied Ms. Sheppard due process and a fair and impartial jury and violated her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

Venireman David Paul Herd was interviewed and accepted by both sides as juror number 2 on February 8, 1995.  SF 6:105.  None of the chosen jurors were sworn until they returned to hear evidence.  SF 20:10.

The next venireman interviewed after Mr. Herd, Doriece Petty Otto, was accepted as juror number 3.   SF 6:155.   The following venireman, James Allen Johnson, was accepted as juror number 4.  SF 6:196.

Two days later, on February 10, 1995, Mr. Herd reappeared.  SF 8:3.  He had originally told the court that he had been under treatment for a prostate problem, but that the medication had solved the problem.  SF 6:63.  Yet upon his return, he said he had had a "flare-up" since being chosen two days before, and was now concerned that he would have to be excused every 15 minutes to go to the bathroom.  SF 8:7.  In response to the State's leading, he said he could not concentrate on the testimony if he had to urinate.  SF 8:7.

During his initial interview, Mr. Herd indicated in his overall responses that he believed in the death penalty and could participate with no trouble.  He did, however, label himself as a follower, rather than a leader.  SF 6:101.  On his second visit, he said he still believed in the death penalty, but that having thought about it over the two day

period, he *did not believe* he could give the death penalty.  SF 8:5.  On the State's prompting, he said he could not follow the law and could not answer the questions truthfully.  SF 8:10.  He told the defense that he could consider the death penalty, but he could not give the death penalty.  SF 8:12.  The State's challenge for cause was then granted, over defense objection.  SF 8:13.

A potential juror cannot be challenged for cause because of his views on capital punishment unless those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Adams v. Texas*, 448 U.S. 38, 100 S. Ct. 2521, 2526 (1980).

The problem presented here, however, is more complex, because Mr. Herd in fact testified under oath that all was well, and two days later suffered an attack of nerves.

Looking in detail at some of the venireman in *Adams*, however, particularly as explained in Riley *v. State*, 889 S.W.2d 290 (Tex. Crim. App. 1993), Mr. Herd was an acceptable juror.  In *Adams*, venireman White believed in capital punishment but could not participate, and ultimately said she could not lay her feelings aside and answer the questions honestly.    Venireman Ferguson said he would with his "conscious" automatically vote against the death penalty.  The state's challenge for cause in each case was granted, and the Supreme Court held the exclusion was improper.

Just as this Court compared the excluded venireman in *Riley* with those improperly excluded in Adams making the same comparison with venireman Herd, the same result is required.  Mr. Herd's responses are very similar to those made by venireman White in *Adams*.  The exception is that the negative responses occurred two

176

days after the positive ones, after Mr. Herd had the opportunity to suffer a "reality check."

Neither the State nor the defense should have any interest in a juror who will get pleasure from assessing the death penalty or who wants readily to do it. It *should* be a difficult thing. It *should* be something to give every juror pause, to cause stress, and to engender second thoughts. Mr. Herd was not excused for a legal reason. He was excused because he reacted to the reality of the death penalty in the way that every juror should react, with stress, fear, concern and anxiety.

A juror who *unequivocally* demonstrates an inability to answer fairly and impartially the special issues submitted pursuant to the provisions of Article 37.071 of the Code of Criminal Procedure is subject to a challenge for cause. *Rougeau v. State*, 738 S.W.2d 651, 659 (Tex. Crim. App. 1987), *cert. denied*, 485 U.S. 1029, 108 S. Ct. 1586 (1988). Because the reality check suffered by Mr. Herd took two days, he cannot be said to have unequivocally done so.

The medical issue, by itself, did not reach the level of requiring the removal of Mr. Herd. If two days previously his prostate problem had been solved, with the time available between his selection and the beginning of evidence, medical assistance could have been sought and the problem again resolved with medication. One of the reasons for selecting alternate jurors in cases such as this is to have someone to step in if a medical problem becomes severe. That option was already available.

An additional issue appears within this record on this matter as well. Because jury selection in a death penalty case is conducted individually and the veniremen are selected

or rejected individually, the jury itself is built somewhat like a brick wall, with each choice dependent on the choices made before that point, and each choice influencing the following choices.  Here, Mr. Herd was agreed upon as chosen juror number 2.

Upon that choice, chosen jurors number 3[18] and number 4[19] were placed.  That same day, others were excused by agreement[20] or for cause.[21]  The next day, more panelists were excused by agreement.[22]  Others were excused by defense peremptory challenge.[23]  Some were excused by State peremptory challenge.[24]  Some were excused for cause.[25]  The following day, Mr. Herd reappeared.

In short, a great many choices were made by the defense as to agreements to excuse and challenges for cause or for peremptory purposes, based on the assumption and belief, based on sworn testimony from Mr. Herd, that he would be a juror in this case. Those choices could not be undone.

Due course of law pursuant to Article 1.04 of the Texas Code of Criminal Procedure and Article 1, section 19 of the Texas Constitution, and due process of law pursuant to the Fifth and Fourteenth Amendments of the United States Constitution require that the State provide a fair trial to an accused citizen.  Part of a fair trial in a

---

[18] Doriece Petty Otto SF 6:155.
[19] James Allen Johnson SF 6:194.
[20] Susan Battle SF 6:201.
[21] Michael Preston Speer SF 6:209.
[22] Veniremen Windham and Baker SF 7:4; Sandra Burgess Farina SF 7:130; veniremen 56 and 57 SF 7:131; Ms. Hide SF 7:202.
[23] Bernadette Marise Johnson SF 7:52; Larry Eugene Gibson SF 7:100; David Glenn Hall SF 7:137; John C. Chalmers SF 7:213.
[24] Nathaniel Cherry SF 7:111; Valerie Jordan Perrin SF 7:201.
[25] Juvencio Vince Rodriguez, III SF 7:65; Robert Warren Mulkey, Jr. SF 7:135.

death penalty case includes the ability to formulate the jury in the "brick by brick" fashion.  The trial court, by its action in allowing juror number 2, Mr. Herd, to "chicken out" of jury service, deprived Ms. Sheppard of that due course of law.

Because the trial court erred in allowing Mr. Herd to "chicken out" after his selection as a member of the jury in this case, this cause should be ordered reversed and remanded for a new trial.

