United States District Court
Southern District of Texas
**ENTERED**
March 29, 2017
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ERICA YVONNE SHEPPARD, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:14-0655 |
| | § | |
| LORIE DAVIS, Director, Texas | § | |
| Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING
## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Erica Yvonne Sheppard is a Texas death row inmate. This case is before the Court on Sheppard's Amended Petition for Writ of Habeas Corpus [Doc. # 28], and Respondent Lorie Davis' Motion for Summary Judgment [Doc. # 46] ("Motion"). Having carefully considered the Amended Petition, the Summary Judgment Motion, Sheppard's Reply to the Motion, all the arguments and authorities submitted by counsel, and the entire record, the Court is of the opinion that Davis' Motion must be **granted**, and Sheppard's Amended Petition for Writ of Habeas Corpus should be **denied**. The Court grants a certificate of appealability on certain aspects of Sheppard's ineffective assistance of counsel claim regarding the punishment phase of her trial.

## I.    BACKGROUND

Sheppard was convicted of capital murder and sentenced to death on March 3, 1995, for murdering Marilyn Sage Meagher during the course of robbing Meagher. On June 30, 1993, Meagher's daughter discovered her mother's body in a spare bedroom of an apartment she shared with her mother in Houston, Texas. 20 Tr. at 18-19, 39-42.[1] When law enforcement arrived at the scene, they found Meagher's body under a pile of bed linens, with

_____

[1]    "Tr." refers to the transcript of Sheppard's trial.

a plastic dry cleaning bag wrapped around her head. There were three knives and a broken statue nearby. *Id.* at 95-102. Police recovered a finger and palm print, subsequently matched to Sheppard's left hand, from the door leading to the spare bedroom. *Id.* at 197-206.

An autopsy revealed a number of stab wounds on Meagher's body, several of them very deep. 21 Tr. at 177-78, 185-87. Injuries to Meagher's head were consistent with a statue being slammed into her head with "a great deal of force." *Id.* at 187.

The day after the murder, Korey Jordan contacted the police. 20 Tr. at 114. Jordan was friends with Sheppard's brother, Jonathan. He was at Jonathan's apartment in the same complex as Meagher's the day before the murder. There, he heard Sheppard and James Dickerson talk about robbing or carjacking someone. 21 Tr. at 90-98.

Jordan testified that, when Dickerson complained that he needed money, Sheppard replied "let's go back to the old theme." *Id.* at 96. Dickerson stated: "If taking a life is what I have to do to get some money, then that's what I have to do." Sheppard responded that she'd "rather catch a . . . skinny white woman walking between her car and her apartment with no children." *Id.* at 98-99. Dickerson got two knives from Jonathan's kitchen, one of which looked like a knife recovered from the crime scene, and talked to Sheppard about the best clothes to wear for committing the crime. *Id.* at 99-101. They left Jonathan's apartment wearing dark clothes. *Id.* at 101-02.

The day after the murder, police found Meagher's vehicle in Bay City, Texas. 20 Tr. at 117. A witness testified that he saw both Sheppard and Dickerson use the vehicle on the same evening that Meagher's body was found. 21 Tr. at 12-17. Police recovered Dickerson's fingerprint from the vehicle. 20 Tr. at 177-78.

The following day, police arrested Sheppard and Dickerson in a motel room in Bay City. 21 Tr. at 39-42. They recovered a knife similar to one found near Meagher's body from a drawer containing women's clothing in the motel room. *Id.* at 46-47. Sheppard subsequently confessed to the murder. *Id.* at 142-43.

During the penalty phase of Sheppard's trial, the State introduced evidence that Sheppard unsuccessfully attempted to "jack" another female victim the night before the Meagher murder, 25 Tr. at 7, 10, 19, 40-42, and that Sheppard also admitted to a friend that

she would "jack" cars and sell the parts, *id.* at 64-65.  The state also presented evidence that Sheppard participated in a drive-by shooting with Jerry Bryant, Jr. ("Bryant"), the father of Sheppard's youngest child, on November 17, 1991. *Id.* at 75-114.  Sheppard drove the car. *Id.* at 78-79.

The State further presented evidence that Sheppard had a poor reputation for being peaceful and law abiding in her hometown.  *Id.* at 124, 131.  Two witnesses who were housed with Sheppard during her pretrial detention testified that Sheppard drew attention to news coverage of the Meagher murder "like she was bragging."  *Id.* at 137-38, 161.  The State presented evidence that Sheppard spoke callously about the murder, *id.* at 138-39, threatened to harm a fellow inmate, and asked how she could fake her way into a section of the jail reserved for inmates with mental disorders, *id.* at 141-44.

Meagher's family testified about the impact her death had on them.  Her son testified that he felt like he was robbed of 20 or 30 years with his mother.  He sought help from a psychologist to cope with his mother's murder.  *Id.* at 169-72.  Meagher's sister also testified about the impact of the murder on her and her children.  *Id.* at 176-79.

In the defense case during the punishment phase, Sheppard presented documents and testimony from the Director of the Matagorda County Women's Crisis Center, an organization that provides shelter for abused women and children, that she stayed at the Center.  26 Tr. at 31-33.  The documents show that she went to the Center due to domestic abuse, and that Center staff referred her to a legal aid attorney for assistance in obtaining a protective order and a divorce.  *Id.* at DX[2] 2-B.  She presented similar evidence from Covenant House, an emergency shelter for runaway and homeless youth, that she spent time there.  *Id.* at 35-37.

Sheppard first stayed at Covenant House when she was 16 years old.  She had a young child at that time.  The Houston Police Department referred her to Covenant House due to conflict between Sheppard and her mother.  She stayed at Covenant House a second time when she was 17 years old.  *Id.* at DX 3-B.

---

[2]      "DX" refers to the Defendant's trial exhibits.

Sheppard also called psychiatrist Priscilla Ray, M.D.  Dr. Ray presented a clinical evaluation based on a two-hour interview of Sheppard.  DX4-B, at 1.  Defense counsel asked Dr. Ray to evaluate Sheppard for competency to stand trial, sanity, and her susceptibility to influence by men who were in a position to abuse her.  Am. Pet., App. 24, at 2.  Dr. Ray's clinical conclusions focused on Sheppard's competency to stand trial rather than development of mitigation evidence.  DX 4-B. at 5.  Dr. Ray testified that Sheppard suffered from depression, which was only partially treated.  She opined that there was a genetic component to Sheppard's depression based on her family history.  26 Tr. at 41-42.  Dr. Ray also testified that Sheppard seemed remorseful for the murder.  *Id.* at 45.  Based on Sheppard's mental status, her history, the nature of her crime, and general relevant statistics, Dr. Ray opined that Sheppard was unlikely to engage in future acts of violence, either in prison or in society.  *Id.* at 43-46.  Dr. Ray testified that Sheppard was more of a follower than a leader, and would be less likely to commit acts of violence if not in "a situation in which a man is likely to be abusive or possibly may be abusive and has some sway over her." *Id.* at 60-61.

Dr. Ray's expert report was also admitted into evidence.  The report stated that Sheppard was raised by her maternal grandmother, that both her mother and her grandmother had significant health problems, that her parents divorced when she was young and her father was not a frequent presence in her life, and that she has a brother, a half brother, and a step brother.  DX 4-B.  Dr. Ray did not testify to these facts or elaborate.  Dr. Ray's report revealed that Sheppard dropped out of school in tenth grade because she was pregnant.  She eventually obtained a GED and attended school to become a medical assistant.  She dropped out because Bryant, her boyfriend at the time, wanted her at home.  *Id.*  Sheppard reported being sexually abused as a child by a friend of her mother's.  Sheppard reported the abuse to her mother, but her mother did not believe her.  She also reported being raped by a stranger when she was a teenager, and being abused by Bryant, the father of her third child. *Id.*  The abuse by Bryant included striking Sheppard and threatening to kill her.  *Id.* Sheppard also told Dr. Ray her version of the events regarding Meagher's murder.  She denied agreeing to harm anyone the day before the murder, and claimed that she told

4

Dickerson, who was Sheppard's brother's romantic partner, *see* 22 Tr. at 15, to get a job if he needed money.  She further claimed that Dickerson threatened to kill her and her baby if she didn't help him with the robbery-murder, that she acted under duress, and that Dickerson planted the knife in her clothing drawer at the motel.  DX 4-B.

Sheppard also called as a witness Patrice Green, a lifelong friend.  Green testified that Sheppard attended church regularly, had three children, and worked for Green's husband, a Justice of the Peace.  26 Tr. at 70-73.

Sheppard's grandmother, Annie Smith, testified that she was Sheppard's primary caregiver during Sheppard's youth, and that Sheppard lived with Smith more than with her own mother.  Smith testified that Sheppard lived with her for most of the first 20 years of her life.  *Id.* at 75-77.  She also testified briefly that Bryant abused Sheppard.  Sheppard moved away from her grandmother to try to evade Bryant.  *Id.*

The jury found that there was a probability that Sheppard would commit future acts of criminal violence posing a danger to society, that she caused, intended to cause, or intended for another to cause Meagher's death, and that the mitigating evidence was insufficient to warrant a life sentence.  28 Tr. at 5-7.  Accordingly, the trial court sentenced Sheppard to death.

The Texas Court of Criminal Appeals ("TCCA") affirmed Sheppard's conviction and sentence.  *Sheppard v. State*, No. AP-72,127 (Tex. Crim. App. June 18, 1997).  Sheppard did not seek *certiorari* from the Supreme Court of the United States.

Sheppard filed a state application for a writ of habeas corpus raising 40 claims for relief, including numerous claims of ineffective assistance of counsel.  *See* 1 SHCR at 3-10.[3] The state habeas court held an evidentiary hearing on Sheppard's ineffective assistance of counsel claims, which included testimony and an affidavit by Hazel Bolden, Sheppard's second chair trial counsel, opining that lead counsel Charles A. Brown did a poor job

---

[3]     "SHCR" refers to the Clerk's Record from Sheppard's state habeas corpus proceeding.

representing Sheppard.  2 WH at 220-26.[4]  The trial court entered extensive written findings of fact and conclusions of law, *see* 5 SHCR at 1310-71, and recommended granting relief on Sheppard's claim that trial counsel rendered ineffective assistance

> at the punishment phase of applicant's trial in failing to present or fully develop evidence regarding the applicant's background and failure to present testimony expert or otherwise that would allow the jury to understand the implications of the applicant's background including physical abuse sexual abuse or domestic violence for consideration in determining the answer to the special issues.

*Id.* at 1338.

The TCCA denied Sheppard's application for a writ of habeas corpus, rejecting the trial court's recommendation to grant relief on the ineffective assistance of counsel claim. *Ex Parte Sheppard,* No. WR-78132-01, 2013 WL 5568434 (Tex. Crim. App. Oct. 9, 2013) (*per curiam*).  On May 19, 2014, the Supreme Court denied Sheppard's petition for a writ of *certiorari*.  *Sheppard v. Texas*, 134 S. Ct. 2288 (2014).

Sheppard filed her initial federal petition for a writ of habeas corpus on March 18, 2014.  She amended her petition on April 17, 2015.  Before the Court is Respondent's Motion for Summary Judgment filed June 24, 2016, along with her Amended Answer to the Amended Petition.  Sheppard responded to the Motion on September 7, 2016, and Respondent replied on November 7, 2016.

## II.    APPLICABLE LEGAL STANDARDS

### A.    The Anti-Terrorism and Effective Death Penalty Act

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Woodford v. Garceau*, 538 U.S. 202, 205-08 (2003); *Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997). Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable

---

[4]      "WH" refers to the transcript of Sheppard's state writ hearing.

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Cobb v. Thaler*, 682 F.3d 364, 372-73 (5th Cir. 2012).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *See Kittelson v. Dretke*, 426 F.3d 306, 318 (5th Cir. 2005). Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc); *see also Pape v. Thaler*, 645 F.3d 281, 292-93 (5th Cir. 2011). The focus for a federal court under the "unreasonable application" prong is "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" *Id.* (quoting *Neal*, 239 F.3d at 696, and *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies

the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'")

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Martinez v. Caldwell*, 644 F.3d 238, 241-42 (5th Cir. 2011).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997).

This Court may only consider the factual record that was before the state court in determining the reasonableness of that court's findings and conclusions.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Review is "highly deferential," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*), and the unreasonableness standard is "difficult [for a petitioner] to meet."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

## B.   Summary Judgment Standard in Habeas Corpus Proceedings

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  This principle is limited, however; Rule 56 applies insofar as it is consistent with established habeas practice and procedure.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (citing Rule 11 of the Rules Governing Section 2254 Cases).  Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party.  *See id.* Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" regarding the state court's findings of fact, those findings must be accepted as correct.  *See id.*  Thus, the Court may not construe the facts in the state petitioner's favor

where the prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness in 28 U.S.C. § 2254(e)(1) should not apply. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997).