> **5.  The trial court's failure to allow the jury to consider a verdict against Ms. Sheppard on the lesser included noncapital offenses of robbery and murder.**

The jury was not instructed that it could find Ms. Sheppard guilty of robbery or murder, but not capital murder.  The jury in this case was instructed that it could convict Ms. Sheppard of capital murder, provided that the evidence demonstrated beyond a reasonable doubt not only that Ms. Sheppard was engaged in the commission or attempted commission of robbery, but also that during the commission of the robbery or attempted commission thereof, if any, the defendant:

> intentionally caused the death of Marilyn Sage Meagher by cutting or stabbing Marilyn Sage Meagher with a deadly weapon, namely, a knife, and such act by the defendant did cause the death of Marilyn Sage Meagher or the defendant, Erica Yvonne Sheppard, with the intent to promote or assist the commission of the offense of capital murder, if any, solicited, encouraged, directed, aided or attempted to aid James Dickerson in cutting or stabbing Marilyn Sage Meagher with the specific intention of thereby killing Marilyn Sage Meagher.

Tr. 207.  In fact, the jury was instructed that, if it did not find Ms. Sheppard guilty of capital murder, she must be acquitted.

Robbery is a lesser included offense of capital murder where, as here, robbery or attempted robbery is what aggravates the offense of murder to capital murder.  Likewise, murder is a lesser included offense of capital murder.  *See* TEX. PENAL CODE ANN. § 19.03(c).

The jury could have rationally found from the evidence at trial that Ms. Sheppard was guilty of robbery but not capital murder under appropriate instructions to the jury. The evidence at trial would also have allowed rational jury findings that Ms. Sheppard committed murder, but not capital murder.

In particular, the witness statements and testimony relied on by the prosecution do not establish the elements of capital murder as set forth in the charge of the Court. Tr. 207-8.   Ms. Sheppard did not testify during the guilt/innocence phase of her trial. Neither Ms. Sheppard's statement nor the testimony of any trial witness indicates that a murder during the course of robbery was contemplated or that Ms. Sheppard actually committed a murder.  As a result, the evidence at trial was such that the jury could have rationally found that Ms. Sheppard was guilty of either robbery or simple murder rather than capital murder.

Due process and the Eighth Amendment to the United States Constitution require that, in a capital case, the jury must be allowed to consider a lesser included noncapital offense if the jury could rationally acquit on the capital crime and convict for the noncapital crime.  *Cordova v. Lynaugh*, 838 F.2d 764, 765 (5th Cir.), *cert. denied*, 486 U.S. 1061, 108 S. Ct. 2832 (1988).  Where, as here, the choice given to the jury was between conviction for capital murder and acquittal, the pressure to avoid acquitting

Ms. Sheppard driving the jury toward conviction for capital murder, registers the due process and Eighth Amendment violations. Further, this type of constitutional error by the trial court can never be harmless. *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382 (1980); *Hopper v. Evans*, 456 U.S. 605, 102 S. Ct. 2049 (1982).

Because the jury could rationally have concluded that Ms. Sheppard was guilty of robbery or simple murder, but not capital murder, the trial court's failure to instruct the jury that it could convict Ms. Sheppard of the noncapital offenses denied her due process and violated her Eighth Amendment rights, as well as her rights under state law. Ms. Sheppard's conviction was constitutionally infirm. There being no valid conviction for capital murder, the trial court lacked jurisdiction to impose a sentence of death.

**D.    Trial Counsel Rendered Ineffective Assistance With Respect to the Guilt/Innocence Phase of Ms. Sheppard's Trial By Failing to Present Evidence and Obtain a Jury Instruction on Duress.**

**1.    Trial counsel failed to present evidence of the only viable defense available to Ms. Sheppard: that she was under duress preceding, during, and after the crime.**

The State's case was based upon Ms. Sheppard's statement. From the time of her first meeting with counsel, Ms. Sheppard reported facts that gave rise to a viable defense. She told Attorney Brown that she was under duress and in fear for her life and that of her infant child at the time of the crime. *See* Brown Affidavit, App. 1, ¶¶ 18, 44, 54 and Ex. B (Brown's notes of first interview); *see also* Bolden Affidavit, App. 2, ¶¶ 42-43. In the face of the statement, the fact that the only living witnesses to the crime were Ms. Sheppard, her co-defendant, and her infant child, and the lack of an alibi or any alibi witness, duress was the single viable defense available to Ms. Sheppard at trial.

The persons with knowledge of what occurred immediately prior to, during, and immediately after the crime were Ms. Sheppard and her co-defendant, James Dickerson. Trial counsel failed to elicit facts supporting Ms. Sheppard's claim of duress from either of those persons. Numerous persons had observed Ms. Sheppard and Dickerson during the two-day period following the crime, and had knowledge of facts that would have supported the claim of duress. Trial counsel failed to elicit that testimony from those witnesses. Numerous persons had knowledge of Ms. Sheppard's social history, and of facts that would have supported the duress theory and tended to prove that Ms. Sheppard was particularly susceptible to duress at the hands of a large man like her co-defendant, Dickerson. Trial counsel failed to elicit that testimony. And, it is typical for defense attorneys representing a client like Ms. Sheppard to engage expert witnesses to explain the susceptibility to duress and reaction to threats by a person having a background and life experience similar to those of the defendant. Trial counsel failed to do so. Charlton Affidavit, App. 7.

An attorney has a duty to present available evidence and testimony to support his client's defense. *Ex parte Ybarra*, 629 S.W.2d 943 (Tex. Crim. App. 1982). The failure to seek out and interview potential witnesses constitutes ineffective assistance where the result is that a viable defense available to the accused is not advanced. *Id.*; *Ex Parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1982). An attorney who fails to advance the only viable defense available to his client is ineffective. *Ex Parte Duffy*, 607 S.W.2d at 517.

### a.      Trial counsel failed to call Ms. Sheppard as a witness.

Ms. Sheppard consistently and repeatedly asserted that she was under duress at the time of the crime.  Sheppard Affidavit, App. 14, ¶ 55; Brown Affidavit, App. 1, ¶¶ 18, 44 and Ex. B (Brown's notes of first interview);  Bolden Affidavit, App. 2, ¶ 42.   Attorney Brown learned this in his first meeting with Ms. Sheppard.   Brown Affidavit, App. 1, ¶ 44; Bolden Affidavit, App. 2, ¶ 42.   Ms. Sheppard relayed the same facts to trial counsel's investigator, John Castillo.   *See* Castillo's Report, Brown Affidavit, App. 1, Ex. A.