## III.   <u>ANALYSIS</u>

Sheppard's petition raises seven broad claims for relief with numerous subparts. Respondent groups the claims and identifies 19, including subclaims in the pending Amended Petition.  This includes five broad claims of ineffective assistance of counsel. Sheppard responds that she intends to raise only one overriding claim of ineffective assistance of counsel at the punishment phase of her trial consisting of several instances in which counsel's conduct fell below prevailing professional norms, *see* Reply to Mot. for Sum. Jmt. [Doc. # 49], at 28, as well as several claims of ineffective assistance of counsel during the guilt-innocence phase and on appeal.  The Court examines each specific instance raised by Sheppard, and considers whether counsel's acts and omissions, singly or in combination, amounted to constitutionally ineffective assistance of counsel.  They are addressed in turn.

### A.   <u>Ineffective Assistance of Counsel</u>

Sheppard contends that she received ineffective assistance of counsel at both the guilt-innocence and punishment phases of her trial.   To prevail on a claim for ineffective assistance of counsel, Petitioner "must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and "the deficient performance prejudiced the defense." *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  To prove "prejudice"under the *Strickland* test, there must be a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687.

In order to prevail on the first prong of the *Strickland* test, the "deficient performance" prong, Petitioner must demonstrate that counsel's representation fell below an objective

standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances, avoiding the distorting effects of hindsight. In the context of a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 465 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. As the Fifth Circuit succinctly framed this concept: "Is this additional mitigating evidence so compelling that there is a reasonable probability at least one juror could reasonably have determined that . . . death was not an appropriate sentence?" *Neal v. Puckett*, 239 F.3d 683, 692 (5th Cir. 2001). This requires a "substantial, not just conceivable, likelihood of a different result*.*" *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)(quotation marks omitted).

Review of counsel's performance is deferential, and counsel enjoy a strong presumption that their conduct is within the "wide range" of the bounds of professional norms. *Strickland*, 466 U.S. at 689; *Id.* at 688-90. A petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To make this determination, a reviewing court must "consider *all* the relevant evidence that the jury would have had before it if [Sheppard] had pursued [a] different path—not just the mitigation evidence [Sheppard] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

The Supreme Court has explained, in any event, that when a state court has adjudicated a claim of ineffective assistance of counsel on the merits, the petitioner bears an especially heavy burden.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689, 104 S. Ct. 2052; *Lindh v. Murphy,* 521 U.S. 320, 333, n.7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*]*,* 556 U.S., at 123, 129 S. Ct. [1411], at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is

substantial. 556 U.S., at 123, 129 S. Ct., at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011).  As the Fifth Circuit has explained:

That a federal habeas court would reach a different conclusion is not enough, standing alone, to merit relief under AEDPA's high standard. *See* [*Williams v. Taylor*, 529 U.S. 362,] 411, 120 S. Ct. 1495 [(2000)]. As the Supreme Court recently reiterated, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* [562 U.S. at 102].

*Trottie v. Stephens*, 720 F.3d 231, 240–41 (5th Cir. 2013).  If the Court finds that counsel rendered deficient performance, the cumulative effect of any deficiencies may be sufficient to satisfy *Strickland*'s prejudice prong, even if no particular instance of deficient performance is enough, by itself, to constitute *Strickland* prejudice.  *See*, *e.g.*, *Moore v. Johnson*, 194 F3d 586, 619 (5th Cir. 1999).

## 1.    Punishment Phase

Sheppard argues that trial counsel failed to investigate and to present adequate evidence on both the future dangerousness and the mitigation special issues.[5]  The Court has considered all Sheppard's contentions in connection with whether counsel's performance was deficient and whether any deficiencies caused prejudice in connection with each special issue. Sheppard's arguments on each special issue overlap substantially.  The Court therefore focuses on arguments regarding mitigation first and addresses future dangerousness thereafter.

### a.    Mitigation Special Issue

---

[5]    The Texas capital sentencing scheme at the time of Sheppard's trial first required a jury to first answer two special issues:  (1) whether the defendant posed a future danger to society; and (2) whether she actually caused, or intended to cause, or intended for another to cause, the death of the victim.  SHCR at 1432-33.  Only after answering these two questions in the affirmative did the jury proceed to the mitigation special issue.  That special issue asks whether there is sufficient mitigating evidence to warrant a life sentence rather than a death sentence.

### I.    Performance Prong

Sheppard first argues that counsel rendered ineffective assistance under *Strickland* by failing to investigate and develop meaningful mitigation evidence and, accordingly, failing to make an adequate mitigation presentation to the jury.  The Court concludes that it is a close question whether the TCCA was unreasonable in finding that counsel was not deficient and that there was no prejudice to Sheppard, but concludes that Sheppard has not met her heavy burden under the AEDPA.

*__Overview__.*  Sheppard acknowledges that counsel retained an investigator, but contends that neither lead nor the other counsel followed up on useful information the investigator discovered.  *E.g.*, Am. Pet. at 50.  Sheppard asserts, with virtually uncontested evidentiary support, that her trial counsel was aware before trial that: she was physically and verbally threatened by Dickerson on the day of the murder; she had been sexually abused as a child, and that her mother did not believe her allegations of sexual abuse; she was physically abused by Bryant, the father of her third child; and she had a family history of depression, among other difficulties she faced.  She complains that counsel was grossly ineffective because they failed to develop available evidence concerning the implications of her substantial childhood difficulties.  Had counsel followed up with interviews of many family members, people with knowledge of her stays at the women's shelters, and experts to evaluate her to assess the impact of these experiences, these witnesses could have educated the jury about the effect of these numerous negative experiences on her, and thus enabled the jury to evaluate them for mitigation.

As Sheppard acknowledges, some information about these issues was presented through the expert report and testimony of Dr. Priscilla Ray, a psychiatrist.  She argues, however, that the testimony was far too limited, in part because Dr. Ray's assignment from trial counsel Brown was merely to focus on competency and sanity, and to determine whether she was likely to be influenced by men who were in a position to abuse her, *see* Pet.  Resp., at 76 *et seq*., an unreasonably narrow assignment under the circumstances of this case.  Sheppard contends that she and Dr. Ray talked for only two hours, and Dr. Ray's report was a mere five pages.  Further, the report presented matters in "skeletal fashion."

Sheppard argues that counsel should have called as witnesses Sheppard herself, her mother, and/or her brother to present more detailed testimony on these matters. Lead trial counsel Brown also admitted at the state habeas hearing that he did not ask Dr. Ray or Sheppard's grandmother, Annie Smith, about Sheppard's history of abuse, pregnancies and abortions, or any personal or family history of mental illness. 2 WH at 160-62.

Sheppard further contends that counsel should have, but did not, retain a mitigation expert, a social worker, a neurologist, a neuropsychologist, and experts on child abuse, spousal abuse, trauma, and post-traumatic stress disorder ("PTSD"). She complains, as noted, that Brown failed to give the one expert he had retained, psychiatrist Dr. Ray, sufficiently broad instructions to enable her to address subjects pertinent to mitigation (and future dangerousness). *See* Pet. Resp., at 76-82. Sheppard now presents expert opinion evidence that, had Dr. Ray or other experts been retained prior to trial, they would have been able to testify to the jury that she has below average intelligence, which results in faulty social judgment and a compromised ability to exercise judgment in demanding, novel, or unclear situations. Sheppard also exhibits symptoms of organic brain dysfunction. Am. Pet., App. 25. She also presents expert opinion evidence that she suffers from PTSD, major depression, and dissociative disorder as a result of repeated instances of physical, emotional, and sexual abuse, Am. Pet., App. 26, and poses a low risk of committing future acts of violence, Am. Pet., App. 6.

Sheppard's arguments amount to a weighty failure to investigate claim. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 466 U.S. at 690-91). When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial. *See United States v. Green*, 882 F.2d 999,

1003 (5th Cir. 1989).

  ***State Habeas Ruling on Ineffective Assistance of Counsel on Mitigation Issue.*** The state habeas trial court recommended granting relief on Sheppard's claim that counsel failed to investigate and develop mitigating evidence to present at the penalty phase, *Id.* at 1338. That court, while concluding that Brown provided effective counsel during the guilt-innocence phase, found that

> trial counsel provided ineffective assistance at the punishment phase of [Sheppard]'s trial in failing to present or fully develop evidence regarding [Sheppard]'s background and failing to present testimony expert or otherwise that would allow the jury to understand the implications of [Sheppard]'s background including physical abuse, sexual abuse or domestic violence for consideration in determining the answer to the special issues.  The Court finds that this failure resulted in a violation of [Sheppard]'s constitutional rights.

5 SHCR at 1337-38.

  The TCCA disagreed and denied relief.  *Ex Parte Sheppard*, 2013 WL 5568434 at *1. The TCCA held that counsel presented several witnesses who testified about Sheppard's background and presented records from the Matagorda Women's Crisis Center and Covenant House.  The Court noted that defense counsel also presented Dr. Ray's testimony and expert report.  Therefore, the TCCA held, the evidence Sheppard faults counsel for not presenting was cumulative of the evidence that was presented.  *Id.* at **1-2.  As explained hereafter, this Court disagrees with the TCCA's conclusion.  However, under applicable Fifth Circuit authority, the Court concludes the Fifth Circuit would not find the TCCA was unreasonable.

  ***Bar Association Guidelines.*** Sheppard cites numerous authorities and materials to argue that counsel had a well-established duty to investigate her life and mental health history, and develop and present mitigation evidence.  *See* Am. Pet. at 28-49 (citing ABA and Texas State Guidelines, as well as CLE materials issued before Sheppard's trial, and other authorities discussing relevant standards).  She contends that counsel's investigation did not comply with the relevant American Bar Association Guidelines, or the 1994 State Bar of Texas Guidelines for capital case representation.  This is true.  However, the Fifth Circuit has taken the position in an unpublished ruling that the ABA Guidelines are not controlling.

  The ABA Guidelines do not control our assessment.  The Supreme Court has

explained that "the Federal Constitution imposes one general requirement:
that counsel make objectively reasonable choices." *Bobby v. Van Hook*, 130
S. Ct. 13, 17 (2009) (quotation marks and citation omitted). "The question is
whether an attorney's representation amounted to incompetence under
'prevailing professional norms,' not whether it deviated from best practices or
most common custom." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (quoting
*Strickland*, 466 U.S. at 690). We look for guidance about the norms in the
relevant state as they existed at the time of the trial. *See Wiggins v. Smith*, 539
U.S. 510, 524 (2003). . . . The Guidelines are helpful only if they "reflect
prevailing norms of practice." *Van Hook*, 130 S. Ct. at 17 n.1 (quotation marks
and citation omitted). The Guidelines also "must not be so detailed that they
would interfere with the constitutionally protected independence of counsel
and restrict the wide latitude counsel must have in making tactical decisions."
*Id.* (quotation marks and citation omitted). Whether a counsel's decisions are
legitimate will depend on the circumstances. *Id.* at 16.

*Ayestas v. Thaler*, 462 F. App'x 474, 479 (5th Cir. 2012), *vacated on other grds.,* 133 S. Ct.
2764 (2013). It is assumed that the same conclusion would apply to the 1994 State Bar of
Texas Guidelines. This is an issue for further appellate consideration.

During postconviction proceedings, Sheppard presented important evidence from
witnesses who observed her suffer abuse at the hands of her mother and her boyfriend,
people who knew Sheppard as a youth and could testify to her character, background, and
difficult life circumstances. Sheppard identifies numerous such witnesses who could have
testified on her behalf during the punishment phase, but who were never called. *See*, *e.g.*,
Pet. Resp. at 32-33.

**_Analysis of Trial Counsel's Performance._** Based on the habeas and trial records, it
appears that Brown engaged in not insubstantial preparation for Sheppard's trial, but failed
to do all that was appropriate. The TCCA rejected the state habeas court's recommendation
to grant Sheppard's ineffective assistance of counsel claim in investigating and presenting
evidence in mitigation at the punishment phase. *Ex Parte Sheppard*, 2013 WL 5568434 at
**1-2. The TCCA's conclusions are highly questionable in light of the trial and habeas
records presented.

The state habeas record established that the state trial court held a live hearing at
which Brown testified. He explained that, at the time of Sheppard's trial, he had about 13
years experience as a criminal lawyer after graduation from Texas Southern University Law

School.  Charles Brown Affidavit, Am. Pet., App. 1, ¶ 2.  He perceived the case to be a "high profile one in which the prosecution and court were under an extraordinarily [sic] level of pressure to obtain a conviction and death sentence."  *Id.*, ¶ 11.[6]  While he had tried one capital murder case before Sheppard's, he did so as second chair.  *Id.*, ¶ 8.  He testified at the state habeas hearing that he had tried between 10 and 20 murder cases, and "a lot" of first degree felony cases.  2 WH at 94-96.