Ms. Sheppard and Dickerson were the only witnesses to the threats Dickerson made toward Ms. Sheppard prior to and during the crime.   Trial counsel's affidavits reflect their opinions that it was a mistake not to call Ms. Sheppard to testify.   Brown Affidavit, App. 1, ¶ 54; Bolden Affidavit, App. 2, ¶ 43.

The mistake was fatal and demonstrates that Ms. Sheppard was deprived of her Sixth Amendment right to effective assistance of counsel because duress was the only viable defense available.

### b.      Trial counsel failed to call Jerry Bryant, Jr. as a witness.

Bryant was present at the trial and could have testified to Ms. Sheppard's demeanor, refusals to speak, and apparent fear of Dickerson during the period immediately following the crime.  Brown Affidavit, App. 1, ¶¶ 46, 49.

Counsel was ineffective due to his failure to call Bryant to testify.

     **c.**    **Trial counsel failed to elicit testimony from Sherry Brown that would have supported the defense of duress.**

Sherry Brown was called as a witness by the State, and was recalled to the stand by Attorney Brown.   SF 21:7, 22:30.   This witness had seen Ms. Sheppard and co-defendant Dickerson between the time of the crime and the time of the arrest.   She had observed that Dickerson stayed close to and maintained a vigilant watch over Ms. Sheppard throughout that time.   *See* Castillo's report, Brown Affidavit, App. 1, Ex. A.   She had noticed that Ms. Sheppard appeared nervous and upset, but was unwilling to explain why.  *Id.*

Defense counsel failed to elicit from Ms. Brown testimony regarding her observations of Ms. Sheppard and Dickerson.   That testimony would have corroborated Ms. Sheppard's explanation that she was under duress while in Dickerson's company.   Counsel's failure to elicit such testimony was ineffective.

     **d.**    **Trial counsel failed to elicit testimony from Annie Smith that would have supported the defense of duress.**

Ms. Sheppard's grandmother, Annie Smith, saw Ms. Sheppard and co-defendant Dickerson between the time of the crime and the time of the arrest.   She, too,  observed that Dickerson stayed close to and maintained a vigilant watch over Ms. Sheppard throughout that time.   *See* Castillo's report, Brown Affidavit, App. 1, Ex. A.   She, too, noticed that Ms. Sheppard appeared nervous and upset, but was unwilling to explain why. *Id.*

Defense counsel failed to call this witness to testify during the guilt/innocence phase of the trial.   Her testimony would have corroborated Ms. Sheppard's explanation

that she was under duress while in Dickerson's company.   Counsel's failure to call this witness and elicit such testimony was ineffective.

> **e.      Trial counsel he failed to call as witnesses persons with knowledge of Ms. Sheppard's social history and elicit from them facts that would have supported the defense of duress.**

Ms. Sheppard was an abused child.   She left her mother's home on numerous occasions, twice seeking shelter at the Covenant House facility for runaways.   Although her academic records show that she was a reasonably good student, she dropped out of school in tenth grade, pregnant: the father denied responsibility for the pregnancy. Subsequently, the father of her second child also denied his relationship with her.   Jerry Bryant, Ms. Sheppard's husband and the father of her youngest child, abused her.   For help, she turned to the Matagorda Women's Crisis Center.   *Ms. Sheppard left that center and went to live temporarily with her brother just two weeks prior to the crime.*

Trial counsel failed to present evidence of Ms. Sheppard's social history.   Had Ms. Sheppard testified, she would have described nineteen years of being repeatedly bounced back to the care of her grandmother because her parents could not provide her a safe home.   She would have described how the neglect and abuse by her parents was followed by dismissive and abusive behavior by each of the men who had promised to love her.   Witnesses to her upbringing and social history would have corroborated this, had they been called.   However, no school teachers were called to testify.   Neither of her parents was called, nor was her stepmother.   No sibling was called.

Ms. Sheppard's grandmother, Annie Smith, was not called during the guilt/innocence phase of the trial.   None of the counselors from either Covenant House or

the Women's Crisis Center were called.  Neither the chaplain with whom she had often visited during her pretrial incarceration nor any minister from the churches in Bay City and Houston that she attended were called to testify.  The only witnesses called by the defense were prosecution witnesses, one of whom (Korey Jordan) hardly knew Ms. Sheppard), and the other of whom, Sherry Brown, was not questioned on any subject that would have supported the defense of duress.

Trial counsel's failure to present testimony and other evidence of Ms. Sheppard's social history, which would have supported the defense that she was susceptible to the influence and threats of James Dickerson, was ineffective.

### f. Trial counsel failed to engage and present testimony of any expert witness to support the defense of duress.

Having failed to present the defendant to explain to the jury that her presence at the scene and involvement in the crime were not voluntary, and having failed to present testimony or evidence of Ms. Sheppard's social history that would have enhanced the credibility of that explanation, trial counsel, not surprisingly, failed to engage or present any expert on his client's susceptibility to duress.

Expert testimony regarding the impact of child and spousal neglect and abuse would have supported the defense of duress, and should have been offered.  Trial counsel failed even to investigate Ms. Sheppard's abuse history or the availability of such expert testimony.  This was ineffective.  *See* Charlton Affidavit, App. 7.

The prosecutor's argument to the jury -- " She was not physically abused; but even if she was, what kind of excuse is that?" reflects the importance of expert testimony on

the effect of abuse.  An expert could have explained to the jury that abuse victims,

particularly recent and untreated abuse victims, are especially susceptible to duress.  *See*

Cunningham Affidavit, App. 6.

### 2.  Counsel failed to obtain a jury instruction on duress.

Defense counsel requested that the trial court instruct the jury as to the defense of

duress.  Tr. 198.  In part, the proposed duress instruction stated:

> Now, therefore, if you find from the evidence beyond a
> reasonable doubt that Erica Shepard [sic] did commit the
> offense of capital murder as alleged in the indictment and
> hereinbefore defined in this charge, but you further find by
> preponderance of the evidence that James Dickerson or
> another had threatened to kill Erica Shepard [sic] or another if
> she did not participate in said capital murder, and that his
> threats were such threats of force as would render a person of
> reasonable firmness incapable of resisting the pressure, and
> that Erica Shepard [sic] was in fear of imminent loss of her
> life or that of another or serious bodily injury at the hands of
> James Dickerson or another if she did not participate in the
> robbery and that so believing, she did participate therein, then
> you will acquit the defendant and say by your verdict "not
> guilty."