At Brown's request, the trial court appointed two other attorneys to assist him with Sheppard's defense.  *Id.* at 29-30.  Brown, however, states he was dissatisfied with the second-chair attorney, Hazel Bolden, an eight year attorney, as too inexperienced to be of value and gave her little to do.  *See* Brown Aff., ¶¶ 14-15, 17, 40-42; *see* Hazel Bolden Affidavit, Am. Pet., App. 2; 2 WH at 199-205.  The third attorney appointed by the trial court was appointed 17 months after Brown, days after jury selection had begun and "did not begin participating in the defense until the day that trial began."  Brown Aff., ¶¶ 5, 15.  Thus, there was uncontradicted evidence before the state habeas court that all the attorneys were inexperienced in capital defense and largely if not totally unprepared on many matters.  Neither Bolden nor Woldy met with the investigator appointed by the court or any witnesses for Sheppard.  *Id.*, ¶ 17; Bolden Aff., ¶¶ 7-40.[7]  Bolden states she was not aware of the Dickerson trial and did not attend it, did not interview any witnesses or potential witnesses, and was not aware of Brown doing so.  Bolden Aff., ¶¶ 38.  There is no evidence Brown gave these attorneys assignments to assist or work with the investigator.  Brown essentially functioned as solo counsel for Sheppard in her capital trial.

Regarding Brown's investigation and preparation for trial, Brown met with Sheppard 15 or 20 times before the trial began.  2 WH at 48.  He spoke to Sheppard's mother and

---

[6]    Brown attested that he understood that "the victim of the crime ... was very involved in local politics and that four members of the Harris County District Court bench attended her funeral."  Brown Aff., Am. Pet., App. 1, ¶ 11.

[7]    Bolden stated that she had been "advised by a veteran criminal defense attorney not to take any action or do anything in the case without the lead attorney's direction because of the risk that doing so could compromise the case."  Bolden Aff., ¶ 6.

grandmother, to Bryant, and to a counselor at Covenant House. He also reviewed the 15-page report of interviews conducted by his investigator. Brown Aff., ¶ 16; 2 SHCR at 512-13. However, Brown did not interview any of the potential witnesses identified by his client or the investigator before the trial. Brown Aff., ¶¶ 19-39. He states he reviewed the state's file and attended Dickerson's capital murder trial, which was held before Sheppard's. 2 WH at 101-104. He also spoke to Dickerson's attorneys. 2 WH at 104.

During the state habeas proceedings, Brown gave some explanation for various trial decisions. He testified that he was aware of Sheppard's claim that Dickerson coerced her into participating in the robbery-murder, but also explained that he was aware of facts undermining this assertion. He noted that Sheppard did not mention duress to the police, that she went swimming with Dickerson at the motel after the murder, and that she spoke to Bryant outside of Dickerson's presence at the motel. *Id.* at 136-39. He also testified that he was aware of other issues mentioned in Dr. Ray's report. *Id.* at 44-45, 56-59.

Brown testified that, based on his personal observation, he did not believe that Sheppard's brother Jonathan wanted to help her at the time of the trial. *Id.* at 101-02. He did not mention why he reached this conclusion. *See* Affidavit of Jonathan Sheppard, Am. Pet., App. 16.

Brown noted that Sheppard's mother spoke to the media frequently and he was concerned that he would not be able to control her if she testified. *Id.* at 121. Brown subpoenaed Bryant, but Bryant did not want to testify after being told he could face criminal liability and should seek advice of counsel.[8] He stated that other potential witnesses refused to talk to the defense team. *Id.* at 116-25.[9]

---

[8]    Sheppard also alleges that the prosecutor engaged in misconduct by threatening Bryant (although not in front of the jury) to prevent him from testifying. This claim is addressed *infra*. Brown did not report this to the trial court. Brown Aff., ¶ 52.

[9]    These potential witnesses included Paula Allen, a witness to the extraneous drive-by shooting, Waylon Griggs, the target of the drive-by shooting, Korey Jordan, who was in the apartment when Dickerson and Sheppard hatched their plan to commit a robbery, and Lawrence P. Gwin, an attorney who was counsel for Dickerson in his

(continued...)

Brown, in his affidavit executed in 1998, acknowledged errors in his trial strategy, such as not calling Sheppard to testify (in the guilt and punishment phases of the trial) to establish her state of mind concerning Dickerson's threats, and not calling other witnesses including her grandmother, Annie Smith, Sherry Brown, and Maybeline Fisher, if not Jerry Bryant, Jr., counselors of Covenant House and the Matagorda Women's Crisis Center, and experts witnesses to elaborate on the impact of child and spousal abuse.  Brown Aff., ¶¶ 53, 54.

The state habeas court found that Brown consulted with Sheppard, reviewed the prosecution file, reviewed Sheppard's extraneous offenses, consulted with Dr. Ray to develop mitigation evidence, investigated potential defensive theories including duress, interviewed potential witnesses, obtained relevant records, observed Dickerson's trial, and consulted with Dickerson's counsel.  SHCR at 1336-37.  The state habeas trial court found that Brown's strategy was to portray Dickerson as the main actor and to seek mercy for Sheppard based on her gender and background.  *Id.* at 1337.  While the state court found that Brown had a coherent strategy, it did not address why Brown did not go further to find witnesses to support the defense and why he did not utilize his co-counsel, Bolden, to work with their investigator to meet with and obtain some potential additional witnesses for mitigation at trial.

As noted, Sheppard relies on criticisms lodged by second chair counsel Hazel Bolden's affidavit and testimony that she thought Brown did a poor job representing Sheppard.  2 WH at 220-26; Am. Pet., App. 2.  The state habeas court acknowledged this affidavit, but found co-counsel Bolden's criticisms unpersuasive because they were based on "a hindsight evaluation of trial counsel's representation . . . ," and because Bolden never informed the trial court of any concerns over Brown's representation.  SHCR at 1335-36.[10]

---

[9]        (...continued)
          capital murder trial.

[10]       The state court did not credit Brown's affidavit, which acknowledged deficiencies in
          investigation of potential evidence and presentation of mitigation witnesses.  The state
                                                                                        (continued...)

During the punishment phase, Brown presented evidence to the jury through Dr. Ray and four lay witnesses:  Patricia Birdwell, who authenticated records from the Matagorda County Women's Center, explained the Center's services, and testified that Sheppard was admitted to the Center, 26 Tr. at 31-34;  Ronda Robinson of Covenant House, who authenticated documents, explained Covenant House's services, and testified that Sheppard was admitted to Covenant House, *id.* at 35-37;  Patrice Green, who testified that she knew Sheppard since Sheppard was a baby, and that Sheppard worked for Green's husband, *id.* at 70-74[11]; and Annie L. Smith, Sheppard's grandmother, who testified that Sheppard lived with her for much of Sheppard's life, and that Sheppard was abused by Jerry Bryant, Jr., *id.* at 75-78.  These witnesses presented the basic mitigating facts concerning Sheppard's life, namely, that Sheppard was the product of a broken marriage, had little contact with her father, and was largely raised by her grandmother.  These witnesses mentioned also that Sheppard's mother was not supportive and did not believe her allegations of childhood sexual abuse, and that Sheppard ran away from home as a teenager and sought shelter at Covenant House.  The jury learned that Sheppard later was in an abusive relationship with Bryant, the father of one of her children, and that she sought assistance from a Crisis Center for abused women.  The jury knew that she had three children with three different men.  They knew that she dropped out of school but eventually earned a GED, and held several jobs.

Brown presented some evidence through Dr. Ray that Sheppard suffered from depression, and had a family history of depression.  *Id.* at 42.  The defense presented her theory that Dickerson committed the murder, and that Dickerson threatened to harm Sheppard and her baby if she did not participate.  There was no evidence that Sheppard was violent while in pretrial detention, and Dr. Ray stated that Sheppard was statistically unlikely to be violent if sentenced to life imprisonment.  *See id.* at 43-46.

---

[10]     (...continued)
habeas court instead stated it relied on Brown's live testimony, which that court found credible and more probative.

[11]     Counsel attempted to introduce evidence of Sheppard's reputation through Green, but was unable to formulate unobjectionable questions.

Sheppard contends that counsel could have presented much more first-hand available, detailed, descriptive evidence of her life history, *see, e.g.,* Am. Pet., at 29-32, which cumulatively was severely deficient performance (and also, especially considered cumulatively, establish *Strickland* prejudice, *see* pgs. 25-26, *infra*).  Sheppard argues, for example, that Brown failed to interview her or her grandmother about her social history, *see id.* at 30, 32.  She points out there was first-hand testimony of her childhood sexual and other physical abuse, her strained relationship with her mother and her largely absent father, her mother's abusive partners, her unstable childhood living arrangements, her pregnancies and abusive relationships, and other relevant facets of her life.  *Id.* at 30-32, and Appendices, *passim.*  Sheppard urges that counsel should have called as witnesses, at a minimum, Sheppard herself, her mother, her grandmother, and her brother, Jonathan.  She relies primarily on her own affidavit, and affidavits by her mother and grandmother, for these points.  *See* Am. Pet., Apps. 8, 9, 14.[12]

Respondent identifies strategic reasons for defense counsel's decision not to call these family witnesses.  Defense counsel was concerned about his ability to control Sheppard's mother while testifying, in light of her comments to the media.  The trial judge also had admonished Sheppard's mother to stop harassing witnesses.  22 Tr. at 5-7.

Defense counsel testified at the hearing that he made a strategic decision not to call Sheppard's brother, Jonathan, based on his observation of Jonathan during Dickerson's trial. There was no explanation, however, whether Brown considered whether Jonathan's testimony at the Dickerson trial were entirely different from those to be covered at the punishment phase of Sheppard's trial, such as matters regarding Sheppard's childhood.

---

[12]    Sheppard's grandmother, Annie Smith, testified, but was asked only briefly about the fact that she largely raised Sheppard.  She testified that Sheppard lived with her because Sheppard's parents separated and her mother had to work, but made no mention of the tension and abuse between Sheppard and her mother.  *See* 22 Tr. at 75-78.  However, as discussed elsewhere in this memorandum, counsel had valid reasons not to call Sheppard's mother, the perpetrator of much of the childhood abuse and rejection, as a witness.  Further, the state habeas court found that Sheppard made her own decision not to testify.

Respondent contends that defense counsel's choice not to call Sheppard at the punishment phase was understandable because she personally faced potentially damaging cross-examination if she testified.  The state court found this persuasive, although it is entirely unclear what testimony or evidence Brown or the state habeas court or TCCA thought would be elicited that the prosecution did not already intend to use against her.

Furthermore, there is no explanation why Brown did not interview Sheppard's grandmother, Annie Smith, in great detail.  She was called to testify at trial but gave superficial testimony on Sheppard's childhood and other experiences.

In sum, because defense counsel articulated strategic, albeit superficial, reasons for not calling the family witnesses now identified by Sheppard, the TCCA's ruling that these decisions did not amount to deficient performance under *Strickland* has some foundation.  Thus, under Fifth Circuit precedent, the conclusion is not sufficiently incorrect to be deemed legally unreasonable.

Sheppard argues also that counsel should have called as witnesses Aaron Green, a Justice of the Peace for Matagorda County, who was Sheppard's former employer and knew Sheppard's grandmother and Bryant.  Sheppard contends that he could have testified to Sheppard's temperament and work ethic, to her susceptibility to being manipulated, and to Bryant's abusive personality and evidence that he abused Sheppard.  Aaron Green Affidavit, Am. Pet., App. 18.  Sheppard also argues that Kelly Garcia, a fellow inmate at the Harris County jail, could have testified that Sheppard participated in Bible study and was religious, and that she was concerned for her family.  Garcia asserts that Sheppard claimed she was coerced into participating in the murder, and was remorseful. Am. Pet., App. 13.  Emma Brooks, a family friend, could also have testified to Sheppard's faith and peaceful nature, Am. Pet, App. 19, as could have Tangela Price-Sells, a cousin of Sheppard's half-brother, Am. Pet., App. 20,  and Lloyd Jackson, a deacon at Mother Zion Missionary Baptist Church in Bay City, Am. Pet., App. 21.   Other potential witnesses include a Harris County jail chaplain, Am. Pet, App. 10, representatives of from Covenant House and the Matagorda County Women's Crisis Center, Am. Pet, App. 12,  Bryant's ex-mother-in-law, Am. Pet, App. 17, and the Director of a Women's Crisis Center (who could have testified concerning

Sheppard's history of abuse), Am. Pet, App. 11. Sheppard contends that her brother, Jonathan, would have aided presentation of the mitigation evidence because he could have testified to physical and sexual abuse that he and Sheppard suffered as children, that their mother did not believe their claims of abuse by a babysitter, and to the emotional deprivation and turmoil they experienced due to their unstable family life. *See* Am. Pet, App. 16. Finally, Sheppard urges that Brown should have called Tommi Eanes, a longtime romantic partner of Sheppard's mother, who could have testified to Sheppard's difficult relationship with her mother, including verbal abuse, corporal punishment, and verbal threats of harm. She also could have testified to Sheppard's non-violent nature. Am. Pet, App. 23. Brown testified at the state writ hearing that he did not know who Aaron Green, Emma Brooks, Tangela Price-Sells, Lloyd Jackson, or Isabel Rodriguez (Jerry Bryant, Jr.'s ex-mother in law) were, nor did he attempt to interview any of them. 2 WH at 62-63; *see* Brown Aff., ¶¶ 19-39 . The state habeas trial court found that Brown's failure to develop and present mitigating evidence was deficient. SHCR at 1348.