Tr. 198.  At the charge conference, the following exchange was had between defense

counsel and the Court:

> Mr. BROWN:  We have submitted to the Court two proposed
> charges.
>
> Ms. WOLDY:  And the State has been given copies of each.
>
> One is entitled Defendant's Proposed Instruction as to Duress,
> and we would submit to the Court that our request in that
> regard deals with the testimony that Mr. Dickerson had
> custody of child in this case and maintained custody of it
> immediately following the offense and that Ms. Sheppard was
> in a position of following instructions at the pain of possible

danger to the child.

THE COURT:  All right, Ms. Woldy, *I do not think that any such evidence was raised during this trial; and I'm going to deny that special requested charge*.

SF 22:50-51 (emphasis supplied).  Because defense counsel failed to submit any evidence to support the defense of duress, even though evidence of duress was readily available (Sheppard Affidavit, ¶ 55; Brown Affidavit, ¶ 54, Exs. A, B), the Court denied the special requested charge.

Counsel's failure to introduce evidence of duress and to obtain an instruction to the jury on that defensive theory constitutes ineffective assistance and severely prejudiced the rights of Ms. Sheppard.  *Strickland*, 466 U.S. at 694; *Ex Parte Drinkert*, 821 S.W.2d at 956.  *See* Charlton Affidavit, App. 7.  Reversal and remand for a new trial is required.

**E.    The Trial Court's Errors in Excluding Mitigating Evidence in the Punishment Phase Denied Ms. Sheppard Due Process and a Fundamentally Fair Trial and Violated Ms. Sheppard's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.**

**1.    The trial court erred in excluding mitigating evidence in the punishment phase from Ms. Sheppard's grandmother, Annie Smith, regarding her opinion of whether Ms. Sheppard would be a threat to society if sentenced to life imprisonment.**

When the defense was ready to begin their part of the punishment phase of the trial, there were objections outside the presence of the jury.  The prosecutor said: "The first thing is that we would like you to instruct Mr. Brown again to admonish each and every one of his witnesses pursuant to *Fuller v. State* that they not give an opinion as to a life or death sentence as set out by the Court of Criminal Appeals in *Fuller* as well as

*Satterwhite*.  We would ask that you admonish him to tell each one of his witnesses that so there is no outburst by them."  SF 26:4.

The prosecutor continued to object to some more pressing things, and the Court did not rule on that motion at that time.  However, while Annie Smith, Ms. Sheppard's grandmother, was testifying, defense counsel asked "If she was sentenced to life imprisonment, do you think that she would be a threat to society?"  The State objected, saying that was an improper opinion from a lay witness.  The objection was sustained. SF 26:77.  That information was never presented to the jury.

The cases referred to by the State, *Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 941, 113 S. Ct. 2418 (1993), and *Satterwhite v. State*, 858 S.W.2d 412 (Tex. Crim. App.), *cert. denied* 510 U.S. 970, 114 S. Ct. 455 (1993), do not support the proposition that a lay witness may not testify to an opinion concerning future dangerousness.  In its direct appeal Opinion in this case, the CCA recognized that a properly qualified lay witness can give future dangerousness opinion testimony and that "a trial court may err in sustaining a state's objection to this type of testimony."  Op. 15, *citing* TEX. R. CRIM. EVID. 701; *Fierro v. State*, 706 S.W.2d 310, 317 (Tex. Crim. App. 1986); *Russell v. State*, 665 S.W.2d 771, 777-78 (Tex. Crim. App. 1983), *cert. denied*, 465 U.S. 1073 (1984).

Lay witness opinion testimony has long been admissible on the future dangerousness issue for which it was offered in this case.  *Esquivel v. State*, 595 S.W.2d 516 (Tex. Crim. App. 1980); *Cass v. State*, 676 S.W.2d 589 (Tex. Crim. App. 1984); *Jackson v. State*, 822 S.W.2d 18 (Tex. Crim. App. 1990), *cert. denied*, 509 U.S. 921,

113 S. Ct. 3034 (1993).  When the jury was denied the opportunity to hear what even Ms. Sheppard's grandmother thought about her future dangerousness, it cannot be said beyond a reasonable doubt that this error had no bearing on the death penalty punishment assessed.

Because the trial court erred in denying Ms. Sheppard the opportunity to present lay witness testimony regarding the future dangerousness issue, this cause should be ordered reversed and remanded for a new trial.  To the extent that the state law of evidence bars such testimony in the punishment phase of a capital trial, due process concerns prevail over state law.  *Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 2151-52 (1979).

### 2. The trial court erred in excluding mitigating evidence in the punishment phase regarding Ms. Sheppard's experiences at the Matagorda County Women's Crisis Center and Covenant House.

Patricia Birdwell, director of the Matagorda County Women's Crisis Center, brought records at the request of the defense to show the contacts with the center that Ms. Sheppard had had.  The prosecution went through them carefully and objected essentially to everything presented that had come directly from Ms. Sheppard -- in other words, to everything that showed why she was being treated by them.  SF 26:7 *et seq*.

Ronda Robinson, program director at Covenant House, brought records at the request of the defense to show the contacts with their program that Ms. Sheppard had been involved in.  Once again, the prosecution carefully weeded out everything significant Ms. Sheppard had told them.  SF 26:17 *et seq*.  Those portions of the records that were admitted before the jury were admitted as Defense Exhibits 2B and 3B.

190

SF 26:33, 36.   The deleted portions were admitted for record purposes as Defense Exhibits 2C and 3C.  SF 27:51.

The redacted portions of Exhibits 2B and 3B showed, among other things, the many reasons Ms. Sheppard had for seeking aid from those organizations.  *See* discussion at Claim 23 herein.

Rule 803(6) of the Texas Rules of Criminal Evidence removes properly authenticated business records from the hearsay ban.  The State made no objection to predicate as to these exhibits and their "business records" status.  No offer was made as to the excluded portions of the records *for the truth of the matter*.

What Ms. Sheppard had told the agencies to obtain their assistance was not admissible to show that what she had told them was true.  *Stapleton v. State*, 868 S.W.2d 781 (Tex. Crim. App. 1993).  Ms. Sheppard *was* entitled, however, to admit that same proof to show what she told those agencies in order to obtain their assistance.  *Crane v. State*, 786 S.W.2d 338 (Tex. Crim. App. 1990).