Sheppard also complains that counsel was ineffective for failing to call additional experts. While implicitly acknowledging that Dr. Ray's report contained information concerning her life history, Sheppard contends that Dr. Ray's evaluation was cursory. There is no dispute that Brown asked Dr. Ray only to evaluate Sheppard for sanity, competency to stand trial, and susceptibility to being influenced by men who were in a position to abuse her. Dr. Ray was not asked to offer a psychiatric diagnosis, particularly whether Sheppard suffers from PTSD. Sheppard contends that the limited scope of Dr. Ray's evaluation was unjustified. Sheppard also argues that additional expert testimony likely would have bolstered her case that she was susceptible to coercion or duress, and therefore less culpable. She elaborates that, even if there was a strategic reason not to rely on a duress defense in the guilt-innocence phase,[13] there was no reason at the punishment phase not to emphasize her emotional weaknesses and the effects of her especially difficult childhood in the mitigation

---

[13]     Brown explained that there was significant evidence to counter Sheppard's assertions, and he was concerned that this defense would alienate the jury at the guilt-innocence phase.

context.  She also contends that the experts would have supported other aspects of her mitigation arguments.

Specifically, Sheppard submits an extensive analysis by Dr. Mark Cunningham.  Dr. Cunningham concludes that various factors in Sheppard's life "could have been of significant mitigating impact to the jury" and support a conclusion that Sheppard would not be a future danger.  Cunningham Report, Am. Pet., App. 6, *passim*.  These include her early life instability, observed domestic violence, sexual and physical abuse suffered as a child, learning disability, her attention deficit disorder, her sexual victimization by older males, her teenage pregnancies, PTSD, and the impact of her execution on her own children.  *Id.*  He further opines that the time spent by Dr. Ray interviewing and evaluating Sheppard was grossly inadequate for the purpose of assessing mitigation factors (or future dangerousness factors), and her testimony and report did not contain actuarial or group statistical evidence tending to show that Sheppard presents a low risk for future violence.  *Id.*

Sheppard also submits a robust declaration by Dr. Myla Young, a clinical psychologist specializing in neuropsychology.  Dr. Young states that Sheppard's intellectual functioning is in the low average range, which makes her vulnerable to emotional dependency.  People in this range "often assume a passive role in interpersonal relationships . . ." and are easily swayed.  Dr. Young also concluded that Sheppard suffers from brain dysfunction which impairs her judgment and decision-making ability, and makes her vulnerable to influence by others.  Am. Pet., App. 25.

Sheppard submits an affidavit by Dr. Rebekah Bradley, an Assistant Professor of Psychiatry and Behavior Science at Emory University and the director of a Veteran's Administration, multi-disciplinary, outpatient, PTSD team for veterans.  She evaluated Sheppard and concluded that Sheppard suffers from major depression, PTSD, and dissociative order.  These are effects of childhood and adolescent trauma suffered by Sheppard, including her own sexual abuse, and witnessing violence between her parents.  Sheppard's psychological conditions make it difficult for her to form relationships, and make her likely to acquiesce or cooperate rather than fighting back.  Am. Pet., App. 26.

The state habeas trial court found that Brown's failure to present this expert testimony

23

constituted deficient performance, SHCR at 1348, but the TCCA rejected this finding and conclusion.  Sheppard's assertion that Dickerson had threatened her and her baby was before the jury.  The TCCA found that introducing additional expert psychological evidence was cumulative.  *Ex Parte Sheppard*, No. WR-78.132-01 (Tex. Crim. App. Oct. 9, 2013), slip op. at 5.  The TCCA's analysis suffers from two weaknesses.  First, as raised by Dr. Ray in passing, once guilt was determined, Sheppard would be imprisoned for 35 years and away from male dominating influences.  More importantly, as Sheppard argues, the jury must decide the mitigation question independent of the future dangerousness (as well as the second special issue).  While the mitigating evidence might have some relevance to the first two special issues, the mitigation special issue stands independent of the other two, and the jury could find that the mitigating evidence justifies a life sentence, notwithstanding the answers to the other two special issues.[14]

This Court finds that trial counsel Brown rendered deficient performance in investigating and presenting evidence on mitigation on behalf of Sheppard because of, collectively, gross inadequacies of his own factual mitigation investigation, such as his failure to interview key witnesses (including Sheppard, her grandmother, and brother), his failure to follow up with other potential witnesses uncovered by his investigator and to more assertively pursue potential mitigation witnesses, his failure to utilize appointed co-counsel for these purposes, and his failure to adequately frame

---

[14]    Sheppard also argues that better development of her background and psychological evidence would have provided her with a better response to the extraneous offense evidence by strengthening her claim that she was pressured or manipulated into participating.

It is noted that many Fifth Circuit cases deem evidence of this nature to be "double-edged" because it permits the argument that Sheppard's susceptibility to manipulation or coercion suggests that she could be manipulated or coerced into committing violence in the future.  However, Dr. Ray's testimony, which was crucial to the limited defense at the punishment phase, already opened this avenue of argument.  Defense counsel, having raised the issue, had a duty to present convincing evidence in support of the theory, not merely superficial proof.

the scope of work for psychiatrist Dr. Ray or retain other necessary experts to assess Sheppard. This Court recognizes it is not permitted to second-guess trial counsel's reasoned strategic trial decisions. The Court questions, however, whether Brown's decisions were based on informed reasoning, given his flagrant lack of investigation and personal involvement in or follow up on his investigator's work. Indeed, to his credit, Brown acknowledges these matters in his affidavit submitted to the state habeas court. *See* Am. Pet., App. 2. Nevertheless, given the extreme deference due to the state court findings and conclusions, this Court is not permitted to find unreasonable the TCCA's conclusion that this evidence was cumulative, *see, e.g., Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007); *Parr v. Quarterman*, 472 F.3d 245, 257-58 (5th Cir. 2006); *Neal v. Puckett*, 286 F.3d 230, 243 (5th Cir. 2002); *Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006), and there was therefore a valid reason for trial counsel not to emphasize this evidence.

### ii. Prejudice Prong

Sheppard submits numerous affidavits expanding upon the facts noted above. In assessing prejudice in a sentencing hearing, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 465 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. To satisfy the *Strickland* prejudice prong, Sheppard must show that the "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Sheppard's] culpability," *Wiggins v. Smith*, 539 U.S., at 538 (quoting *Williams v. Taylor*, 529 U.S. 362, 398 (2000)). The jury's appraisal is so influenced if it is reasonably probable that the new mitigating evidence "would have affected the sentencing decision of at least one juror." *Lewis v. Dretke*, 355 F.3d 364, 369 (5th Cir. 2003).

It is clear that presentation of such fact and expert evidence at trial through live witnesses—those with personal knowledge and one or more experts with educated, professional explanations—would have provided more detail, nuance, and understanding for the jury about, not only the hardships Sheppard suffered as a child and young adult, but their effect on her. This testimony could have provided important mitigating information.

However, the jury would have had to consider the entire factual picture, which included evidence presented by the State that Sheppard participated in a brutal robbery-murder.  There was evidence that Sheppard had assisted in planning aspects of the crime.  There also was evidence that Sheppard had engaged in prior crimes of violence, including possibly a drive-by shooting and carjackings.  While this Court finds that it may well be that the additional evidence would have affected the sentencing decision of at least one juror, the TCCA's contrary conclusion must be considered under the stringent and deferential standards allowed in federal review.  Sheppard does not meet her heavy burden to show the TCCA was unreasonable in finding that there was not a reasonable probability that such presentations would have changed the outcome" of the punishment phase.  *See*, *e.g.*, *Carson v. Collins*, 993 F.2d 461, 466 (5th Cir. 1993).

### b.    <u>Future Dangerousness Special Issue</u>

Sheppard also contends that counsel failed to present "any coherent theory to support a negative answer" on the question whether there was a probability that she would commit future acts of criminal violence constituting a threat to society. Am. Pet. at 55.  The Court considers Sheppard's arguments on the mitigation issue here as well.  Sheppard focuses on the absence of fact witnesses and expert testimony pertaining to the future dangerousness issue.

Sheppard argues specifically that counsel failed to present evidence of duress, and failed to call Bryant to testify about Sheppard's social history and the unadjudicated drive-by shooting.  Sheppard submits no affidavits of Bryant or other witnesses who could have testified to facts supporting a duress defense.  She further contends that counsel should have moved for a mistrial based on the prosecutor's statement to Bryant's counsel that Bryant faced possible criminal charges if he testified, and that counsel failed to adequately cross-examine the State's witnesses or present evidence to counter evidence of the extraneous drive-by shooting.  Sheppard also points to counsel's failure to call numerous witnesses (described above) who, she contends, could have testified about her background, including her church attendance and good temperament and nature, failure to elicit such testimony from those he did call, failure to present evidence from the Matagorda County Women's Shelter

and Covenant House, and failure to present an adequate life history during the penalty phase.

Sheppard urges also that counsel failed to present any evidence on future dangerousness other than superficial, limited points in Dr. Ray's report and brief live testimony.[15] Sheppard also contends that counsel failed to provide expert proof to emphasize the low statistical likelihood that Sheppard would be violent if sentenced to life imprisonment.

In response to these contentions and evidence, the state habeas court found that defense counsel cross-examined the State's witnesses to discredit the State's contention that Sheppard participated in other carjackings.  5 SHCR at 1342.  The state habeas court also found that Dr. Ray testified to Sheppard's remorse over the murder, and testified that the chance of Sheppard committing future acts of violence posing a continuing threat to society was less than fifty percent.  Dr. Ray further testified that Sheppard was even less likely to be a threat when in a situation, such as prison, in which a man would be unable to abuse or manipulate her.  *Id.*  Dr. Ray's report also noted that Sheppard acted under threats from Dickerson.  *Id.*

Regarding Sheppard's contention that counsel failed to rebut the evidence of her participation in the drive-by shooting, the state habeas court found that her attorney from the drive-by shooting case was, contrary to her current assertion, unavailable to testify and refused to speak to Sheppard's counsel on several occasions.  2 WH at 119; 5 SHCR at 1288-89.  The court further found that Sheppard's trial counsel cross-examined Paula Allen, the State's witness on this issue, and impeached her with her prior inconsistent statements and bias against Sheppard. 5 SHCR at 1353-54.  The state habeas court also found unavailing Sheppard's claim that counsel should have called Bryant and Vincent Perry (the man Paula Allen claimed to have been with on the night of the shooting) to testify about the drive-by

---

[15]     As discussed in more detail, *supra*, Dr. Ray reported that Sheppard suffered from depression, which was only partially treated, and that she seemed remorseful for the murder.  Dr. Ray opined that Sheppard was unlikely to engage in future acts of violence. Dr. Ray noted Sheppard's unstable family history, her history or pregnancies and sexual abuse, and her claim that she participated in the Meagher robbery-murder under duress.  *See* 26 Tr. at 41-46, 60-61; DX 4-B.

shooting, because her assertions about their possible testimony were speculative, presumably because she presented no affidavits from these witnesses.  *Id.* at 1355, 1369.

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984)).  "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial."  *Id.*

The state habeas court in this respect was not unreasonable, as defined by the Fifth Circuit, in concluding that the evidence cited by Sheppard was cumulative of evidence presented.  *See*. *e.g.*, *Coble*, 496 F.3d at 436 ("[T]hese witnesses would have presented testimony already provided by other witnesses.  Counsel's decision not to present cumulative testimony does not constitute ineffective assistance.").  In addition to the evidence cited by the state habeas court, the record reflects that Sheppard presented some evidence of her history of abuse, including testimony by her grandmother that Bryant abused her.  In fact, this testimony was conclusory, but the basic facts and Sheppard's personal history were presented to the jury.  Further, also as noted by the state habeas court, Dr. Ray presented her conclusion that Sheppard had an abusive past and a history of abusive relationships with men, was easily manipulated, and was remorseful.