The excluded portions of these records carry a heavy mitigation potential.  It cannot be said beyond a reasonable doubt that their exclusion had no effect on the death penalty decision by the jury.  Because the trial court erred in allowing the prosecution to delete major portions of the business records offered during the punishment phase of the trial, this cause should be ordered reversed and remanded for a new trial.

**3. The trial court erred in refusing to permit defense witness Patrice Green to testify at punishment about Ms. Sheppard's reputation and character.**

Patrice Green, a registered nurse from Bay City, was called to testify for Ms. Sheppard, who she had known throughout her life.  SF 26:70.

Ms. Sheppard was denied the answers to the following questions:

1.    During the course of her life, do you know of any other things [other than the case at bar] she had been arrested for?  SF 26:71.

2.    During the time you have known her, how would you describe her reputation in Bay City?  SF 26:72.

3.    Do you have an opinion as to her reputation as far as you know it in Bay City?  SF 26:72.

4.    What is your personal opinion of her character and reputation?  SF 26:73.

Article 37.071(2)(a) of the Texas Code of Criminal Procedure requires the trial court to admit evidence as to any matter the court deems relevant to sentencing.  Ms. Green, a life-long acquaintance of Ms. Sheppard, was in a position to render such evidence.   While the questions asked of Ms. Green were not stylistically perfect, character evidence is at the core of the aggravating/mitigating quandary in which a capital murder jury is placed during the punishment phase of a death penalty case.

The jury in this case had to make an *individualized* determination of whether capital punishment was appropriate in this case.  In order to do so, they had to be allowed to consider all relevant mitigating evidence and have a way to use it.  *Green v. State*, 912 S.W.2d 189 (Tex. Crim. App. 1995), *cert. denied*, 518 U.S. 1021, 116 S. Ct. 2556 (1996).  Evidence is mitigating if a reasonable juror could conclude that the evidence was a basis

for a sentence less than death.  *Alvarado v. State*, 912 S.W.2d 199 (Tex. Crim. App. 1995).

Because a death sentence is unique, there is a requirement and need for consideration of the character and record of the individual offender.  *Woodson v. North Carolina*, 428 U.S. 280, 303-304, 96 S. Ct. 2978, 2991 (1976).  When a jury is not allowed to consider mitigation along with the aggravating circumstances of the offense, the constitutional balance of the capital sentencing scheme is at risk.  *Wilkerson v. State*, 881 S.W.2d 321, 329 (Tex. Crim. App.), *cert. denied*, 513 U.S. 1060, 115 S. Ct. 671 (1994).

Ms. Sheppard was denied the opportunity to present evidence that a reasonable juror could have viewed as mitigating, or at least enlightening, as to Ms. Sheppard's life-long character around non-family members.  Because of the death sentence imposed, it cannot be said beyond a reasonable doubt that the error had no effect on the punishment assessed.

Because the trial court erred in denying Ms. Sheppard the opportunity to present character evidence at punishment, this cause should be ordered reversed and remanded for a new trial.

**4.   The application of the Texas Rules of Criminal Evidence to exclude the testimony of defense witness Patrice Green at the punishment phase violated Ms. Sheppard's rights to a fair trial and due process under the Fourteenth Amendment.**

In its Opinion affirming the exclusion of Ms. Green's testimony, the CCA noted that "It is well established that our rules of evidence remain in force and are applicable to the sentencing phase of a capital trial."  Op. (App. 15) at 16.

The United States Supreme Court has held that the application of state rules of evidence to exclude testimony relevant to an issue in the punishment phase of a capital trial violates due process and denies a defendant a fair trial.  *Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 2151-52 (1979).   The exclusion of Ms. Green's relevant and probative testimony at the punishment phase denied Ms. Sheppard due process and a fair trial on punishment.  Reversal and remand is required.

**5.   Exclusion of the testimony of Jerry Bryant on Fifth Amendment grounds deprived Ms. Sheppard of a fair trial and violated Ms. Sheppard's rights to due process under the Fourteenth Amendment.**

In *Rodriguez v. State*, 513 S.W.2d 594 (Tex. Crim. App. 1974), the CCA held that because no inference of guilt can be drawn from a witness' refusal to testify under protection of the Fifth Amendment of the United States Constitution, it was not error for the trial court to refuse to require the witnesses to invoke their Fifth Amendment rights before the jury.  *Id.* at 595.  To the extent that the rule set forth in *Rodriguez* prohibited Mr. Brown from proving mitigating circumstances that would have saved Ms. Sheppard from a death sentence, the rule deprived Ms. Sheppard of a fair trial and violated her constitutional right to due process of law.  *See Green v. Georgia*, 442 U.S. 95, 97 (1979).

194

**F.      A Pattern of Prosecutorial Misconduct Violated Ms. Sheppard's Right to Due Process and a Fundamentally Fair Trial Under the Fifth, Eighth and Fourteenth Amendments.**

**1.      The prosecutor misstated the law with regard to what mitigation is in closing argument at the punishment phase, and the trial court endorsed it.**

During the prosecutor's final argument on punishment, he made the following comments about mitigation:

> Let me talk for a moment about the third special issue, the one that asks you if there is sufficient mitigating evidence that suggests the punishment in the case should be life.
>
> And let me give you a couple of guidelines on what we think you should be looking for in the way of mitigation.
>
> Mitigation should not be just anything.  Now, if you have a bad hair day or something like that, you don't like the way somebody looks, that's not mitigation.
>
> Mitigation should be something that is out of the ordinary, something that is out of the ordinary; and I submit to you it should also be something that bears some relationship to the crime, that explains the crime in some way.
>
> Maybe it causes it.  Maybe it is some sort of moral justification for the crime.

SF 27:6-7.

Defense counsel objected to that misstatement of the law and limiting the jury to just those definitions.  The trial judge overruled the objection.  SF 27:7.

When an erroneous definition of a significant word is supplied to the jury during voir dire by the prosecutor and the judge, reversible error results.  *Lopez v. State*, 779 S.W.2d 411 (Tex. Crim. App. 1989).

195

Here there was more than merely an erroneous definition in place. Because "death is different,"[26] and because the entire Texas capital punishment scheme is geared to the use of mitigating evidence as a safety valve, *see Alvarado v. State*, 912 S.W.2d 199, 217 (Tex. Crim. App. 1995), a limitation by the State, endorsed by the trial court, on the definition of "mitigation" denied Ms. Sheppard due course of law and due process under Article 1.04 of the Texas Code of Criminal Procedure, Article 1, section 19 of the Texas Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution.