And, trial counsel articulated some valid reasons not to call certain specific witnesses now identified by Sheppard, such as Sheppard's mother and Bryant, as discussed above.  Last, there is an argument that the evidence Sheppard argues should have been presented is somewhat cumulative of the evidence presented through Dr. Ray.[16]

---

[16]     Brown called four lay witnesses who testified concerning Sheppard's stays at the Crisis Center and Covenant House, 26 Tr. at 31-38, and about her church attendance, employment history, children, her parents' divorce, and her abuse at the hands of

(continued...)

The state court's finding that trial counsel was aware of the information now cited by Sheppard may be questionable, *see*, *e.g.*, 2 WH at 62-65, but that court's finding that counsel made strategic choices regarding presentation of evidence, *see* 5 SHCR at 1269-72, is a credibility determination with some support in the record and thus is not unreasonable, as defined by binding appellate authority. *See*, *e.g.*, *Turner v. Epps*, 412 F. Appx. 696 (5th Cir. 2011) (counsel is not deficient for failing to introduce cumulative mitigating evidence). This Court is not at liberty to second-guess that reasonableness conclusion. *See Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the decisions of state courts"). Accordingly, Sheppard does not meet her heavy burden to show the TCCA was unreasonable in finding that there was not a reasonable probability that the evidence Sheppard contends should have been presented on future dangerousness and duress "would have changed the outcome" of the punishment phase.

### c.    Failure to Object to Instruction on Law of Parties

In discussing the case with prospective jurors, the trial judge gave an example of a bank robbery, stating that both the actual robber and the driver of the getaway car would be guilty of robbery. *See*, *e.g.*, 4 Tr. at 11-13. This statement is a correct statement of Texas' law of parties. *See* TEX. PENAL CODE § 7.01. The trial judge, however, also stated that not only would the robber and driver both be guilty of robbery, but that each should receive the same punishment. *See Sheppard*, slip op. at 2, n.2. This is an incorrect statement of the law. *See*, *e.g.*, *Enmund v. Florida*, 458 U.S. 782, 797 (1982) (holding that the Eighth Amendment does not "permit[] imposition of the death penalty on one. . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed"). Trial counsel did not object.

Sheppard challenged the trial court's statement on appeal. The TCCA agreed that the

---

[16]    (...continued)
Bryant, *id.* at 70-77.

judge's illustration was an incorrect statement of the law, but held that the claim was waived by trial counsel's failure to object. *Sheppard*, slip op. at 2. Sheppard argues that this waiver constituted ineffective assistance of counsel.

There can be no question that counsel rendered deficient performance by failing to object. The statement of law was incorrect, and there is no apparent strategic reason for counsel's failure to object. Sheppard, however, cannot demonstrate *Strickland* prejudice.

The evidence presented at trial does not support Sheppard's implicit contention that she was only a minor or peripheral participant in the Meagher murder. Rather, the evidence showed that she participated in the beating and stabbing that led to Meagher's death. Thus, the trial judge's incorrect statement of the law was not relevant because Sheppard had no plausible argument to make that she did not actually and actively participate in the murder. Indeed, in assessing punishment, the jury specifically found that Sheppard intended that Meagher be killed. 5 SHCR at 1433. Therefore, this claim is without merit.

### d.    Failure to Object to Prosecutor's Statements

During jury *voir dire*, the prosecutor stated, correctly, that Sheppard would be eligible for parole after serving 35 years if she was sentenced to life imprisonment. He added, however, that the Legislature has changed the amount of time a life sentenced inmate is required to serve before becoming eligible for parole, and implied that another such change could reduce the time Sheppard would have to serve to as little as 15 years. *See*, *e.g.*, 6 Tr. at 125; 9 Tr. at 24-25. Counsel did not object.

Sheppard points to various Texas state cases holding that parole eligibility is not a proper issue for jury consideration in a death penalty case. *See*, *e.g.*, *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1997). She acknowledges, however, that it was her counsel who filed a motion requesting permission to discuss parole eligibility during jury *voir dire*. *See* Am. Pet. at 155. The state habeas court found that this was reasonable trial strategy based on counsel's stated intent to show that people become less dangerous as they age. *See* 1 SHCR at 72. Sheppard makes no showing that this conclusion was unreasonable. She argues, however, that it was ineffective assistance for counsel to allow the prosecutor to mislead the venire members as to how long she would have to serve.

Assuming that the prosecutor acted improperly, and that defense counsel should have objected, Sheppard cannot demonstrate *Strickland* prejudice on this point. During the sentencing phase of trial, the jury was specifically instructed that they were not to consider parole eligibility in passing sentence, and that, in any event, Sheppard would have to serve 35 years before being considered for parole. 1A CR at 220.[17] Jurors are presumed to follow their instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *see Galvan v. Cockrell*, 293 F.3d 760, 765-66 (5th Cir. 2002), and Sheppard makes no showing that her jury failed to do so. Because the jury was properly instructed on this issue before deliberating Sheppard's sentence, Sheppard cannot demonstrate prejudice.

### e.      Failure to Move for a Mistrial

Sheppard contends that the prosecutor threatened to indict Bryant if he testified at Sheppard's trial. She argues that this constituted prosecutorial misconduct, and that counsel should have moved for a mistrial.

Sheppard subpoenaed Bryant to testify on her behalf, but he did not testify. Prior to the beginning of the punishment phase, the prosecutor told the trial court that Bryant would need a lawyer if he testified, as he might wish to invoke his Fifth Amendment privilege. 25 Tr. at 5. Sheppard raised several claims concerning this exchange in her state habeas application.

Defense counsel submitted an affidavit in which he stated that he wanted to call Bryant to testify concerning the extraneous drive-by shooting, but that the prosecutor told defense counsel that he would indict Bryant for child endangerment if he testified. The prosecutor submitted an affidavit in which he denied having any recollection of such a conversation. Instead, the prosecutor stated, it was his practice to advise an attorney considering calling a witness who might incriminate himself that he (the prosecutor) would present any matter raised by the testimony to a grand jury. He explained that it was not his intent to threaten, but to alert counsel to the risks to the potential witness. SHCR at 522. At the evidentiary hearing conducted in connection with Sheppard's state habeas application,

---

[17]      "CR" refers to the Clerk's Record on appeal.

trial counsel similarly characterized the prosecutor's statement as informing counsel to advise the witness that he might need an attorney if he testified.  2 SH Tr. at 123-24.

The state habeas court found that Bryant did not want to testify, and that counsel decided not to call him because he believed he would not be a good witness.  SHCR at 21. The habeas court also found that there was no prosecutorial misconduct.  *Id.* at 1330, 1363. The state habeas court's findings and conclusion are not contrary to Fifth Circuit law. Even if defense counsel's plainly strategic decision were deemed deficient, a conclusion the state habeas court did not reach, that court's secondary conclusion that there was no prosecutorial misconduct was not an unreasonable conclusion.

Threats of retaliation against witnesses by the government violate a criminal defendant's right to due process.  *Washington v. Texas*, 388 U.S. 14, 19 (1967).  To demonstrate a due process violation, a defendant must show substantial government interference.  A defendant accomplishes this by showing "a causal connection between the governmental action and the witness' decision not to testify."  *United States v. Anderson*, 755 F.3d 782, 792 (5th Cir. 2014).

The Fifth Circuit, however, has held that it is not prosecutorial misconduct for a prosecutor to inform a witness that his testimony might expose him to criminal charges. *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988).  Indeed, in *Viera*, the Fifth Circuit specifically stated that "[b]y adding that he would move promptly to present any violation to the Grand Jury, the prosecutor cannot be charged with harassment, particularly when the statement was made to defense counsel rather than to a prospective lay witness." *Id.*

The facts of the case at bar are substantially similar to those in *Viera*, where the Fifth Circuit found no prosecutorial misconduct.  As in *Viera*, the prosecutor communicated with counsel, not the witness.  As in *Viera*, the prosecutor merely advised counsel that the witness could face charges if he made incriminating statements.  This does not amount to misconduct. There was therefore no basis for counsel to move for a mistrial or otherwise object, and thus no ineffective assistance with regard to Bryant.

## 2.    Guilt-Innocence Phase

Sheppard raises several claims of ineffective assistance of counsel during the guilt-innocence phase of trial.

### a.      Lesser Included Offense Instructions

Sheppard complains that counsel erred by failing to request a lesser included offense instruction on the non-capital charges of robbery or murder, failed to object to the absence of such instruction, and failed to complain on appeal about the absence of such instruction. Due process requires a jury charge "on a lesser included offense if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater," *i.e.*, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." *Beck v. Alabama*, 447 U.S. 625, 635, 637 (1980) (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)).  Under these circumstances, "the failure to give the jury the . . . option of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.  Such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck*, 447 U.S. at 637.  A lesser included offense charge is required under these circumstances to avoid presenting the jury with a false dichotomy: Either convict a defendant who is guilty of a serious non-capital crime (but not a capital crime) on the capital charge, or acquit her so as to avoid convicting her of the more serious offense. *See*, *e.g.*, *Hopper v. Evans*, 456 U.S. 605, 611 (1982). "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [Texas] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Beck*, 447 U.S. at 638.

Sheppard argues that the evidence left some doubt as to whether she had a sufficiently culpable mental state to be guilty of capital murder.  However, the evidence of record at trial supported the finding that she was a full participant in the violent acts of robbery and murder, resulting in the victim's death.  The record makes clear that Sheppard intended to participate in a robbery.  Regarding proof on the murder, Sheppard confessed to knocking Meagher to the ground, handing Dickerson a knife, retrieving a larger knife for Dickerson to use to slash Meagher's throat, and holding Meagher down while Dickerson placed a plastic bag over

Meagher's head and smashed a statue into her head.  *See* Sheppard's confession, 21 Tr. at 168-70, State's Exh. 38-B.  Murder committed during the course of a robbery is capital murder.  *See* TEX. PENAL CODE § 19.03 (a)(2); *see also* SHCR at 1431 (indictment).  In light of the evidence that Sheppard was a willing participant in the robbery and murder, there was no reasonable basis for a finding that Sheppard was guilty of robbery or murder, but not capital murder.  Because there was no evidence to support a finding of guilt on a lesser included offense, Sheppard was not entitled to a lesser included offense instruction.  *See Cordova v. Lynaugh*, 838 F.2d 764, 767 (5th Cir. 1988) ("The federal standard is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater") (internal quotation marks and citation omitted), *overruling on other grounds recognized by Vanderbilt v. Collins,* 994 F.2d 189, 195 (5th Cir. 1993).  Therefore, counsel was not deficient for failing to seek such an instruction, failing to object to the absence of the instruction, or failing to raise the issue on appeal.

### b.    Refusal to Allow Sheppard to Testify

Sheppard states that she wished to testify at trial, but that her counsel prevented her from doing so.  A criminal defendant has a Fifth Amendment right to testify.  *Rock v. Arkansas*, 483 U.S. 44, 49-52 (1987).  The state habeas court, however, found that the only evidence supporting Sheppard's claim that she was prevented from testifying was her own self-serving statement to that effect.  Her trial counsel testified during Sheppard's state habeas hearing that he advised Sheppard of her right to testify and advised her against testifying, but that the decision was hers.  2 WH at 128-29, 188.  The state habeas court found counsel's statement more credible than Sheppard's.  5 SHCR at 1343.  Sheppard makes no showing that this finding was unreasonable.

### c.    Failure to Present a Defense of Duress

Sheppard next contends that counsel was ineffective by failing to present evidence and obtain a jury instruction on the defense of duress.  She contends that she told her trial counsel that she participated in the robbery and murder only because Dickerson threatened to harm Sheppard and her baby if she did not.  *See* Brown Affidavit, Am. Pet., App. 1; Bolden

Affidavit, Am. Pet., App. 2.  Her statement to the police, however, does not state that she was coerced or indicate duress.  *See* SX 38A.[18]

## I. <u>Allegedly Available Evidence on Duress</u>

Sheppard argues that counsel failed to elicit any testimony from Sheppard, Dickerson, or any of several other people with information that would have supported a duress defense. She further contends that counsel failed to elicit any testimony that Sheppard was particularly susceptible to duress, from either lay witnesses with knowledge of her social history, or expert witnesses.  Sheppard argues that the following people could have testified.

***Sheppard.***  As noted above, counsel did not call Sheppard to testify, despite her claim that she acted under duress.  She notes that she and Dickerson were the only witnesses to Dickerson's alleged threats.

***Bryant.***  Sheppard contends that Bryant could have testified to Sheppard's demeanor and fear of Dickerson.

***Sherry Brown.***  Sherry Brown was called as a witness by the State, and was recalled by defense counsel.  She saw Sheppard and Dickerson between the time of the crime and their arrest.  Sheppard contends that Brown could have testified that Dickerson kept close watch over Sheppard, and that Sheppard appeared nervous and upset, but was unwilling to explain why.  These assertions are based on statements in the mitigation investigator's report. *See* Brown Aff., Exh. A.  Defense counsel did not elicit testimony from Brown regarding her observations of Sheppard and Dickerson.