The jury must be allowed to consider *all relevant mitigating evidence*, *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954 (1978), and must have a means to give effect to that evidence. *Penry v. Lynaugh*, 492 U.S. 302, 317, 109 S. Ct. 2934, 2946 (1989). *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (investigations into mitigating evidence should "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor" and that "among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences."); *Ex parte Gonzales*, 204 S.W.3d 391, 397 (Tex. Crim. App. 2006) (Mitigating evidence includes "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant") (citing

---

[26] *Woodson v. North Carolina*, 428 U.S. 280, 303-304 (1976).

TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1)).  *See also Ex parte Gonzales*, 204 S.W.3d at 400 (Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the circumstances of the offense, the defendant's character and background, and any evidence that lessens the personal moral culpability of the defendant) (Cochran, J., concurring).

The prosecutor's limitation of the type of mitigation the jury could use, and the trial court's *de facto* endorsement of that limitation by his overruling of objections to the limitation, denied Ms. Sheppard the opportunity to have the jury consider *all relevant* mitigating evidence, and gave Ms. Sheppard no means of having them do so.

The requirement that the sentencer in a capital case not be precluded from considering *as a mitigating factor, any aspect of a defendant's character or record*, is grounded in constitutional principles.  *Lockett*, 98 S. Ct. at 2962.  The only limitation is that the evidence on the issue of mitigation be relevant, on the same relevancy test that applies to all evidence.  It must have a tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence.  TEX. R. CRIM. EVID. 401; *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990).

Evidence mitigates against the imposition of the death penalty if a reasonable juror *could* conclude that it was a basis for a sentence less than death.  *Alvarado v. State*, 912 S.W.2d 199 (Tex. Crim. App. 1995).

The constitutionality of the capital sentencing scheme depends upon the sentencer's ability to consider both the aggravating and mitigating aspects of a crime.

197

*Wilkerson v. State*, 881 S.W.2d 321, 329 (Tex. Crim. App.), *cert. denied*, 513 U.S. 1060, 115 S. Ct. 671 (1994).   The very limitation of the definition of "mitigation" or "mitigating evidence" limits the final special issue to a true or false situation, rather than an inquiry into an area designed for broad review, and thus creates the danger of an unacceptable risk of randomness, the mark of the arbitrary and capricious sentencing process prohibited by *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726 (1972).   *See Tuilaepa v. California*, 512 U.S. 967, 114 S. Ct. 2630 (1994).

Because the trial court erred in affirming the prosecutor's erroneous limitation of the definition of "mitigation" or "mitigating evidence," this cause should be ordered reversed and remanded for a new trial.

> **2.   The state improperly presented argument at punishment that there had been no evidence about physical abuse, when the State's own objections to the evidence offered by the defense kept the evidence out.**

During argument on punishment, the prosecutor pointed out:

> There have been some hints about physical abuse.   There have been suggestions that in the past the defendant was physically abused by men in her life.   Okay?   Hints is all you have been given.   I submit to you there has been no proof of that.   There have been no eyewitnesses who have come forward, no abuser who has given a tearful confession in court to abuse of Ms. Sheppard; but you can assume that it occurred if you like.   I submit to you that it doesn't make any difference.

SF 27:9.

Defendant's Exhibits 2B and 3B were records offered and admitted by the defense during the punishment phase of the trial from the Matagorda County Women's Crisis Center and Covenant House, regarding the efforts of those agencies to assist

Ms. Sheppard at various times in her life.  SF 26:5-38, 27:51.  However, before those records were admitted, large portions were deleted on motion of the State, allegedly because they were "hearsay on hearsay."  The deleted portions of the records appear in the trial record as Defendant's Exhibits 2C and 3C.  The error in the deletion of those portions of the record is set out in Claims 23 and 24 above.  In addition, the ineffectiveness of defense counsel in failing to admit evidence of the sexual, emotional and physical abuse suffered by Ms. Sheppard throughout her life is set forth in Claim 16.

The prosecutor cannot take actions during the trial to deny the admission of evidence and then argue to the jury that conclusions should be drawn because of the absence of that same evidence.  *Sifford v. State*, 505 S.W.2d 866 (Tex. Crim. App. 1974).  *See also State v. Lopez*, 810 S.W.2d 401 (Tex. Crim. App. 1991).  The prosecutor here cannot deny admission of evidence of abuse and then argue on punishment that there was no evidence of abuse.  Due process requires better.

Because the trial court erred in allowing the prosecutor to argue about the omission of evidence the State had caused to be omitted, this case should be reversed and remanded for a new trial.

### 3.  The trial court erred in allowing the prosecutor to shift the burden of proof to the defense as to the death penalty during argument.

The prosecutor argued at punishment that even if Ms. Sheppard had been abused, it did not matter.  He went on to say:

> She was not physically abused; but even if she was, what kind of excuse is that?

It's unfortunate that some people in our world are abused, but it doesn't excuse criminal acts, and it certainly doesn't excuse criminal acts, and it certainly doesn't excuse capital murder.

No one has it easy in life. Everybody has their problems. You can't allow Erica Sheppard to escape the death penalty because she may have been abused at some point in her life.

MS. WOLDY:   Object to that set of words 'escaping the death penalty.'

It makes it appear that the jury's obligation is to give the death penalty unless something else is proven, and that is not the burden of proof, and I object to that.

THE COURT: Ladies and gentlemen, what the lawyers say to you it's not evidence.

MS. WOLDY: Your Honor, excuse me –

THE COURT: Overruled.

SF 17:9-10.

To be proper jury argument, the argument must be limited to a summation of the evidence, reasonable deductions from the evidence, an answer to an argument by opposing counsel, or plea for law enforcement.  *Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App.), *cert. denied*, 516 U.S. 843, 116 S. Ct. 131 (1995).

The first two special issues submitted to the jury, as well as the State's jury selection conversation throughout voir dire, clearly demonstrate that the burden of proof as to those issues is beyond a reasonable doubt, and that the burden falls upon the State -- in short, the presumption is for a life sentence.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(c) (Vernon 1996 Supp.).

The third special issue only became relevant when the first two were answered affirmatively.  While there is no assigned burden of proof on that issue, the consideration of mitigation is *not* "escaping" the death penalty.  It is merely applying the law that the jury has been instructed to apply.  Mitigation can as well come from evidence presented by the State.