***Annie Smith.***  Annie Smith is Sheppard's grandmother.  Sheppard asserts, again based on statements in her investigator's report, that Smith saw Sheppard and Dickerson between the time of the crime and the time of arrest.  Sheppard contends that Smith could also have testified that Dickerson maintained close watch over Sheppard and that Sheppard appeared nervous and upset, but was unwilling to explain why.

***Other Evidence of Sheppard's Social History.***  Sheppard also cites to the same evidence of her social history discussed above in connection with the punishment phase.  She

---

[18]    "SX" refers to the State's trial exhibits.

argues that this evidence would have shown her susceptibility to manipulation and coercion. She also claims counsel was ineffective for failing to call an expert witness to testify as to her susceptibility to manipulation and coercion.

 ***Failure to Obtain a Duress Jury Instruction***. Finally, Sheppard contends that counsel was ineffective by failing to obtain a jury instruction on duress.

### ii. Analysis of Trial Counsel's Performance Regarding Duress Defense

 Respondent notes that counsel did, in fact, request an instruction on duress.  *See* 1A CR at 198.  The trial court refused the instruction because the evidence did not support a duress instruction. 22 Tr. at 50-51.  Respondent also notes that parts of Sheppard's statement to the police, Dickerson's statement, and the trial testimony of Korey Jordan contradict Sheppard's claim that she acted under duress.

 Respondent argues that there is evidence that counsel was aware of Sheppard's claim of duress, and made a strategic decision not to emphasize this defense.  During Sheppard's state writ hearing, trial counsel noted evidence that Sheppard tried to rob someone else the day before the murder.  2 WH at 132.  And there was evidence that Sheppard prepared for the robbery of Meagher by putting on dark clothes and bringing a knife from Jonathan's apartment, *id.* at 132-35.  Counsel also noted that there was evidence that Sheppard was not afraid of Dickerson.  Moreover, she did not mention being threatened by Dickerson in her statement to the police.  *Id.* at 139.

 The state habeas court specifically noted that Sheppard told the police that she and Dickerson attempted to rob someone the day before the murder, and that they entered Meagher's apartment because they decided to rob whoever was there and steal that person's car.  That court found that Sheppard fully participated in the robbery-murder, bringing a knife to the crime scene, handing Dickerson a knife while he held Meagher on the ground, demanding that Meagher give Sheppard the keys to her car, retrieving and handing Dickerson a butcher knife from Meagher's kitchen, and holding Meagher down while Dickerson put a plastic bag over Meagher's face.  5 SHCR at 1349.

 Korey Jordan testified at trial that he heard a conversation between Dickerson and

Sheppard the day before the murder where they discussed committing a robbery and, possibly, murder.  Jordan testified that, when Dickerson said that they needed money, Sheppard suggested that they "go back to the old theme."  21 Tr. at 95.  Dickerson responded that "[i]f taking a life is what I have to do to get some money, then that's what I have to do," to which Sheppard responded that she would rather catch  "a skinny white woman walking between her car and her apartment with no children."  21 Tr. at 95-99.  Jordan further testified that Sheppard told Dickerson that some knives Dickerson brought in from the kitchen were too small to kill anyone and that she did not want Dickerson to stab anyone in the car, because they would get blood on themselves and the car.  *Id.* at 99-101.  Respondent further points to evidence that, contrary to Sheppard's description of events after the murder, her counsel was aware that Sheppard was left alone for extended periods of time, that Sheppard and Bryant went swimming together without Dickerson, and that Sheppard never told Bryant that Dickerson was threatening her.  2 WH at 135-39.  The state habeas court noted the substantial evidence cutting against a defense of duress.  *See* SHCR at 1349-51.

The state habeas court found that counsel's decision not to pursue a duress defense was sound trial strategy.  *Id.* at 1351.  In light of the significant evidence undermining this defense, this Court cannot say that the state habeas court's conclusion is unreasonable.  Unsuccessfully arguing duress would have harmed Sheppard's, and defense counsel's, credibility before the jury.  Defense counsel could have had understandable concerns that pursuing a weak duress defense at the guilt-innocence stage would have been harmful to their penalty phase case.  Sheppard fails to demonstrate that counsel rendered deficient performance by not presenting a duress defense.

In addition, Sheppard and Dickerson were the only two witnesses with first-hand knowledge of what occurred prior to and during the crime.  While Sheppard now argues that she wanted to testify, the state habeas court found that it was her decision not to do so.  Sheppard fails to show that the state habeas court's finding is an unreasonable application of the facts.  As discussed above, counsel made a reasoned decision not to call Dickerson after observing him at his own trial and performing other due diligence.

Without testimony from participants in the crime, the other potential evidence on

duress that Sheppard cites is of little value.  Evidence that she might have been susceptible to coercion is not particularly helpful in the absence of evidence that she was coerced. Evidence that she was upset after committing a murder does not necessarily indicate that she acted under coercion; she might have been upset because she had committed a serious crime. Sheppard thus fails to demonstrate deficient performance by trial counsel Brown in this regard.

### B.    Trial Court Errors

#### 1.    Trial Court's Erroneous Comments on Law of Parties

Sheppard contends that she was denied due process by the trial court's erroneous comments on punishment under the law of parties, an issue discussed above.  *See* Section III.A.1.c, *supra*.  As noted, the claim was dismissed by the TCCA on Sheppard's direct appeal as waived by trial counsel's failure to object.  Respondent also argues that the claim lacks merit.

#### a.    Procedural Default

The procedural default doctrine may bar federal review of a claim.  "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment."  *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).  The Supreme Court has ruled that:

> In all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  "This doctrine ensures that federal courts give proper respect to state procedural rules."  *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

To be "adequate" to support the judgment, the state law ground must be both "firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 424 (1991). If the state law ground is not firmly established and regularly followed, there is no bar to federal review and a federal habeas court may consider the merits of the claim. *Barr v. Columbia*, 378 U.S. 146, 149 (1964). An important consideration in determining whether an "adequate" state law ground exists is the application of the state law ground to identical or similar claims. *Amos v. Scott*, 61 F.3d 333, 340-41 (5th Cir. 1995).

The adequacy of a state law ground to preclude federal court review of federal constitutional claims is a federal question. *Howlett v. Rose*, 496 U.S. 356, 366 (1990). If the state court decision rests on federal law, then there is no bar to federal habeas corpus review.

Sheppard raised the claim of erroneous comment on the law of parties on direct appeal. The TCCA rejected the claim as waived under Texas law because Sheppard did not contemporaneously object to the statements.

To preserve a claim for federal review, a defendant must make a specific and timely objection at the time of the allegedly objectionable conduct. *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). "Texas applies its contemporaneous objection rule 'strictly and regularly' and . . . it is an 'independent and adequate state-law procedural ground sufficient to bar federal court habeas review of federal claims.'" *Id.* (quoting *Amos v. Scott*, 61 F.3d 333, 345 (5th Cir. 1995)), *cert. denied*, 528 U.S. 1145 (2000)). Failure to object constitutes a procedural default under Texas law, which bars federal habeas review unless the petitioner shows cause for the default and actual prejudice flowing from the alleged constitutional violation, *or* a miscarriage of justice. *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977).

"Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). Prejudice to overcome a procedural default is shown where there is a reasonable probability that the defaulted claim, if properly raised, would have changed the outcome of the proceeding. *See*, *e.g. Sawyer v. Whitley*, 505 U.S. 333, 345 (1992) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985), and *Strickland*, 466 U.S. at 694).

The fundamental-miscarriage-of-justice exception is limited to the following circumstances: (1) where the petitioner can show that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense," *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quotation omitted); or (2) in the capital sentencing context, where the petitioner can show "'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer*, 505 U.S. at 336). Importantly, the fundamental-miscarriage-of-justice exception applies only where a petitioner supplements a constitutional claim with a colorable showing of factual, as opposed to legal, innocence. *See McCleskey v. Zant*, 499 U.S. at 495 (quoting *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986)); *accord Schlup v. Delo*, 513 U.S. 298, 327 (1995).

Sheppard does not contend that she is factually innocent of capital murder, or that she is legally ineligible for the death penalty. She accordingly fails to demonstrate a miscarriage of justice. Nor does Sheppard assert any "cause" for her default. Further, she does not show sufficient prejudice to demonstrate a reasonable probability that the outcome of her trial would have been different had a timely objection been raised. As discussed above, the evidence establishes that Sheppard was an active, not merely peripheral, participant in the robbery and murder. Therefore, the trial court's erroneous statement as to punishment on the law of parties was not relevant to Sheppard. Because Sheppard fails to demonstrate cause or prejudice, or a fundamental miscarriage of justice, this claim is procedurally defaulted and this Court cannot grant relief.

### b.      Due Process – Merits

Procedural default notwithstanding, this claim lacks merit. Errors in jury instructions do not state a claim for relief unless the error resulted in "prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986). The habeas petitioner must demonstrate that the error "had a substantial and injurious effect or influence on the determination of the jury's verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999). In a habeas proceeding, the burden of demonstrating that an erroneous jury instruction violates the petitioner's Due Process rights is "greater than the showing required to establish

plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

As discussed above, the trial court's comments to the jurors during *voir dire* was incorrect as a matter of law. The jury instructions given immediately prior to sentencing deliberations, however, were correct. Moreover, the evidence does not support a finding that Sheppard was merely a minor participant who did not have reason to believe that deadly force would be used. Rather, the evidence supports a finding that Sheppard was an active participant in the events leading to Meagher's death. For these reasons, Sheppard cannot demonstrate that the erroneous comments, later corrected by the jury instructions, had a substantial and injurious effect on the jury's verdict. She is not entitled to relief on this claim.

### 2. *Batson* Claim Regarding Ronnie Simpson

Sheppard is African-American. The prosecutor used three of his peremptory challenges to strike African-Americans from the jury.[19] Sheppard challenged one of these strikes, arguing that they were based on the prospective jurors' race. The prosecutor offered race-neutral explanations for the strikes, and the trial court overruled Sheppard's challenges.

In *Batson v. Kentucky*, 476 U.S. 79, (1986), the Supreme Court held that the use of peremptory strikes to remove jurors on the basis of race violates the equal protection clause. When a defendant makes a *prima facie* showing that a peremptory challenge was based on race the prosecutor must offer a race-neutral explanation for the strike. If the prosecutor does so, it then falls to the defendant to demonstrate that the offered explanation is pretextual. *See*, *e.g.*, *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995). Sheppard fails to demonstrate that the offered race-neutral explanation was pretextual.

Ronnie Simpson was the first African-American juror struck by the State. In response to a *Batson* challenge, the prosecutor stated that he had concerns, based on Simpson's answers to *voir dire* questions, that Simpson was predisposed to answering "yes" on the mitigation special issue because Sheppard has children. The State also noted that Simpson said that he had been wrongly arrested and spent some time in jail based on a misidentification, causing concerns about bias against law enforcement. Simpson also

---

[19]     Two people who served on the jury are African-American. Am. Pet. at 166.

expressed reservations about his ability to answer "yes" on future dangerousness based on the facts of the crime, though he eventually stated that he could do so.  The prosecutor said that this caused concern that Simpson would be predisposed to answer the special issues in Sheppard's favor.  Finally, the prosecutor noted that Simpson said hello to Sheppard at the beginning of his *voir dire*, causing the prosecution to worry about an affinity between Simpson and Sheppard.  5 Tr. at 84-86.  While defense counsel argued that Simpson could be fair and impartial, he did not rebut the State's race neutral explanations.  *Id.* at 87-88.

Sheppard later renewed the challenge, claiming that two white jurors who were accepted by the State gave substantially similar answers. 6 Tr. at 109.  The trial court again overruled the objection.  *Id.*

Sheppard raised the objection again at the conclusion of *voir dire*.  At this point, the prosecutor pointed out that two of the jurors selected were African-American, and that only three of nine peremptory challenges used by the State were used to strike African-Americans.  Defense counsel acknowledged that these assertions were true. 19 Tr. at 186-87.  The trial court again denied the challenge.

Sheppard raised this claim in her direct appeal.  The TCCA identified the correct legal standard of review, and concluded that there was no basis for overturning the trial court's conclusion that the challenged peremptory strikes were not racially motivated.  *Sheppard v. State*, slip op. at 4.

Respondent points out that the white jurors who Sheppard asserts gave substantially similar answer were not, in fact, similarly situated.  She notes that the white jurors in question, Paul Herd and Larry Raymond Chambers, answered questions in ways materially different from Simpson.  For example, Herd stated that his son was prosecuted for an incident with his girlfriend. 6 Tr. at 67.  Herd stated that he did not think his son's conduct warranted a felony charge but, unlike Simpson, did not say that his son was the victim of a false arrest or prosecution.  6 Tr. at 76.