The prosecutor's statement during argument encouraged the jury to assume the death penalty appropriate and only allow a life sentence if Ms. Sheppard presented sufficient evidence to allow her to "escape" the death penalty.   Such argument encouraged the jury to ignore the jury instructions and to place the burden of avoiding the death penalty solely on Ms. Sheppard.  That was improper argument and should not have been permitted.

Because the trial court erred in allowing the prosecutor to shift the burden of proof during punishment argument, this cause should be ordered reversed and remanded for a new trial.

### 4.  The trial court erred in allowing the State to argue, totally outside the record, that Ms. Sheppard had hit the victim with the statue.

During the prosecutor's punishment argument, he invited the jury to speculate as to what actually happened with the statue that was found broken at the scene.  He pointed out first that Ms. Sheppard's written statement stated that James Dickerson went down the hallway to get the statue.  SF 27:45.  The prosecutor said that Ms. Sheppard told the psychiatrist who testified at trial that she went down the hallway and got the statue and gave it to James Dickerson.  SF 27:45-46.  It should be noted that in both versions, James

Dickerson wielded the statue, and there was no other evidence to the contrary before the jury.  Nevertheless, the prosecutor went on to say:

> . . . No way.  No way.
>
> James is still sitting on the lady who is got the paper wrapped around her face, who is dying and suffocating and screaming and begging for her life.
>
> She takes that statue by the base, holds it with both hands, and swings it so hard it smashes against her head and it snaps in half.

SF 27:46.

The defense objected to pure fabrication and no basis in the evidence.  The objection was overruled.  SF 27:46.

To be proper jury argument, the argument must be limited to a summation of the evidence, reasonable deductions from the evidence, an answer to an argument by opposing counsel, or a plea for law enforcement.  *Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App.), *cert. denied*, 516 U.S. 843, 116 S. Ct. 131 (1995).

The record contains absolutely no evidence indicating that Ms. Sheppard was the individual who struck the Complainant with the statue.  Every piece of evidence produced by the State or the defense proves that James Dickerson wielded the statue.

Because the facts are totally contrary to the State's argument, that argument cannot be a reasonable deduction from the evidence, nor can it be invited by a defense argument.  It was calculated to arouse the prejudice of the jury by making Ms. Sheppard more "morally culpable" than the record demonstrated, thus making the death penalty for her a reality.  *Campbell v. State*, 610 S.W.2d 754 (Tex. Crim. App. 1980).

Because the trial court erred in overruling Ms. Sheppard's objection to the State's improper argument outside the record, this cause should be ordered reversed and remanded for a new trial.

### 5. The prosecutor committed misconduct in forcing a key defense witness not to testify.

In the instant case, the prosecutor improperly threatened Jerry Bryant, a key defense witness with prosecution if he testified for the defense. The prosecutor then compounded his misconduct by emphasizing the absence of the defense witness in his closing argument.

These acts by the prosecutor constitute prosecutorial misconduct that warrants a new trial. Threatening a witness with prosecution to keep that witness from testifying at trial constitutes prosecutorial misconduct. *See Davis v. State*, 831 S.W.2d 426, 438 (Tex. App.—Austin 1992, pet. ref'd) (finding prosecutorial misconduct where prosecutor threatened to prosecute witness for perjury if she did not change her testimony). *See generally Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351 (1972) (per curiam) (finding reversible error where trial court's threats of prosecution for any acts of perjury by sole defense witness resulted in witness refusing to testify).

Prior to the punishment phase of the trial, the prosecutor warned Mr. Brown that he would prosecute Jerry Bryant, Jr. for harboring a fugitive or endangerment of a child if Mr. Bryant testified on behalf of Ms. Sheppard.[27]   *See* Brown Affidavit, App. 1, ¶ 50;

---

[27] The impropriety of the prosecutor's conduct is exacerbated by the fact that he had no basis to prosecute

203

Leonard Affidavit, App. 4.   After Mr. Brown advised Mr. Bryant of the prosecutor's

threats, Mr. Bryant did not testify.  Brown Affidavit, App. 1, ¶ 51.

The prosecutor then capitalized on his own misconduct by emphasizing the

absence of defense witnesses in its closing argument.  In closing, the prosecutor stated to

the jury:

> There have been some hints about physical abuse.  There have been suggestions that in the past the defendant was physically abused by men in her life.  Okay?  Hints is all you have been given.  I submit to you there has been no proof of that.  There have been no eyewitnesses who have come forward, *no abuser who has given a tearful confession in court to abuse of Ms. Sheppard*.

SF 27:9 (emphasis added).

Mr. Bryant's absence as a defense witness was harmful to Ms. Sheppard's case

and, indeed, could have meant the difference between a life sentence and the death

penalty.  *See Boyde v. State*, 513 S.W.2d 588, 591 (Tex. Crim. App. 1974) (conduct by

prosecutor that inflames or prejudices the minds of the jury cannot be harmless and

requires reversal of the conviction).

As previously noted, Ms. Sheppard has suffered from mental, physical and sexual

abuse consistently from a very young age.  As noted by the prosecutor in his closing

argument in the trial court, however, the defense failed to provide any evidence of such

abuse and mistreatment.  SF 27:9.

---

Mr. Bryant.  Indeed, the prosecutor was aware that Mr. Bryant did not harbor Ms. Sheppard or endanger their child, but instead called the police and told them where to find Ms. Sheppard.  SF 3:8.

Had Mr. Bryant testified, defense counsel could have (1) demonstrated that Mr. Bryant battered her, threatened to kill her and her child on numerous occasions and repeatedly abused her; (2) shown that Ms. Sheppard was under duress at the time of the offense and that mitigating circumstances reflected in her background, social history and susceptibility to James Dickerson's threats weighed against a death sentence; and (3) explained the circumstances surrounding the alleged extraneous offense regarding the shooting of Mr. Griggs and the ultimate dismissal of all charges against Ms. Sheppard. Brown Affidavit, App. 1, ¶ 54.  The absence of Mr. Bryant's testimony, coupled with the prosecutor's emphasis in closing argument on the lack of defense witnesses, constitutes reversible prosecutorial misconduct.  *See Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988).