Respondent acknowledges that Chambers, like Simpson, stated that he would consider the fact that Sheppard had children to be mitigating and could not vote to impose a death sentence solely on the facts of the crime. 5 Tr. at 117, 126.  Respondent points out, however, that these are the only similarities.  Chambers expressed no hostility toward law enforcement

or any affinity with Sheppard.  While the State's acceptance of juror Chambers raises some questions, it does not so clearly demonstrate that the State's answers were pretextual as to support a finding that the trial court's ruling, based not only on the explanations, but also on the court's observation of the proceedings and determinations of the participants' credibility, was wrong.  Nor can this Court conclude that the TCCA's rejection of the claim on appeal was unreasonable under the facts presented.  Accordingly, Sheppard is not entitled to relief on this claim.

### 3.    Sheppard's Challenge for Cause to Edith Greer Smith

On a juror questionnaire, Edith Greer Smith expressed her agreement with the statement that "any man, woman, child or any person young or old, man or woman, if found guilty of capital murder should pay for it with their own life."  13 Tr. at 91.  Defense counsel questioned her about this answer, and Smith affirmed that she felt that anyone convicted of capital murder should be sentenced to death.  Sheppard challenged her for cause, and the trial court denied the challenge.  *Id.* at 91-93.

Following questioning by the prosecution, defense counsel again asked Smith if she could "envision a set of circumstances" where she still could answer "yes" to the mitigation special issue.  Smith replied that she could.  *Id.* at 100-101.  Sheppard then used a peremptory challenge to remove Smith from the jury panel.  *Id.* at 103.  Sheppard eventually used all of her peremptory challenges.

Sheppard raised the denial of her  challenge for cause on direct appeal.  The TCCA, in denying the claim, noted that the law was not explained to Smith, and when defense counsel asked her if she would consider the full range of punishment, she replied that she would.

In *Wainwright v. Witt*, 469 U.S. 412, 424 (1985), the Supreme Court held that the standard for removing a juror based on his or her views on the death penalty "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Smith stated that she could follow the law and consider the full range of punishment.  The trial court was in the best position to determine the credibility of her statements.  Based on the record and controlling law, the TCCA's conclusion that the trial court did not abuse its discretion in denying Sheppard's

challenge for cause was reasonable, and is entitled to deference.

### 4.    Removal of Juror David Paul Herd

David Paul Herd was accepted as a juror by both parties on February 8, 1995.  Prior to his selection, Herd told the trial court that he was receiving treatment for a prostate condition, but that medication had his condition under control.  Two days later, Herd said he had a flare up and was concerned that he would need frequent bathroom breaks.  Sheppard notes that Herd originally stated that he could follow the law but, upon his reappearance in court, stated that he could not vote to impose a death sentence.  She contends that it was an attack of nerves, not a prostate flare up, that caused Herd's withdrawal.  Sheppard, citing no evidence, offers the medical conclusion that "[t]he medical issue, by itself, did not reach the level of requiring the removal of Mr. Herd."  Am. Pet. at 177.

Sheppard raised this issue on appeal, and the TCCA found no abuse of discretion "in dismissing a venireman whose medical condition might necessitate frequent interruptions of trial . . . ."  5 SHCR at 1382.  The claim was also rejected on state habeas.  *Id.* at 1314, 1359.

The trial court's removal of Herd for medical reasons does not raise a viable constitutional issue.  While Sheppard attempts to dismiss the medical reason and turn this into an effort by the State to remove a juror who was favorable to Sheppard, she presents no evidence that demonstrates that Herd was lying about his medical condition.  Crediting Herd's expressed concerns was a sufficient basis for his removal.  The state court's denial of relief was reasonable.

### 5.    Refusal of Lesser Included Offense Instruction

Sheppard contends that she was denied due process when the trial court failed to instruct the jury that it could convict Sheppard of the lesser included offenses of robbery and murder.  As discussed in connection with Sheppard's claim that counsel was ineffective for failing to request such a lesser included offense instruction, the evidence did not support a finding that she was guilty of either of these lesser included offenses but not of capital murder.  Therefore, for the same reasons discussed above, she was not entitled to a lesser included offense instruction under *Beck v. Alabama*, 447 U.S. 625, 635 (1980).  The trial court's failure to give such an instruction did not deny her due process.

### 6.    Exclusion of Mitigating Evidence During Punishment Phase

Sheppard argues that the trial court erred in excluding mitigating evidence during the punishment phase.

### a.    Lay Opinion Testimony

The court excluded testimony by Sheppard's grandmother, Annie Smith, offering an opinion that Sheppard would not pose a future threat to society if sentenced to life imprisonment. 26 Tr. at 77.  When Smith was asked her opinion, the State objected based on *Fuller v. State*, 829 S.W.2d 412 (Tex. Crim. App. 1993).  The state took the position that *Fuller* bars lay opinion testimony.  Sheppard disagrees.

Sheppard raised this issue on direct appeal.  The TCCA noted that, under Texas law, "a properly qualified lay witness can testify to an opinion concerning the probable continuing threat to society posed by a capital murder defendant." *Sheppard*, slip op. at 15.  The TCCA concluded, however, that Sheppard defaulted the claim by failing to make a proffer on the record at trial.  *Id.*

Sheppard raised the claim in her state habeas application.  The state habeas court also found that the claim was defaulted because Sheppard failed to preserve it at trial.  In the alternative, the state habeas court found that Sheppard failed to demonstrate that she was harmed by the ruling because Smith was biased toward Sheppard, Dr. Ray testified that Sheppard would not be a future danger, and the State presented strong evidence that Sheppard would be a danger in the future. 5 SHCR at 1318-19, 1360.

### I.    Procedural Default

The Texas Rules of Evidence require that, to preserve error, a defendant must make a proffer on the record to allow a reviewing court to assess the harm caused by an erroneous refusal to allow evidence.  *See* TEX. R. EVID. 103(a)(2).[20]  As discussed above, failure to comply with a state procedural requirement constitutes a procedural default that bars federal review unless the petitioner can demonstrate either cause for the default and prejudice caused by the default, *or* can demonstrate that the federal court's failure to review the claim will result in a fundamental miscarriage of justice.  Sheppard identifies no cause, *i.e.*, a factor

---

[20]    At the time of Sheppard's trial, this rule was codified as Rule 103(a)(2) of the Texas Rules of Criminal Evidence.

external to the defense that prevented her compliance with the state procedural rule.  Neither does she show that this Court's refusal to address the merits of the claim will result in a fundamental miscarriage of justice.

To show a fundamental miscarriage of justice relevant to this claim, Sheppard must show that she is "actually innocent" of the death penalty.  *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992); *see* text generally at pgs. 40-42, *supra*.  The Supreme Court has explained that "[t]he phrase 'innocent of [the] death [penalty],'" however, "is not a natural usage of those words[.]" *Id.* at 340.  "A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of a crime."  *Id.*  It is not easy to apply this doctrine in the capital sentencing scheme.  "Sensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to the innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met."  *Id.* at 345.

Thus, as the Supreme Court has emphasized, a determination on whether a petitioner is actually innocent of the death penalty "must focus on those elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 347; *accord Schlup v. Delo*, 513 U.S. 298, 323 (1992).  In this context, the Fifth Circuit has held that evidence of a purported mitigating circumstance that does not show that the petitioner was actually innocent "of a death-eligible offense" is insufficient to establish actual innocence of the death penalty and does not overcome the procedural bar.  *See Haynes v. Quarterman*, 526 F.3d 189, 195-96 (5th Cir. 2008) (involving a case where it was undisputed that the petitioner murdered a police officer); *see also Carty v. Quarterman*, 345 F. App'x 897, 911 (5th Cir. 2009) (repeating in a death penalty case that "[m]itigation evidence cannot be the basis of a claim of a fundamental miscarriage of justice.") (citing *Sawyer*, 505 U.S. at 347).  Because Sheppard's claim relates only to excluded mitigation evidence, she cannot prevail under the fundamental miscarriage of justice exception to the procedural default rule.

### ii.      Merits of the Constitutional Claim

Sheppard cites Texas state law to argue that the trial court's ruling was incorrect.

Violations of state law are not generally cognizable on habeas review unless the error renders the trial as a whole fundamentally unfair. *See Fuller v. Johnson*, 158 F.3d 903, 908 (5th Cir. 1998) (citing *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether the conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The state habeas court's alternative merits ruling, concluding that Sheppard suffered no harm as a result of the evidentiary ruling excluding Sheppard's grandmother Annie Smith's testimony regarding future dangerousness, may be subject to dispute but does not meet the unreasonableness standard in this Circuit. All of the matters cited by the habeas court are accurate: Smith is Sheppard's grandmother and she had a close relationship with Sheppard, creating a natural bias in Sheppard's favor. Dr. Ray, Sheppard's expert, who has the credentials to offer a substantiated opinion on future dangerousness, opined (albeit superficially) that Sheppard would likely not pose a future threat. The State presented substantial evidence that Sheppard had a violent history, lacked remorse, and therefore posed a future danger to society. Because these findings and the related conclusion are not unreasonable, they are entitled to deference under the AEDPA. Sheppard thus fails to demonstrate that the trial court's ruling denied her a fair trial, and thus fails to demonstrate a constitutional violation.

### b.   Crisis Center Records

Sheppard attempted to introduce records from the Matagorda County Women's Crisis Center and Covenant House. The State objected "essentially to everything presented that had come directly from Ms. Sheppard . . . ." Am. Pet. at 190. Among the information excluded were Sheppard's statements about why she was seeking assistance from these organizations. Sheppard argues that these documents were admissible as business records under Rule 803(6) of the Texas Rules of Evidence. The State objected that they were hearsay within hearsay.

On appeal, the TCCA agreed that Sheppard's statements contained within the documents were inadmissible hearsay, even though the documents themselves might be

admissible business records.  Sheppard tries to avoid this ruling by arguing that she was not offering the records for the truth of her statements contained therein.  This contention rings hollow as there is little other reason for her to have sought their admission.  The fact and broad outlines of the reasons Sheppard went to the Matagorda County Women's Crisis Center and Covenant House were established through other evidence.  The only new information in the excluded portions was contained in Sheppard's statements.  It thus appears that the evidentiary ruling was not incorrect under Texas law.

In any event, as noted above, if there was a violation of state law, it is not  cognizable on habeas review unless the error renders the trial as a whole fundamentally unfair.  *Fuller*, 158 F.3d at 908.  Because, as discussed above, Sheppard fails to demonstrate that the exclusion of this evidence deprived her of a fair trial, she fails to raise a viable constitutional issue, and is not entitled to relief.

### c.      **Patrice Green**

Sheppard called Patrice Green, a lifelong friend, to testify.  The trial court did not allow Green to answer questions about her knowledge of whether Sheppard had  any  prior arrests, her opinion of Sheppard's reputation and character, and Sheppard's reputation in her hometown of Bay City.  The state appellate and habeas courts rejected the claim because Sheppard failed to make a bill of exception, thereby preventing the reviewing courts from determining whether Green's testimony would have been mitigating.

While Sheppard correctly notes that the Eighth Amendment requires that a capital sentencing jury be able to consider relevant mitigating evidence, *see*, *e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976), Sheppard presents no affidavit and provides no proof that Green's testimony would have been mitigating.  She therefore fails to demonstrate that her Eighth Amendment rights were violated by the trial court's evidentiary rulings.

### d.      **Texas Rules of Criminal Evidence**

Citing *Green v. Georgia*, 442 U.S. 95 (1979), Sheppard argues that "the application of state rules of evidence to exclude testimony relevant to an issue in the punishment phase of a capital trial violates due process . . . ."  Am. Pet. at 194.  Sheppard reads *Green* far too broadly.

*Green* held that the Eighth Amendment *might* require admission of otherwise inadmissible evidence if that evidence is necessary to the defense and carries with it sufficient indicia of reliability. In that case, Green's co-defendant, Moore, admitted to a friend that he, and not Green, killed the victim.[21] The trial court excluded testimony about Moore's confession. The Supreme Court held:

> Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.

*Green*, 442 U.S. at 97.

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Court stated:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas*, 409 U.S. 95, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972); *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *In re Oliver*, 333 U.S. 257, 68 S. Ct. 499, 92 L. Ed. 682 (1948). In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

*Chambers*, 442 U.S. at 302.

Thus, the Supreme Court in *Green* and *Chambers* made clear that rules of evidence are applicable, and do not necessarily require the admission of otherwise inadmissible

---

[21]   At the time, Georgia did not recognize a hearsay exception for statements against penal interest. *See Green*, 442 U.S. at 97 n.3.

evidence unless that evidence is both necessary to the defense and carries sufficient independent indicia of reliability.  In this case, the record establishes that the evidence excluded by the trial court had material mitigating value.  However, the Fifth Circuit typically deems such evidence cumulative and/or "double-edged."  *See Johnson v. Cockrell*, 306 F.3d 249, 253 (5th Cir. 2002) (failure to present double-edged evidence did not prejudice the defendant).  Moreover, Sheppard points to no independent indicia of reliability as to any of the excluded evidence that would bring it within the ambit of *Green*.  She therefore fails to demonstrate any constitutional violation in the exclusion of the evidence.