Finally, although Mr. Brown failed to bring the prosecutor's misconduct to the trial court's attention [*see* Brown Affidavit, App. 1, ¶ 52], the misconduct constituted reversible error.  *See Boyde*, 513 S.W.2d at 591 (finding reversible error despite defense counsel's failure to request limiting instruction where instruction would not have cured error).   Indeed, threatening a witness with prosecution if that witness testifies for the defense is not the type of misconduct that can be cured by a limiting instruction from the trial court.  On the contrary, once the court determines that the prosecution has tampered with a witness' ability or willingness to testify, a new trial is appropriate.  *Davis*, 831 S.W.2d at 438 (granting new trial where trial court erroneously denied mistrial after prosecutor forced witness to change her testimony).  Thus, the prosecutor's misconduct in threatening to prosecute Mr. Bryant if he testified for Ms. Sheppard and then

emphasizing the lack of the defense witness in closing argument constitutes prosecutorial misconduct for which Ms. Sheppard is entitled to a new trial.

**G.     Ms. Sheppard was denied her constitutional rights to equal protection and due process by the admission of her prior unadjudicated offenses at the sentencing phase of her capital murder trial.**

The CCA has interpreted Article 37.071 of the Code of Criminal Procedure to allow for the use of unadjudicated offenses at the sentencing phase of a capital murder trial. *See McCoy v. State*, 713 S.W.2d 940 (Tex. Crim. App. 1986), *cert. denied*, 480 U.S. 940, 107 S. Ct. 1590 (1987). Such evidence was introduced at the sentencing phase of Ms. Sheppard's trial.

Had Ms. Sheppard been charged with a noncapital offense, only those bad acts or extraneous offenses "proved beyond a reasonable doubt" would have been admissible at sentencing. TEX. CODE CRIM. PROC. ANN. art. 37.07(3)(a). By creating and enforcing these different rules regarding the use of unadjudicated offenses, the State has denied Ms. Sheppard equal protection of the law. Further, because death sentences are qualitatively different from prison sentences, the sentencing process in a capital case must have heightened reliability. *Woodson v. North Carolina*, 428 U.S. 290, 305 (1976); *Ake v. Oklahoma*, 470 U.S. 68, 87 (1985) (Burger, C.J., concurring) ("in capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases"). This reliability requirement is violated in Texas where the sentencer is permitted to hear of unadjudicated offenses which have not been proved beyond a reasonable doubt, offenses which are by nature unreliable. *See Williams v. Lynaugh*, 484 U.S. 935, 938 (1987) (Marshall, J., dissenting from denial of certiorari)

("[I]mposition of the death penalty in reliance on mere allegations of criminal behavior fails to comport with the constitutional requirement of reliability.").

Ms. Sheppard was charged by indictment with capital murder. That document alleged that she committed the crime of murder in the course of committing or attempting to commit a robbery. Under Texas law, the "maximum penalty" for that crime was imprisonment for life unless the jury made an additional finding: (1) that there was a probability that Ms. Sheppard posed a continuing threat to society. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1). If the jury failed to find sufficient facts to support future dangerousness, the maximum sentence was life in prison. Thus, the aggravating factor increased the maximum penalty from life in prison to a death sentence.

Despite the fact that future dangerousness was a necessary prerequisite to increase the penalty from life in prison to a death sentence, that accusation was not contained in Ms. Sheppard's indictment. The failure to include that necessary element in the indictment renders her death sentence unconstitutional.

In *Jones v. United States,* 526 U.S. 227 (1999), the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243, n.6. In *Apprendi v. New Jersey,* 530 U.S. 466, 475 (2000), the Supreme Court held that the Fourteenth Amendment affords citizens the same protections when they are prosecuted under state law.

207

In *Ring v. Arizona,* 122 S.Ct. 2428 (2002) the Supreme Court held that the rule of *Jones* and *Apprendi* applies with equal force to capital cases.  Aggravating factors operate as the functional equivalent of an element or a greater offense.  *Ring,* 122 S.Ct. at 2443.  "The relevant inquiry is one not of form, but of effect."  *Apprendi,* 530 U.S. at 494.

The CCA has repeatedly held that aggravating circumstances in a capital murder case are not "elements" of the crime.  *See  Moore v. State,* 969 S.W.2d 4, 13 (Tex. Crim. App. 1998); *Callins v. State,* 780 S.W.2d 176, 186-87 (Tex. Crim. App. 1989).  However, as stated above, the critical inquiry is not the label, but whether the facts increase the maximum penalty otherwise available.  Indeed, as Justice Scalia noted in his concurring opinion in *Ring*, the state could call the facts "elements of the crime," "sentencing factors," or "Mary Jane," and the analysis would be identical: failure to state those facts in the charging document renders the sentence unconstitutional.  122 S.Ct. at 2444.

Ironically, at the very point in the trial where the greatest reliability is constitutionally required -- the punishment phase -- Texas law affords capital defendants less protection than noncapital defendants.  Ms. Sheppard must therefore be granted a new trial where this evidence is excluded.

208

## PRAYER FOR RELIEF

WHEREFORE, Petitioner ERICA YVONNE SHEPPARD prays that this Court:

1.     Issue a writ of habeas corpus to have her brought before it, to the end that she may be discharged from her unconstitutional confinement and restraint and/or be relieved of her unconstitutional sentence of death;

2.     Grant her the authority to obtain subpoenas *in forma pauperis* for witnesses and discovery of documents, and other information necessary to prove the facts as alleged in her petition;

3.     Grant her an evidentiary hearing at which she may be allowed to present evidence on these claims and allow her a reasonable period of time subsequent to any hearing this Court may conduct in which to brief the issues of law and of fact raised by this petition and/or such hearing; and

4.     Grant such other relief as the ends of justice may require.

Respectfully submitted,

*/s/ W. Alan Wright*
W. Alan Wright
Texas Bar No. 22062700
Federal ID No. 14350
*Attorney in Charge*

CROUCH & RAMEY, LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas  75201
214-922-7131 Telephone
214-922-7101 Facsimile
awright@crouchfirm.com

**ATTORNEYS FOR PETITIONER
ERICA YVONNE SHEPPARD**

## VERIFICATION

I, W. Alan Wright, above-named counsel for Petitioner, declare under penalty of perjury this 17th day of April, 2015 that I have read the foregoing application and that its contents are true and correct within my own knowledge, except as to matters stated on information and belief, which I believe to be true.

*/s/ W. Alan Wright*
Alan Wright

## CERTIFICATE OF SERVICE

I certify that on April 17, 2015, a copy of the foregoing pleading was electronically served on counsel for the Respondent by filing the document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.

Matthew Ottoway
Assistant Attorney General
Post Office Box 12548
Austin, Texas  78711-2548
matthew.ottoway@texasattorneygeneral.gov

*/s/ W. Alan Wright*
W. Alan Wright