### e.  Bryant

Again citing *Green* for the proposition that she was entitled to present any information that might have mitigating value, Sheppard argues that it was error for the trial court not to compel Bryant to appear and invoke his Fifth Amendment rights.  Again, Sheppard reads too much into *Green*, and fails to demonstrate how Bryant's repeated invocation of his Fifth Amendment rights would have been in any way mitigating.

### 7.  Prosecutorial Misconduct

Sheppard raises several claims of prosecutorial misconduct during the punishment phase.  "To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).  "'A trial is fundamentally unfair if there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'"  *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)), *cert. dism'd*, 531 U.S. 1134 (2001).  The Fifth Circuit has observed that a "prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases."  *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984).

### a.  Closing Argument on Mitigation Evidence

During his closing argument in the punishment phase, the prosecutor stated that "[m]itigation should be something that is out of the ordinary . . . and I submit to you, it

should be something that bears some relationship to the crime, that explains the crime in some way." 27 Tr. at 6. Sheppard raised a contemporaneous objection, which was overruled. She now argues that this was a misstatement of the law, and violated her rights under the Eighth and Fourteenth Amendments.

In *Lockett v. Ohio*, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." 438 U.S. at 604 (emphasis in original). This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases." *Id.* at 605. In *Penry v. Johnson*, 532 U.S. 782 (2001), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence." *Id.* at 797 (internal quotation marks, citation and brackets omitted).

On direct appeal, the TCCA held that the prosecutor was "not suggesting to the jurors that they were precluded from considering certain types of evidence . . . [but] was making an argument urging jurors to conduct their deliberation in a manner favorable to the State's position rather than giving the jurors a definition of mitigating evidence." *Sheppard v. State*, slip op. at 19. The TCCA further noted that the prosecutor told the jury to look at the definition of mitigating evidence in the jury charge, and that the charge accurately stated the law. *Id.*

Under Fifth Circuit law, this court must apply a two-step analysis in reviewing claims of prosecutorial misconduct. *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000). First, the Court must determine whether the prosecutor made an improper remark. *Wise*, 221 F.3d at 152. "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.*

Regardless of whether the prosecutor's statement was incorrect, there is no dispute that the jury charge correctly defined mitigating evidence. As discussed above, jurors are

presumed to follow the court's instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and Sheppard makes no showing to overcome that presumption.  She therefore fails to demonstrate that the prosecutor's comments affected her substantial rights, and is not entitled to relief.

**b.      Argument About Evidence of Physical Abuse**

The prosecutor argued that Sheppard presented "hints," but no proof, that she had a history of being physically abused by men.  27 Tr. at 9.  Sheppard tried to introduce documents from the Matagorda County Women's Crisis Center and Covenant House reflecting her claims of abuse.  The State objected to these documents, and portions of them were excluded as hearsay.  Sheppard now argues that it was improper for the prosecutor to "take actions . . . to deny the admission of evidence and then argue . . . that conclusions should be drawn because of the absence of that same evidence."  Am. Pet. at 199.

Sheppard's argument relies entirely on state law.  She therefore fails to identify a federal Constitutional claim on which relief can be granted.

Moreover, Sheppard's argument relies on state cases that are inapposite.  Sheppard cites *Sifford v. State*, 505 S.W.2d 866 (Tex. Crim. App. 1974), and *Lopez v. State*, 810 S.W.2d 401 (Tex. Crim. App. 1991), for the proposition that a prosecutor cannot argue that a defendant failed to prove a point after the prosecutor sought to exclude evidence relevant to that point.  In *Sifford*, the TCCA held that a prosecutor *did not* act improperly when arguing that a defendant failed to prove the results of a breathalyzer test when it was the *defendant* who moved to exclude the evidence.  This case is not on point.  In *Lopez*, the prosecutor commented on the defendant's decision not to testify at his own trial.  The TCCA found that this comment violated both the Texas Constitution and the Fifth Amendment to the United States Constitution.  *Lopez* thus does not assist Sheppard.

As discussed above, Sheppard's statements contained in the records from the Crisis Center and Covenant House were inadmissible hearsay.  Sheppard points to no admissible evidence that was excluded on this point, and to no state or federal case that is on point.  She therefore fails to demonstrate any prosecutorial misconduct with regard to the comments on her failure to prove abuse.

**c.      Burden of Proof**

The prosecutor argued that "[y]ou can't allow Erica Sheppard to escape the death penalty because she may have been abused at some point in her life." 27 Tr. at 10. Sheppard objected, arguing that this comment shifted the burden to Sheppard to prove that she should not be sentenced to death. The trial court and the TCCA rejected this claim.

The Texas courts' rejection of the claim is reasonable. The Texas capital sentencing scheme at the time of Sheppard's trial first required a jury to answer the first two special issues: (1) whether the defendant posed a future danger to society; and (2) whether she actually caused, or intended to cause, or intended for another to cause, the death of the victim. SHCR at 1432-33. Only after answering these two questions in the affirmative did the jury proceed to the mitigation special issue. That special issue asks whether there is sufficient mitigating evidence to warrant a life sentence rather than a death sentence. It is, in effect, asking whether the defendant, who the jury already decided meets the requirements for a death sentence, should "escape the death penalty" based on the mitigating evidence. The state courts' decision that the prosecutor did not suggest that Sheppard bore any burden to present mitigating evidence was not unreasonable. Sheppard is not entitled to relief on this basis.

### d.     Argument that Sheppard Hit the Victim with a Statue

Sheppard next contends that the prosecutor argued that Sheppard hit the victim in the head with a statue, despite the absence of any evidence of this fact. Under Texas law, a prosecutor may present argument to the jury on four types of issues: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and (4) pleas for law enforcement. *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App.), *cert. denied sub nom. Moody v Texas*, 506 U.S. 839 (1992). The TCCA held that this argument was a reasonable deduction from the evidence. This conclusion is not unreasonable. It is therefore entitled to deference.

Even if the prosecutor's argument was improper, it did not render the trial unfair. Sheppard, in her statement to the police, said that she held the victim – who, by this time had her throat slashed and a plastic bag placed over her head – down while Dickerson hit her with the statue. SX 38A. Thus, even if the prosecutor's statement was incorrect, Sheppard's own

statement showed her active role in the beating.  There is no reasonable probability that the sentence would have been different had the prosecutor not made this statement.

### e.   Bryant

Sheppard once again contends that the prosecutor threatened Bryant with prosecution if he testified, and argues that this was prosecutorial misconduct.  As discussed above, the record shows that the prosecutor warned Bryant's counsel that Bryant could face  possible prosecution if he made incriminating statements while testifying.

While threats of retaliation against witnesses by the government violate a criminal defendant's right to due process, *Washington v. Texas*, 388 U.S. 14, 19 (1967), it is not prosecutorial misconduct for a prosecutor to inform a witness that his testimony might expose him to criminal charges.  *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988).  Indeed, in *Viera*, the Fifth Circuit specifically stated that "[b]y adding that he would move promptly to present any violation to the Grand Jury, the prosecutor cannot be charged with harassment, particularly when the statement was made to defense counsel rather than to a prospective lay witness."  *Id.*  Thus, this claim does not demonstrate any prosecutorial misconduct.

### 8.   Extraneous Offense Evidence

The State introduced evidence of an unadjudicated extraneous offense by Sheppard in this capital case.  Sheppard notes that, under Texas law, the use of an unadjudicated offense would not be permitted if she was charged with a noncapital crime.  She argues that this dichotomy violates her Fourteenth Amendment right to equal protection of the law.

The Fifth Circuit has held that "there is no constitutional prohibition on the introduction at a trial's punishment phase of evidence showing that the defendant has engaged in extraneous, unadjudicated, criminal conduct."  *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005); *see also Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir. 1987) ("the admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eight and fourteenth amendments").  Sheppard's argument, however, is not that the admission of the offense itself violates her rights, but that the difference in the admissibility of such offenses between a capital trial and a non-capital trial violates the equal protection

clause.  She cites no case holding that this disparity violates equal protection.

In *Teague v. Lane*, 489 U.S. 288 (1989), the Supreme Court held that, except in very limited circumstances, a federal habeas court cannot retroactively apply a new rule of criminal procedure. The Court explained that:

> a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.  To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 301 (emphasis in original).   The AEDPA effectively codified the *Teague* non-retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly established at the time the conviction becomes final."  *Peterson v. Cain*, 302 F.3d 508, 511 (5th Cir. 2002) (citing *Terry Williams v. Taylor*, 529 U.S. 362, 380-81 (2000)), *cert. denied*, 537 U.S. 1118 (2003).

Because no court has announced the rule that Sheppard now urges, such rule was not clearly established at the time her conviction became final.  Therefore, this Court cannot grant relief on this claim.  It is noted that this issue may well be one that deserves attention in the proper case.

## IV.   CERTIFICATE OF APPEALABILITY

Petitioner has not requested a certificate of appealability ("COA"), but this court may determine whether she is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone."  *Lackey v. Johnson*,

116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has stated:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000).

This Court has carefully and exhaustively considered each of Petitioner's claims. While the issues Petitioner raises are clearly important and deserving of the closest scrutiny, this Court finds that all but one of Sheppard's claims is foreclosed by clear, binding precedent.

The exception is Sheppard's claim that she received ineffective assistance of counsel regarding the development and presentation of mitigation evidence in the punishment phase of her trial. The Court concludes that jurists of reason could disagree with the Court's ultimate rejection of Sheppard's claim of ineffective assistance in the development and presentation of mitigating evidence. The Court concludes this claim raises issues that

deserve encouragement to proceed further.  In particular, there is serious question whether the TCCA was reasonable in concluding that counsel's performance on the mitigation issue was not deficient under *Strickland* even though it is clear that counsel failed to use available resources, such as his second-chair attorney and additional investigator services, and failed to personally undertake detailed interviews of key sources of information, such as school, crisis center, friends, family, and third-party witnesses.  Counsel could be said to have failed fully to investigate significant background facts, to adequately prepare lay and expert witnesses for trial, *and* to present live, fulsome testimony about Sheppard's personal history, numerous instances of childhood abuse and other travails, and her persisting emotional and mental issues.  These witnesses, properly interviewed and prepared, could have explained the true scope of Sheppard's traumatic childhood events and their impact on her decision-making abilities.  They could have given sympathetic testimony about the emotional effect of the repeated abuse, the potential for maturation and insights she would gain during a long incarceration, and other mitigating information.  *See, e.g.*, potential witnesses referenced in Cunningham Report, Am. Pet., App. 6; Bradley Aff., Am. Pet., App. 26; Young Decl., Am. Pet., App. 25; Jonathan Sheppard, Am. Pet., App. 16.  The superficial, limited testimony of the punishment phase live witnesses, the limited scope of Dr. Ray's testimony, the heavy reliance for Sheppard's personal history on Dr. Ray's brief written report and redacted crisis center records left the jury with only a truncated and sparse sense of Sheppard as a person.  This dry record was substantially less persuasive and comprehensible to a jury than testimony from numerous people, properly prepared to testify, who knew Sheppard and experts who could have meaningfully evaluated and studied her background.  In this Court's view, counsel's preparation on the mitigation issue fell materially short of longstanding ABA and State Bar of Texas recommended standards for capital cases.  The Respondent's contention that the unpresented evidence was merely cumulative or double-edged is not realistic in light of the volume and type of evidence that the jury did not hear.

With regard to the other claims, this Court concludes that, under controlling precedent, Petitioner has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Regarding those claims that have been dismissed on procedural

grounds, this Court concludes that jurists of reason would not find it debatable whether the petition states valid grounds for relief and would not find it debatable whether this court is correct in its procedural determinations.  This Court concludes that, with the exception of the punishment phase ineffective assistance of counsel claim, Petitioner is not entitled to a certificate of appealability.

## V.    CONCLUSION AND ORDER

For the foregoing reasons, it is **ORDERED** as follows:

1.    Respondent Lorie Davis' Motion for Summary Judgment [Doc. # 46] is **GRANTED**;

2.    Petitioner Erica Yvonne Sheppard's Amended Petition for Writ of Habeas Corpus [Doc. # 28] is **DENIED** in all respects and is **DISMISSED WITH PREJUDICE**; and

3.    A **certificate of appealability shall issue** only on Sheppard's claim that counsel rendered ineffective assistance in the investigation, development and presentation of mitigating evidence during the punishment phase at trial.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

A separate final judgment shall be entered.

SIGNED at Houston, Texas, this **29th** day of **March, 2017.**

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE